**SUSAN MARTIN (AZ#014226)**
**DANIEL BONNETT (AZ#014127)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
smartin@martinbonnett.com

**DAN GETMAN (*Pro Hac Vice*)**
**GETMAN & SWEENEY PLLC**
9 Paradies Lane
New Paltz, NY 12561
(845) 255-9370
dgetman@getmansweeney.com

**EDWARD TUDDENHAM**
1339 Kalmia Rd. NW
Washington, DC 20012
**etudden@io.com**

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Virginia Van Dusen, et al., )<br><br>                    Plaintiffs, )<br><br>        vs. )<br><br>Swift Transportation Co., Inc., et al., )<br><br>                    Defendants. ) | **No. CV 10-899-PHX-JWS**<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Oral Argument Requested** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................ii

I.     INTRODUCTION............................................................... 1

II.    STATEMENT OF FACTS.................................................. 2

       A.    Statement of the Case.................................................. 2

       B.    Facts Supporting the Motion.................................... 3

             1.    Swift's Circular Lease.................................... 3

             2.    Signing the Lease/ICOA ............................... 5

             3.    Defendants' Control Over Plaintiffs' Labor ................ 7

             4.    Earnings.......................................................... 10

             5.    Swift's Use of Collections and DAC Reports.............. 11

III.   ARGUMENT ..................................................................... 14

       A.    PLAINTIFFS ARE LIKELY TO SUCCEED
             ON THE MERITS.................................................. 14

             1.    The Unconscionability Standard. ................ 15

             2.    The Lease/ICOA Contract Is Procedurally
                   Unconscionable .......................................... 16

             3.    The Lease/ICOA Is Substantively
                   Unconscionable ........................................... 17

                   a.    The Contract Imposes Unconscionable
                         Penalties .............................................. 18

                   b.    The Contract Is Unconscionable Because It
                         Allows Swift To Place Drivers in Default For Any
                         or No Reason  ...................................... 20

c. The Contract Is Unconscionable Because It
Allows Swift To Exact Disadvantageous Changes
to the Contract at Will...........................................21

B. PLAINTIFFS ARE SUFFERING IRREPARABLE
INJURY..................................................................22

1. Defendants' Collection Measures Irreparably
Harm Plaintiffs..............................................22

2. Negative DAC Reports Irreparably Harm Plaintiffs....25

3. Defendants' Unilateral Contract Changes Forced
Upon Plaintiffs Will Cause Irreparable Harm .............26

C. THE BALANCE OF HARDSHIPS FAVORS ISSUANCE
OF AN INJUNCTION ...............................................27

D. THE PUBLIC INTEREST FAVORS ISSUANCE
OF AN INJUNCTION ...............................................28

CONCLUSION ..........................................................29

1
2

# TABLE OF AUTHORITIES

3

Cases:                                                                    Page(s):

4
5

*Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Company, Chemical Division*, 404 U.S. 157 (1971) .................................. 22

6
7

*American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) .............................................................................. 25

8
9

*Armistead v. Vernitron Corp., 944 F.*2d 1287 (6th Cir.1991)................................ 22

10

*ASARCO v. USW,* 2005 U.S. Dist. LEXIS 208731 (D.Ariz. July 26, 2005) ......... 22

11

*Bates v. C & S Adjusters, Inc.* 980 F.2d 865 (2d Cir. 1992) ................................ 24

12

*Batory v. Sears, Roebuck and Co.,* 456 F.Supp.2d 1137 (D.AZ 2006)................. 22

13
14

*Benedict College v. National Credit Systems, Inc.,* 2009 WL 3839473 (D.S.C.2009) ...................................................................... 23

15
16

*Berne Corp. v. Government of Virgin Islands,* 120 F.Supp.2d 528 (D.Virgin Islands 2000) ........................................................ 25

17
18

*Brennan v. Bally Total Fitness,* 198 F.Supp.2d 377 (S.D.N.Y. 2002)................... 18

19
20

*Broemmer v. Abortion Services of Phoenix, Ltd.,* 173 Ariz. 148, 840 P.2d 1013 (1992) ................................................................... 16

21

*Bryant v. TRW, Inc., 487 F.Supp.* 1234 (E.D.Mich.1980) .................................... 24

22
23

*Chalk v. United States Dist. Court Dist. of Cal.,* 840 F.2d 701 (9th Cir.1988)................................................................................. 24

24

*Collins v. Retail Credit Co.,* 410 F.Supp. 924 (E.D.Mich.1976) .......................... 24

25
26

*Crossley v. Lieberman,* 90 B.R. 682 (E.D.Pa.1988) ............................................ 23

27

*Crown Zellerbach Corp. v. Wirtz,* 281 F.Supp. 337 (D.D.C., 1968) ........................................................................... 26

28

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Davis v. O'Melveny & Myers,* 485 F.3d 1066 (9th Cir. 2007) ............................. 16

*Davison v. City of Tucson,* 924 F.Supp. 989 (D. Ariz. 1996) ................................ 14

*DeCastro v. Bhokari,* 201 A.D.2d 382 (NY App. Div. 1st Dept.1994) ................. 26

*Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058 (9th Cir. 2000) ....... 25

*Estee Lauder Companies Inc. v. Batra,*
430 F.Supp.2d 158, 174 (S.D.N.Y. 2006) ............................................................... 24

*F.C.C. v. Pacifica Foundation,* 438 U.S. 726 (1978)............................................. 23

*Fairfield Lease Corp v. Marsi Dress Corp.,*
303 N.Y.S.2d 179 (N.Y. Cir. Ct. 1969) .................................................................. 19

*Fairfield Lease Corp. v. Pratt,* 541, 278 A.2d 154 (Conn.Cir. 1971).................... 19

*Fairfield Lease Corp. v. Umberto,* 1970 WL 12608 (NY City 1970).................... 19

*Gibson v. Berryhill,* 411 U.S. 564 (1973) .............................................................. 25

*Guerrero v. RJM Acquisitions LLC,* 499 F.3d 926 (9th Cir. 2007) ............26, 28-29

*Harrington v. Pulte HomeCorp.,* 211 Ariz. 241,
119 P.3d 1044 (App.Div.1 2005) ........................................................................... 16

*Hertz Commercial Leasing Corp. v. Dynatron*, Inc.
37 Conn.Supp. 7, 427 A.2d 872 (Conn.Super., 1980) ............................................ 19

*In re Merwin & Willoughby Co.,* 2 Cir., 206 F. 116 (N.D.N.Y. 1913) ................. 19

*Industralease Automated & Scientific Equipment Corp. v. RME Enterprises, Inc.,*
396 N.Y.S. 2d 427 (2d Dept. 1977)......................................................................... 18

*Ingle v. Circuit City Stores, Inc., 328 F.3d 1165* (9th Cir. 2003) ....................15-18

*John Deere Leasing Co. v. Blubaugh, 636 F.Supp*. 1569 (D.Kan. 1986)............. 20

*Jordan v. Metropolitan Life Ins. Co.* 280 F.Supp.2d 104 (S.D.N.Y. 2003)......25-26

*Larson-Hegstrom & Associates, Inc. v. Jeffries,*
145 Ariz. 329, 701 P.2d 587 (App.1985) ............................................................... 19

*Long v. Beneficial Finance Co. of New York, Inc.,*
39 A.D.2d 11, 330 N.Y.S.2d 664 (4th Dep't 1972) .................................................. 23

*Lopez v. Town of Cave Creek, AZ,* 559 F.Supp.2d 1030 (D.Ariz. 2008) .............. 28

*Madrid v. Peak Const., Inc.* 2009 WL 3710719 (D.Ariz. 2009) ........................... 17

*Maxwell v. Fidelity Fin. Servs., Inc.,* 184 Ariz. 82, 907 P.2d 51 (1995) ........... 15-18

*McKesson Automated Healthcare, Inc. v. Brooklyn Hospital Center,*
779 N.Y.S.2d 765 (Kings Co. 2004) ................................................................. 19, 29

*Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829 (8th Cir.1976 ....................... 24

*Miranda v. Guerrero,* 2009 WL 1381250 (S.D.Fla. 2009) .................................... 26

*Morris v. Credit Bureau of Cincinnati, Inc.,*
563 F.Supp. 962 (S.D.Ohio 1983) ........................................................................ 24

*Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257 (9th Cir. 2006) ....................... 15, 18

*Nelson v. National Aeronautics and Space Admin.,*
530 F.3d 865 (9th Cir. 2008) .......................................................................... 25, 27

*Net Global Marketing, Inc. v. Dialtone, Inc.*
217 Fed.Appx. 598, 2007 WL 57556 (9th Cir. 2007) ........................................... 21

*Pacific Am. Leasing Corp. v. S.P.E. Bldg. Sys.,*
152 Ariz. 96, 730 P.2d 273 (App.1986) ............................................................... 15

