1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   RONALD J. HOLLAND, Cal. Bar No. 148687 *(Pro Hac Vice)*
3  rholland@sheppardmullin.com
   ELLEN M. BRONCHETTI, Cal. Bar No. 226975 *(Pro Hac Vice)*
4  ebronchetti@sheppardmullin.com
   PAUL S. COWIE, Cal. Bar No. 250131 *(Pro Hac Vice)*
5  pcowie@sheppardmullin.com
   Four Embarcadero Center, 17th Floor
6  San Francisco, California 94111-4109
   Telephone:  415-434-9100
7  Facsimile:  415-434-3947

8  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
9    Including Professional Corporations
   ROBERT MUSSIG, Cal. Bar No. 240369 *(Pro Hac Vice)*
10 rmussig@sheppardmullin.com
   ANNA M. STANCU, Cal. Bar No. 288283 *(Pro Hac Vice)*
11 astancu@sheppardmullin.com
   333 South Hope Street, 43rd Floor
12 Los Angeles, California 90071
   Telephone:  213-620-1780
13 Facsimile:  213-620-1398

14 Attorneys for Defendants
   SWIFT TRANSPORTATION CO. OF
15 ARIZONA, LLC, INTERSTATE EQUIPMENT
   LEASING, LLC, CHAD KILLEBREW and
16 JERRY MOYES

17                 UNITED STATES DISTRICT COURT

18                 FOR THE DISTRICT OF ARIZONA

19

| | |
|---|---|
| 20  VIRGINIA VAN DUSEN; JOHN DOE 1; and JOSEPH SHEER, individually and on behalf of all other similarly situated persons, | Case No. CV 10-899-PHX-JWS |
| 22            Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF VICKII SCHWALM'S STATUS AS AN INDEPENDENT CONTRACTOR** |
| 24  v. | |
| 25  SWIFT TRANSPORTATION CO., INC.; INTERSTATE EQUIPMENT LEASING, INC.; CHAD KILLIBREW; and JERRY MOYES, | [Filed concurrently with Notice of Motion, Separate Statement, Request for Judicial Notice, and Declarations of Anna M. Stancu and Robert Mussig] |
| 27          Defendants. | |

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. RELEVANT FACTUAL BACKGROUND ...................................................... 2

    A.    Schwalm's History With Swift And Her ICOAs ................................ 2

    B.    Schwalm Determined The Way She Performed Her Work As An Owner-Operator ................................................................................. 3

    C.    Schwalm Made Significant Investments In Equipment And Materials, And Could Hire Labor As An Owner-Operator ................................... 6

    D.    As An Owner-Operator, Schwalm Had Opportunity To Make Significant Profit Or Experience Loss Depending On Her Managerial Skill ................................................................................................... 7

    E.    As An Owner-Operator, Schwalm's Work Required Specialized Skill .......... 7

    F.    The Parties' Intention Was To Form An Independent Contractor Relationship ...................................................................................... 8

    G.    As An Owner-Operator, Schwalm Was Paid By The Job And Received A 1099 Form ......................................................................... 8

III. LEGAL STANDARD ...................................................................................... 8

IV. SCHWALM WAS PROPERLY CLASSIFIED AS  AN INDEPENDENT CONTRACTOR ............................................................................................... 9

    A.    Schwalm Exhibited Complete Control Over The Manner and Means Of Performing Her Work ................................................................... 11

    B.    Schwalm Could Select What Loads She Wanted To Pick Up, Could Decline Loads, And Independently Determined Her Work Schedule ......... 12

    C.    Schwalm Made Significant Investments In Her Equipment, Material, And Tools, And Could Hire Employees If She So Chose ............................ 13

    D.    Schwalm Could (And Did) Have Her Own Business, Considered Herself A "Successful Businesswoman," And She Admits Her Opportunity For Profit Or Loss Was Based On Her Specialized Managerial Skill .............................................................................. 14

    E.    Schwalm Was Paid Via Weekly Settlements, Did Not Receive Employee Benefits, And Was Treated As An Independent Contractor For Tax Purposes .............................................................................. 15

    F.    Courts In Analogous Cases Have Found That Drivers Were Properly Classified As Independent Contractors ............................................. 16

V. CONCLUSION ........................................................................................................ 17

MEMORANDUM OF P'S AND A'S ISO MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO PLAINTIFF VICKII SCHWALM'S STATUS AS AN INDEPENDENT CONTRACTOR

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Addisu v. Fred Meyer, Inc.*
   198 F.3d 1130 (9th Cir. 2000)............................................................................ 9

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ............................................................................... 8, 9

*Arpin v. Santa Clara Valley Transp. Agency*
   261 F.3d 912 (9th Cir. 2001)............................................................................ 9

*Aviles v. Quik Pick Express, LLC*
   No. CV-15-5214-MWF (AGR), 2015 U.S. Dist. LEXIS 174960 (C.D.
   Cal. Dec. 3, 2015) .......................................................................... 9, 16

*Bell v. Atl. Trucking Co.*
   No. 3:09-cv-406-J-32MCR, 2009 U.S. Dist. LEXIS 114342 (M.D. Fla.
   Dec. 7, 2009)............................................................................... 9

