1
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2
   Including Professional Corporations
RONALD J. HOLLAND, Cal. Bar No. 148687 *(Pro Hac Vice)*
3
rholland@sheppardmullin.com
ELLEN M. BRONCHETTI, Cal. Bar No. 226975 *(Pro Hac Vice)*
4
ebronchetti@sheppardmullin.com
PAUL S. COWIE, Cal. Bar No. 250131 *(Pro Hac Vice)*
5
pcowie@sheppardmullin.com
Four Embarcadero Center, 17th Floor
6
San Francisco, California 94111-4109
Telephone:    415-434-9100
7
Facsimile:    415-434-3947

8
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
9
   Including Professional Corporations
ROBERT MUSSIG, Cal. Bar No. 240369 *(Pro Hac Vice)*
10
rmussig@sheppardmullin.com
ANNA M. STANCU, Cal. Bar No. 288283 *(Pro Hac Vice)*
11
astancu@sheppardmullin.com
333 South Hope Street, 43rd Floor
12
Los Angeles, California 90071
Telephone:    213-620-1780
13
Facsimile:    213-620-1398

14
Attorneys for Defendants
SWIFT TRANSPORTATION CO. OF
15
ARIZONA, LLC, INTERSTATE EQUIPMENT
LEASING, LLC, CHAD KILLEBREW and
16
JERRY MOYES

17
UNITED STATES DISTRICT COURT

18
FOR THE DISTRICT OF ARIZONA

19
VIRGINIA VAN DUSEN; JOHN DOE 1; and JOSEPH SHEER, individually and on
20
behalf of all other similarly situated persons,
21

Plaintiffs,
22

23
v.

24
SWIFT TRANSPORTATION CO., INC.; INTERSTATE EQUIPMENT LEASING,
25
INC.; CHAD KILLIBREW; and JERRY MOYES,
26

Defendants.

27

28

Case No. CV 10-899-PHX-JWS

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF PETER WOOD'S STATUS AS AN INDEPENDENT CONTRACTOR**

[Filed concurrently with Notice of Motion, Separate Statement, Request for Judicial Notice, and Declarations of Anna M. Stancu and Robert Mussig]

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................... 1

II.  RELEVANT FACTUAL BACKGROUND ........................................... 2

    A.  Wood's History With Swift And His ICOAs ............................... 2

    B.  Wood Determined The Way He Performed His Job As An Owner-Operator 3

    C.  Wood Made Significant Investments In Equipment And Materials, And Could Hire Labor As An Owner-Operator ........................................ 5

    D.  As An Owner-Operator, Wood Had Opportunity To Make Significant Profit Or Experience Loss Depending On His Managerial Skill ........................... 6

    E.  As An Owner-Operator, Wood Was Paid By The Job And Received A 1099 Form ....................................................................................... 6

III.  LEGAL STANDARD ................................................................... 7

IV.  WOOD WAS PROPERLY CLASSIFIED AS AN INDEPENDENT CONTRACTOR ................................................................................ 8

    A.  Wood Had Virtually Complete Control Over The Manner and Means By Which He Performed His Work As Well As The Location Where He Performed His Work ....................................................................... 10

    B.  Wood Could Select What Loads He Wanted To Pick Up, Could Decline Loads, And Independently Determined When To Work, And How Long To Work For ...................................................................................... 11

    C.  Wood Made Significant Investments In His Equipment, Material, And Tools, And Could Hire Employees If He So Chose ...................................... 12

    D.  Wood Could (And Did) Have His Own Business, And His Opportunity For Profit Or Loss Was Based On His Managerial Skill ................................. 13

    E.  Wood Only Worked As An Owner-Operator For Relatively Short Durations Of Time .................................................................................... 14

    F.  Wood Was Paid Via Weekly Settlements, Did Not Receive Employee Benefits,  And Was Treated As An Independent Contractor For Tax Purposes .............................................................................................. 14

    G.  Courts In Analogous Cases Have Found That Drivers Were Properly Classified As Independent Contractors ............................................. 15

V.  CONCLUSION .......................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Addisu v. Fred Meyer, Inc.*
198 F.3d 1130 (9th Cir. 2000) ......................................................................... 7

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ......................................................................................... 7

*Arpin v. Santa Clara Valley Transp. Agency*
261 F.3d 912 (9th Cir. 2001) ........................................................................... 7

*Aviles v. Quik Pick Express, LLC*
No. CV-15-5214-MWF (AGR), 2015 U.S. Dist. LEXIS 174960 (C.D.
Cal. Dec. 3, 2015) ...................................................................................... 8, 15

*Bell v. Atl. Trucking Co.*
No. 3:09-cv-406-J-32MCR, 2009 U.S. Dist. LEXIS 114342 (M.D. Fla.
Dec. 7, 2009) ................................................................................................... 8

*Carney v. JNJ Express, Inc.*
10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) ......................................... 15

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ......................................................................................... 7

*Chao v. Mid-Atlantic Installation Servs.*
16 Fed. Appx. 104 (4th Cir. 2001) ................................................................ 12

*Cmty. for Creative Non-Violence v. Reid*
490 U.S. 730 (1989) ..................................................................................... 8, 9

