SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
RONALD J. HOLLAND, Cal. Bar No. 148687 *(Pro Hac Vice)*
rholland@sheppardmullin.com
ELLEN M. BRONCHETTI, Cal. Bar No. 226975 *(Pro Hac Vice)*
ebronchetti@sheppardmullin.com
PAUL S. COWIE, Cal. Bar No. 250131 *(Pro Hac Vice)*
pcowie@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415-434-9100
Facsimile:    415-434-3947

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ROBERT MUSSIG, Cal. Bar No. 240369 *(Pro Hac Vice)*
rmussig@sheppardmullin.com
ANNA M. STANCU, Cal. Bar No. 288283 *(Pro Hac Vice)*
astancu@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone:    213-620-1780
Facsimile:    213-620-1398

Attorneys for Defendants
SWIFT TRANSPORTATION CO. OF ARIZONA, LLC, INTERSTATE EQUIPMENT LEASING, LLC, CHAD KILLEBREW and JERRY MOYES

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VIRGINIA VAN DUSEN; JOHN DOE 1; and JOSEPH SHEER, individually and on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>SWIFT TRANSPORTATION CO., INC.; INTERSTATE EQUIPMENT LEASING, INC.; CHAD KILLIBREW; and JERRY MOYES,<br><br>Defendants. | Case No. CV 10-899-PHX-JWS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF JOSEPH SHEER'S STATUS AS AN INDEPENDENT CONTRACTOR**<br><br>[Filed concurrently with Notice of Motion, Separate Statement, Request for Judicial Notice, and Declaration of Robert Mussig] |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................ 1

II. RELEVANT FACTUAL BACKGROUND ......................................................... 2

    A. Sheer's History With Swift And His ICOA ................................................ 2

    B. Sheer Determined The Way He Performed His Job As An Owner-Operator ............................................................................................. 2

    C. Sheer Made Significant Investments In Equipment And Materials And Could Hire Labor As An Owner-Operator ................................................. 4

    D. As An Owner-Operator, Sheer Had Opportunity To Make Significant Profit Or Experience Loss Depending On His Managerial Skill ............................ 5

    E. The Parties' Intention Was To Form An Independent Contractor Relationship ................................................................................................. 5

    F. As An Owner-Operator, Sheer Was Paid By The Job, Received A 1099 Form, And Was Not Eligible For Benefits ................................................... 6

III. LEGAL STANDARD ........................................................................................... 6

IV. SHEER WAS PROPERLY CLASSIFIED AS AN INDEPENDENT CONTRACTOR .................................................................................................... 7

    A. Sheer Had Virtually Complete Control Over The Manner and Means By Which He Performed His Work As Well As The Location Where He Performed His Work ................................................................................... 9

    B. Sheer Could Select What Loads He Wanted To Pick Up, Could Decline Loads, And Independently Determined When To Work, And How Long To Work For ................................................................................................... 10

    C. Sheer Made Significant Investments In His Equipment, Materials, And Tools, And Could Hire Employees If He So Chose ................................... 11

    D. Sheer Could Have His Own Business, And His Opportunity For Profit Or Loss Was Based On His Managerial Skill ................................................... 11

    E. Sheer Was Paid Via Weekly Settlements, Did Not Receive Benefits, And Was Treated As An Independent Contractor For Tax Purposes ................. 12

    F. Courts In Analogous Cases Have Found That Drivers Were Properly Classified As Independent Contractors ...................................................... 13

V. CONCLUSION ................................................................................................... 15

-i-

SMRH:477958756.3    MEMORANDUM OF P'S AND A'S ISO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF JOSEPH SHEER'S STATUS AS AN INDEPENDENT CONTRACTOR

# TABLE OF AUTHORITIES

Page(s)

Cases

*Addisu v. Fred Meyer, Inc.*
198 F.3d 1130 (9th Cir. 2000) ....................................................................................... 6

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ....................................................................................................... 6

*Arpin v. Santa Clara Valley Transp. Agency*
261 F.3d 912 (9th Cir. 2001) ........................................................................................ 6

*Aviles v. Quik Pick Express, LLC*
No. CV-15-5214-MWF (AGR), 2015 U.S. Dist. LEXIS 174960 (C.D. Cal. Dec. 3, 2015) ......................................................................................... 7, 13