*People by Abrams v. Anderson,* 137 A.D.2d 259,
529 N.Y.S.2d 917(App.Div. 4 Dept. 1988) ........................................................... 24

*Pima Sav. and Loan Ass'n v. Rampello*
168 Ariz. 297, 812 P.2d 1115 (Ariz.App. 1991) ................................................... 19

*Pinner v. Schmidt,* 805 F.2d 1258 (5th Cir.1986) ................................................ 24

vi

*Pollis v. New School for Social Research,*
829 F .Supp 584 (S.D.N.Y.1993) ............................................................ 24

*Pultz v. Economakis,* 2005 WL 1845635, 7 (N.Y.Sup. 2005) ............................ 26

*Scotts Co. v. United Industries Corp.,* 315 F.3d 264 (4th Cir. 2002) ................... 27

*Selchow & Righter Co. v. McGraw-Hill Book Co.,*
580 F.2d 25 (2d Cir. 1978) ................................................................... 24

*State by Lefkowitz v. ITM, Inc.*
52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup.Ct. NY Cty. 1966)................................. 23

*State of NY v. Wolowitz, 468 N.Y.S.2d 131* (2nd Dept. 1983)............................... 18

*State of S.C. ex rel. Patrick v. Block,* 558 F.Supp. 1004 (D.S.C. 1983)............24-25

*Teng v. Metropolitan Retail Recovery Inc.* 851 F.Supp. 61 (E.D.N.Y. 1994) ....... 23

*Towers Fin. Corp. v. Dun & Bradstreet, Inc.,* 803 F.Supp. 820 (S.D.N.Y.1992)  26

*United Steel Workers of America v. Textron, Inc.,* 836 F.2d 6 (1st Cir.1987)  ...... 24

*Univ. of Hawai'i Professional Assembly v. Cayetano,*
183 F.3d 1096 (9th Cir. 1999) ............................................................... 27

*Waddell v. Equifax Information Services, LLC,*
2006 WL 2640557 (D.Ariz.)  ................................................................. 23

*Walczak v. EPL Prolong, Inc.,* 198 F.3d 725 (9th Cir. 1999) ............................ 14

*Williams v. Aries Financial LLC,* 2009 WL 3851675 (E.D. N.Y. 2009)............... 18

*Wood v. County of Alameda,* 1995 WL 705139  (N.D.Cal. Nov. 17, 1995).......... 28

Statutes:

Arizona Uniform Commercial Code § 47-2A504 ................................................ 19

# I.      INTRODUCTION

Swift Transportation Co., Inc. (Swift) is the largest truckload carrier in the world. Plaintiffs are truck drivers, called into Defendants' busy terminals to sign roughly 60 pages consisting of multiple contracts, addenda, charts, and inter-related legal provisions, ostensibly to "lease" a truck.[1]  Defendants have crafted a circular scheme in which they lease trucks to Plaintiff truck drivers, for immediate lease back to Swift for a period up to four years. The core documents effecting the circular relationship are the Lease/ICOA documents which the related companies, Swift and Interstate Equipment Leasing Co., Inc. (IEL) have drafted for "owner operators" to haul freight for Swift's customers. Plaintiffs are not permitted to take the contracts to review with an attorney and are made to sign the contracts then and there, or not at all. These contracts have unconscionable terms hidden within – among others, clauses which permit Defendants to fire the driver for any reason or no reason, and once fired, declare the driver to be "in default," repossess the truck, and simultaneously demand all remaining payments that otherwise would have been due if the lease had been continued. This suit claims that these draconian provisions are unconscionable and unlawful.

Plaintiffs now move this Court for a preliminary injunction to preserve the status quo pending the Court's ultimate determination whether the contracts at issue in this case are unconscionable and unlawful contracts of adhesion.[2] Specifically, Plaintiffs seek to enjoin Defendants from: 1) seeking to collect debts allegedly owed by Plaintiffs who have been or may be classified by Defendants as "in default" of their lease/ICOA

_____

[1]      As explained in detail below, the contracts at issue consist of two documents, a lease agreement and an independent contractor operating agreement (ICOA).  Throughout this brief Plaintiffs will refer to these documents as the "contract" or the "Lease/ICOA contract."

[2]  The claims in this case are litigable in this Court because Defendants have, in every lease, consented to suit in Court, rather than arbitration. *See* Ex. H-2, Sykes Lease ¶ 21.

contract; 2) furnishing adverse credit and/or employment reports concerning Plaintiffs who have been or may be classified by Defendants as "in default" of their lease/ICOA contract, and 3) requiring Plaintiffs to agree to changes in their lease/ICOA contracts on threat of placing them in default if they decline to agree to the change.[3]  Plaintiffs have been and will continue to suffer irreparable harm without preliminary injunctive relief.  In contrast, Defendants will not suffer prejudice from this preliminary injunction if Defendants' contracts are ultimately found to be lawful and enforceable.   Plaintiffs made good faith efforts to negotiate with Defendants regarding the preliminary relief requested herein.  However, Defendants refused to negotiate the request. *See* Ex. B., Getman letter to Boudreau; Ex. C, Boudreau E-mail.

## II.      STATEMENT OF FACTS

### A.      Statement of the Case

This lawsuit is brought as a nationwide class and collective action on behalf of truckers who lease Swift trucks from IEL and drive them for Swift under a lease back to Swift. Plaintiffs' claims in this case are threefold: First, Plaintiffs contend that the Defendants have violated the FLSA and state employment laws by misclassifying drivers as "independent contractors" when they are, in fact and by law, "employees" of the Defendants. Second Amd. Compl. ¶¶ 4, 14, 70, 77, 85, 108-90, 134, 140, 152.

Second, Plaintiffs seek a declaratory judgment that their lease/ICOA contracts are unconscionable and unenforceable.[4]  Under the contract, Defendants are permitted to terminate Plaintiffs' services to Swift for any reason or no reason at all, and then treat that termination as a "default" of the lease by the trucker. *Compare, e.g.* Ex. H-1, Sykes ICOA

---

[3] At this time, Plaintiffs are not seeking a preliminary injunction barring Defendants from placing drivers into default nor do they seek to preclude Defendants from repossessing the leased vehicles from drivers placed in default.

[4]      Plaintiffs also seek damages to the extent Defendants have been unjustly enriched by the unconscionable contracts.

at ¶16 *and*  Ex. H-2, Sykes contract  at ¶12(g) (Exhs. H-1 and H-2 are used throughout as a representative sample of ICOAs and leases.)   Defendants may even terminate drivers for retaliatory reasons and treat that termination as a default by the driver.[5] *See e.g.,* Ex. T, Carpenter Decl., ¶ 29.  Once Defendants put a trucker in default, the Lease/ICOA contract permits Defendants to repossess the leased truck *and* simultaneously demand that the driver immediately pay all remaining lease payments to the end of the lease – thereby exacting unconscionable liquidated damages. *Id.*  The contract also allows Defendants to keep Plaintiffs' substantial truck deposits,[6] escrowed funds,[7] and other charges.  Plaintiffs claim that these contract provisions are unconscionable and voidable under state contract law.

Third, Plaintiffs claim that Defendants' contracts constitute a scheme of "forced labor" in violation of 18 U.S.C. §1589 and 1595. Defendants threaten Plaintiffs that they will use the legal system to enforce the crushing five or six figure debt that Defendants' Lease/ICOA contract imposes on Plaintiffs if they do not work exclusively for Swift and follow Swift's rules and instructions precisely for periods up to four years – the length of the lease term.

**B.     Facts Supporting the Motion**

**1.     Swift's Circular Lease**

Swift is the largest truckload carrier in the world. http://www.swifttrans.com/c-clamp.aspx?id=174. It claims to generate 3.4 billion in yearly revenues. *Id.*  Swift and

---

[5] Defendant Swift was found to have engaged in retaliatory terminations by the NLRB *in Swift Transportation Co., Inc. and IBT*, 2009 WL 4885436 (N.L.R.B. Div. of Judges).

[6] Plaintiff Carpenter had a $20,000 truck deposit that he lost when Defendants put him in default. Ex. T, Carpenter Decl. ¶ 26, 36.

[7] Defendants generally keep Plaintiffs' maintenance funds required by the Lease and performance bond. *See e.g.* Ex. F, Van Dusen Decl., ¶ 22. These funds can amount to many thousands of dollars.

IEL are interrelated privately held companies. IEL is headquartered in the same building as Swift and is owned and run by the same principal – Defendant Jerry Moyes.  The two companies also have interrelated officers and operating management. Ex. A, Corporate Information. For example, Defendant Chad Killibrew (Jerry Moyes's son-in-law), is the President of IEL and Executive Vice President of Business Transformation for SWIFT. He also recently served as Vice President of Swift's Owner Operator Division. *Id.* Chad Killebrew also regularly signed both the Lease as the signing agent for IEL and the ICOA as the signing agent for Swift. *See, e.g.,* Ex. U, Motolinia lease at 8, 10, 11, 14, 15; contract at 25-26.