*Carney v. JNJ Express, Inc.*
   10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) ...................................................... 16

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ........................................................................... 8

*Chao v. Mid-Atlantic Installation Servs.*
   16 Fed. Appx. 104 (4th Cir. 2001) ..................................................................... 14

*Cmty. for Creative Non-Violence v. Reid*
   490 U.S. 730 (1989)........................................................................... 9, 10

*Davis v. Larson Moving & Storage Co.*
   No. 08-1408, 2008 U.S. Dist. LEXIS 87251 (D. Minn. Oct. 27, 2008) ................. 10, 16

*Dole v. Amerilink Corp.*
   729 F. Supp. 73 (E.D. Mi. 1990).................................................................... 14

*Donovan v. Sureway Cleaners*
   656 F.2d 1368 (9th Cir. 1981)........................................................................ 11

*Nationwide Mut. Ins. Co. v. Darden*
   503 U.S. 318 (1992) ........................................................................ 10

*Real v. Driscoll Strawberry Associates, Inc.*
    603 F.2d 748 (9th Cir. 1979) ......................................................................... 11

*Salamon v. Our Lady of Victory Hosp.*
    514 F.3d 217 (2nd Cir. 2008) ........................................................................ 10

*Tarin v. County of Los Angeles*
    123 F.3d 1259 (9th Cir. 1997) ......................................................................... 8

*Wolcott v. Nationwide Mut. Ins. Co.*
    884 F.2d 245 (6th Cir. 1989) ......................................................................... 15

*Young v. Swift Transportation Co. of Arizona LLC*
    State of California Labor Commissionor Case No. 08-46182 RR .......................... 13, 17

Statutes

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ..................................................... 1, 9, 10

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* .................................................... 10

Fair Labor Standards Act, 29 U.S.C. § 203(d), (e)(1), (g) ......................................... 11

Other Authorities

Fed. R. of Civ. Proc. 56(c) ................................................................................. 8

1

### I. <u>INTRODUCTION</u>

2      Plaintiff Vickii Schwalm performed truck driving services for Defendant Swift

3   Transportation Co., Inc. as an independent contractor/Owner-Operator.  Although

4   Schwalm signed an Independent Contractor Operating Agreement ("ICOA") with Swift

5   which clearly and unmistakably specified her status as an independent contractor, she now

6   claims that she was misclassified and was actually an employee.  Schwalm's claim fails as

7   a matter of law.  The undisputed evidence shows that Schwalm was unequivocally an

8   independent contractor under the applicable legal standard.[1]

9      Swift did not exert employer-like control over Schwalm during the time she was an

10  Owner-Operator – the most crucial factor in determining whether an employment

11  relationship existed.  Schwalm maintained control over virtually every aspect of her work,

12  including how she managed her routes and the manner and means by which she delivered

13  freight.  For instance, Schwalm selected her own delivery routes, had the ability to turn

14  down loads without repercussion, and set her own work hours.  Further, Swift did not

15  provide Schwalm with, nor require her to follow, any of its company policies while she

16  was an Owner-Operator.  She also simultaneously established her own trucking business

17  while working as an Owner-Operator for Swift, the success or failure of which depended

18  upon her own entrepreneurial and managerial skill.  Schwalm even admits that "she ran her

19  truck like a business," she was an "aggressive" business woman, and her business was

20  successful due to her own business decisions and approach.  Finally, Schwalm supplied all

21  of her own equipment (including her truck), paid her own expenses, paid her own taxes,

22  and had the ability to hire employees and work for other carriers if she chose.

23      As is clear from Schwalm's deposition testimony, as well as the language in her

24  _____

[1]  Because Schwalm was properly classified as an independent contractor, her ICOA,

25  which contains an arbitration provision, is not a "contract of employment."  Thus, her

    claims are not exempt from arbitration under Section 1 of the Federal Arbitration Act

26  ("FAA").  *See* 9 U.S.C. §1 (exempting "contracts of employment . . . of workers engaged

27  in foreign or interstate commerce" from the FAA).  She should therefore be required to

    arbitrate her claims.

28

ICOA and the Equipment Leasing Agreement she signed with Defendant Interstate Equipment Leasing, Inc., there is no aspect of Schwalm's work as an Owner-Operator that is indicative of an employment relationship, and she was properly classified as an independent contractor.  No reasonable trier of fact could weigh the evidence and reach a contrary conclusion.  Accordingly, the Court should find that Schwalm was properly classified as an independent contractor during her time as an Owner-Operator.