*Davis v. Larson Moving & Storage Co.*
No. 08-1408, 2008 U.S. Dist. LEXIS 87251 (D. Minn. Oct. 27, 2008) ............. 8, 15, 16

*Dole v. Amerilink Corp.*
729 F. Supp. 73 (E.D. Mi. 1990) ................................................................... 13

*Donovan v. Sureway Cleaners*
656 F.2d 1368 (9th Cir. 1981) ......................................................................... 9

*Green v. United States*
700 F. Supp. 2d 1280 (M.D. Fla. Mar. 22, 2010) ........................................ 14

-ii-

*Nationwide Mut. Ins. Co. v. Darden*
    503 U.S. 318 (1992) ............................................................................................. 8

*Real v. Driscoll Strawberry Associates, Inc.*
    603 F.2d 748 (9th Cir. 1979) ............................................................................. 9

*Salamon v. Our Lady of Victory Hosp.*
    514 F.3d 217 (2nd Cir. 2008) ............................................................................ 9

*Tarin v. County of Los Angeles*
    123 F.3d 1259 (9th Cir. 1997) .......................................................................... 7

*Wolcott v. Nationwide Mut. Ins. Co.*
    884 F.2d 245 (6th Cir. 1989) ........................................................................... 13

*Young v. Swift Transportation Co. of Arizona LLC*
    State of California Labor Commissionor Case No. 08-46182 RR ................. 16

*Zents v. Baylor Trucking Co.*
    No. 5:11-cv-1941, 2013 U.S. Dist. LEXIS 52287 (N.D. Ohio Apr. 11,
    2013) ................................................................................................................. 14

<u>Statutes</u>

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ................................................. 9

Fair Labor Standards Act, 29 U.S.C. § 203(d), (e)(1), (g) .................................... 9

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ........................................................ 1

<u>Other Authorities</u>

Federal Rule of Civil Procedure 56(c) ..................................................................... 7

# I.    <u>INTRODUCTION</u>

Plaintiff Peter Wood performed truck driving services for Defendant Swift Transportation Co., Inc. as an independent contractor/Owner-Operator.  Although Wood signed multiple Independent Contractor Operating Agreements ("ICOAs") with Swift which clearly and unmistakably specified his status as an independent contractor, he now claims that he was misclassified and was actually an employee.  Wood's claim fails as a matter of law.  The undisputed evidence shows that Wood was unequivocally an independent contractor under the applicable legal standard.[1]

Swift did not exert employer-like control over Wood during the time he was an Owner-Operator – the most crucial factor in determining whether an employment relationship existed.  Wood maintained control over virtually every aspect of his work, including how he managed his routes and the manner and means by which he delivered freight.  For example, Wood had the ability to select his own delivery routes, could determine on his own how he should complete those routes, and set his own work hours.  Further, Swift did not provide Wood with, nor require him to follow, any of its company policies while he was an Owner-Operator.  Finally, Wood supplied all of his own equipment (including his truck), paid his own expenses, paid his own taxes, and had the ability to hire employees and work for other carriers if he chose.  He even established his own trucking business at one point called Starlight Trucking and entered into an ICOA not on his own behalf but rather as "Peter Wood dba Starlight Trucking."

As is clear from Wood's deposition testimony, as well as the language in his ICOAs and the Equipment Leasing Agreement he signed with Defendant Interstate Equipment Leasing, Inc., there is no aspect of Wood's work as an Owner-Operator that is indicative of an employment relationship, and he was properly classified as an independent contractor

---

[1]  Because Wood was properly classified as an independent contractor, his ICOAs, which contain arbitration provisions, are not "contracts of employment."  Thus, his claims are not exempt from arbitration under Section 1 of the Federal Arbitration Act ("FAA").  *See* 9 U.S.C. §1 (exempting "contracts of employment . . . of workers engaged in foreign or interstate commerce" from the FAA).  He should therefore be required to arbitrate his claims.

1    during his time as an Owner-Operator.  No reasonable trier of fact could weigh the

2    evidence and reach a contrary conclusion.  Accordingly, the Court should find that Wood

3    was properly classified as an independent contractor during his time as an Owner-

4    Operator.

5              **II.     RELEVANT FACTUAL BACKGROUND**

6    **A.    Wood's History With Swift And His ICOAs**

7         Wood was originally hired by Swift as an employee driver.  (Wood Depo. at 11:23-

8    12:3.)  That was on February 24, 2005.  (*Id.*)  He had three separate stints as an employee

9    driver: from February 24, 2005 to December 26, 2005; from October 10, 2008 to February

10   19, 2009; and from September 26, 2013 to April 25, 2014.  (*See* Wood Depo. at 11:23-

11   12:3.)  There is no allegation that Wood was paid improperly while he was an employee.

12   (See Docket No. 588, Plaintiffs' Third Amended Collective and Class Action Complaint.)