*Bell v. Atl. Trucking Co.*
No. 3:09-cv-406-J-32MCR, 2009 U.S. Dist. LEXIS 114342 (M.D. Fla. Dec. 7, 2009) ...................................................................................................... 7

*Carney v. JNJ Express, Inc.*
10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) ............................................. 13

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ....................................................................................................... 6

*Chao v. Mid-Atlantic Installation Servs.*
16 Fed. Appx. 104 (4th Cir. 2001) ................................................................... 11

*Cmty. for Creative Non-Violence v. Reid*
490 U.S. 730 (1989) ................................................................................................. 7, 8

*Davis v. Larson Moving & Storage Co.*
No. 08-1408, 2008 U.S. Dist. LEXIS 87251 (D. Minn. Oct. 27, 2008) ................... 7, 14

*Dole v. Amerilink Corp.*
729 F. Supp. 73 (E.D. Mi. 1990) ...................................................................... 11

*Donovan v. Sureway Cleaners*
656 F.2d 1368 (9th Cir. 1981) ................................................................................. 8

*Nationwide Mut. Ins. Co. v. Darden*
503 U.S. 318 (1992) ............................................................................................. 7, 8

*Real v. Driscoll Strawberry Associates, Inc.*
   603 F.2d 748 (9th Cir. 1979) .................................................................................. 9

*Salamon v. Our Lady of Victory Hosp.*
   514 F3d 217 (2nd Cir. 2008) .................................................................................. 8

*Tarin v. County of Los Angeles*
   123 F.3d 1259 (9th Cir. 1997) ................................................................................ 6

*Wolcott v. Nationwide Mut. Ins. Co.*
   884 F.2d 245 (6th Cir. 1989) ................................................................................ 12

*Young v. Swift Transportation Co. of Arizona LLC*
   State of California Labor Commissionor Case No. 08-46182 RR ............................... 14

Statutes

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ....................................................... 8

Fair Labor Standards Act, 29 U.S.C. § 203(d), (e)(1), (g) ............................................. 8

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ..................................................... 1, 7, 8

Other Authorities

Federal Rule of Civil Procedure 56(c) ........................................................................ 6

SMRH:477958756.3

-iii-

MEMORANDUM OF P'S AND A'S ISO MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF JOSEPH SHEER'S STATUS AS AN INDEPENDENT CONTRACTOR

## I.     **INTRODUCTION**

Plaintiff Joseph Sheer performed truck driving services for Defendant Swift Transportation Co., Inc. as an independent contractor/Owner-Operator. Although Sheer signed an Independent Contractor Operating Agreement ("ICOA") with Swift which clearly and unmistakably specified his status as an independent contractor, he now claims that he was misclassified and was actually an employee. Sheer's claim fails as a matter of law. The undisputed evidence shows that Sheer was unequivocally an independent contractor under the applicable legal standard.[1]

Swift did not exert employer-like control over Sheer during the time he was an Owner-Operator – the most crucial factor in determining whether an employment relationship existed. Sheer maintained control over virtually every aspect of his work, including how he managed his routes and the manner and means by which he delivered freight. For example, Sheer had the ability to select his own delivery routes and could determine on his own how he should complete those routes. Further, Swift did not provide Sheer with, nor require him to follow, any of its company policies while he was an Owner-Operator. Finally, Sheer supplied all of his own equipment (including his truck), paid his own expenses, paid his own taxes, and had the ability to hire employees and contract with other carriers if he chose.

As is clear from Sheer's deposition testimony, as well as the language in his ICOA and the Equipment Leasing Agreement he signed with Defendant Interstate Equipment Leasing, Inc., there is no aspect of Sheer's work as an Owner-Operator that is indicative of an employment relationship, and he was properly classified as an independent contractor during his time as an Owner-Operator. No reasonable trier of fact could weigh the

---

[1] Because Sheer was properly classified as an independent contractor, his ICOA, which contains an arbitration provision, is not a "contract of employment." Thus, his claims are not exempt from arbitration under Section 1 of the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §1 (exempting "contracts of employment . . . of workers engaged in foreign or interstate commerce" from the FAA). He should therefore be required to arbitrate his claims.

SMRH:477958756.3

evidence and reach a contrary conclusion. Accordingly, the Court should find that Sheer was properly classified as an independent contractor during his time as an Owner-Operator.