Swift arranges to lease trucks from Paccar Financial Corp. *See, e.g.,* Ex. O (Plaintiff Jose Motolinia truck registration ).[8]  Thereafter, Defendant IEL re-leases those same trucks to Plaintiff drivers. *See, e.g.*., Ex. U, Motolinia lease, at 1-10.  At the same time, a Plaintiff driver leases a truck from IEL, IEL requires the trucker to execute a lease of the truck right back to Swift, through the ICOA.[9] Thus, Defendants operate a circular scheme whereby they lease their trucks to their drivers, and simultaneously demand that the drivers lease the trucks right back to them.

Swift operates some 16,000 trucks,[10] of which roughly 3,000 involve this circular lease.  Swift recruits truckers, including its own employee drivers, to participate in this circular lease scheme by luring them with promises of becoming an "owner operator" or "business partner" of Swift. *See* Ex. V, Swift Website Materials; Ex. F, Van Dusen Decl., ¶ 1; Ex. G, Sheer Decl., ¶ 2; Ex. I Hoffman Decl., ¶ 2, Ex. H; Sykes Decl., ¶ 2; Ex. R, Grogan Decl., ¶3.

---

[8]  Plaintiff Doe is Jose Motolinia, and was identified in open Court in the S.D.N.Y.

[9]  Federal Motor Carrier Regulations require independent contractors who drive these trucks for a carrier to "lease" the truck to the carrier with specific terms. *Clarendon Nat. Ins. Co. v. Medina,* 2010 WL 1050195 (N.D.Ill. 2010).

[10]  http://www.swifttrans.com/c-clamp.aspx?id=174

### 2.    Signing the Lease/ICOA

There is a significant disparity in bargaining power between Swift with its vast legal team and the truckers (typically with high school level education). *See* Ex. D, Sheer Decl., ¶¶ 7-10; Van Dusen Decl., ¶¶ 22, 23, 26; Doe 1 Decl.,  ¶¶ 8 -10. Defendants used high pressure tactics and coercion to get Plaintiff truckers to sign their contracts. *See* Ex. D, Sheer Decl., ¶¶ 4-11; Van Dusen Decl., ¶¶ 4-27; Doe 1 Decl., ¶¶ 3-15.  First, truckers were required to put down deposits for specific trucks even before seeing the Lease/ICOA contract. *See, e.g.,* Ex. T, Carpenter Decl., ¶ 4. Then, the truckers were called to distant locations to sign pre-printed contracts in busy truck terminals. Ex. D, Sheer Decl., ¶ 5, Doe Decl., ¶ 4.

The contract consists of two documents, a Lease from IEL and an "Independent Contractor Operating Agreement" (ICOA) with Swift as a condition of entering into the lease. The Lease specifically requires drivers to enter into the ICOA with Swift, Ex. H-2, Sykes lease, ¶ 2(e), and drivers must sign both forms at the same time, or neither is valid, *id.,* at 12, Authorization and Assignment ¶ 1.  *See also* Ex. G-2, Sheer lease ¶ 2.  The Lease and the ICOA operate as a single contract created by Defendants jointly for a common business purpose – trucking freight for Swift. Defendant Killebrew often signed both the ICOA for Swift and the Lease for IEL.  *See, e.g.,* Ex. U, Motolinia lease at 8, 10, 11, 14, 15; contract at 25-26.

Drivers were not permitted time to review the 60 or more pages of the Lease/ICOA contract (containing addenda, charts, and legal forms), and they were not permitted to review the forms with an attorney. Ex. D, Sheer Decl., ¶ 10; Van Dusen Decl., ¶ 10, 11; Doe Decl., ¶ 6, 10, 15;  Ex. T, Carpenter Decl., ¶ 4. Plaintiffs were not allowed to take the contract out of the truck terminal, and all were required to sign the Lease/ICOA agreements then and there, or they would not get their truck and thus many would have no means of transportation home. *See* Ex. D, Sheer Decl., ¶¶ 6, 9-11; Van Dusen Decl., ¶¶ 7, 12; Doe 1

Decl., ¶¶ 3, 4, 14.  There were "sign here" tabs indicating where to sign. There were

substantial financial costs imposed if Plaintiffs refused to sign.  Ex. D, Van Dusen Decl., ¶

12 and Doe 1 Decl., ¶ 14.

      The Lease and ICOA have interconnecting provisions which would not be obvious

to a layperson and are not even immediately discernable to a legal professional. For

example, the ICOA suggests that either party may terminate the agreement at any time for

any reason.  *See* Ex. F-1, ICOA ¶16; Ex. H-1, ICOA ¶16; Ex. G-1, ICOA ¶17, Ex I-1

ICOA ¶17.  What is not evident, however, is that if either party terminates the ICOA, the

termination is defined as a "default" by the trucker through terms contained not in the

ICOA, but in the lease. *See e.g.* Ex. G-2, Lease ¶12(g); Ex. H-2, Lease ¶12(g). Thus, when

Swift exercises its option to terminate a trucker for no reason, the trucker is deemed

automatically to have defaulted on his lease. *Id.*  Also not evident are the negative

consequences that flow from Swift's termination of the trucker under the ICOA.  Upon

"default" under the Lease, Defendants repossess the truck.  *See Leases, e.g.,* Ex. G-2, ¶ 13;

Ex. H-2, ¶ 13; Sheer Decl., ¶¶ 19-20; Ex. R, Grogan Decl., ¶¶ 10-13; Ex. T, Carpenter

Decl., ¶ 17, 22.  Yet even after Defendants repossess the trucks, the Lease makes the

trucker liable for all remaining lease payments.  *See Leases, e.g.,* Ex. H-2, ¶ 13; Ex. G-2, ¶

13.  Upon termination of their employment under the ICOA and the resulting default under

the Lease, truckers can also lose their deposits, escrowed funds, performance bonds, and

the ability to buy out the Lease which is only permitted at the end of the Lease term.  *See*

*Leases, e.g.,*  Ex. H-2, ¶¶ 13(f) and 19; Ex. G-2, ¶¶ 13(f), 19, and Authorization for

Deduction at 13*;* Ex. G, Sheer Decl., ¶ 31, Ex. F, Van Dusen Decl., ¶ 22, Ex. T, Carpenter

Decl., ¶ 24, 26.  Upon information and belief, Defendants give no accounting of the funds

they take from the Plaintiffs' various accounts.

      Another hidden feature of the contracts is that all these same penalties apply if a

driver were to turn in his truck voluntarily, pursuant to the "mutual" termination clause of

the ICOA, or if he were simply to decide not to renew the ICOA. So despite the contractual assurance that a driver can terminate the ICOA at any time, in fact, drivers cannot do so without suffering crushing financial debt due under the Lease.  Ex. I, Hoffman Decl., ¶ 18. Drivers are virtual captives of Defendants as a result of the contracts' draconian liquidated damages clauses, and, as explained below, as a result of Defendants' ability to blackball Plaintiffs from any further work in trucking, and by furnishing negative information to the DAC report. Ex. F, Van Dusen Decl. ¶ 24.[11]  None of these features are evident on the face of the Lease/ICOA and the "mutual" ability to terminate the ICOA gives no hint of the devastating financial consequences that result from either side exercising that clause.

Swift's right to place drivers in default for any or no reason coupled with the draconian financial consequences that flow from such a default give rise to two additional aspects of the contract not apparent at the time it is signed.  First, although the ICOA states that a driver can drive his leased truck for another carrier with the permission of Swift, *see, e.g*., Ex. H-1, Sykes ICOA ¶ 5b; Ex. F-1, Van Dusen ICOA ¶ 5 b, in practice, Defendants never grant truckers permission to use the trucks to drive for other carriers, and once the contract is signed, Defendants state the prohibition repeatedly. Ex. G, Sheer Decl., ¶¶ 12, 19; Ex. I, Hoffman Decl., ¶ 15; Ex. H, Sykes Decl., ¶ 16;  Ex. R, Grogan Decl., ¶ 5; Ex. T, Carpenter Decl., ¶ 9; Ex. Q, Palmer Decl., ¶ 12.  This verbal prohibition is easily enforced given the ability of Defendants to quickly place the drivers in default if they

---

[11]  The DAC report is the trucking industry's pre-employment screening tool. Like a credit report, the DAC follows a trucker wherever they go, reporting negative employer experiences wherever a trucker has worked; it also follows a trucker to virtually all prospective jobs – contract or employee -- in trucking industry. *See* Ex. N, HireRight. Com DAC Background. The DAC report is created by HireRight (operated by US Information Services, Inc.). HireRight states: "DAC Employment History File contains historical employment records from more than 2,500 motor carriers, and acts as a 'file cabinet' for participating members" who are required to submit records to gain access to the database. Currently containing over 5.7 million records, with thousands added every month, the DAC Employment History File is the only employment history database of its kind in the transportation industry." *Id.*

persist in requesting permission to drive for another carrier.