## II.  RELEVANT FACTUAL BACKGROUND

### A. Schwalm's History With Swift And Her ICOAs

Schwalm was originally hired by Swift as an employee driver.  (Deposition of Vickii Schwalm ("Schwalm Depo.") at 13:14-14:1.)  That was on April 6, 2005.  (*Id.*)  During her five-year employment as a Swift company driver, Schwalm studied the trucking industry, met with trucking industry planners, and conducted "a lot of research," with the intention of starting her own trucking business. (Undisputed Material Fact ("UMF") 1.)  On May 21, 2010, Schwalm started her trucking business, Already There Trucking, and became an Owner-Operator for Swift. (UMFs 2-3.)  On that date, she entered into an ICOA with Swift which set forth the terms and conditions of the parties' independent contractor relationship. (UMF 4.)  The ICOA unequivocally states that "[Schwalm] shall be considered an Independent Contractor and not an employee of [Swift]."  (UMF 5.)  It also states in no uncertain terms that Schwalm:  (1) was solely responsible for determining the "method, means and manner" of performing work and providing services under the ICOA, (2) was not required to purchase or rent any products, equipment, or services from Swift, (3) had no obligation to accept any loads tendered by Swift, (4) had no obligation to purchase fuel from Swift, (5) was solely responsible for proving the equipment and the labor necessary to perform all work under the ICOA, (6) was solely responsible for paying her own operating and maintenance expenses, and (7) and (7) was entitled to haul for other carriers as long as she removed any Swift indicia from her truck.  (UMF 6-11, 81.)  The terms of the ICOA clearly indicate that Schwalm was properly classified as an independent contractor.

Swift terminated its independent contractor relationship with Schwalm in June 2012.  In total, she was only an Owner-Operator for approximately two years.

**B.  Schwalm Determined The Way She Performed Her Work As An Owner-Operator**

As an Owner-Operator, Schwalm exercised control over nearly every aspect of the way she performed her work.

Schwalm did not undergo any training or orientation as an Owner-Operator, and did not receive any instructions on how to carry out her work. (UMF 12, 14.)  Swift did not provide her with, nor require her to be familiar with, any Swift policies or procedures as an Owner-Operator. (UMF 15.)  She did not receive a handbook as an Owner-Operator. (UMF 13.)  Swift did not evaluate her based on any set of rules or policies as an Owner-Operator, nor did it hold her to any rules or policies. (UMF 16.)  Also, Swift did not evaluate her performance when she was an Owner-Operator. (UMF 17.)

By stark contrast, when Schwalm was an ***employee*** driver for Swift, she was required to undergo extensive training and orientation, and was closely supervised and regularly evaluated.  (Schwalm Depo. at 14:20-21:21, 23:19-26:22.)  Indeed, as an employee, Schwalm underwent six full weeks of "24/7" training with a Swift-appointed mentor, during which time Swift taught her not only how to drive a truck, but also trained her on all rules, regulations, policies, and procedures applicable to Swift employees. (Schwalm Depo. at 14:20-21:21.)  The employee training Schwalm underwent when she was an employee driver also specifically covered appropriate attire and appearance, the employee code of conduct, and other requirements she was expected to follow.  (*Id.*)  During the orientation she completed as an employee driver, Swift provided Schwalm with an employee handbook, which she understood she had to abide by.  (*Id.*)  Schwalm understood, when she was an employee, that she could be terminated for failing to follow any of Swift's policies or procedures.  (Schwalm Depo. at 20:15-20.)  During her employment with Swift, Schwalm received yearly performance evaluations in which she was scored on her conduct and performance.  (Schwalm Depo. at 23:19-26:22.)  A poor evaluation would negatively affect her compensation.  (Schwalm Depo. at 26:5-22.)

1   Swift did not control Schwalm's working hours when she was an Owner-Operator.

2   (UMF 18.)  Swift did not determine or even suggest when Schwalm should start work for

3   the day, end work for the day, or how long she was required to work on any given day.

4   (UMF 19.)  To the contrary, Schwalm unilaterally set the expectation that she would be a

5   "high miles driver," (i.e., work long hours) and conveyed to Swift that if her expectations

6   in this regard were not met, she would end her contractual relationship with Swift. (UMF

7   20.)  Moreover, Schwalm could decide when she wanted to return to her home terminal

8   and take time off.  (Deposition of Dave Berry ("Berry Depo.") at 46:22-47:11.)  By

9   contrast, when Schwalm was an employee driver for Swift, Swift set her hours of work and

10  required her to take breaks during her shifts.  (Schwalm Depo. at 38:11-39:6.)

11  Swift also did not require Schwalm to take any particular route when delivering her

12  freight, nor to visit any particular fueling station, repair shop, or maintenance shop. (UMF

13  21.)  While Swift suggested routes, it was Schwalm's personal preference to use the route

14  that Swift suggested because it was often the most direct route. (UMF 22.)  She felt that

15  Swift's recommended routes were optimal for maximizing efficiency in delivering freight.

16  (UMF 23.)  She understood that these recommended routes were strictly provided to assist

17  her with trip planning but were not *required* routes. (UMF 24.)  She understood she could

18  travel any route she chose and fuel at any location she desired. (UMF 25.)  However, if she

19  could find a shorter route, she would do so and use her own route. (UMF 26.)  Nobody

20  from Swift ever contacted her to criticize or question the route she took. (UMF 27.)

21  Schwalm was not required to inform Swift that she was taking a different route than the

22  optional route provided to her.  (Berry Depo. at 96:10-15.)  Moreover, Schwalm could also

23  chose whatever fueling stops, repair shops, and maintenance shops she wanted. (UMF 28.)

24  She did not suffer any negative consequence for using locations that Swift did not

25  recommend. (UMF 29.)

26  Additionally, Schwalm was free to accept and decline freight loads offered to her as

27  an Owner-Operator. (UMF 30.)  It was entirely her choice *not* to turn down load offerings.