13        Wood also had two stints as an independent contractor/Owner-Operator.

14   (Undisputed Material Fact ("UMF") 2.)  The first began in late March or early April of

15   2009.  (UMF 3.)  He entered an ICOA with Swift at that time.  (UMF 3.)  Wood

16   acknowledges that the switch from employee to Owner-Operator was entirely voluntary

17   and that he made the switch in order to be independent and profitable, and start a business

18   partnership with Swift.  (UMF 1.)  His first stint as an Owner-Operator ended after

19   approximately three and a half months, in July of 2009.  (UMF 4.)

20        His second stint as an Owner-Operator began on April 25, 2014.  (UMF 5.)  It

21   ended on August 27, 2014.  During this stint, he formed a business entity called Starlight

22   Trucking and entered into an ICOA with Swift not on his own behalf but rather as "Peter

23   Wood dba Starlight Trucking."  (UMFs 6-7.)  It should go without saying that Starlight

24   Trucking was not, and could not have been, an employee of Swift.

25        The ICOAs signed by Wood and/or Starlight Trucking were substantially similar in

26   content.  They unequivocally state that "[Wood] shall be considered an Independent

27   Contractor and not an employee of [Swift]."  (UMF 8.)  They also state in no uncertain

28   terms that Wood:  (1) was solely responsible for determining the "method, means and

manner" of performing work and providing services under the ICOA, (2) was not required to purchase or rent any products, equipment, or services from Swift, (3) had no obligation to accept any loads tendered by Swift, (4) had no obligation to purchase fuel from Swift, (5) was solely responsible for proving the equipment and the labor necessary to perform all work under the ICOA, (6) was solely responsible for paying his own operating and maintenance expenses, and (7) was entitled to haul for other carriers as long as she removed any Swift indicia from her truck.  (UMFs 9-14, 54.)  The terms of the ICOAs clearly indicate that Wood was properly classified as an independent contractor.

**B.**     **Wood Determined The Way He Performed His Job As An Owner-Operator**

During his two stints as an Owner-Operator, Wood controlled virtually every aspect of the way he performed his work.

Swift did not provide Wood any training or orientation whatsoever as an Owner-Operator.  (UMF 15.)  Swift did not provide him with, nor require him to be familiar with, any Swift policies or procedures as an Owner-Operator.  (UMF 16.)  By stark contrast, when Wood was an ***employee*** driver for Swift, he was required to undergo extensive training and orientation.  (Wood Depo. at 13:15-18:4, 33:14-20.)  Indeed, as an employee, Wood underwent three full weeks of training, during which time Swift taught him not only how to drive a truck, but also trained him on all rules, regulations, policies, and procedures applicable to Swift employees.  (*Id.*)  The extensive training Wood underwent as an employee lasted from 6 am to 5 pm every day, 5 to 6 days per week, for three weeks.  (*Id.*)  During that pre-employment orientation, Swift provided Wood with an employee handbook, which he understood he had to abide by.  (*Id.*)  None of these trainings or instructional periods occurred when Wood began a stint as an Owner-Operator.  (UMF 15.)  Wood did not even undergo an interview when he applied and joined as an Owner-Operator.  (Wood Depo. at 52:17-19.)

Swift also did not control Wood's working hours when he was an Owner-Operator.  (UMF 17.)  Wood could decide when he wanted to return to his home terminal and take time off.  (Deposition of David Berry ("Berry Depo.") at 46:22-47:11.)  By contrast, when

1   Wood was an employee driver for Swift, Swift set his hours of work, determined when he

2   took home time, and trained employees on the same. (Wood Depo. at 37:13-17, 40:14-22;

3   Berry Depo. 46:22-47:11.)

4       Swift also did not require Wood to take any particular route when delivering his

5   cargo. (UMF 18.) While Swift would provide a recommended route to him, Wood took a

6   route that was different from Swift's recommended route "as much as possible." (UMF

7   19.) This was because he did not agree that Swift's recommended route was the quickest

8   or most efficient available. (*Id.*) Thus, he would create and take routes that he felt allowed

9   him to be as efficient as possible in delivering his loads, regardless of what route Swift

10  suggested. (UMF 20.) Wood did not have to inform Swift that he was taking a different

11  route than the optional route provided to him. (Berry Depo. at 96:10-15.)

12      Moreover, Wood could select which fueling stops, repair shops, and maintenance

13  shops he used. (UMF 21.) His ICOAs specifically provided that he was "not required to

14  purchase fuel from [Swift]." (UMF 12.) Indeed, Wood visited fueling stops that were not

15  recommended by Swift "three quarters of the time" that he needed fuel. (UMF 22.) He

16  could take his truck to any location of his choosing for repairs, and in fact, he avoided

17  Swift repair shops because he did not like them and thought they did not do good work.

18  (UMFs 22, 24.)

19      Swift also did not require Wood to accept any particular cargo loads offered to him

20  as an Owner-Operator. (UMF 24.) In fact, he was instructed by a Fleet Manager that as an

21  Owner-Operator, he would need to acquire his own loads and that it was up to him to

22  develop business for himself. (UMF 25.) Wood unequivocally knew he had the ability

23  and authority to decline loads that were offered to him as an Owner-Operator. (UMF 26.)