## II.      RELEVANT FACTUAL BACKGROUND

### A.     Sheer's History With Swift And His ICOA

Sheer was originally hired by Swift as an employee driver in November 2002. (Deposition of Joseph Sheer ("Sheer Depo.") at 23:1-5.) He worked for Swift as an employee driver until August 2006. (Sheer Depo. 23:18-25.) There is no allegation in this case that Sheer was paid improperly while he was an employee driver. (*See* Dkt. 588.)

Sheer was an Owner-Operator for Swift from August 7, 2006 to April 2009. (Undisputed Material Fact ("UMF") 1.) When he first became an Owner-Operator, he entered into an ICOA with Swift. (UMF 2.) Sheer's ICOA unequivocally states that "[Sheer] shall be considered an Independent Contractor and not an employee of [Swift]." (UMF 4.) It also states in no uncertain terms that Sheer: (1) was solely responsible for determining the "method, means and manner" of performing work and providing services under the ICOA, (2) was not required to purchase or rent any products, equipment, or services from Swift, (3) had no obligation to accept any loads tendered by Swift, (4) had no obligation to purchase fuel from Swift, (5) was solely responsible for proving the equipment and the labor necessary to perform all work under the ICOA, (6) was solely responsible for paying his own operating and maintenance expenses, and (7) was entitled to contract with other carriers if he chose. (UMF 5-11.) The terms of the ICOA clearly indicates that Sheer was properly classified as an independent contractor.

### B.     Sheer Determined The Way He Performed His Job As An Owner-Operator

During his stint as an Owner-Operator, Sheer controlled virtually every aspect of the way he performed his work.

Sheer received only one day of training when he became an Owner-Operator, which Swift provided as a convenience to educate Sheer on "tax issues" and "how to run efficiently." (UMF 12.) Swift did not provide him with, nor require him to be familiar

-2-

with, any Swift policies or procedures as an Owner-Operator.  (UMF 13.)  Sheer did not receive any handbooks as an Owner-Operator.  (UMF 14.)

By stark contrast, when Sheer was an *employee* driver for Swift, he was required to undergo extensive training and orientation.  (Sheer Depo. at 27:18-34:3, 35:9-12, 35:15-36:2, 55:15-56:12, 64:18-65:5.)  Indeed, as an employee, Sheer underwent three days of orientation, four full weeks of behind-the-wheel training with a trainer, and four weeks of behind-the-wheel training with another new hire.  (Sheer Depo. at 27:18-34:3.)  During that pre-employment orientation, Swift also provided Sheer with an employee handbook, which he understood he had to abide by.  (Sheer Depo. at 35:9-12, 35:15-36:2.)  Sheer understood that, when he was an employee, he could be disciplined for failing to follow Swift's policies or procedures, and indeed he was disciplined on multiple occasions for doing so.  (Sheer Depo. at 55:15-56:12.)

None of this training or instruction occurred when Sheer became an Owner-Operator.  (UMF 15.)  Nor did he receive any written materials regarding any policies he was expected to follow as an Owner-Operator.  (Sheer Depo. at 121:17-21.)

Swift also did not require Sheer to take any particular route when delivering his freight.  (UMF 16.)  Sheer did not have to inform Swift that he was taking a different route than the optional route provided to him.  (Deposition of David Berry ("Berry Depo.") at 96:10-15.)  Sheer opted to use the suggested routes because they maximized efficiency, but it was entirely his personal choice to do so.  (UMF 17.)

Moreover, Sheer could select which fueling stops, repair shops, and maintenance shops he used.  (UMF 18.)  His ICOA specifically provided that he was "not required to purchase fuel from [Swift]."  (UMF 19.)  He could take his truck to any location of his choosing for repairs, and in fact, he made the decision of which repair and maintenance shops to use based on convenience and price.  (UMF 18, 20.)

Swift also did not require Sheer to accept any particular freight loads offered to him as an Owner-Operator.  (UMF 21.)  Sheer unequivocally knew he had the ability and authority to decline loads that were offered to him as an Owner-Operator.  (UMF 22.)  In

1  fact, no one at Swift, including a Driver Manager, could force Sheer to take a load. (Berry
2  Depo. at 81:25-82:13.)  Sheer never faced any negative repercussions when turning down
3  loads. (UMF 23.)  Conversely, as an employee driver, Sheer could not turn down loads
4  which Swift provided him and Swift could demand that an employee driver take a load.
5  (Berry Depo. at 71:17-72:14.)