Second, Swift's power to place drivers in default for any or no reason whatsoever, gives Swift the power to force drivers to agree to mid-term modifications of the terms of their contracts (which invariably benefit Swift) under threat of being placed in default. *Id.; See e.g.* Ex. S, Fairley Decl., ¶¶ 7-9.  For example, during the term of the lease, Plaintiff Van Dusen was told to agree to a two-cent-per-mile reduction in the amount of money she was reimbursed for fuel costs. Ex. F, Van Dusen Decl., ¶ 9.  When she told Swift she could not accept such a change, she was told to either accept immediately or have her truck repossessed.  *Id.*

### 3.     Defendants' Control Over Plaintiffs' Labor

The Defendants' total control is enshrined in a bold and sweeping statement in every single ICOA. Swift's ICOA specifically states that, **"While operating the Equipment under COMPANY'S authority, COMPANY shall have exclusive possession, control and use of the equipment during the term of this Agreement."** *See, e.g.* **,** ¶ 5A of the ICOA in Exs. F-1, G-1, H-1, I-1.

While Swift has the right to control the truck in every respect, Plaintiffs bear all the operational and maintenance costs for Defendant's fleet and bear all the business and liability risks that would otherwise have been borne by Swift.[12] Once they sign the

---

[12]This scheme lets Defendants shift all the costs and risks associated with fleet maintenance to their truckers while keeping all the benefits (even down to claiming tax depreciation on the trucks). Defendants also benefit greatly by misclassifying Plaintiffs as independent contractors. Defendants charge Plaintiffs tens of thousands of dollars per year for the lease of Defendants' trucks, and they also require Plaintiffs to pay for other equipment such as the QualComm, and Plaintiffs must pay for all gas, insurance, bonding, repairs and maintenance, tolls, and a variety of other items. *See, e.g.,* ICOA ¶¶ 5, 6, 8, 10, 11, and Schedule B in Exs. F-1, G-1, H-1, I-1.  Defendants even exact a financial profit for accounting transactions by charging Plaintiffs a $15 accounting fee to issue Plaintiffs' paychecks. *See e.g.,* Ex. H-3, p.7; H-1, ICOA ¶ 4. And, Defendants secure a far more stable workforce since Plaintiffs cannot leave their work with Swift for a period of up to four years under threat of being penalized by liquidated damages for "defaulting" on the lease -- longevity that could never be demanded of at will employees.

Lease/ICOA contract, Plaintiffs do not obtain their own trucking work. Rather, Defendants dispatch the Plaintiffs to their jobs, setting the load time, the delivery time, and also setting the route. While the drivers are nominally permitted to select their own route, if they deviate from Swift's preferred route, Swift imposes financial penalties. *See* Ex G, Sheer Decl., ¶10;  Ex. H, Sykes Decl., ¶ 8; Ex. I, Hoffman Decl., ¶ 9; Ex. L, Qualcomm Messages re Route. Nor are Plaintiffs able to refuse loads assigned by Swift without serious consequences.  If a driver turns down loads,  he or she is reprimanded and not assigned further loads for a period of time (thus exacting a financial penalty). *See e.g.* Ex. F, Van Dusen Decl., ¶ 7; Ex. G, Sheer Decl., ¶10; Ex. H, Sykes Decl. ¶ 8; Ex. I, Hoffman ¶ 9; Ex. K, Qualcomm Message re Load. Thus, Plaintiffs are not able to control their profit or loss; Swift does. Even though Defendants assign loads to each driver and thus assign how much each driver may drive, Defendants take "overage" charges if a driver drives more than 11,000 miles a month. *See, e.g.,* Ex. H-2, Sykes Lease ¶2(c); Ex. G-2, Sheer Lease ¶ 21.[13]

Implementing Swift's "exclusive possession, control and use of the equipment," set forth in the ICOA, Swift sets work rules for Plaintiffs by imposing an over 200 page manual of work rules with which drivers were required to comply. *See, e.g.,* Ex. M, Swift Manual Excerpts, (Ex. M-1 is a partial list of instructions culled from the manual). *See also* ICOAs, Ex. H-1, ¶16; Ex. F-1, ¶16; Ex. G-1, ¶17; Ex. I-1 ¶17. These instructions include Swift's own speed limits, fueling requirements, and a wide variety of performance standards.[14] Swift even sets rules for personal appearance and demeanor.

---

[13]  Defendants also use Plaintiffs to train Swift's new hire employee drivers on the road. *See, e.g.,* Ex. R, Grogan Decl., ¶ 6. Thus, Plaintiffs bear the significant liability risks associated with new drivers, and they also bear the increased maintenance costs on their trucks for new drivers' just learning the formidable skills needed to shift tractors.

[14]  A violation of the work rules is a specific basis for claiming that the contract is terminated and therefore putting the driver in default. *See e.g.,* Exs. H-1 and F-1, ICOA ¶17(A); Exs. G-1 and I-1, ICOA ¶ 16.

*See* Ex. M-1, Swift Manual Excerpts at 6.  As noted above, Plaintiffs cannot use their leased truck as they see fit, such as to drive for other carriers offering better pay or more convenient loads.

Defendants also routinely monitor Plaintiffs' whereabouts in real time by using a QualComm device, a mobile communications tool used in the trucking industry. Defendants' current contract requires Plaintiffs to equip their truck with a QualComm device, generally also leased from Swift. *See e.g.,* Exs. F-1 & H-1, ICOAs ¶5(D), Exs. G-1 & I-1, ICOAs ¶5(C). The QualComm has a GPS and reports the truck location to the Swift dispatcher. Thus, the QualComm enables Swift to know when drivers are driving, and when they are resting. It enables Swift to monitor miles driven, average miles per hour, and collect various statistics about a driver in real time. It also measures compliance with the route set by Swift for the load. Ex. M, Swift Manual, pp. 12-24 (§ 7). The QualComm also enables Defendants to give drivers instructions in real time while on the road, with email-like capabilities. *See* Ex. L, Qualcomm Messages.  For example, Swift uses the QualComm to instruct drivers about their next load, delivery time, route changes. *See, e.g.,* Ex. M-D, Swift Manual, pp. 12, 20-34. Defendants also convey detailed instructions to truckers by contacting them on their cellphones and through voicemail. S*ee e.g.* Ex. M, Swift Manual at 34.

Swift also uses hardware to control the truck. Swift sets a "speed governor" on the engine of each truck that sets maximum speed and engine revolutions per minute thereby controlling the maximum speed the truck may travel. *See* Ex. G, Sheer Decl., ¶ 10; Ex. H, Sykes Decl., ¶ 8; Ex. I Hoffman Decl., ¶9; Ex. Q, Palmer Decl., ¶ 6.  Swift has mandatory settings for the governor that drivers are not permitted to change, and these settings are designed to limit the truck to speed rates BELOW posted speed limits. *See id.*  Any time a driver takes his truck to a Swift authorized service station, the governor settings are checked, and if a driver has arranged to change the settings, they are changed back to Swift's

mandated settings. Swift's governor settings also restrict the amount of miles a driver may cover in a set amount of time, precluding a driver from making his own decisions about fuel efficiency, pay per hour, and risk. *See id.*

The Lease/ICOA also leverages control over drivers. The termination and default provisions therein effectively give Swift the ability to "fire" its workers at will. Ex. G-1, ICOA ¶ 17. Carpenter was fired because Defendant Killebrew said we're "tired of you." Ex. T, Carpenter Decl., ¶ 29. Swift fired Plaintiff Joseph Sheer even though he violated no law and no work rule. Ex. G, Sheer Decl., ¶ 14-21. Once Swift terminated his ICOA, he was deemed to be in "default" of his lease. *Id.* at ¶ 21-32. Defendants demanded repossession of the truck and began billing him for all remaining lease payments due on the truck (approximately $32,000). *Id.* Drivers must comply or face loss of work, loss of the truck, negative credit and DAC reports, and crushing debt.

### 4.    Earnings

As a result of the Lease/ICOA contract terms and the complete control that Defendants exercise over Plaintiffs, Plaintiffs are frequently unable to earn either federal or state minimum wage guarantees.  In numerous weeks, Plaintiffs make no money at all; in fact, they "go deeper in debt to the company store." Plaintiffs Sykes, Van Dusen, and Hoffman made so little money that they could not afford to continue to work for Swift, make their required lease payments, pay for gas, tolls, insurance, taxes, maintenance, equipment, bonding, and bear all the other charges Swift required them to bear, and still support themselves and their families. Ex. F, Van Dusen Decl., ¶¶ 5-18, 22; Ex. H, Sykes Decl., ¶¶ 10-18, 20;  I, Decl Hoffman, ¶¶ 13-17, 20-27.  Plaintiff Hoffman made so little money that his personal vehicle was repossessed and he and his wife became homeless, both forced to live in the truck. He had to cut back on his heart medication even though he had four prior heart attacks. Ex. I, Hoffman Decl., ¶¶13-28.  Plaintiff Sykes was operating at a loss, despite eleven weeks of working for Swift, which led to his not having enough

money to pay for fuel oil for the family's home, forcing the family (including three children) to live for a week without heat. Ex. H, Sykes Decl., ¶ 12-15.  Plaintiff Van Dusen could not keep up with home mortgage payments or even keep enough money in her account to pay for training courses. Ex. F, Van Dusen Decl., ¶ 13, 18.  Each of these Plaintiffs made so little money that they had to turn in their trucks.