28  (UMF 31.)  She made that choice because she wanted to maximize her revenue. (UMF 32.)

1 She took the opportunity to deliver every load she could to maximize profit. (UMF 32.)
2 Nor was Schwalm ever instructed or required to haul freight for any particular customer as
3 an Owner-Operator. (UMF 33.)  Swift provided her with the option of working on a
4 "dedicated route" (i.e., delivering for one particular customer), and Schwalm was aware of
5 other drivers who preferred to work dedicated routes and opted to do so as Owner-
6 Operators, but Schwalm chose to decline this option. (UMF 34-35)  Schwalm's preference
7 was driving cross-country as opposed to dedicated routes, because she felt the former
8 provided the opportunity to make more revenue. (UMF 36.) It was entirely Schwalm's
9 choice to drive cross-country routes as opposed to dedicated routes. (UMF 37.)

10 　　　　Swift also had no control over Schwalm's appearance as an Owner-Operator.  She
11 was not required to wear a uniform, nor adhere to any rules regarding her attire. (UMF 38.)

12 　　　　Schwalm was not required to communicate, check in, or interact with anyone from
13 Swift while she was carrying out her work. (UMF 39.)  She did not have a supervisor.
14 (UMF 40.)  She did not receive any instructions on how to perform her work as an Owner-
15 Operator. (UMF 41.)  Nobody from Swift met with her at pick-up or drop-off sites. (UMF
16 42.)  All of Schwalm's communications with Swift when she was an Owner-Operator were
17 initiated by her. (UMF 43.)  She would consistently go several days without any inter-
18 action with Swift while she was working. (UMF 44.) She never communicated with IEL.
19 (UMF 45.)

20 　　　　Swift did not control who drove with or for Schwalm.  As an Owner-Operator,
21 Schwalm could drive in a "team" if she preferred. (UMF 46.)  She chose not to, as she
22 preferred driving alone. (UMF 47.)  As an Owner-Operator, she could also assign someone
23 of her choosing to deliver freight or perform other work in her place. (UMF 48.)  Although
24 Schwalm considered various ideas on how to run her Owner-Operator business, she
25 ultimately decided the ideal business model for her involved herself and her own truck, as
26 opposed to a fleet and other employees. (UMF 49.)  However, Swift did not take part in
27 that decision; rather it was Schwalm's choice to make. (UMF 50.)  Also, as an Owner-
28 Operator, she could also have a passenger ride with her while she performed her work.

(UMF 51.)  As an employee driver, by contrast, Schwalm was not able to hire or team up with other people, but rather was required to perform all work herself.  (Schwalm Depo. at 60:19-61:2).

Finally, Schwalm could use her truck for personal reasons and did not have to seek approval to do so. (UMF 52.)  By contrast, as an employee driver, Schwalm was required to obtain approval if she ever wanted to use the truck for any personal reason, such as to go home.  (Schwalm Depo. at 38:11-39:6.)

## C. Schwalm Made Significant Investments In Equipment And Materials, And Could Hire Labor As An Owner-Operator

When Schwalm was an employee driver, Swift provided her with all the equipment and tools she needed to perform her work and did not permit her to hire others to carry out her job duties.  (Schwalm Depo. at 36:5-37:2.) As an Owner-Operator, by contrast, neither Swift nor IEL provided anything to Schwalm that she needed to run her business. (UMF 53.)  As an Owner-Operator, Schwalm was required to invest in her own equipment and make all purchases herself.  She invested thousands of dollars into her truck. (UMF 54.) Schwalm knew she was free to obtain the truck from anywhere she wanted. (UMF 55.) Schwalm was responsible for the repair, maintenance, and upkeep of her truck as an Owner-Operator. (UMF 56.)  She paid for her own damage insurance, health insurance, and workers' compensation insurance as an Owner-Operator. (UMF 57.)  She rented her own Qualcomm system, a common means of communication in the trucking industry which could be used with other trucking companies. (UMF 58.)  She also purchased her own transponder, which she could use on toll roads and weigh stations, because she believed it optimized her use of time. (UMF 59.)  Indeed, Swift did not provide her with *anything* she needed to perform her work as an Owner-Operator free of charge, including fuel. (UMF 53.)

Critically, Schwalm could hire drivers, driver helpers, and laborers to work for her as an Owner-Operator. (UMF 60.)  She knew other Owner-Operators working with Swift who hired drivers to work for them. (UMF 61.)  After careful consideration, Schwalm

MEMORANDUM OF P'S AND A'S ISO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF VICKII SCHWALM'S STATUS AS AN INDEPENDENT CONTRACTOR

decided that hiring other drivers was not a smart move for her own business, but was well aware that the decision was entirely hers to make. (UMF 62.)  Also, Schwalm was able to operate **multiple** trucks if she chose. (UMF 63.)