24  It was his own personal discretionary decision not to decline loads very often, because he

25  sought to maximize his revenue. (UMF 27.) In fact, no one at Swift, including a Driver

26  Manager, could force Wood to take a load. (Berry Depo. at 81:25-82:13.) Conversely, as

27  an employee driver, Wood could not turn down loads which Swift provided him, or he

28  would be terminated. (Wood Depo. at 45:14-46:2.)

1   Swift also had no control over Wood's appearance when he was an Owner-
2   Operator.  Wood was neither required to wear a uniform, nor to adhere to any rules
3   regarding his attire.  (UMF 28.)

4   Wood was not required to communicate, check in, or interact with anyone from
5   Swift while he was carrying out his work.  (UMF 29.)  Nobody met with him at pick-up or
6   drop-off sites to check in or supervise him.  (UMF 30.)  Indeed, any communications
7   between Wood and Swift were typically initiated by Wood.  (UMF 31.)

8   Significantly, while Wood did have a "Driver Manager" (or point of contact at his
9   home terminal), **he had the authority to fire his Driver Manager** and ***indeed did fire*** his
10   Driver Manager because they did not see eye to eye.  (UMF 32.)  Wood also was able to
11   choose what terminal he was based out of, as well as what division he wanted to drive for
12   (line-haul, dedicated, or intermodal), whereas employees are assigned their home terminal
13   and division.  (Berry Depo. 15:14-16:6; 19:11-20:14.)

14   Additionally, Swift did not control who drove with Wood.  As an Owner-Operator,
15   Wood was aware he could work in a "team" driving if he wanted.  (UMF 33.)  He chose
16   not to, purely based on his own personal preference.  (UMF 34.)  As an Owner-Operator,
17   he knew he could also assign someone of his choosing to drive in his place.  (UMF 35.)
18   This was not an option for Wood when he was an employee driver for Swift, during which
19   time he was required to perform all work himself.  (Wood Depo. at 46:25-47:22.)  As an
20   Owner-Operator, Wood could also have a passenger ride with him while he performed his
21   work.  (UMF 36.)

22   Finally, Wood could use his truck to perform work for other carriers, so long as he
23   removed any Swift indicia from his truck.  (UMFs 37, 54.)  He was also free to use his
24   truck for personal reasons as he saw fit.  (UMF 38.)

25   **C.    Wood Made Significant Investments In Equipment And Materials, And Could
          Hire Labor As An Owner-Operator**
26

27   When he was an employee driver, Swift provided Wood with all the equipment and
28   tools he needed to perform his work and did not permit him to hire laborers to carry out his

-5-

1   job duties.  (Wood Depo. at 19:2-21:6.)  As an Owner-Operator, by contrast, Wood was

2   required to make significant investments in his equipment and make all purchases himself.

3   He invested thousands of dollars into his truck (which he was able to obtain from any

4   source, but he chose to lease the truck from IEL because he had "no desire to" lease from

5   any other company).  (UMFs 39-41.)  Wood then opted to take over that trucker's lease

6   because he knew the equipment and its prior driver.  (UMF 42.)  Wood was responsible for

7   the repair, maintenance, and upkeep of his truck as an Owner-Operator.  (UMF 43.)  He

8   paid for his own insurance as an Owner-Operator.  (UMF 44.)  Indeed, Swift did not

9   provide him with *anything* he needed to perform his work as an Owner-Operator free of

10  charge, including fuel.  (UMF 45.)  Critically, Wood could hire drivers, driver helpers, and

11  laborers to work for him as an Owner-Operator, as long as they met state and federal legal

12  requirements, such as Department of Transportation regulations.  (UMF 46.)  Wood had to

13  pay his own employees as an Owner-Operator – Swift did not do so.  (UMF 47.)

14  **D.    As An Owner-Operator, Wood Had Opportunity To Make Significant Profit Or Experience Loss Depending On His Managerial Skill**

16         Wood entered into an Owner-Operator relationship with Swift because he wanted to

17  have a profitable "business partnership" with Swift.  (UMF 1.)  Wood studied business

18  management in college and wanted to develop his business, Starlight Trucking, in

19  partnership with Swift.  (UMF 48.)  He was aware of other Swift Owner-Operators who

20  had fleets of trucks.  (UMF 49.)  He wanted to develop a fleet of trucks himself.  (UMF

21  50.)  Wood admits he had the ability to work in a team, hire as many employees as he

22  chose, purchase or lease as many trucks as he could afford, and build his own trucking

23  business as an Owner-Operator.  (UMF 51.)

24  **E.    As An Owner-Operator, Wood Was Paid By The Job And Received A 1099 Form**

26         As an Owner-Operator, Wood was paid per the completion of each trip – not by the

27  hour.  (UMF 52.)  He was also paid via weekly settlements, while employees are paid

28  through payroll checks.  (UMF 53.)  He received an Internal Revenue Service ("IRS")

1   Form 1099, not a W-2 form.  (Wood's New Business Partner Independence Contractor

2   Checklist dated March 31, 2009, ¶ 6; Wood's New Business Partner Independence

3   Contractor Checklist dated April 25, 2014, ¶ 6.)

4                               **III.   LEGAL STANDARD**

5           Federal Rule of Civil Procedure 56(c) requires the court to grant summary judgment

6   for the moving party when the evidence, viewed in the light most favorable to the

7   nonmoving party, shows there is no genuine issue as to any material fact, and that the

8   moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tarin v.*

9   *County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

10          The moving party bears the initial burden of establishing the absence of a genuine

11  issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Once this is

12  done, the burden shifts to the nonmoving party to go beyond the pleadings and identify

13  "specific facts showing that there is a genuine issue for trial."  *Id*; *Anderson v. Liberty*

14  *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A scintilla of evidence or evidence that is merely

15  colorable or not significantly probative does not present a genuine issue of material fact."