6  Aside from conversations over Qualcomm in which Sheer was dispatched optional
7  loads, he did not have any interaction with Swift.  (UMF 24.)  Sheer was not required to
8  report to a Swift facility on a daily basis.  (UMF 25.)  As an employee, in contrast, Sheer
9  was required to check in with Swift every morning via Qualcomm. (Sheer Depo. at 44:3-
10 45:20.)

11 Additionally, Swift did not control who drove with Sheer.  As an Owner-Operator,
12 Sheer was aware he could work in a "driver team" if he wanted.  (UMF 26.)  He chose not
13 to, based purely on his own personal preference.  (UMF 27.)  As an Owner-Operator,
14 Sheer could also assign someone of his choosing to drive in his place.  (UMF 28.)  As an
15 Owner-Operator, Sheer could also have a passenger ride with him while he performed his
16 work.  (UMF 29.)

17 Finally, pursuant to the terms of Sheer's ICOA, he could contract with other carriers
18 if he chose, so long as he did not use Swift's resources, name or authorities.  (UMF 11.)

19 **C.  Sheer Made Significant Investments In Equipment And Materials And Could Hire Labor As An Owner-Operator**
20

21 When he was an employee driver, Swift provided Sheer with all the equipment and
22 tools he needed to perform his work and did not permit him to hire laborers to carry out his
23 job duties.  (*See* Sheer Depo. at 55:3-14; 151:19-22; 152:19-25 162:21-24.)  For example,
24 Swift provided him with and paid for his truck, gas, insurance, maintenance, repairs,
25 Qualcomm unit and usage, and PrePass Plus Transponder.  (*Id.*)  As an Owner-Operator,
26 by contrast, Sheer was required to make significant investments in his equipment and make
27 all purchases himself.  He invested thousands of dollars into his truck (which he could
28 have leased or purchased a truck from any company of his choosing, but he chose to lease

-4-

the truck from IEL).  (UMFs 30-31.)  Sheer was also aware of Owner-Operators who invested in multiple trucks.  (UMF 32.)  Sheer was responsible for the repair, maintenance, and upkeep of his truck as an Owner-Operator.  (UMF 33.)  He paid for his own insurance as an Owner-Operator.  (UMF 34.)  Indeed, Swift did not provide him with ***anything*** he needed to perform his work as an Owner-Operator free of charge, including fuel.  (UMF 35.)  Sheer purchased his own Qualcomm unit and paid his own usage fees each week.  (UMF 36.)  Sheer understood that he could buy a Qualcomm unit from another company, and was in no way required to obtain the equipment from Swift.  (UMF 37.)  Critically, Sheer could hire drivers, driver helpers, and laborers to work for him as an Owner-Operator, as long as they met state and federal legal requirements, such as Department of Transportation regulations.  (UMF 38.)  Sheer would have had to pay his own employees as an Owner-Operator – Swift would not have done so.  (UMF 39.)

### D. As An Owner-Operator, Sheer Had Opportunity To Make Significant Profit Or Experience Loss Depending On His Managerial Skill

Sheer talked to "probably 50" other Owner-Operators before deciding to become an Owner-Operator himself.  (UMF 40.)  Based on these conversations, he understood that his success as an Owner-Operator would depend on his "effort" and "dedication."  (UMF 41.) Sheer believes he ultimately became a successful Owner-Operator because of, among other things, his financial or business sense.  (UMF 42.)  Sheer's ICOA provided him the opportunity to make significantly more money than an employee driver by work as a member of a driver team, hiring employees, and purchasing or leasing multiple trucks.  (UMF 43.)

### E. The Parties' Intention Was To Form An Independent Contractor Relationship

Both Sheer and Swift intended to form an independent contractor relationship when they entered into the ICOA.  Before signing his ICOA, Sheer read portions of the ICOA, and understood that the term "Contractor" referred to him.  (UMF 3.)  He understood that he was entering into an agreement whereby he would become an independent contractor with Swift and no longer be a Swift employee.  (Sheer Depo. at 90:4-10.)

F.     **As An Owner-Operator, Sheer Was Paid By The Job, Received A 1099 Form, And Was Not Eligible For Benefits**

As an Owner-Operator, Sheer was paid per the completion of each trip – not by the hour. (UMF 44.) He was also paid via weekly settlements, while Swift employees are paid through payroll checks. (UMF 45.) Also, Sheer paid his own taxes. (UMF 46.) He received an Internal Revenue Service ("IRS") 1099 form, not a W-2 form. (UMF 47.) Further, Swift did not provide Sheer with medical insurance, dental insurance, 401(k) benefits, or any other benefits as an Owner-Operator. (UMF 48.) However, as an employee, Sheer was eligible for benefits, including a 401(k), medical insurance, and accrued vacation time. (Sheer Depo. at 36:19-38:4.)