### 5.    Swift's Use of Collections and DAC Reports

Once Swift puts drivers in "default" status, Defendants take a variety of steps. First, Defendants repossess the trucks.   *See Leases, e.g.,* Ex. G-2, ¶ 13; Ex. H-2, ¶ 13. Then Defendants demand all the remaining Lease payments that would have been made up through the end of the Lease term. *See, e.g., id.*  Without giving an accounting, Swift generally holds Plaintiffs' various deposits and bonds. And Defendants retain all payments thus far made on their truck. *See e.g.* Ex. R, Grogan Decl. ¶ 12-13; Carpenter who lost his $20,000 deposit. Ex. T, Carpenter Decl. ¶ 4, 20-31. Drivers also generally cannot buy out the truck (*e.g,.* by refinancing with another company) if the Lease is terminated early.[15] Grogan Decl., ¶ 12-13; Ex. T, Carpenter Decl. ¶ 31-34. Drivers lose their truck, they lose their income, and are subject to dunning and collections efforts by Defendants to the tune of $60,000 or more. Ex. I, Hoffman Decl., ¶19; Ex. G, Sheer Decl., ¶24; Ex. Q, Palmer Decl. ¶18-20.

Defendants also quickly refer the remaining Lease payments they consider due to collections agencies, such as A.R. Systems, Inc. ("AR Systems") for this work. After Defendants put Plaintiffs Sheer and Hoffman in default status, they put Plaintiffs' remaining Lease obligations into collections, resulting in a daily barrage of bill collector phone calls. Sheer and his very ill wife were called "deadbeats" by the collections agency in scores of harassing phone calls they received each day dunning them for the remaining Lease payments. Ex. G, Sheer Decl. ¶ 23-32; Ex. G-3, Sheer termination letter.

---

[15]  This also prevents drivers from leaving early from the Lease term of up to four years.

When Plaintiff Grogan was defaulted by Defendants, his truck was repossessed with devastating consequences for his family's income. Ex. R, Grogan Decl. ¶10-17. Then, without any means to work, he was told by IEL representatives that they would have his CDL suspended, that he would be barred from the trucking industry and his credit report would be ruined unless he paid the remaining Lease payments. *Id. For further details, see* Ex.R ¶ 19-20. The dunning calls only stopped once Grogan said he had an attorney. *Id.*

After Plaintiff Hoffman turned in his truck because he could not make enough money to survive, he was put in default and was dunned for $63,000 by IEL and AR Systems. He was called multiple times per day and received demands from bill collectors for more than a year. Ex. I, Hoffman Decl., ¶ 18-19; Ex. I-3, Hoffman termination letter. Plaintiffs Van Dusen and Sykes have been told the same thing will happen to them, though the amounts Swift considers them to owe have never been determined. Ex. H, Sykes Decl., ¶19; Ex. F, Van Dusen Decl., ¶ 23; Ex. F-2, Van Dusen termination letter.

Plaintiff Palmer paid $500 per month to IEL after she was put in default, to pay off nearly $66,000 that the company said was due. Ex. Q, Palmer Decl. ¶ 18-26. The payments were put on automatic withdrawal from her bank account for a year until they abruptly ceased in November 2009. *Id.*

Swift furnishes information for and uses the DAC report. Ex. F, Van Dusen Decl., ¶ 24. Once Swift has put a driver in default, it furnishes negative information about the default to DAC. Plaintiff Van Dusen received a negative DAC report from Swift after she was put in default. *Id.,* ¶ 23-24. Because DAC reports are the standard employment screening tool in the trucking industry, negative reports can keep Plaintiffs from ever driving professionally again. Ex. H, Sykes Decl. ¶ 21. *See* Ex. N, HireRight.com. Plaintiff Van Dusen was turned down from a trucking job with Heartland Express due to the negative DAC report. Van Dusen Decl., ¶ 24. When Heartland turned Van Dusen down, she was told that as a result of the negative DAC report, she would never find

13

work in the trucking industry again. *Id.* Thus, if Swift or IEL files a negative report concerning a driver's default, the driver will likely be prevented from gaining further employment in the trucking industry. A clean DAC report is critical to a driver's ability to work in their profession.[16] *See*, e.g., *id.*

## III.    ARGUMENT

Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, ___ U.S. ____, 129 S.Ct. 365 (2008)*; Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009).   As set forth below, Plaintiffs have met all four of these requirements.

### A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

In the Ninth Circuit a party seeking preliminary injunctive relief must demonstrate either*:*

> (1) a likelihood of success on the merits and the possibility of
> irreparable injury; or (2) that serious questions going to the merits
> were raised and the balance of hardships tips sharply in its favor.
> These two alternatives represent "extremes of a single continuum,"
> rather than two separate tests. Thus, the greater the relative hardship
> …, the less probability of success must be shown.

*Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir. 1999) (citations omitted).  *See also Davison v. City of Tucson,* 924 F.Supp. 989, 992 (D. Ariz. 1996) (quoting *Regents of Univ. of Cal. v. Am. Broadcasting Cos.,* 747 F.2d 511, 515 (9th Cir. 1984)).

Here, Plaintiffs meet either test.  There is a strong likelihood of success on the merits with a very real possibility of irreparable injury. Additionally there are serious

---

[16] Indeed, it is fear of negative DAC reports, crushing debt and credit damage, which keeps Plaintiffs laboring at sub-minimum wages for Defendants for periods of years. *See* Second Amended Compl., pp. 29-30 (Eighth Cause of Action).

14

questions going to the merits and the balance of hardships tips sharply in favor of Plaintiffs.

Plaintiffs have a strong probability of success on the merits of their claims that the Lease/ICOA contract is both procedurally and substantively unconscionable because of the oppressive bargaining process and the oppressive and surprise terms of the Lease/ICOA contract including the facts that it allows Swift to place drivers in default of the Lease for no reason, imposes unconscionable penalties upon drivers once they are placed in default, and permits Defendants to demand unilateral changes upon threat of being placed in default.

### 1.      The Unconscionability Standard

"Unconscionability includes both procedural unconscionability, i.e., something wrong in the bargaining process, and substantive unconscionability, i.e. the contract terms per se." *Pacific Am. Leasing Corp. v. S.P.E. Bldg. Sys.*, 152 Ariz. 96, 103, 730 P.2d 273, 280 (Ariz. Ct. App.1986).

"Procedural unconscionability analysis focuses on oppression or surprise. Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice, while surprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006); *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1172 (9th Cir. 2003)("when a party who enjoys greater bargaining power than another party presents the weaker party with a contract without a meaningful opportunity to negotiate, "oppression and, therefore, procedural unconscionability, are present.").

In *Maxwell v. Fidelity Fin. Servs., Inc.*, 184 Ariz. 82, 907 P.2d 51 (1995), the Arizona Supreme Court held that factors indicating procedural or bargaining

15

unconscionability include:

> [T]hose factors bearing upon . . . the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible . . . .

*Id.* at 89, 907 P.2d at 58. In *Broemmer v. Abortion Services of Phoenix, Ltd.*, 173 Ariz. 148, 150-51, 840 P.2d 1013, 1015-16 (1992), the Court defined an adhesion contract as a standardized form "offered to consumers on an essentially 'take it or leave it' basis…" which is unenforceable against the adhered party to the extent that there are terms outside reasonable expectations contained within it. The Ninth Circuit has repeatedly stricken adhesion contracts as procedurally unconscionable. *See e.g,. Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1073-75 (9th Cir. 2007), cert. denied, 128 S.Ct. 1117, 169 L.Ed.2d 845 (2008) (striking down employment related arbitration provision that was offered to employee on a "take it or leave it" basis); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1172 (9th Cir. 2003), *cert. denied*, 540 U.S. 1160 (2004) (presentation on an adhere-or-reject basis is procedurally unconscionable).

A contract is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed. *See Harrington v. Pulte Home Corp.,* 211 Ariz. 241, ¶ 39, 119 P.3d 1044, 1055 (Ariz. Ct. App. 2005) (factors showing substantive unconscionability include "contractual terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity."). *See also Maxwell v. Fidelity Fin. Servs., Inc.*, 184 Ariz. 82, 89 907 P.2d 51, 58 (1995).