### D.  As An Owner-Operator, Schwalm Had Opportunity To Make Significant Profit Or Experience Loss Depending On Her Managerial Skill

Schwalm entered into an Owner-Operator relationship with Swift because she wanted to run a successful business of her own. (UMF 64.)  By her own testimony, Schwalm did just that and claims that she was quite successful as an Owner-Operator. (UMF 65.)  She attributes her success to the fact that she "ran [her] truck like a business." (UMF 66.)  She believes she was more successful than other Owner-Operators because she took on roles and tasks that she believed would benefit her business. (UMF 68.)  She conducted extensive research over the course of her five years as an employee driver regarding the trucking business and the operation of a truck before she went into business for herself as an Owner-Operator. (UMF 1.)  She knew exactly how many miles she had to drive her truck and at what pace she needed to operate to make a profit. (UMF 70.)  She made these determinations based on years of experience in the trucking industry. (UMF 70.)  She met and spoke with trucking industry planners in order to gain a fuller understanding of the ins and outs of the industry. (UMF 1.)  She structured her business in the way she felt would be most profitable. (UMF 71.)  Schwalm also attributes her success as an Owner-Operator to her reputation as an "aggressive business woman."  (UMF 67.) Schwalm admits her potential profitability as an Owner-Operator was essentially "limitless." (UMF 72.)

### E.  As An Owner-Operator, Schwalm's Work Required Specialized Skill

Schwalm brought years of trucking industry experience and specialized business skills to bear on her work as an Owner-Operator.  She attributes her success as an Owner-Operator to this specialized experience and skill.  By her own testimony, she made profit in her business because of her business acumen, extensive research regarding the industry, years of experience, and "aggressive" approach to running her business. (UMFs 1, 65-72.)

### F.  The Parties' Intention Was To Form An Independent Contractor Relationship

Both Schwalm and Swift intended to form an independent contractor relationship when they entered into the ICOA.  Schwalm became an Owner-Operator because she wanted to incorporate and develop her own business. (UMF 73.)  She understood that by entering into the ICOA, she was becoming a "business partner" of Swift and was no longer an employee. (UMF 75.)  Her goal was to run her business with five to six trucks, in partnership with Swift. (UMG 74.)  She understood that pursuant to the ICOA, she would have free will with respect to her use of her truck and that she could take on any work of her choosing. (UMF 76.)

### G.  As An Owner-Operator, Schwalm Was Paid By The Job And Received A 1099 Form

As an Owner-Operator, Schwalm was paid per the completion of each trip – not by the hour. (UMF 77.)  She was also paid via weekly settlements, while employees are paid through payroll checks. (UMF 78.)  Swift did not deduct taxes from her settlement payments. (UMF 79.)  She received an Internal Revenue Service ("IRS") Form 1099, not a W-2. (UMF 80.)

## III.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) requires the court to grant summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Once this is done, the burden shifts to the nonmoving party to go beyond the pleadings and identify "specific facts showing that there is a genuine issue for trial."  *Id*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

1    Only genuine disputes over facts that might affect the outcome of the suit will

2  properly preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.  If the

3  nonmoving party is unable to meet its burden of producing specific evidence from which a

4  reasonable trier of fact could return a verdict in its favor, summary judgment must be

5  granted.  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

6    Here, the evidence – including the language in Schwalm's independent contractor

7  and lease agreements and Schwalm's deposition admissions – clearly demonstrates that

8  Schwalm was properly classified as an independent contractor by Swift.  No reasonable

9  trier of fact could weigh the evidence and reach a contrary conclusion.  Summary

10  judgment on this issue is therefore appropriate.

### IV.  <u>SCHWALM WAS PROPERLY CLASSIFIED AS<br>AN INDEPENDENT CONTRACTOR</u>

12    The U.S. Supreme Court has not established a single rule or test for determining

13  whether an individual is an independent contractor or an employee.  Under the

14  circumstances in this case, the appropriate standard is the common law "agency" test.  The

15  issue in this case is whether Schwalm's independent contractor agreement with Swift was

16  a "contract of employment" under the FAA.  However, the FAA does not define the phrase

17  "contract of employment" or what it means to be an employee versus an independent

18  contractor.  When a statute does not define "terms that have accumulated settled meaning

19  under … the common law, a court must infer … that Congress mean[t] to incorporate the

20  established [common law] meaning of these terms."  *Cmty. for Creative Non-Violence v.*

21  *Reid*, 490 U.S. 730, 739 (1989).  Accordingly, courts apply the general common law of

22  agency in determining whether an individual is an independent contractor or employee for

23  FAA purposes.  *Aviles v. Quik Pick Express, LLC*, No. CV-15-5214-MWF (AGR), 2015

24  U.S. Dist. LEXIS 174960, at *9-13 (C.D. Cal. Dec. 3, 2015) (applying common law

25  agency test to determine whether putative class members were independent contractors or

26  employees under the FAA); *Bell v. Atl. Trucking Co.*, No. 3:09-cv-406-J-32MCR , 2009

27  U.S. Dist. LEXIS 114342, at *12-20 (M.D. Fla. Dec. 7, 2009) (same); *Davis v. Larson*

28

-9-

MEMORANDUM OF P'S AND A'S ISO MOTION FOR PARTIAL SUMMARY JUDGMENT<br>AS TO PLAINTIFF VICKII SCHWALM'S STATUS AS AN INDEPENDENT CONTRACTOR

*Moving & Storage Co.*, No. 08-1408 (JNE/JJG), 2008 U.S. Dist. LEXIS 87251, 17-18 (D. Minn. Oct. 27, 2008) (same); *accord Reid*, 490 U.S. at 740 (applying general common law of agency to define "employee" under the Copyright Act); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (applying general common law of agency to define "employee" under the Employee Retirement Income Security Act).