16  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

17          Only genuine disputes over facts that might affect the outcome of the suit will

18  properly preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.  If the

19  nonmoving party is unable to meet its burden of producing specific evidence from which a

20  reasonable trier of fact could return a verdict in its favor, summary judgment must be

21  granted.  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

22          Here, the evidence – including the language in Wood's ICOAs and lease

23  agreements and Wood's deposition admissions – clearly demonstrates that Wood was

24  properly classified as an independent contractor by Swift.  No reasonable trier of fact could

25  weigh the evidence and reach a contrary conclusion.  Summary judgment on this issue is

26  therefore appropriate.

27

28

## IV.   <u>WOOD WAS PROPERLY CLASSIFIED AS AN INDEPENDENT CONTRACTOR</u>

The U.S. Supreme Court has not established a single rule or test for determining whether an individual is an independent contractor or an employee.  Under the circumstances in this case, the appropriate standard is the common law "agency" test.  The issue in this case is whether Wood's independent contractor agreement with Swift was a "contract of employment" under the FAA.  However, the FAA does not define the phrase "contract of employment" or what it means to be an employee versus an independent contractor.  When a statute does not define "terms that have accumulated settled meaning under … the common law, a court must infer … that Congress mean[t] to incorporate the established [common law] meaning of these terms." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989).  Accordingly, courts apply the general common law of agency in determining whether an individual is an independent contractor or employee for FAA purposes.  *Aviles v. Quik Pick Express, LLC*, No. CV-15-5214-MWF (AGR), 2015 U.S. Dist. LEXIS 174960, *9-13 (C.D. Cal. Dec. 3, 2015) (applying common law agency test to determine whether putative class members were independent contractors or employees under the FAA); *Bell v. Atl. Trucking Co.*, No. 3:09-cv-406-J-32MCR , 2009 U.S. Dist. LEXIS 114342, *12-20 (M.D. Fla. Dec. 7, 2009) (same); *Davis v. Larson Moving & Storage Co.*, No. 08-1408 (JNE/JJG), 2008 U.S. Dist. LEXIS 87251, 17-18 (D. Minn. Oct. 27, 2008) (same); *accord Reid*, 490 U.S. at 740 (applying general common law of agency to define "employee" under the Copyright Act); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (applying general common law of agency to define "employee" under the Employee Retirement Income Security Act).

Under the common law analysis of agency, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mut. Ins. Co.*, 503 U.S. at 323.  The Court must considers a number and variety of factors, including:

> (1) The hiring party's right to control the manner and means by which the product is accomplished;

-8-

(2) The skill required;
(3) The source of the instrumentalities and tools;
(4) The location of the work;
(5) The duration of the relationship between the parties;
(6) Whether the hiring party has the right to assign additional projects to the hired party;
(7) The extent of the hired party's discretion over when and how long to work;
(8) The method of payment;
(9) The hired party's role in hiring and paying assistants;
(10) Whether the work is part of the regular business of the hiring party;
(11) Whether the hiring party is in business;
(12) The provision of employee benefits; and
(13) The tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52.  "Other relevant factors may also be considered so long as they are drawn from the common law of agency."  *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2nd Cir. 2008).  Applying these factors to the facts of this case, it is clear that Wood was properly classified as an independent contractor.[2]

Here, Wood's own admissions demonstrate that he was properly classified as an independent contractor during the time he was an Owner-Operator for Swift.  As explained

---

[2]  There have been previous references in this case to the "economic realities" test for determining whether an individual is an independent contractor or employee.  However, the economic realities test only applies when making such a determination under the Fair Labor Standards Act of 1938, 29 U.S.C. 201 *et seq.* ("FLSA").  The common law agency test is not used because, unlike the FAA, the FLSA expressly defines the terms "employer", "employee," and "employ."  *See* 29 U.S.C. § 203(d), (e)(1), (g).  The economic realities test focuses on "whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service."  *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (citations and quotations omitted).  The test analyzes the following a non-exhaustive list of six-factors to make this determination:

(1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
(3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
(4) whether the service rendered requires a special skill;
(5) the degree of permanence of the working relationship; and
(6) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).  The factors under the economic realities test are essentially a subset of the factors under the common law agency test.  Regardless of which test the Court applies, Wood was an independent contractor, not an employee, as set forth below.