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) requires the court to grant summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once this is done, the burden shifts to the nonmoving party to go beyond the pleadings and identify "specific facts showing that there is a genuine issue for trial." *Id*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

Only genuine disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. If the nonmoving party is unable to meet its burden of producing specific evidence from which a reasonable trier of fact could return a verdict in its favor, summary judgment must be granted. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

1       Here, the evidence – including the language in Sheer's ICOA and lease agreement
2  and Sheer's deposition admissions – clearly demonstrates that Sheer was properly
3  classified as an independent contractor by Swift.  No reasonable trier of fact could weigh
4  the evidence and reach a contrary conclusion.  Summary judgment on this issue is
5  therefore appropriate.

6  **IV.    <u>SHEER WAS PROPERLY CLASSIFIED AS AN INDEPENDENT
7  CONTRACTOR</u>**

8       The U.S. Supreme Court has not established a single rule or test for determining
9  whether an individual is an independent contractor or an employee.  Under the
10 circumstances in this case, the appropriate standard is the common law "agency" test.  The
11 issue in this case is whether Sheer's independent contractor agreement with Swift was a
12 "contract of employment" under the FAA.  However, the FAA does not define the phrase
13 "contract of employment" or what it means to be an employee versus an independent
14 contractor.  When a statute does not define "terms that have accumulated settled meaning
15 under … the common law, a court must infer … that Congress mean[t] to incorporate the
16 established [common law] meaning of these terms."  *Cmty. for Creative Non-Violence v.*
17 *Reid*, 490 U.S. 730, 739 (1989).  Accordingly, courts apply the general common law of
18 agency in determining whether an individual is an independent contractor or employee for
19 FAA purposes.  *Aviles v. Quik Pick Express, LLC*, No. CV-15-5214-MWF (AGR), 2015
20 U.S. Dist. LEXIS 174960, *9-13 (C.D. Cal. Dec. 3, 2015) (applying common law agency
21 test to determine whether putative class members were independent contractors or
22 employees under the FAA); *Bell v. Atl. Trucking Co.*, No. 3:09-cv-406-J-32MCR , 2009
23 U.S. Dist. LEXIS 114342, *12-20 (M.D. Fla. Dec. 7, 2009) (same); *Davis v. Larson*
24 *Moving & Storage Co.*, No. 08-1408 (JNE/JJG), 2008 U.S. Dist. LEXIS 87251, 17-18 (D.
25 Minn. Oct. 27, 2008) (same); *accord Reid*, 490 U.S. at 740 (applying general common law
26 of agency to define "employee" under the Copyright Act); *Nationwide Mut. Ins. Co. v.*
27 *Darden*, 503 U.S. 318, 323-24 (1992) (applying general common law of agency to define
28 "employee" under the Employee Retirement Income Security Act).

Under the common law analysis of agency, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mut. Ins. Co.*, 503 U.S. at 323.  The Court must considers a number and variety of factors, including:

> (1) The hiring party's right to control the manner and means by which the product is accomplished;
> (2) The skill required;
> (3) The source of the instrumentalities and tools;
> (4) The location of the work;
> (5) The duration of the relationship between the parties;
> (6) Whether the hiring party has the right to assign additional projects to the hired party;
> (7) The extent of the hired party's discretion over when and how long to work;
> (8) The method of payment;
> (9) The hired party's role in hiring and paying assistants;
> (10) Whether the work is part of the regular business of the hiring party;
> (11) Whether the hiring party is in business;
> (12) The provision of employee benefits; and
> (13) The tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52.  "Other relevant factors may also be considered so long as they are drawn from the common law of agency." *Salamon v. Our Lady of Victory Hosp.*, 514 F3d 217, 227 (2nd Cir. 2008).  Applying these factors to the facts of this case, it is clear that Sheer was properly classified as an independent contractor.[2]