Plaintiffs need not show both procedural and substantive unconscionability in order to demonstrate unconscionability.  *See Maxwell,* 184 Ariz. at 90, 907 P.2d at 59 (claim of unconscionability can be established by a showing of substantive

unconscionability alone). *Id.*[17]

## 2.    The Lease/ICOA Contract Is Procedurally Unconscionable

As the affidavits of Plaintiffs make clear there was a significant disparity in bargaining power between Swift Transportation, with its legal team, and the high school educated truckers.  Moreover Swift used high pressure tactics when offering the Lease/ICOA agreement to drivers: drivers were presented with the voluminous lease and ICOA documents with countless attachments on a take-it-or-leave-it sign- it-quick basis. Both documents had to be signed as a package and no modifications in either document were permitted.  *See* Exhibit D, Declarations of Van Dusen, Sheer, & Doe 1. The truckers were not permitted sufficient time to review the agreements and none were allowed to take them out of the office in order to review them further at home. *Id.* Nor were drivers allowed to take the agreements to an attorney to review, although some specifically asked for permission to do so. *Id.* Signature tabs indicated where Plaintiffs had to sign.[18]  In short, they were presented with the agreements and expected to sign them then and there, or not at all.  The impact of key terms, such as the default provisions, could only be discovered upon a careful and repeated analysis of the interplay between clauses buried deep in the lease and ICOA. *See, e.g.,* Ex. H-2, Lease ¶ 12; Ex. G-2, Lease ¶ 12; Ex. H-1, ICOA ¶ 16a; Ex. G-1, ICOA ¶ 17a. Truckers could not be expected to fully understand these interrelated legal terms given how little time they received to review the documents and their inability to obtain legal advice.

---

[17] In *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 -1171 (9th Cir. 2003) (citations omitted), the Court held that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."

[18] The procedural unconscionability in using signature tabs to short circuit careful consideration has been noted by this Court in *Madrid v. Peak Const., Inc.*  2009 WL 3710719, at 2 (D.Ariz. 2009) ("The stickers are inappropriately suggestive to potential collective action members that their signature is required.").

Under *Nagrampa,* 469 F.3d at 1280 and *Maxwell,* 184 Ariz. 82, 907 P.2d 51, these circumstances are more than sufficient to establish procedural unconscionability.[19]

### 3.  The Lease/ICOA Is Substantively Unconscionable

The lease/ICOA contract is substantively unconscionable for three distinct reasons:  First, it imposes unconscionable penalties on drivers who seek to terminate the lease. Second, it gives Defendants the ability to place drivers in default of the Lease for any reason, or no reason whatsoever.  Third, it allows Swift to impose unilateral changes in the contract terms to the disadvantage of drivers.  As set forth below, either one of these aspects of the contract are sufficient to render it unenforceable as a matter of law.

### a.  The Contract Imposes Unconscionable Penalties

Paragraph 13 of the lease portion of the contract specifically states that in the event of a default, the lessor may terminate the lease (*e.g.,* Ex. H-2, ¶13(a)), require the driver to return the truck (or seize it) and charge the driver for the cost of repossession, (*e.g.,* Ex. H-2, ¶13(c), (d), and (f)), and declare the entire amount of the rent for the full term of the lease immediately due and payable as "liquidated damages." (*e.g.,* Ex. H-2, ¶13(b)). In other words, Swift claims the right to both retain the truck and demand full payment of all remaining lease payments --even those not yet due.[20]

Courts have consistently found that contracts permitting a lessor to repossess the leased equipment and simultaneously to collect all remaining payments for a breach are unconscionable. *See, e.g., McKesson Automated Healthcare, Inc. v. Brooklyn Hospital*

---

[19] *See also Brennan v. Bally Total Fitness,* 198 F.Supp.2d 377, 383 -84 (S.D.N.Y. 2002); *Williams v. Aries Financial LLC,* 2009 WL 3851675 at *11 (E.D. N.Y. 2009); *State of NY v. Wolowitz,* 468 N.Y.S.2d 131 (2 d Dept. 1983); *Industralease Automated & Scientific Equipment Corp. v. RME Enterprises, Inc.,* 396 N.Y.S. 2d 427, 490 (2d Dept. 1977).

[20] Also, the CABS Training Manual received after signing states:  "You are responsible for the full length – all payments -- of the lease, regardless of whether you quit, turn in the truck early, or leave early.  Walking away from the lease will be considered a default of the lease and you will subject to any collections, including any cost for repair of the truck as needed." Ex. P, p.22.

*Center,* 779 N.Y.S.2d 765, 770 (N.Y. Sup. Ct. 2004) (in case involving lease of hospital equipment court held that allowing lessor to accelerate all payments due under the lease and seize the equipment "would impose an unconscionable forfeiture and penalty . . . and contravene public policy."); *Fairfield Lease Corp. v. Pratt,* , 278 A.2d 154, 156 (Conn.Cir. Ct.1971) (finding lease of coffee machine that allowed lessor the right to repossess the equipment and demand payment of all unaccrued and unearned lease payments to be unconscionable under UCC §2-302); *Fairfield Lease Corp. v. Umberto,* 1970 WL 12608 (N.Y. Civ. Ct. 1970)(same); *Fairfield Lease Corp v. Marsi Dress Corp.,* 303 N.Y.S.2d 179 (N.Y. Cir. Ct. 1969)(same). *See also In re Merwin & Willoughby Co.,* 206 F. 116, 122-125 (N.D.N.Y. 1913) (claim for unearned lease payments disallowed in bankruptcy because lessor seized equipment and lease provision giving lessor right to payment of remainder of lease payments after seizure was unconscionable). *Hertz Commercial Leasing Corp. v. Dynatron, Inc.,* 427 A.2d 872 (Conn.Super.Ct. 1980)(clause in equipment lease that even a minor breach by lessee would allow leasing company at its option, to recover damages far in excess of fair value of breach was unconscionable under Uniform Commercial Code and, as such, was unenforceable. Uniform Commercial Code, § 2-302(1))*; Fairfield Lease Corporation v. Pratt,* 540-41, 278 A.2d 154 (1971).

Courts have also held that a breach remedy allowing for acceleration of all remaining lease payments acts as a liquidated damage clause that constitutes an unlawful penalty. *See Pima Sav. and Loan Ass'n v. Rampello* 168 Ariz. 297, 300, 812 P.2d 1115, 1118  (Ariz. Ct. App. 1991)([A]n agreement made in advance of a breach is a penalty unless both of two conditions are met. First, the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by any breach. Second, the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation.); *Larson-Hegstrom & Associates, Inc. v. Jeffries,* 145 Ariz. 329, 701 P.2d 587 (Ariz. Ct. App.1985); UCC § 47-2A504; *John Deere Leasing Co. v. Blubaugh,*  636 F.Supp. 1569, 1575 (D.Kan. 1986).

Defendants' acceleration clause setting all remaining lease payments as the damages is not a reasonable forecast of harm caused by the default. Defendants, having repossessed the truck, have the ability to release the truck and minimize damages. Second, any cost that Defendants may suffer from the repossession and release can be accurately estimated because Defendants have experienced hundreds, if not thousands of such terminations and there is no reason the losses are variable or otherwise incalculable. Defendants' ability to repossess the trucks and demand all payments that would have been due if the trucker still had the truck is unconscionable.

### b.  The Contract Is Unconscionable Because It Allows Swift To Place Drivers in Default For Any or No Reason

The repossession with a demand for all remaining payments is unconscionable in itself. But here, it is all the more egregious because Defendants can cancel the contract for any reason or no reason AND treat its own cancellation as a default of the driver, thereby triggering the repossession and full payment aspect of the contract. Paragraph 16 of the ICOA portion of the contract states that "[t]his Agreement may be terminated by either party with or without cause upon ten (10) days prior written notice to the other party." Ex. H-1, Sykes ICOA ¶ 16. While this provision may appear to be mutual, it must be read in conjunction with the lease portion of the contract. That document provides that a driver must enter into an ICOA with Swift Transportation Co., Inc., Ex. H-2, Sykes lease ¶ 2(e), and that a driver "shall be in default under this Lease" in the event that the "Lessee's ICOA with Carrier is terminated by Carrier or Lessee." *Id.* ¶12(g). In other words, Swift can terminate all its duties under the Lease/ICOA contract for any reason or no reason whatsoever without financial consequences, but the driver remains liable on the lease for all of the unpaid lease payments (as well as losing the truck) regardless of whether Swift or the driver invokes the termination clause. Nothing in the contract places any limit upon Swift's power to exercise this heads-I-win-tails-you-lose procedure.  Swift

20

can put drivers in default within ten days of their signing a lease agreement, seize the equipment and still demand full payment of the entire lease. Or it can wait until a driver has only one more payment to make before he or she may buy her truck outright, place the driver in default and seize the truck, if financially advantageous to do so. Such complete lack of mutuality renders the contract void and unenforceable.