Under the common law analysis of agency, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mut. Ins. Co.*, 503 U.S. at 323. The Court must considers a number and variety of factors, including:

(1) The hiring party's right to control the manner and means by which the product is accomplished;
(2) The skill required;
(3) The source of the instrumentalities and tools;
(4) The location of the work;
(5) The duration of the relationship between the parties;
(6) Whether the hiring party has the right to assign additional projects to the hired party;
(7) The extent of the hired party's discretion over when and how long to work;
(8) The method of payment;
(9) The hired party's role in hiring and paying assistants;
(10) Whether the work is part of the regular business of the hiring party;
(11) Whether the hiring party is in business;
(12) The provision of employee benefits; and
(13) The tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52. "Other relevant factors may also be considered so long as they are drawn from the common law of agency." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2nd Cir. 2008). Applying these factors to the facts of this case, it is clear that Schwalm was properly classified as an independent contractor.[2]

---

[2]   There have been previous references in this case to the "economic realities" test for determining whether an individual is an independent contractor or employee. However, the economic realities test only applies when making such a determination under the Fair Labor Standards Act of 1938, 29 U.S.C. 201 *et seq.* ("FLSA"). The common law agency test is not used because, unlike the FAA, the FLSA expressly defines the terms "employer", "employee," and "employ." *See* 29 U.S.C. § 203(d), (e)(1), (g). The

Here, Schwalm's own admissions demonstrate that she was properly classified as an independent contractor during the time she was an Owner-Operator for Swift.  As explained above, Schwalm's deposition testimony shows that she was able to control the manner and means of completing her work, determine what routes and loads she chose, set her own hours, provide her own tools, hire her own employees, and establish her own business, the success or failure of which was dependent upon her own business acumen. Further, Schwalm's ICOA and leasing agreement stated in no uncertain terms that she was an independent contractor, and the terms and conditions of these agreements exerted nominal control over Schwalm.  The entirety of these factors show that Schwalm was properly classified as an independent contractor as a matter of law.

## A. Schwalm Exhibited Complete Control Over The Manner and Means Of Performing Her Work

The undisputed evidence demonstrates that Schwalm had full control over the manner and means of performing her work.  As described above, it is undisputed that:

---

economic realities test focuses on "whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service."  *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (citations and quotations omitted). The test analyzes the following a non-exhaustive list of six-factors to make this determination:

(1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
(3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
(4) whether the service rendered requires a special skill;
(5) the degree of permanence of the working relationship; and
(6) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979) (holding that whether someone is an employee or independent contractor is determined "upon the circumstances of the whole activity").  The factors under the economic realities test are essentially a subset of the factors under the common law agency test.  Regardless of which test the Court applies, Schwalm was an independent contractor, not an employee, as set forth below.

- Schwalm did not undergo any training or orientation as an Owner-Operator and did not receive any instructions on how to execute her work. (UMF 12, 14.) She did not receive any handbook as an Owner-Operator. (UMF 13.)

- Swift did not evaluate Schwalm based on any set of rules or policies as an Owner-Operator, nor did it hold her to any rules or policies. (UMF 16.)

- Schwalm did not have a supervisor. (UMF 40.) No one from Swift or IEL contacted her to "check up" on her work. (See UMF 43.) Nobody from Swift met with her at pick-up or drop-off sites. (UMF 42.) All of Schwalm's communications with Swift when she was an Owner-Operator were initiated by her. (UMF 43.) She would go days at a time without speaking to Swift. (UMF 44.) She never communicated with IEL. (UMF 45.)

- Swift did not require Schwalm to take any particular route when delivering her freight, and she could choose to take Swift's recommended route or not based on her own personal business judgment. (UMFs 21-26.)

- Schwalm could visit any fueling station, repair shop, or maintenance shop of her choosing. (UMFs 9, 21, 25, 28-29.)

- Schwalm chose to work a cross-country route instead of a dedicated route because in her judgment a cross-country route would be more profitable. (UMF 36.)

- Swift did not control Schwalm's appearance in any way and did not require her to wear a uniform. (UMF 38.)

- Schwalm could assign someone of her choosing to deliver freight or perform other work in her place. (UMF 48.)

- Schwalm could use her truck for personal reasons and did not have to get Swift's approval to do so. (UMF 52.)

- Swift did not control who drove with or for Schwalm. Schwalm could work as a "team" with another driver, or she could ride with a passenger. (UMFs 46, 51.)

Schwalm's experience is consistent with the terms and conditions of her ICOA with Swift. Based on the above, it is clear that Swift had little or no control over any facet of how Schwalm performed her work. Moreover, her experience as an Owner-Operator vastly differed from her experience as an employee at Swift, during which time Swift exerted considerable control over her work. (*See* Section II B.)

Because Schwalm admits she had full control over the manner and means of performing her work, this factor weighs in favor of an independent contractor relationship.