-9-

above, Wood's deposition testimony shows that he was able to control the manner and means of completing his work, determine what routes and loads he chose, set his own hours, hire his own employees, and establish his own business, the success or failure of which was dependent upon his own business acumen.  In addition, Wood provided his own tools and only spent brief periods of time as an Owner-Operator for Swift, which is indicative of an independent contractor relationship, not an employment relationship.  He was also treated as an independent contractor for payment, tax, and benefit purposes.  Further, Wood's ICOAs and leasing agreement stated in no uncertain terms that he was an independent contractor, and the terms and conditions of these agreements exerted nominal control over Wood.  The entirety of these factors show that Wood was properly classified as an independent contractor as a matter of law.

**A.** **Wood Had Virtually Complete Control Over The Manner and Means By Which He Performed His Work As Well As The Location Where He Performed His Work**

The undisputed evidence demonstrates that Wood had full control over the manner and means of performing his work.  As described above, it is undisputed that:

- Wood did not undergo any training or orientation whatsoever as an Owner-Operator.  (UMF 15.)

- Swift did not provide Wood with, nor require him to be familiar with, Swift's company policies as an Owner-Operator.  (UMF 16.)

- Swift did not require Wood to take any particular route when delivering his cargo.  (UMF 18.)  While Swift would provide a recommended route to him, Wood admits he took a route that was different from Swift's recommended route "as much as possible."  (UMF 19.)  Wood did not have to inform Swift that he was taking a different route than the optional route provided to him.  (Berry Depo. at 96:10-14.)

- Wood could also chose whatever fueling stops he wanted.  (UMFs 12, 21.)  Wood visited fueling stops that were not recommended by Swift the vast majority of the time that he needed fuel.  (UMF 22.)

- Wood could take his truck to any location of his choosing for repairs.  In fact, he avoided Swift repair shops because he did not like them and thought their work was deficient.  (UMFs 21, 23.)

- Wood was not required to communicate, check in, or interact with anyone from Swift while he was carrying out his work.  (UMF 29.)  Nobody met with him at pick-up or drop-off sites.  (UMF 30.)

-10-

- Wood had the authority to fire his Driver Manager (point of contact at the terminal) and did so.  (UMF 32.)

- Swift exerted minimal control over who drove with Wood.  Wood could drive as a "team" if he so chose.  (UMFs 33, 51.)  Alternatively, he could "assign" someone of his choosing to drive in his place.  (UMF 35.)  He could also elect to have a passenger ride with him.  (UMF 36.)

- Swift could not discipline Wood as an Owner-Operator.  (Berry Depo. 268:5-7.)
- Wood could use his truck to perform work for other companies and could also use his truck for personal reasons.  (UMFs 37-38, 54.)

- Wood was able to choose what terminal he was based out of, as well as what division he wanted to drive to (line-haul, dedicated, or intermodal), whereas employees are assigned their home terminal and division.  (Berry Depo. 15:14-16:6; 19:11-20:14.)

- Swift did not exert any control over Wood's appearance as an Owner-Operator.  (UMF 28.)

- Wood could select what loads he wanted to pick up, could decline loads and independently determine when to work and how long to work for, as explained in further detail below.  (UMFs 11, 17, 24-27.)

Wood's experience is consistent with the terms and conditions of his ICOAs with Swift.  Based on the above, it is clear that Swift had no control over any facet of how Wood performed his work.  Moreover, his experience as an Owner-Operator vastly differed from his experience as an employee at Swift, during which time Swift exerted significantly more control over his work.  (*See* Section (II)(B).)

Because Wood admittedly had full control over the manner and means of performing his work, this factor weighs in favor of an independent contractor relationship.

**B.** **Wood Could Select What Loads He Wanted To Pick Up, Could Decline Loads, And Independently Determined When To Work, And How Long To Work For**

The undisputed evidence shows that Swift had no control over what loads Wood decided to pick up, when he decided to work, or how long he chose to work for.  Wood admits that Swift did not require him to accept any particular freight loads offered to him as an Owner-Operator.  (UMF 24.)  Wood even recalled that a Fleet Manager explicitly instructed him that would need to acquire his own loads and that it was up to him to develop business for himself.  (UMF 25.)  Thus, Wood unequivocally knew he had the ability and authority to decline loads that were offered to him as an Owner-Operator.

-11-

(UMF 26.)  Although Wood did not decline loads very often because he sought to maximize his revenue, accepting loads was entirely his choice.  (UMF 27.)  No one at Swift could force Wood to take a load, and Wood would not be disciplined if he turned down a load.  (Berry Depo. at 81:25-82:13; 268:5-7.)  Conversely, as an employee driver, Wood could not turn down loads which Swift provided him, or he would be fired.  (Wood Depo. at 45:14-46:2.)  This is further evidence that Wood was in an independent contractor relationship with Swift while he was an Owner-Operator.

Moreover, unlike with its employees, Swift did not control Wood's working hours when he was an Owner-Operator.  (UMF 17.)  Wood could decide when he wanted to return to his home terminal and take home time.  (Berry Depo. 46:22-47:11.)  By contrast, when Wood was an employee driver for Swift, Swift set his hours of work, determined when he took home time, and trained employees on the same.  (Wood Depo. at 37:13-17, 40:14-22; Berry Depo. 46:22-47:11.)

This factor weighs in favor of Wood being properly classified as an independent contractor as well.