---

[2] There have been previous references in this case to the "economic realities" test for determining whether an individual is an independent contractor or employee.  However, the economic realities test only applies when making such a determination under the Fair Labor Standards Act of 1938, 29 U.S.C. 201 *et seq.* ("FLSA").  The common law agency test is not used because, unlike the FAA, the FLSA expressly defines the terms "employer", "employee," and "employ." *See* 29 U.S.C. § 203(d), (e)(1), (g).  The economic realities test focuses on "whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (citations and quotations omitted).  The test analyzes the following a non-exhaustive list of six-factors to make this determination:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
> (4) whether the service rendered requires a special skill;

Here, Sheer's own admissions demonstrate that he was properly classified as an independent contractor during the time he was an Owner-Operator for Swift.  As explained above, Sheer's deposition testimony shows that he was able to control the manner and means of completing his work, determine what routes and loads he chose, hire his own employees, and establish his own business if he so chose, the success or failure of which was dependent upon his own business acumen.  In addition, Sheer provided his own tools, which is indicative of an independent contractor relationship, not an employment relationship.  He was also treated as an independent contractor for payment, tax, and benefits purposes.  Further, Sheer's ICOA and leasing agreement stated in no uncertain terms that he was an independent contractor, and the terms and conditions of these agreements demonstrate that Swift had little to no control over Sheer.  These factors show that Sheer was properly classified as an independent contractor as a matter of law.

### A. Sheer Had Virtually Complete Control Over The Manner and Means By Which He Performed His Work As Well As The Location Where He Performed His Work

The undisputed evidence demonstrates that Sheer had full control over the manner and means of performing his work.  As described above, it is undisputed that:

- Sheer received only one day of training when he became an Owner-Operator, which Swift provided as a convenience to educate Sheer on "tax issues" and "how to run efficiently."  (UMF 12.)  This is in sharp contrast to the extensive training he received as an employee driver.
- Swift did not provide Sheer with, nor require him to be familiar with, Swift's company policies as an Owner-Operator.  (UMF 13.)
- Swift did not require Sheer to take any particular route when delivering his freight. (Sheer Depo. at 124:22-25.)  Sheer opted to use the suggested routes, but it was entirely his personal choice to do so.  (UMF 16.)  Sheer did not have to inform Swift that he was taking a different route than the optional route provided to him. (Berry Depo. at 96:10-15.)
- Sheer could also choose whatever fueling stops he wanted.  (UMF 18.)

---

(5) the degree of permanence of the working relationship; and
(6) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).  The factors under the economic realities test are essentially a subset of the factors under the common law agency test. Regardless of which test the Court applies, Sheer was an independent contractor, not an employee, as set forth below.

- Sheer could take his truck to any location of his choosing for repairs, and in fact, he made the decision of which repair and maintenance shops to use based on convenience and price. (UMF 20.)
- Sheer had minimal interactions with Swift. (UMF 24.) Sheer was not required to report to a Swift facility on a daily basis. (UMF 25.)
- Swift exerted minimal control over who drove with Sheer. Sheer could drive as part of a "driver team" if he so chose. (UMF 26.) Alternatively, he could "assign" someone of his choosing to drive in his place. (UMF 28.) He could also elect to have a passenger ride with him. (UMF 29.)
- Sheer could contract with other carriers, so long as he did not use Swift's resources, name or authorities in doing so. (UMF 11.)
- Sheer could select what loads he wanted to pick up, could decline loads and independently determine when to work an how long to work for, as explained in further detail below.

Sheer's experience is consistent with the terms and conditions of his ICOA with Swift. Based on the above, it is clear that Swift virtually no control over any significant facet of how Sheer performed his work. Moreover, his experience as an Owner-Operator vastly differed from his experience as an employee at Swift, during which time Swift exerted significantly more control over his work. (*See* Section (II)(B).)

Because Sheer admittedly had full control over the manner and means of performing his work, this factor weighs in favor of an independent contractor relationship.

**B.** **Sheer Could Select What Loads He Wanted To Pick Up, Could Decline Loads, And Independently Determined When To Work, And How Long To Work For**

The undisputed evidence shows that Swift had no control over what loads Sheer decided to pick up, when he decided to work, or how long he chose to work for. Sheer admits that Swift did not require him to accept any particular freight loads offered to him as an Owner-Operator. (UMFs 7, 21.) Thus, Sheer unequivocally knew he had the ability and authority to decline loads that were offered to him as an Owner-Operator. (*See id.*) No one at Swift could force Sheer to take a load, and Sheer would not be disciplined or face any other negative repercussions if he turned down a load. (UMFs 21-23.) This is further evidence that Sheer was in an independent contractor relationship with Swift while he was an Owner-Operator.