Attributing the "default" to the driver, when it is really Swift who has ceased to comply with the bargain, gives Swift the ability to report the "default" to collection agencies and place negative references on the DAC employment screening or driver credit reports.

### c.  The Contract Is Unconscionable Because It Allows Swift To Exact Disadvantageous Changes to the Contract at Will.

Defendants demand that Plaintiffs agree to mid-term contract modifications under threat of repossession and full repayment. *See, e.g.,* Ex. F, Van Dusen Decl., ¶ 9; Ex. S, Fairley Decl. ¶¶ 7-10. The ability to demand advantageous mid-term contract modifications is both further evidence of the unconscionable power relations established by the adhesive Lease/ICOA, and is unconscionable itself. In *Net Global Marketing, Inc. v. Dialtone, Inc,.* 602, 2007 WL 57556, 3 (9th Cir.  2007), the Ninth Circuit noted that the unilateral ability to change the existing terms of a contract to one's benefit was the virtual hallmark of unconscionability.

> "the unilateral modification clause renders the arbitration provision severely one-sided in the substantive dimension, … . The unilateral modification "pervade[s]" and "taint[s] with illegality" the entire agreement to arbitrate, severance of terms within the arbitration clause would not cure the problem. *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir.2002) (citing *Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 696, and Cal. Civ.Code § 1670.5(a)).

*Id.,* Similarly, in *Batory v. Sears, Roebuck and Co.,* 456 F.Supp.2d 1137, 1140 (D. Ariz. 2006) this Court found that an employer's unilateral right to modify or terminate an

arbitration contract was substantively unconscionable.[21]

The Lease/ICOA is unconscionable because it gives Defendants such power over the Plaintiffs that Defendants may demand even more disadvantageous changes to the terms of the contract at will. For example, Defendants routinely lower the Plaintiffs' reimbursement rates, under threat that if they refuse to accept the change, Defendants will put Plaintiffs in "default status" and repossess their trucks, while demanding continued payment.  Ex. S Fairley Decl., ¶¶ 7-11,  Ex. F Van Dusen Decl. ¶ 9.

## B.   PLAINTIFFS ARE SUFFERING IRREPARABLE INJURY

Plaintiffs are being irreparably harmed by the above-described unconscionable aspects of the Lease/ICOA contract and absent preliminary injunctive relief, will continue to suffer irreparable injury in at least three ways.  First, Plaintiffs considered to be in default are subject to negative DAC Reports that negatively impact their creditworthiness and blackball them from being hired by any trucking companies and working in their chosen careers as truck drivers. Second, Plaintiffs considered in "default" by Defendants are subject to emotional distress from Defendants' measures to collect an unlawful debt. Finally, Defendants' ability to demand that Plaintiffs agree to contractual changes <u>during the period of the contracts, under threat of being placed in default,</u> either forces plaintiffs to work for years at unlawfully reduced rates of pay, or to have their trucks repossessed,

---

[21] Unilateral changes to collective bargaining agreements by the employer, union, or employees are invalid as contract modifications because of lack of mutuality. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1296 (6th Cir.1991)(explaining that to construe the Plan to allow the employer to terminate benefits of an employee-promisee, at will and without notice, is to invent a term which lacks mutuality of obligation, is illusory, and unenforceable). Employers cannot unilaterally reserve the right to change the terms of a CBA and then adopt terms that conflict with rights granted under a CBA. *ASARCO v. USW*, 2005 U.S. Dist. LEXIS 208731 at *12 (D.Ariz. July 26, 2005) (citing *Armistead*, 944 F.2d at 1297). In other words, a reservation of rights clause in a plan document cannot affect contractually vested or bargained-for rights. *Id.; see also Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Company, Chemical Division*, 404 U.S. 157, 183 (1971)

their deposits and escrowed funds taken, lose their jobs, and still be liable for all remaining lease payments, just because they insisted on defendants' compliance with the existing terms of the contracts.  These harms will be examined in turn.

### 1.  Defendants' Collection Measures Irreparably Harm Plaintiffs

Courts and Congress have noted that irreparable harm can ensue from the collection of unlawful debts. *Benedict College v. National Credit Systems, Inc.,* 2009 WL 3839473 (D.S.C. 2009)(collections agency enjoined from collecting debts for college, in part based on concern for irreparable injury to student creditworthiness); *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 749 (1978).  Courts have issued preliminary injunctions involving collections measures to enforce unconscionable contracts. *See State by Lefkowitz v. ITM, Inc.* 52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup.Ct. NY Cty. 1966).

This Court has noted that consumers who have been denied credit may be awarded damages for "humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses." *Waddell v. Equifax Information Services, LLC,*  2006 WL 2640557, 4 (D.Ariz.) citing *Stevenson v. TRW Inc.*  987 F.2d 288, 296 (5th Cir.). Numerous cases have noted that unlawful debt collections inevitably entail infliction of emotional distress. *See Teng v. Metropolitan Retail Recovery Inc.* 851 F.Supp. 61, 68 -69 (E.D.N.Y. 1994) ("we believe that violations of the FDCPA, by their very nature, (e.g., abusive, deceptive or unfair debt collection practices), are those kinds of actions which may be expected to cause emotional distress"); *Crossley v. Lieberman*, 90 B.R. 682 (E.D.Pa.1988), aff'd, 868 F.2d 566 (3d Cir.1989) (same). *See also Long v. Beneficial Finance Co. of New York, Inc.,* 39 A.D.2d 11, 12-14, 330 N.Y.S.2d 664 (4th Dep't 1972)(tort of intentional infliction of emotional distress was actionable in debtor-creditor relationship).

The Ninth Circuit has repeatedly held that emotional distress can constitute irreparable injury. *See, e.g., Chalk v. United States Dist. Court Dist. of Cal.*, 840 F.2d 701, 709-10 (9th Cir.1988). Numerous other courts have found that emotional distress is

irreparable injury. *Pollis v. New School for Social Research,* 829 F .Supp 584, 598 (S.D.N.Y.1993) (affirming that non-economic claims such as emotional harm can demonstrate irreparable harm); *United Steel Workers of America v. Textron, Inc.,* 836 F.2d 6, 8 & 9 (1st Cir.1987) (finding that the loss of insurance benefits to retired workers would likely result in emotional distress, concern about financial disaster and possibly deprivation of life's necessities and, therefore, constituted irreparable harm). *See also Pinner v. Schmidt,* 805 F.2d 1258, 1265 (5th Cir.1986); *Collins v. Retail Credit Co.,* 410 F.Supp. 924, 936 (E.D.Mich.1976); *Bryant v. TRW, Inc.,* 487 F.Supp. 1234, 1242-43 (E.D.Mich.1980), *affirmed.* 689 F.2d 72 (6th Cir.1982); *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834-35 (8th Cir.1976); *Morris v. Credit Bureau of Cincinnati, Inc*., 563 F.Supp. 962, 969 (S.D.Ohio 1983).

Moreover, the Congressional findings and declaration of purpose in 15 U.S.C. §16929(a) notes that abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." *Bates v. C & S Adjusters, Inc.* 980 F.2d 865, 868 (2d Cir. 1992).

Defendants' adverse collections and credit reporting measures irreparably harm Plaintiffs. Plaintiffs will never be able to calculate or prove the various harms that will ensue to each trucker from these measures during the pendency of the case. *Selchow & Righter Co. v. McGraw-Hill Book Co*., 580 F.2d 25, 28 (2d Cir. 1978); *Estee Lauder Companies Inc. v. Batra,* 430 F.Supp.2d 158, 174 (S.D.N.Y. 2006); *People by Abrams v. Anderson* 137 A.D.2d 259, 271, 529 N.Y.S.2d 917, 924 (App.Div. 4 Dept. 1988). Monetary relief is not practical; nor could it ever furnish Plaintiffs full relief from the harms caused.

Here, the collections measures are particularly vexing to plaintiffs given that the debt is demonstrably unlawful. Collections of taxes likely to be found unlawful have also been enjoined for causing irreparable injury. *See State of S.C. ex rel. Patrick v. Block,*

24

558 F.Supp. 1004 (D.S.C. 1983)(preliminary injunctive relief granted given financial positions of farmers concerned with agriculture Secretary's deduction of 50 cents per 100 weight from proceeds of sales of all milk marketed commercially in the United States constituted irreparable injury); *Cf. Berne Corp. v. Government of Virgin Islands,* 120 F.Supp.2d 528 (D.Virgin Islands 2000)(irreparable injury need not be shown to enjoin unlawful collections by taxing authority).