## B.  Schwalm Could Select What Loads She Wanted To Pick Up, Could Decline Loads, And Independently Determined Her Work Schedule

The undisputed evidence shows that Swift had no control over what freight loads Schwalm decided to pick up, when she decided to work, or how long she chose to work for. Schwalm admits that Swift did not require her to accept any particular freight loads offered to her as an Owner-Operator. (UMFs 8, 30.) Schwalm rarely turned down loads

1   because she wanted to maximize her revenue. (UMFs 31-32.)  It was entirely her choice

2   *not* to turn down load offerings.  Nor was Schwalm ever instructed or required to haul

3   freight for any particular customer as an Owner-Operator. (UMF 33.)

4          Moreover, Swift did not control Schwalm's working hours when she was an

5   Owner-Operator. (UMF 18.)  Swift did not determine or even suggest when Schwalm

6   should start work for the day, end work for the day, or how long she was required to work

7   on any given day. (UMF 19.)  To the contrary, Schwalm set the expectation that she would

8   work long hours. (UMF 20.)  Moreover, Schwalm could decide when she wanted to return

9   to her home terminal and take time off.  (Berry Depo. 46:22-47:11.)  By contrast, when

10  Schwalm was an employee driver for Swift, *Swift* set her hours of work, including

11  requiring her to take breaks during her shifts.  (Schwalm Depo. at 38:11- 39:6, 40:4-13.)

12         Schwalm's ability to select of what loads she would pick up and set her own hours

13  of work also weighs in favor of her being properly classified as an independent contractor.

14  **C.   Schwalm Made Significant Investments In Her Equipment, Material, And Tools, And Could Hire Employees If She So Chose**

15         As explained above, Schwalm made a significant investment into the

16  instrumentalities of her work.  She invested of thousands of dollars into her truck. (UMF

17  54.)  Schwalm knew she was free to obtain the truck from anywhere [she] wanted. (UMF

18  55.)  Schwalm was responsible for the repair, maintenance, and upkeep of her truck as an

19  Owner-Operator. (UMF 56.)  She paid for her own damage insurance, health insurance,

20  and workers' compensation insurance as an Owner-Operator. (UMF 57.)  She rented her

21  own Qualcomm system and transponder. (UMF 58.)  Indeed, IEL and Swift did not

22  provide her with ***anything*** she needed to perform her work, including fuel. (UMF 10-12,

23  53.)

24         This is in stark contrast to Schwalm's experience as an employee driver, during

25  which time Swift provided and paid for Schwalm's truck, gas, maintenance, repair, tolls,

26  insurance, and everything else she needed.  (Schwalm Depo. at 36:5-37:2, 124:6-9.)

27         Critically, Schwalm could hire drivers, driver helpers, and laborers to work for her

28

as an Owner-Operator – which was not the case when Schwalm was an employee driver. (UMF 60.)  After careful consideration, Schwalm decided not to hire other drivers, but acknowledges that this was her own decision. (UMF 62.)  Numerous courts have held that these circumstances weigh "strongly in favor" of concluding that an individual is an independent contractor.  *See Chao v. Mid-Atlantic Installation Servs.*, 16 Fed. Appx. 104, 107 (4th Cir. 2001) (explaining that expenditures on instrumentalities to perform work are usually expected of independent contractors but not of employees, who are given the tools to perform their job by their employer); *see also Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76 (E.D. Mi. 1990) (same).

**D.  Schwalm Could (And Did) Have Her Own Business, Considered Herself A "Successful Businesswoman," And She Admits Her Opportunity For Profit Or Loss Was Based On Her Specialized Managerial Skill**

As Schwalm testified, she entered into an Owner-Operator relationship with Swift because she wanted to run a successful business of her own. (UMF 64.)  She eventually developed her own business, Already There Trucking. (UMF 2.)  Schwalm admits that she was successful as an Owner-Operator because she "ran [her] truck like a business."  (UMF 66.)  Schwalm, a self-proclaimed "aggressive" business woman, conducted extensive research over the course of her five years as an employee driver regarding the trucking business and the operation of a truck before she went into business as an Owner-Operator. (UMFs 1, 67.)  Based upon this research, she knew exactly how many miles she had to drive her truck and at what pace she needed to operate to make a profit. (UMF 69.)  She met and spoke with trucking industry planners in order to gain a fuller understanding of the ins and outs of the industry. (UMF 1.)  Schwalm honed her business knowledge managerial skills, and structured her business in a way that it would be the most profitable. UMF 1.)  Based on her acumen, experience, and aggressive approach, she was able to profit as an Owner-Operator. (UMF 1, 65-72.)  Indeed, Schwalm believes she was more successful than other Owner-Operators because of the decisions she made and the tasks that she took on. (UMF 68.)

In addition, Schwalm was able to hire additional help if she determined that doing

-14-

so would benefit her business demands and entrepreneurial design. (UMFs 60-61.)  Also, Schwalm was not prohibited from simultaneously performing work for other carriers if she believed that doing so was in the best interest of her business and bottom line.  (ICOA, ¶ 5(b).)