## C.  Wood Made Significant Investments In His Equipment, Material, And Tools, And Could Hire Employees If He So Chose

As explained above, Wood made a significant investment into the instrumentalities of his work.  He invested thousands of dollars into the lease of his truck.  (UMF 39.)  Wood was responsible for the repair, maintenance, and upkeep of his truck as an Owner-Operator, and he paid for his own insurance.  (UMFs 14, 43.)

Indeed, Swift did not provide Wood with **anything** he needed to perform his work as an Owner-Operator free of charge, including fuel.  (UMF 45.)  In contrast, when Wood worked as an employee driver, Swift provided him with all the equipment and tools he needed to perform his work, including his truck, gas, maintenance, repair, tolls, insurance, and any other instrumentalities that he may need.  (Wood Depo. at 19:2-21:6.)

Also, as Wood testified, he could hire drivers, driver helpers, and laborers to work for him if he so chose.  (UMFs 46, 51.)  If he decided to hire an employee, he would be

-12-

1   required to pay him or her – not Swift.  (UMF 47.)   Numerous courts have held that these

2   circumstances weigh "strongly in favor" of concluding that an individual is an independent

3   contractor.  *See Chao v. Mid-Atlantic Installation Servs.*, 16 Fed. Appx. 104, 107 (4th Cir.

4   2001) (explaining that expenditures on instrumentalities to perform work are usually

5   expected of independent contractors but not of employees, who are given the tools to

6   perform their job by their employer); *see also Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76

7   (E.D. Mi. 1990) (same).

8   **D.**     **Wood Could (And Did) Have His Own Business, And His Opportunity For**

          **Profit Or Loss Was Based On His Managerial Skill**

9

10       As Wood testified, he initially entered into an Owner-Operator relationship with

11  Swift because he wanted to be profitable and commence a business partnership with the

12  company.  (UMF 1.)  He eventually developed his own business, Starlight Trucking, and

13  aspired to develop a fleet of trucks – a feat that he acknowledges other Owner-Operators

14  were able to accomplish due to their own business acumen and willingness to accept the

15  financial risk taking on additional trucks and employees.  (UMFs 6, 50.)  While working as

16  an Owner-Operator, Wood was able to develop his own business model and had full

17  opportunity to determine what loads to take and decline in order to efficiently manage his

18  workload and be the most profitable.

19       In addition, Wood was able to hire additional help if he determined that doing so

20  would benefit his business demands and entrepreneurial design.  (UMF 46, 51.)  Also,

21  Wood was not prohibited from simultaneously performing work for other entities if he

22  believed that doing so was in the best interest of his business and bottom line.  (UMFs 37,

23  54.)

24       Wood could also fully control his costs (such as fuel costs, repairs, etc.) through

25  efficient management.  For instance, he could decide whether or not to turn down loads

26  because certain loads would not be fuel efficient or economical.  (UMFs 11, 24-27.)

27  Whether or not Wood efficiently managed his costs also affected his bottom line.

28

1    Given these circumstances, it is evident that Wood's managerial skill directly
2    affected his profit or loss – which is a critical factor in determining whether he was
3    properly classified as an independent contractor. *Wolcott v. Nationwide Mut. Ins. Co.*, 884
4    F.2d 245, 251 (6th Cir. 1989) (applying the common law agency test to determine if an
5    independent contractor relationship existed and finding that the fact that the plaintiff
6    "exercised managerial skill in the operation of his business" weighed in favor of an
7    independent contractor relationship).

8    **E.    Wood Only Worked As An Owner-Operator For Relatively Short Durations Of Time**
9

10   Wood only worked as an Owner-Operator for a few months at a time.  His first stint
11   as an Owner-Operator in 2009 lasted just three and a half months.  (UMFs 3-4.)  His
12   second stint as an Owner-Operator in 2014 only lasted for four months.  (*See* UMF 5.)
13   There is no evidence that the parties intended to establish a long-term employment
14   relationship when they entered into the ICOAs.  The brief duration of Wood's stints as an
15   Owner-Operator also weighs in favor of an independent contractor relationship. *Green v.*
16   *United States*, 700 F. Supp. 2d 1280, 1300 (M.D. Fla. Mar. 22, 2010); *Zents v. Baylor*
17   *Trucking Co.*, No. 5:11-CV-1941, 2013 U.S. Dist. LEXIS 52287, *23-24 (N.D. Ohio Apr.
18   11, 2013).

19   **F.    Wood Was Paid Via Weekly Settlements, Did Not Receive Employee Benefits, And Was Treated As An Independent Contractor For Tax Purposes**
20

21   Swift's method of payment to Wood is wholly indicative of an independent
22   contractor relationship.  As an Owner-Operator, Wood was paid per completed trip – not
23   by the hour.  (UMF 52.)  He was also paid via weekly settlements, while Swift's
24   employees are paid through payroll checks.  (UMF 53.)  Wood received an IRS Form 1099
25   and was paid as an independent contractor for tax purposes, while employee drivers
26   receive a W-2 form.  (Wood's New Business Partner Independence Contractor Checklist
27   dated March 31, 2009, ¶ 6; Wood's New Business Partner Independence Contractor
28   Checklist dated April 25, 2014, ¶ 6.)  Thus, Swift's payment method to Wood drastically

-14-

1  differed from its payment method to its employees.  In addition, Wood did not receive any

2  employee benefits from Swift while he was an Owner-Operator.  (UMFs 13-14, 44.)