-10-

1   This factor weighs in favor of Sheer being properly classified as an independent
2   contractor as well.

### C. Sheer Made Significant Investments In His Equipment, Materials, And Tools, And Could Hire Employees If He So Chose

As explained above, Sheer made a significant investment into the instrumentalities of his work. He invested thousands of dollars into his truck and was aware of other Owner-Operators who invested in multiple trucks. (UMFs 30, 32.) Sheer was responsible for the repair, maintenance, and upkeep of his truck as an Owner-Operator, and he paid for his own insurance. (UMFs 33-34.)

Indeed, Swift did not provide Sheer with **anything** he needed to perform his work as an Owner-Operator free of charge, including fuel. (UMF 35.) In contrast, when Sheer worked as an employee driver, Swift provided him with all the equipment and tools he needed to perform his work, including his truck, gas, maintenance, repair, Qualcomm unit, insurance, and any other instrumentalities that he may need. (*See* Sheer Depo. at 55:3-14; 151:19-22; 152:19-25; 162:21-24.)

Also, Sheer he could hire drivers, driver helpers, and laborers to work for him if he so chose. (UMF 38.) If he decided to hire an employee, he would be required to pay him or her, and Swift would not have any control over the employee's payment. (UMF 39.) Numerous courts have held that these circumstances weigh "strongly in favor" of concluding that an individual is an independent contractor. *See Chao v. Mid-Atlantic Installation Servs.*, 16 Fed. Appx. 104, 107 (4th Cir. 2001) (explaining that expenditures on instrumentalities to perform work are usually expected of independent contractors but not of employees, who are given the tools to perform their job by their employer); *see also Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76 (E.D. Mi. 1990) (same).

### D. Sheer Could Have His Own Business, And His Opportunity For Profit Or Loss Was Based On His Managerial Skill

As Sheer testified, he fully understood that he could own his own trucking business if he felt so inclined. While working as an Owner-Operator, Sheer was able to develop his

-11-

1  own business model and had full opportunity to determine what loads to take and decline
2  in order to efficiently manage his workload and be the most profitable.

3  In addition, Sheer was able to hire additional help if he determined that doing so
4  would benefit his business demands and entrepreneurial design.  (UMF 38.)  Also, Sheer's
5  ICOA did not prohibit him from simultaneously contracting with other entities if he
6  believed that doing so was in the best interest of his business and bottom line.  (UMF 11.)

7  Sheer could also fully control his costs (such as fuel costs, repairs, etc.) through
8  efficient management.  For instance, he could decide whether or not to turn down loads
9  because certain loads would not be fuel efficient or economical.  (UMF 17.)  Whether or
10 not Sheer efficiently managed his costs also affected his bottom line.

11 Given these circumstances, it is evident that Sheer's managerial skill directly
12 affected his profit or loss – which is a critical factor in determining whether he was
13 properly classified as an independent contractor.  *Wolcott v. Nationwide Mut. Ins. Co.*, 884
14 F.2d 245, 251 (6th Cir. 1989) (applying the common law agency test to determine if an
15 independent contractor relationship existed and finding that the fact that the plaintiff
16 "exercised managerial skill in the operation of his business" weighed in favor of an
17 independent contractor relationship).

18 **E.    Sheer Was Paid Via Weekly Settlements, Did Not Receive Benefits, And Was Treated As An Independent Contractor For Tax Purposes**
19

20 Swift's method of payment to Sheer is wholly indicative of an independent
21 contractor relationship.  As an Owner-Operator, Sheer was paid per completed trip – not
22 by the hour.  (UMF 44.)  He was also paid via weekly settlements, while Swift's
23 employees are paid through payroll checks.  (UMF 45.)  Sheer received an IRS Form 1099
24 and was paid as an independent contractor for tax purposes, while employee drivers
25 receive a W-2 form.  (UMFs 46-47.)  Moreover, Sheer purchased his own tax services with
26 ATBS, which he understood was not owned by Swift.  (UMF 49.)  Thus, Swift's payment
27 method to Sheer drastically differed from its payment method to its employees.  In
28

addition, Sheer did not receive any employee benefits from Swift while he was an Owner-Operator.  (UMF 48.)

These factors further weigh in favor of finding that Sheer was properly classified as an independent contractor.