### 2. Negative DAC Reports Irreparably Harm Plaintiffs

Negative reporting to a DAC employment screening report constitutes irreparable injury since it is likely to result in blackballing of the plaintiff from employment in the trucking industry. The risk of losing one's ability to gain employment for which one is experienced and trained is irreparable injury and it is not capable of legal remedy since it is impossible to compass, assess and calculate. Blacklisting from an industry has been held to constitute irreparable injury. *Gibson v. Berryhill*, 411 U.S. 564, 571-2 (1973) (harm to optometrists' ability to practice their profession is irreparable injury). The Ninth Circuit recently held, "the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages." *Nelson v. National Aeronautics and Space Admin.* 530 F.3d 865, 882 (9th Cir. 2008); and *see American Trucking Associations, Inc. v. City of Los Angeles* 559 F.3d 1046, 1059 (9th Cir. 2009)("the loss of one's [business] does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of [losses]."). *Cf. Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1071 (9thCir. 2000)(retaliatory blacklisting difficult to address with legal remedy).

In *Jordan v. Metropolitan Life Ins. Co.* 280 F.Supp.2d 104, 108 -09 (S.D.N.Y. 2003), the Court found irreparable injury would ensue from filing a negative U-5 Report on an insurance agent, which would damage his reputation and employment opportunities

25

with comparable insurance companies, "There is no doubt that the negative Form U-5 will substantially damage Jordan's reputation in the insurance industry." The Court went on to note that **"A negative Form U-5 "can effectively 'blackball' a [dealer] from the industry… There is no adequate remedy at law for Jordan's damages if MetLife mistakenly filed a false Form U-5." *Id.* at 108-109. (denying injunction for lack of likelihood of success on the merits); *See also Towers Fin. Corp. v. Dun & Bradstreet, Inc.,* 803 F.Supp. 820, 822-23 (S.D.N.Y.1992) (finding irreparable harm where "[plaintiff's] reputation among customers and potential customers will be severely damaged ... [and the injury] is both imminent and 'incapable of being fully remedied by monetary damages' "); *Crown Zellerbach Corp. v. Wirtz*, 281 F.Supp. 337 (D.D.C., 1968) (Paper manufacturer and union entitled to preliminary injunction against Secretary of Labor from directly or indirectly debarring manufacturer from further business with the government); *Miranda v. Guerrero,* 2009 WL 1381250 (S.D.Fla. 2009)(Court enjoined publication of nude photographs that would tend to interfere with an aspiring singer's chosen career).

Similarly, blackballing generally constitutes irreparable injury. *Pultz v. Economakis* 2005 WL 1845635, 7 (N.Y.Sup. 2005)(irreparable injury to tenants likely from landlord reporting rent strike participants to credit agencies). "Irreparable harm would ensue if the cooperative were not restrained from cancelling plaintiffs' shares or issuing negative information with respect to the rent strike participants to credit reporting agencies." *DeCastro v. Bhokari,* 201 A.D.2d 382, 383 (NY App. Div. 1st Dept.1994).

### 3.  Defendants' Unilateral Contract Changes Forced Upon Plaintiffs Will Cause Irreparable Harm

Plaintiffs are irreparably injured by Defendant's use of the ICOA/Lease provisions to secure contract modifications disadvantageous to Plaintiffs under the threat that Defendants will terminate the ICOA, repossesses the leased truck, claim all deposits and escrowed funds, while demanding all future lease payments.

In *Nelson v. National Aeronautics and Space Admin,* the Ninth Circuit found a Hobson's choice resulted for employees who failed to submit to a potentially unconstitutional required disclosure of personal medical information: "it is undisputed that if [employees] do not sign the SF 85 waiver by October 5, 2007," they will "be deemed to have voluntarily resigned," there exists a "concrete injury that is imminent and not hypothetical" and thus ripe for review. 530 F.3d 865, 873 (9th Cir. 2008). There the court granted the preliminary injunction finding that "the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages."Id. at 882. The same threat exists here, *i.e.,* that Plaintiffs will lose their opportunity to do gainful work. But Plaintiffs also bear the additional harm that combined with losing their jobs, here they will lose the means of plying their trade -- their trucks, lose all payments and deposits already made on them, lose their ability to work in their chosen profession (through negative DAC reporting), and also be subject to crushing debt burdens and collections, with no way to earn the funds to pay up.

### C.    THE BALANCE OF HARDSHIPS FAVORS ISSUANCE OF AN INJUNCTION

To determine which way the balance of the hardships tips, a court must identify the possible harm that would be caused to Defendants by a wrongfully issued preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Hawai'i Professional Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999)."[T]he entire preliminary injunction inquiry ... is intended to ensure that the district court 'choose[s] the course of action that will minimize the costs of being mistaken.' Thus, the real issue in this regard is the degree of harm that will be suffered by the Plaintiff or the Defendant if the injunction is *improperly* granted or denied." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) (emphasis in original.).

As demonstrated above, Plaintiffs will suffer grave and irreparable injury if a preliminary injunction is not issued, including loss of their trucks, loss of credit, harassment by bill collectors, and the likely inability to find work in their chosen profession as a result of negative credit and DAC reports from Defendants. Even if Plaintiffs ultimately succeed in demonstrating that the debts giving rise to these devastating collection practices are illegal and void, no judgment will be able to undo the harm caused by the collection practices and negative credit reporting that occurs between now and final judgment. On the other hand, Defendants will suffer little harm from a preliminary injunction, even if Plaintiffs ultimately fail to succeed on the merits. *See Guerrero v. RJM Acquisitions LLC,* 499 F.3d 926, 948-49 (9th Cir. 2007); *Lopez v. Town of Cave Creek, AZ*, 559 F.Supp.2d 1030, 1036 (D.Ariz. 2008) ("Plaintiffs, as day laborers, face not only the loss of First Amendment freedoms, but also the loss of employment opportunities necessary to support themselves and their families."); *Wood v. County of Alameda*, 1995 WL 705139, at * 16 (N.D.Cal. Nov. 17, 1995) (plaintiff's specific financial problems, including fact that she had no financial resources and exhausted all sources of benefits constituted the type of "circumstances which can cause sufficient irreparable injury to support granting a preliminary injunction."). The injunction requested by Plaintiffs only delays Defendants' collection efforts while the legality of the underlying debt is litigated. If the Court ultimately concludes that the Lease/ICOA contract is not unconscionable or otherwise contrary to law, there will be ample time for Defendants to pursue the collection practices allowed them under the Lease/ICOA agreement.

Nor are defendants harmed by being precluded from threatening to put drivers in default if they fail to agree to contractual modifications. If a contract change is legitimate (either because it advantages Plaintiffs or corrects ambiguity), such overweening coercion will not be necessary or appropriate. In short, the balance of hardships to

Plaintiffs from wrongfully refusing the injunction compared to the hardship to Defendants from a wrongfully granted injunction clearly tips in Plaintiffs' favor and justifies entry of the injunction.

### D.   THE PUBLIC INTEREST FAVORS ISSUANCE OF AN INJUNCTION

Here, the public interest favors allowing truckers to secure other employment or credit needed to live or drive, and not to be badgered by bill collectors while litigation over the lawfulness of Defendants' Lease/ICOA is concluded. The cases cited above demonstrate a strong public interest in prohibiting debt collections measures on unlawful debts. *See, e.g., McKesson Automated Healthcare, Inc.,* 779 N.Y.S.2d at 770 (noting that allowing a lessor to accelerate all payments due under a lease *and* seize the equipment "would impose an unconscionable forfeiture and penalty . . . and contravene public policy."). Further, the public policy of preventing collection of an unsubstantiated debt is so pervasive that it has been codified as a provision of the Fair Debt Collection Practices Act. *See Guerrero,* 499 F.3d at 948-949. The same public policy embodied in that Act applies here. Determining whether the alleged debts charged to Plaintiffs are lawful prior to permitting ongoing debt collection efforts supports the public interest. It is not in the public interest to allow unconscionable contract provisions to be enforced. Suspending Defendants' collection and reporting practices until the legality of the challenged provisions can be determined would best serve the public interest.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

Respectfully submitted this 22nd day of June, 2010.

1

2                                             s/Dan Getman

3

4                                             Dan Getman
                                              Getman & Sweeney, PLLC
5                                             9 Paradies Lane
                                              New Paltz, NY 12561
6                                             Telephone:  (845) 255-9370

7

8                                             Susan Martin
                                              Daniel Bonnett
9                                             Jennifer Kroll
                                              Martin & Bonnett, P.L.L.C.
10                                            1850 N. Central Avenue, Suite 2010
                                              Phoenix, Arizona 85004
11                                            Telephone:  (602) 240-6900

12

13                                            Edward Tuddenham
                                              1339 Kalmia Rd. NW
14                                            Washington, DC 20012

15

16                                            ATTORNEYS FOR PLAINTIFFS

17

18

19

20

21

22

23

24

25

26

27

28

30

1

## CERTIFICATE OF SERVICE

2

   I hereby certify that on June 23, 2010, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing.

4

s/ Anibal Garcia

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28