Schwalm could also fully control her costs (such as fuel costs, repairs, etc.) through efficient management.  For instance, she could decide whether or not to turn down loads because certain loads would not be fuel efficient or economical. (UMFs 30-31.)  Whether or not Schwalm efficiently managed her costs also affected her bottom line.

Given these circumstances, it is evident that Schwalm's managerial skill directly affected her profit or loss – which is a critical factor in determining whether she was properly classified as an independent contractor.  *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 251 (6th Cir. 1989) (applying the common law agency test to determine if an independent contractor relationship existed and finding that the fact that the plaintiff "exercised managerial skill in the operation of his business" weighed in favor of an independent contractor relationship)

**E.  Schwalm Was Paid Via Weekly Settlements, Did Not Receive Employee Benefits, And Was Treated As An Independent Contractor For Tax Purposes**

Swift's method of payment to Schwalm is wholly indicative of an independent contractor relationship.  As an Owner-Operator, Schwalm was paid per completed trip – not by the hour. (UMF 77.)  She was also paid via weekly settlements, while Swift's employees are paid through payroll checks. (UMF 78.)  Schwalm received an IRS Form 1099 and was paid as an independent contractor for tax purposes, while employee drivers receive a W-2 form. (UMF 80.)  Thus, Swift's payment method to Schwalm drastically differed from its payment method to its employees.  In addition, Schwalm did not receive any employee benefits from Swift while she was an Owner-Operator. (UMF 10-11, 57.)

These factors further weigh in favor of finding that Schwalm was properly classified as an independent contractor.

**F.  Courts In Analogous Cases Have Found That Drivers Were Properly Classified As Independent Contractors**

In the trucking industry, it is extraordinarily common for companies to enter into contractual service agreements with independent contractor drivers.  These independent contractor relationships are an integral facet of the trucking industry.  Numerous courts that have examined these relationships have found that drivers in similar situations as Schawlm were properly classified as independent contractors.  For instance, in *Aviles*, 2015 U.S. Dist. LEXIS 174960, *11-13, the court found that a putative class of truck drivers were independent contractors because: (1) drivers set their own schedule; (2) the company did not instruct the drivers on what routes to take or when and where to stop for fuel; (3) drivers had the ability to turn down as many loads as they wished; (4) drivers were able to lease truck from the company or any other dealer; (5) drivers could hire their own employees; (6) drivers could balance their loads as they saw fit in order to increase efficiency; (7) drivers could work for other companies; and (8) drivers received no employment benefits and were not subject to income or payroll tax withholdings.  Like in *Aviles*, all of these factors are satisfied here.

Similarly, truck drivers in *Carney v. JNJ Express, Inc.*, 10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) were considered independent contractors because they were "responsible for determining the means of their performance under the Leases, including equipment, routes, and scheduling."  The court also noted the fact that they were "responsible for costs such as fuel, oil, maintenance and repairs, primary insurance, and worker's compensation insurance," showed that they were not employees.  *Id.*  Again, this situation is directly analogous to Schwalm's relationship with Swift.

In yet another nearly identical situation, in *Davis v. Larson Moving & Storage Co.*, 2008 U.S. Dist. LEXIS 87251, 17-18 (D. Minn. Oct. 27, 2008), the Court found that a truck driver was properly classified as an independent contractor because:

> Plaintiff was required to provide his own truck.  Plaintiff assumed control over selection of routes and fuel stops, decisions about maintenance of his truck, arrangements for loading and unloading his truck, and scheduling work hours and rest periods, subject to legal requirements and the needs of Defendant's customers.  Plaintiff was permitted to hire additional personnel

to perform services under the lease, with Plaintiff assuming responsibility for hiring, supervision, and compensation of the additional personnel.  Plaintiff could elect to reject specific shipments and could choose to be unavailable to Defendant for reasonable periods of time.

As in *Davis*, all of these factors are present in this case and weigh in favor of finding that Schwalm was an independent contractor.

Finally, in *Young v. Swift Transportation Co. of Arizona*, LLC, Case No. 08-46182 RR, the California Labor Commissioner examined whether Swift's Owner-Operators are misclassified as independent contractors and determined they are not.  (Request for Judicial Notice, ¶ 1, Exh. 1.)  The Labor Commissioner found that a plaintiff Owner-Operator "maintained control of his own work load" because he was able to choose which loads he accepted and rejected without consequence.  The Labor Commissioner also determined that the plaintiff could perform work for other parties, as long as Swift indicia was removed from his truck.  **Based on these facts, the Labor Commissioner held that the Owner-Operator was properly classified as an independent contractor**.  The issues in this case have already been adjudicated in Swift's favor.  There is no reason for this Court to deviate from the Labor Commissioner's findings.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the instant Motion for Partial Summary Judgment and enter an order finding that Schwalm was properly classified as an independent contractor.

Dated:  June 10, 2016                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By_____/s/ Robert Mussig_____
                    RONALD HOLLAND
                    ELLEN M. BRONCHETTI
                    PAUL S. COWIE
                    ROBERT MUSSIG
                    Attorneys for Defendants
           SWIFT TRANSPORTATION CO. OF ARIZONA,
           LLC, INTERSTATE EQUIPMENT LEASING, LLC,
           CHAD KILLEBREW and JERRY MOYES

-17-