3        These factors further weigh in favor of finding that Wood was properly classified as

4  an independent contractor.

5  **G.      Courts In Analogous Cases Have Found That Drivers Were Properly Classified As Independent Contractors**

6

7        In the trucking industry, it is extraordinarily common for companies to enter into

8  contractual service agreements with independent contractor drivers.  These independent

9  contractor relationships are an integral facet of the trucking industry.  Numerous courts

10 that have examined these relationships have found that drivers in similar situations as

11 Wood were properly classified as independent contractors.  For instance, in *Aviles*, 2015

12 U.S. Dist. LEXIS 174960, *11-13, the court found that a putative class of truck drivers

13 were independent contractors because: (1) drivers set their own schedule; (2) the company

14 did not instruct the drivers on what routes to take or when and where to stop for fuel; (3)

15 drivers had the ability to turn down as many loads as they wished; (4) drivers were able to

16 lease truck from the company or any other dealer; (5) drivers could hire their own

17 employees; (6) drivers could balance their loads as they saw fit in order to increase

18 efficiency; (7) drivers could work for other companies; and (8) drivers received no

19 employment benefits and were not subject to income or payroll tax withholdings.  Like in

20 *Aviles*, all of these factors are satisfied here.

21       Similarly, truck drivers in *Carney v. JNJ Express, Inc.*, 10 F. Supp. 3d 848, 853-854

22 (W.D. Tenn. 2014) were considered independent contractors because they were

23 "responsible for determining the means of their performance under the Leases, including

24 equipment, routes, and scheduling."  The court also noted the fact that they were

25 "responsible for costs such as fuel, oil, maintenance and repairs, primary insurance, and

26 worker's compensation insurance," showed that they were not employees.  *Id.*  Again, this

27 situation is directly analogous to Wood's relationship with Swift.

28

1    In yet another nearly identical situation, in *Davis v. Larson Moving & Storage Co.*,

2  2008 U.S. Dist. LEXIS 87251, 17-18 (D. Minn. Oct. 27, 2008), the Court found that a

3  truck driver was properly classified as an independent contractor because:

4         Plaintiff was required to provide his own truck.  Plaintiff assumed control over
          selection of routes and fuel stops, decisions about maintenance of his truck,
5         arrangements for loading and unloading his truck, and scheduling work hours and
          rest periods, subject to legal requirements and the needs of Defendant's customers.
6         Plaintiff was permitted to hire additional personnel to perform services under the
          lease, with Plaintiff assuming responsibility for hiring, supervision, and
7         compensation of the additional personnel.  Plaintiff could elect to reject specific
          shipments and could choose to be unavailable to Defendant for reasonable periods
8         of time.

9

10    As in *Davis*, all of these factors are present in this case and weigh in favor of

finding that Wood was an independent contractor.

11     Finally, in *Young v. Swift Transportation Co. of Arizona*, LLC, Case No. 08-46182

12  RR, the California Labor Commissioner examined whether Swift's Owner-Operators are

13  misclassified as independent contractors and determined they are not.  (Request for

14  Judicial Notice, ¶ 1, Ex. 1.)  The Labor Commissioner found that a plaintiff Owner-

15  Operator "maintained control of his own work load" because he was able to choose which

16  loads he accepted and rejected without consequence.  The Labor Commissioner also

17  determined that the plaintiff could perform work for other parties, as long as Swift indicia

18  was removed from his truck.  **Based on these facts, the Labor Commissioner held that**

19  **the Owner-Operator was properly classified as an independent contractor**.  The issues

20  in this case have already been adjudicated in Swift's favor.  There is no reason for this

21  Court to deviate from the Labor Commissioner's findings.

22                    V.    **CONCLUSION**

23     For the foregoing reasons, Defendants respectfully request that the Court grant the

24  instant Motion for Partial Summary Judgment and enter an order finding that Wood was

25  properly classified as an independent contractor.

26

27

28

Dated:  June 10, 2016              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By_____ /s/ Robert Mussig _____
RONALD HOLLAND
ELLEN M. BRONCHETTI
PAUL S. COWIE
ROBERT MUSSIG

Attorneys for Defendants
SWIFT TRANSPORTATION CO. OF ARIZONA,
LLC, INTERSTATE EQUIPMENT LEASING, LLC,
CHAD KILLEBREW and JERRY MOYES

-17-

SMRH:477958756.3     DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF PETER
WOOD'S STATUS AS AN INDEPENDENT CONTRACTOR

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to the following CM/ECF registrants:

Susan Joan Martin
Jennifer Lynn Kroll
Martin & Bonnett PLLC
1850 N. Central Ave.; Ste. 2010
Phoenix, AZ  85004

Dan Getman
Edward John Tuddenham
Lesley Tse
Getman & Sweeney, PLLC
9 Paradies La.
New Paltz, NY  12561

Attorneys for Defendants

*/s/ Robert Mussig*