## F. Courts In Analogous Cases Have Found That Drivers Were Properly Classified As Independent Contractors

In the trucking industry, it is extraordinarily common for companies to enter into contractual service agreements with independent contractor drivers.  These independent contractor relationships are an integral facet of the trucking industry.  Numerous courts that have examined these relationships have found that drivers in similar situations as Sheer were properly classified as independent contractors.  For instance, in *Aviles*, 2015 U.S. Dist. LEXIS 174960, *11-13, the court found that a putative class of truck drivers were independent contractors because: (1) drivers set their own schedule; (2) the company did not instruct the drivers on what routes to take or when and where to stop for fuel; (3) drivers had the ability to turn down as many loads as they wished; (4) drivers were able to lease truck from the company or any other dealer; (5) drivers could hire their own employees; (6) drivers could balance their loads as they saw fit in order to increase efficiency; (7) drivers could work for other companies; and (8) drivers received no employment benefits and were not subject to income or payroll tax withholdings.  Like in *Aviles*, all of these factors are satisfied here.

Similarly, truck drivers in *Carney v. JNJ Express, Inc.*, 10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) were considered independent contractors because they were "responsible for determining the means of their performance under the Leases, including equipment, routes, and scheduling."  The court also noted the fact that they were "responsible for costs such as fuel, oil, maintenance and repairs, primary insurance, and worker's compensation insurance," showed that they were not employees.  *Id.*  Again, this situation is directly analogous to Sheer's relationship with Swift.

-13-

SMRH:477958756.3   MEMORANDUM OF P'S AND A'S ISO MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO PLAINTIFF JOSEPH SHEER'S STATUS AS AN INDEPENDENT CONTRACTOR

In yet another nearly identical situation, in *Davis v. Larson Moving & Storage Co.*, 2008 U.S. Dist. LEXIS 87251, 17-18 (D. Minn. Oct. 27, 2008), the Court found that a truck driver was properly classified as an independent contractor because:

> Plaintiff was required to provide his own truck.  Plaintiff assumed control over selection of routes and fuel stops, decisions about maintenance of his truck, arrangements for loading and unloading his truck, and scheduling work hours and rest periods, subject to legal requirements and the needs of Defendant's customers.  Plaintiff was permitted to hire additional personnel to perform services under the lease, with Plaintiff assuming responsibility for hiring, supervision, and compensation of the additional personnel.  Plaintiff could elect to reject specific shipments and could choose to be unavailable to Defendant for reasonable periods of time.

As in *Davis*, all of these factors are present in this case and weigh in favor of finding that Sheer was an independent contractor.

Finally, in *Young v. Swift Transportation Co. of Arizona*, LLC, Case No. 08-46182 RR, the California Labor Commissioner examined whether Swift's Owner-Operators are misclassified as independent contractors and determined they are not.  (Request for Judicial Notice, ¶ 1, Ex. 1.)  The Labor Commissioner found that a plaintiff Owner-Operator "maintained control of his own work load" because he was able to choose which loads he accepted and rejected without consequence.  The Labor Commissioner also determined that the plaintiff could perform work for other parties, as long as Swift indicia was removed from his truck.  **Based on these facts, the Labor Commissioner held that the Owner-Operator was properly classified as an independent contractor**.  The issues in this case have already been adjudicated in Swift's favor.  There is no reason for this Court to deviate from the Labor Commissioner's findings.

///
///
///
///
///
///
///

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the instant Motion for Partial Summary Judgment and enter an order finding that Sheer was properly classified as an independent contractor.

Dated:  June 10, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By  /s/ Robert Mussig
RONALD HOLLAND
ELLEN M. BRONCHETTI
PAUL S. COWIE
ROBERT MUSSIG

Attorneys for Defendants
SWIFT TRANSPORTATION CO. OF ARIZONA, LLC, INTERSTATE EQUIPMENT LEASING, LLC, CHAD KILLEBREW and JERRY MOYES

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to the following CM/ECF registrants:

Susan Joan Martin
Jennifer Lynn Kroll
Martin & Bonnett PLLC
1850 N. Central Ave.; Ste. 2010
Phoenix, AZ  85004

Dan Getman
Edward John Tuddenham
Lesley Tse
Getman & Sweeney, PLLC
9 Paradies La.
New Paltz, NY  12561

Attorneys for Defendants

*/s/ Robert Mussig*

SMRH:477958756.3