**SUSAN MARTIN (AZ#014226)**
**DANIEL BONNETT (AZ#014127)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com

**DAN GETMAN (*Pro Hac Vice*)**
**LESLEY TSE (*Pro Hac Vice*)**
**GETMAN & SWEENEY PLLC**
9 Paradies Lane
New Paltz, NY 12561
(845) 255-9370
dgetman@getmansweeney.com

**EDWARD TUDDENHAM (*Pro Hac Vice*)**
228 W. 137th St.
New York, New York 10030
(202) 249-9499
etudden@prismnet.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Virginia Van Dusen, et al., | ) **No. CV 10-899-PHX-JWS** |
| | ) |
| Plaintiffs, | ) **PLAINTIFFS' OPPOSITION TO** |
| | ) **DEFENDANTS' MOTIONS FOR** |
| | ) **SUMMARY JUDGMENT** |
| vs. | ) |
| | ) |
| Swift Transportation Co., Inc., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

# Table of Contents

Table of Authorities ............................................................................................ ii

FACTS ..................................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.      PLAINTIFFS HAD NO MEANINGFUL CONTROL OVER THEIR WORK .......... 2

II.     PLAINTIFFS HAD NO OPPORTUNITY TO SELECT LOADS ............................ 13

III.    PLAINTIFFS HAD NO MEANINGFUL INVESTMENT IN EQUIPMENT .......... 15

IV.     PLAINTIFFS HAD NO OPPORTUNITY FOR PROFIT OR LOSS BASED ON
        ENTREPRENEURIAL SKILL .............................................................................. 16

V.      DURATION OF EMPLOYMENT FAVORS EMPLOYEE STATUS ...................... 20

VI.     DEFENDANTS' PAY PRACTICES SUPPORT A FINDING OF EMPLOYEE
        STATUS ................................................................................................................. 20

VII.    ANALOGOUS CASES SHOW PLAINTIFFS WERE EMPLOYEES ...................... 21

VIII.   CONCLUSION ....................................................................................................... 23

**Table of Authorities**

**Cases**

*A.A. ex. Rel. Aday v. US,* 2014 WL 554225 (D. Az. Feb. 12, 2014) .................................... 8

*Alexander v. FedEx Ground Package System, Inc.,* 765 F.3d 981 (9th Cir. 2014) ............. 20

*Aviles v. Quik Pick Express LLC,* No. CV-15-5214, 2015 WL 9810998 (C.D. Ca. 2015) . 21

*Baker v. Flint Eng'g. & Const. Co.,* 137 F.3d 1436 (10th Cir. 1998) ................................. 17

*Blue Lake Rancheria v. U.S.,* 653 F.3d 1112 (9th Cir. 2011) ....................................... 4, 8, 10

*Brock v. Mr. W. Fireworks, Inc.,* 814 F.2d (5th Cir. 1987) ................................................. 18

*Carney v. JNJ Express, Inc.,* 10 F. Supp. 3d 848 (W.D. Tenn. 2014) ................................. 22

*Collinge v. IntelliQuick Delivery, Inc.,* No. 2:12-CV-00824 JWS, 2015 WL 1299369 (D. Ariz. Mar. 23, 2015) ..................................................................................................... 17, 23

*Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989) ................................... 8

*Davis v. Larson Moving and Storage Co.,* No. 08-1408, 2008 WL 4755835 (D. Minn. Oct. 27, 2008) ........................................................................................................................... 22

*Donovan v. Sureway Cleaners,* 656 F.2d 1368 (9th Cir. 1981) ....................................... 3, 9

*GreenFleet Systems v. Int'l. Bro. of Teamsters,* 2015 WL 1619964 (NLRB Div. of Judges Apr. 9, 2015) ....................................................................................................................... 23

*J. Huizinga Cartage Co. v. NLRB,* 941 F.2d 616 (7th Cir. 1991) ....................................... 21

*Max Trucking LLC v. Liberty Mut. Ins. Corp.,* 802 F.3d 793 (6th Cir. 2014) .................... 22

*McGuire v. U.S.,* 349 F.2d 644 (9th Cir. 1965) .................................................................... 6

*Narayan v. EGL, Inc.,* 616 F.3d 895 (9th Cir. 2010) ........................................................... 7

*Nat. Mut. Ins. Co. v. Darden,* 503 U.S. 318 (1992) ....................................................... 4, 11

*NLRB v. Friendly Cab Co., Inc.,* 512 F.3d 1090 (9th Cir. 2008) .......................................... 6

*O'Connor v. Uber Technologies Inc.,* 2015 WL 5138097 (N.D. Ca. Sept 1, 2015) ........... 21

*Ruiz v. Affinity Logistics,* 754 F.3d 1093 (9th Cir. 2014) ............................................. 7, 16

*Scantland v. Jeffry Knight,* 721 F.3d 1308 (11th Cir. 2013) ............................................. 18

*Seattle Opera v. NLRB,* 292 F.3d 757 (D.C. Cir. 2002) ...................................................... 21

*Time Auto Transport v. NLRB,* 377 F.3d 496 (6th Cir. 2004) ....................................... 11, 22

*Toyota Motor Sales USA, Inc. v. Superior Court,* 220 Cal. App. 3d 864 (1990) ............... 21

*U.S. v. Rosenwasser,* 323 U.S. 360 (1945) ......................................................... 20

*Usery v. Pilgrim Equipment,* 527 F.2d 1308 (5th Cir. 1976) ............................... 18

**Regulations**

Treas. Reg. §31.3306(i)-1(b) ........................................................................ 4

**Other Authorities**

Department of Labor Administrator's Interpretation No. 2015–1, 2015 WL 4449086 ...... 21

Rev. Rul. 87-41, 1987-1 CB 296 ............................................................... 4, 10

Defendants' motions for summary judgment asserting that Plaintiffs were independent contractors should be denied. Although Defendants filed five different motions for summary judgment they are largely the same and, for the convenience of the court and the parties, Plaintiffs will file this single memorandum in opposition to all five.[1] As explained below, many of the facts on which the motions are based are not supported by the record, and even where they are supported, they do not justify the conclusions that Defendants seek to draw from them. When "all of the incidents of the relationship" are considered, *NLRB v. United Insurance Co. of America,* 390 U.S. 254, 258 (1968), it is clear that the contract and lease under which Plaintiffs worked was a contract of employment exempt from arbitration under §1 of the Federal Arbitration Act and that Plaintiffs were not independent contractors.

## FACTS

Plaintiffs have responded to each of Defendants' five statements of fact, setting forth in detail their disagreements with Defendants' facts. Lest the point be lost in all of the necessary detail, Defendants' statements of "undisputed" fact are based on a compendium of misquotes, misleading partial citations to the relevant evidence, and outright misstatements. *See* Plaintiffs' Five Responsive Statements of Fact.

That said, the essential facts of the relationship created by the Lease/Contract document signed by Plaintiffs are not in dispute. Plaintiffs and other lease operators were hired from among Swift's employee drivers based solely on their demonstrated ability to consistently drive 10,000 miles a month. PSOF[2] ¶¶11-14. They were completely integrated into Swift's trucking business and virtually indistinguishable from Swift's employee drivers: Like employee drivers, lease operators drove exclusively for Swift, PSOF ¶¶166-

---

[1] Plaintiffs also file separate Controverting ("PC ¶") and Additional ("PA ¶") Statements of Fact applicable to each of Defendant's five separate motions (with attached declarations of Sheer, Wood, and Van Dusen), and the Declaration of Lesley Tse (attaching exhibits). Each of these documents is applicable to each of Swift's five motions.

[2] PSOF refers to Plaintiffs' Separate Statement of Facts in Support of Plaintiffs' Motion for Summary Judgment. Doc. 772.

173; they were assigned loads and dispatched in the same way as employee drivers and were used by Swift interchangeably, PSOF ¶¶81, 101, 133, 246; and they were constantly monitored by Swift in the same way as employee drivers, PSOF ¶¶146-156. Lease operators' mileage rates were set unilaterally by Swift, PSOF ¶¶ 113-117. Both kinds of drivers were required to comply with the same Swift policies, PSOF ¶¶98-104,[3] PA ¶¶ 10-20, and were expected to drive the same number of miles each week. PSOF ¶¶101(k), 115. Lease operators had no more investment in their equipment than employee drivers: Swift provided them with their trucks for little or no money down, PSOF ¶¶ 3, 82, and offered 100% financing not only of their lease payments, but of their operating expenses as well. PSOF ¶¶ 84, 210, 217-227, 236-237. As long as they drove the same number of miles per week that Swift expected of its employee drivers, the higher mileage rate they were paid was sufficient to cover those advances and allow them to operate with no more out-of-pocket investment than an employee driver. PSOF ¶¶ 16, 91, 115-116, 231. The contract gave Swift the right to terminate lease operators at-will, which had the effect of automatically placing them in default of their leases. PSOF ¶¶ 49, 52-54. Such a default gave Swift the right to seize the truck and accelerate all remaining lease payments, a right that could have devastating financial consequences for the lease operator. PSOF ¶¶53-54. This ability to place lease operators in default at-will gave Swift the ability to force lease operators to accept unilateral contract changes including reductions in pay. PSOF ¶¶58-59.

## ARGUMENT

## I.   PLAINTIFFS HAD NO MEANINGFUL CONTROL OVER THEIR WORK

Swift's motions claim that Plaintiffs exercised sufficient control over their work to stand as independent economic entities. *See Donovan v. Sureway Cleaners,* 656 F.2d 1368,

---

[3] Swift driver managers and Planners may not always have been consistent in the enforcement of Swift's policies, which explains most of the inconsistencies in the testimony, *see, e.g.* Doc. 772-5, Ex. 4 at VS: 62:1-23, 84:20-85:12 (could deviate from Swift routes as an employee and lease operator)); Doc. 772-2, Ex. 1 at VVD: 98:21-99:4 (could not deviate from Swift routes as an employee or as a lease operator)). Nevertheless, there is no question that Swift had the power to enforce its policies whenever it deemed it necessary.

1  1371 (9th Cir. 1981) ("Control is only significant when it shows an individual exerts such a

2  control over a meaningful part of the business that she stands as a separate economic

3  entity.") (citation omitted). Defendants' arguments do not withstand examination. We

4  respond to each of Defendants' arguments as follows.

5      1. Swift maintained extensive policies that could result in termination. Swift asserts

6  that, while Plaintiffs received a Driver Manual, Doc. 775-5 and 775-6 (Exs. 14a and 14b),

7  and extensive training in that manual as employee drivers, they did not receive any new

8  Swift policy documents when they became lease operators. Based on this, Swift argues

9  that lease operators, unlike employee drivers, had no obligation to comply with Swift

10  policies and were free to operate as they saw fit. But Plaintiffs' contracts state clearly that

11  lease operators may be terminated immediately for violation of "any Company policy."

12  Contract ¶17A. "Any Company policy" necessarily includes the company policies in the

13  Swift Driver Manual, particularly when the Driver Manual indicates on its face that

14  policies set forth therein are applicable to lease operators. PSOF ¶100-101;[4] PA ¶¶ 11-13.[5]

15  Plaintiffs understood that the Driver Manual policies continued to apply to them after they

16  became lease operators and Swift did not, nor could it, disavow that.[6] *Id.* Thus, despite the

17  _____

18  [4] *See, e.g.,* Doc. 775-5, Ex. 14a at DEF4962, DEF4964; DEF4967; DEF4987; DEF4994-5 and  DEF5022*; see also* Doc. 775-6, Ex. 14b.

19
20  [5] *And see* the variety of other policies and instructions applicable to lease drivers set forth
    in the Contracted Driver Manual, Pl. Ex. 12 (Doc. 775-2), Handshake to Horsepower, Pl.
21  Ex. 13 (Doc. 775-4), and the Pre-CABS Training Manual, Pl. Ex. 11 (Doc. 775-2); PA ¶¶ 10-20.

22  [6] *See, e.g.,* Doc. 772-5, Ex. 4 at VS: 140:2-142:7 ("I assumed the [Driver Manual] rules
23  were the rules. I didn't differentiate. I'd been with Swift for five years; I did the rules.
    Nobody came and knocked on the window of my truck and said, hey, rules have changed
24  because you're in a blue truck [color of lease operator trucks]. Nobody said that. Nobody
    messaged me. Nobody called me and said, you're under different rules.")). When asked
25  what lease operators were told about the continued applicability of the policies in the
26  Driver Manual, Swift's representative said he did not know. Doc. 776-8 at Swift 160: 20-
    161:23). Swift did testify that the "Swift policies" referenced in paragraph 17A of the
27  contract were those in Doc. 775-2, Ex. 11 (Pre-CABS Training Manual), Doc. 775-3, Ex.
    12 (Handshake to Horsepower), and Doc. 775-4, Ex. 13 (Contracted Driver Manual).
28  PSOF ¶98. The policies in those documents are identical or virtually identical to the

alleged change in status when they signed their contracts, Plaintiffs continued to have the smallest details of their performance controlled by the same Swift policies they were required to comply with as employees. *See, e.g.* PSOF ¶ 101; Doc 771 at 9-10.

2. Lease operators received training and Swift had the right to require it. Swift's assertion that it provided no training for lease operators is similarly untrue. In addition to the extensive training in Swift policies provided at the time Plaintiffs were first hired by Swift, PSOF ¶¶98-101, Swift continued to require lease operators to attend trainings after they signed their leases. *See* PSOF ¶200-201 (Lease operator contract requires attendance at "Swift Independent Contractor Orientation" and completion of Pre-CABs training course); PSOF ¶202-204 (lease operators required to attend periodic virtual simulator and safety trainings). The provision of training by the principal is indicative of an employment relationship. *See* Rev. Rul. 87-41, 1987-1 CB 296, cited in *Nat. Mut. Ins. Co. v. Darden,* 503 U.S. 318, 324 (1992) (citing receipt of "training" as indicative of employee status). The fact that Swift may not have required all lease operators to undergo additional training, *see, e.g.,* Doc. 772-5, Ex. 4 at VS: 45:3-6, does not change the fact that Swift had the right to insist that lease operators undergo training whenever Swift deemed it necessary or appropriate). *Blue Lake Rancheria v. U.S.,* 653 F.3d 1112, 1120 (9th Cir. 2011) ("it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so" quoting Treas. Reg. §31.3306(i)-1(b)).

3. Absence of formal performance reviews is not germane. Swift's argument that it did not conduct any formal performance evaluations of Plaintiffs' work is of no significance as the weekly financial obligations the lease imposed on Plaintiffs rendered formal evaluations unnecessary. Swift set its mileage rate at a level that required lease

---

policies in the Driver Manual, PSOF ¶101 (*comparing* Doc. 775-2, Ex. 11, Doc. 775-3, Ex. 12 and Doc. 775-4, Ex. 3 *with* Doc. 775-5 and Doc. 775-6, Exs. 14a-b), which may explain why Swift was unsure whether it provided copies of Ex. 11, 12, and 13 to all lease operators.

operators to meet Swift's performance expectation of driving 2400 miles per week in order to make their lease payments. PSOF ¶101(k); 115. Thus, payment of the weekly lease obligation, coupled with Swift's constant monitoring of on-time deliveries, over-speed events, and traffic citations provided Swift with all of the performance evaluation it needed. PSOF ¶104; Doc. 772-5, Ex. 4 at VS: 33:7-17 (describing performance data constantly available for each truck on Planners' screens)). In addition, the at-will termination provision in the contract effectively meant that each driver's performance was subject to constant evaluation; Swift had no need to conduct a formal evaluation to terminate an unsatisfactory driver.[7]

4. Lease Operators were constantly monitored. Swift notes that no one from Swift was present while Plaintiffs worked, but that fact is of no significance. Direct visual supervision is simply impractical in the long-haul trucking industry. Swift could not visually supervise employee drivers either. *See* PA ¶8. Nevertheless, it did constantly monitor the performance of both kinds of drivers throughout the day. Both kinds of drivers were required to contact their driver managers on the same regular schedule, PSOF ¶¶101(h) and (j), 146-149, 156. Both were required to have Qualcomm communication devices as well as Swift's Omni-tracs/Sensor-tracs monitoring devices installed in their trucks so that Swift could constantly monitor their speed, location, estimated time of arrival, as well as their engine RPMs, idle time, and virtually every other aspect of their trucks' performance. PSOF ¶¶104, 150-151. Both kinds of drivers had speed governors in their trucks. PSOF ¶101(n). Swift driver managers used this information to track drivers' progress towards their destinations and intervened whenever it appeared that a lease

_____

[7] It does not appear that Swift's evaluation of lease operators was significantly different from its evaluations of employee drivers. Plaintiff Schwalm, the only Plaintiff that recalled receiving a performance evaluation as an employee driver, was evaluated regarding on-time deliveries and safety issues, Doc. 772-5, Ex. 4 at VS: 23:19-26:4); She was not sure whether she received evaluations as a lease operator but testified that her driver manager continued to evaluate her performance, that nothing was really different in her interaction with her driver manager, *Id.* at VS: 45:3-46:19, and that Swift continued to constantly monitor her on-time deliveries and safety issues. *Id.* at VS: 33:7-17, PSOF ¶104.

operator or employee driver might be late with a delivery, or was violating Swift policies in some way.[8] PSOF ¶104, 152-155, 242-245; *See, e.g.* Doc. 772-4, Ex. 3 at JM: 102:5-20 (if stopped while driving high value load immediately got a message on the Qualcomm asking the reason for stopping)); Doc. 771 at 8-9.

     5. Swift had the right to impose discipline. Swift's claim that it did not impose discipline on lease operators is false. PSOF ¶140 (discipline for turning down loads); PSOF ¶144 (Swift retains the contractual right to seize a lease operator's truck to ensure timely delivery); PSOF ¶¶242-243 (progressive discipline policy applicable to lease operators for speed violations), PSOF ¶244 (write-ups for using unprofessional language); PSOF ¶¶102, 245 (discipline for safety violations). Swift's ability to impose discipline on Plaintiffs indicates an employment relationship.[9] *NLRB v. Friendly Cab Co., Inc.,* 512 F.3d 1090, 1099 (9th Cir. 2008).

---

[8] In an effort to downplay its constant supervision of Plaintiffs, Swift misleadingly claims that Plaintiffs went days without communicating with Swift and that Plaintiffs were the only ones to initiate communications. It is true that once a driver had picked up a load and was on the road, there was no need for further communication as long as the driver was progressing towards his or her destination in a timely manner, Doc. 772-5, Ex. 4 at VS: 103:11-23); PA ¶1, but the lack of communication when there was no need for it is of no significance. *McGuire v. U.S.,* 349 F.2d 644, 646 (9th Cir. 1965) ("The right to control requires only such supervision as the nature of the work requires"). The record is clear that when Swift deemed it necessary, it did not hesitate to communicate with drivers. PSOF ¶152-153, 156, 159, 171, 232, 236, 242-245. Swift's claim that all of Plaintiff Schwalm's communications with Swift were initiated by her mischaracterizes her testimony. Her statement related to her requests for load assignments, not all communications of all kinds. Doc. 772-5, Ex. 4 at VS: 103:4-104:4). She testified to numerous communications initiated by Swift. *Id.* at VS:111:16-117:8; 33:23-34:1; 37:23-38:1; 38:20-39:6; 81:22-82:10; 84:6-10; 85:5-8; 86:9-18; 135:21-136:23.

[9] In a further effort to downplay the extent to which it monitored and controlled Plaintiffs, Defendants attempt to argue that Plaintiffs had no supervisors. That is patently untrue, the evidence shows that Driver Managers, Planners and Rapid Response were constantly telling lease operators what to do. PSOF ¶¶101(m), 101(s), 119, 171, 211, 242, 246. In her deposition, Plaintiff Schwalm stated that Rapid Response supervised her and that nothing was different with her driver manager once she became a lease operator. Doc. 772-5, Ex. 4 at VS: 46:1-49:19). Plaintiffs Sheer, Motolinia and Van Dusen were never asked in their depositions who their supervisors were as lease operators; Plaintiff Wood identified his

6. Route selection is inherent in any driver's job, yet Swift still mandated routes. Swift claims that lease operators could choose their own routes (what roads to take between point A and point B) but, once again, that fact is of no significance in determining Plaintiffs' status as Swift also allowed employee drivers to do the same. PSOF ¶¶160-161. Besides, being allowed to choose one's route is not the kind of thing that allows one to stand as an independent economic entity. *See Narayan v. EGL, Inc.,* 616 F.3d 895, 904 (9th Cir. 2010) ("the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relationship.") (citation and quotation omitted). Of course, Swift did not accord even this minor freedom to Plaintiffs without imposing financial consequences. PSOF ¶¶158-159 (deviating from Swift route could mean loss of fuel surcharge payments and toll reimbursement). Moreover, Swift did <u>not</u> always allow lease operators to choose their own routes. Whenever Swift deemed it necessary, lease operators were required to follow the route specified by Swift. PSOF ¶101(o) (lease operators required to follow Swift route when driving high value loads); PSOF ¶159 (Plaintiff Wood informed by his driver manager that he had to follow the route assigned by Swift).[10] A principal's retention of the right to exercise *necessary* controls is what indicates an employment relationship. *Ruiz v. Affinity Logistics,* 754 F.3d 1093, 1101 (9th Cir. 2014) (entity that retains all necessary control over work is employer even if it relinquishes other aspects of control).

7. Swift's fuel stop recommendations were held out as the least expensive. Swift argues that it allowed Plaintiffs to deviate from Swift's suggested fueling stops, but that fact is also meaningless. Given Swift's greater knowledge of fuel prices, the right to select fueling stops contributed nothing to Plaintiffs' independence. *See* PSOF ¶160 (Swift

---

fleet manager as his supervisor when he was a lease operator. Doc. 772-6, Ex. 5 at PW: 51:17-21). *See also*, PA ¶¶ 6-7.

[10] Plaintiff Wood's experience is a good example of how Swift adjusted its control over drivers as it deemed necessary. When Wood started as a lease operator he was allowed to take his own route, Doc. 772-6, Ex. 5 at PW: 121:18-20, but later, a new driver manager apparently became dissatisfied with Wood's performance and told him he had to follow Swift's routes. *Id.* at PW: 106:5-108:4; 121:21-123:2.

informed drivers that its computer generated recommendation took into account information "that it would be impossible for any one person to know when they are looking for the best price of fuel."). The insignificance of this right is illustrated by Plaintiff Schwalm, one of the more successful Plaintiffs (until Swift started cutting her miles), who testified that she only departed from Swift's recommended fuel locations on one or two occasions in the two years she drove as a lease operator. Doc. 772-5, Ex. 4 at VS: 85:5-18.

8. Swift controlled repair and maintenance. Swift's assertion that lease operators could choose where they stopped for repairs and maintenance is false. The Lease explicitly states that "[a]ll Equipment repairs and maintenance shall be performed at facilities designated or approved by the Lessor." Lease ¶6(c). The fact that Swift may not have enforced this requirement with respect to every repair is irrelevant.[11] It is the right to control, not the exercise of that right, that is the critical factor in the common-law definition of employment. *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 750-752 (1989) (rejecting actual control test in favor of common law right to control test); *Blue Lake Rancheria,* 653 F.3d at 1120; *A.A. ex. Rel. Aday v. US,* Nos. CV-11-08188-PCT-GMS, CV-11-08191-PCT-GMS, 2014 WL 554225 at *7 (D. Ariz. Feb. 12, 2014).

9. Other driver controls mentioned by Swift are meaningless. Swift lists a series of other inconsequential "controls" that it allowed Plaintiffs to exercise including the right to use their trucks to run personal errands (such as getting supplies from Walmart), the right to carry passengers and pets, the right to control their appearance, the right to change from one driver manager to another (which Defendants incorrectly denote as "fire", and the right to drive a "dedicated route." Swift does not explain how "control" over any of these aspects of the job helped Plaintiffs stand as independent economic entities. *See Sureway*

---

[11] Swift cites testimony from some Plaintiffs that they could choose repair locations—a fact that was true as long as they chose from among approved locations. Lease ¶6. IEL testified that drivers had to get approval for work on trucks prior to March 2014. Doc. 776-7, Ex. 26 at IEL: 71:8-15. And admitted it would be a violation of the lease not to obtain approval in the event of an accident. *Id.* at IEL: 67:16-25.

*Cleaners,* 656 F.2d at 1371 ("Control is only significant when I shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.") (citation and quotation omitted). They clearly did not as Swift accorded the same rights to its employee drivers. Both employees and lease operators could use their trucks for personal errands. PSOF ¶248; PA ¶ 3. Both could carry passengers and pets if they obtained Swift's permission and complied with Swift's passenger policies (which were the same for lease operators and employee drivers). PSOF ¶101(c), Lease ¶6(a). Both were subject to the same dress and appearance policies, PSOF ¶101(d)-(e); Swift Driver Manual, Doc. 775-6, Ex. 14(B)(DEF005058). Both kinds of drivers could change their driver managers, Doc. 772-6, Ex. 5 at PW: 65:17-67:1, and both were permitted to drive "dedicated routes" if Swift approved them to do so. Doc. 772-3, Ex. 2 at JS: 170:14-17, 178:4-7; *see also* PA ¶ 2.

10. Plaintiffs could not hire substitute drivers or trip lease with other carriers. Swift asserts only two controls that might have contributed to economic independence, but they were not available to Plaintiffs: (1) that Plaintiffs were allegedly free "to assign someone else of [their] choosing to deliver freight or perform other work in [their] place," and (2) that they allegedly could drive for other companies. The undisputed facts show, however, that Plaintiffs could exercise neither of these rights. As for hiring substitute drivers, while the Contract purported to grant this right, Contract ¶7A, the Lease was explicit that the lessee "shall be the driver assigned to the Equipment." Lease ¶6(a). Only if the lessee were "ill, disabled, or otherwise unable to drive the Equipment" would IEL consider granting permission for the use of a substitute driver (and it was by no means required to do so). *Id.* *See* PSOF ¶176-183. Thus, Swift, not the Plaintiffs, controlled whether a lease operator could use a substitute.[12] *Blue Lake Rancheria,* 653 F.3d at 1120 (right to control, not exercise of control is what matters).[13]

---

[12] Even apart from the fact that the practice was prohibited by the lease, the evidence shows that leasing multiple trucks for employee drivers to drive was not something that Plaintiffs or most other lease operators could afford. Doc. 776-7 at IEL: 122:16-123:21;

9

The right to haul for other motor carriers described in the ¶5B of the Contract was also contradicted by the terms of the Lease. The Lease required each lease operator to enter into an independent operating agreement with a carrier "which shall be Swift Transportation," Lease ¶2(e), and to authorize Swift to deduct "weekly" the driver's "overall lease payments" from the driver's "earned and available settlement compensation" under the operating agreement. *Id.* Thus, drivers had to drive exclusively for Swift so that Swift could make the required weekly deductions. PSOF ¶170. *See also* Doc. 776-7 at IEL: 56:18-58:12 (stating that, while IEL cannot physically stop drivers from working for another carrier, the lease requires them to drive for Swift)). Despite the language in the contract, Swift itself repeatedly and emphatically told Plaintiffs that they could <u>not</u> drive for other carriers under any circumstances. PSOF ¶¶171-172; PA ¶5. This is a particularly telling example of just how much control Swift exercised over Plaintiffs. Swift's ability to terminate a driver at will and place him in default of his lease, PSOF ¶¶51-55, with all of the devastating financial consequences that flowed therefrom, effectively gave Swift the ability to modify the contract at will or to simply ignore its terms and announce that rights described in the contract—such as the alleged right to drive for others—were prohibited.[14] *See* Rev. Rul. 87-41, 1987-1 CB 296, cited in *Darden,* 503 U.S. at 324 (noting that the ability to discharge at-will indicates employment status because the employer can use the threat of dismissal to demand compliance with its instructions). *See also Time Auto Transport v. NLRB,* 377 F.3d 496 (6th Cir. 2004) (finding drivers to be employees, *inter*

---

[13] Plaintiffs did have the right to hire non-driving helpers and laborers, Contract ¶7A, but that right was of no significance as employee drivers had the same right. PSOF ¶¶101(u), 184.

[14] Even if Swift had not barred Plaintiffs from driving for others, the contract requirement that all of the equipment listed in ¶5B be returned to Swift before driving for another carrier, and that no Swift equipment, such as the Qualcomm and trailer, be used, made trip leasing for another carrier impossible as a practical matter. Swift conceded that it knew of no lease operator who had ever successfully used ¶5B of the contract to drive for another carrier. PSOF ¶173.

1    *alia*, because employer could use the threat of terminating their lease with its attendant

2    financial consequences to require compliance with employer demands).

3        11. Lease operators were treated like employees. Toward the end of its control

4    argument Swift makes the blanket assertion that Plaintiffs' experience as lease operators

5    "vastly differed" from their experience as employee drivers. Swift does not explain how it

6    differed or offer any evidence to support its assertion. In fact, from the Plaintiffs'

7    perspective, little if anything changed. PSOF ¶¶246-249; *see, e.g.* Doc. 772-4, Ex. 3 at

8    JM:10, 20 (nothing changed when became a lease operator), 48:13-18 (after signing lease

9    "it continued to be the same, whether company driver or owner operator, it was the

10   same")); Doc. 772-3, Ex. 2 at JS: 23:6-12 ("I don't distinguish between" being a company

11   driver and a lease operator. "I was an employee until 2009 until they terminated the lease

12   on my truck."), 88-95 (no distinction between being an employee driver and a lease

13   operator)); Doc. 772-2 Ex. 1 at VVD: 98 (Swift "didn't treat us any different [as lease

14   operators] than when we were employees. We still were told how to do things. We were

15   still told how to pick up the loads. We were still told what routes to take. We . . . couldn't

16   turn down loads. Just like you couldn't when you were a company driver.")). Their

17   testimony is borne out by the rest of the undisputed testimony.

18       12. Swift exercised all necessary control. Swift concludes its control argument with

19   another sweeping and wholly unsupported assertion, that it "had little or no control over

20   any facet of how [Plaintiffs] performed [their] work." Doc. 769 at 11. Again, Swift's

21   statement flies in the face of the undisputed record: Swift controlled the entire operation in

22   which Plaintiffs worked: it controlled the customer base, it determined what shipments its

23   drivers would haul and what price customers would be charged. PSOF ¶105-112. It

24   controlled what loads were assigned to which drivers, the time frames in which drivers

25   were required to pick up and deliver loads, PSOF ¶¶122-132, 147, and the details of how

26   drivers should drive special loads. PSOF ¶101(o). Swift chose the trucks it offered for

27   Lease and unilaterally dictated the mileage rate it paid Plaintiffs. PSOF ¶¶113-117.

28   Perhaps most important of all, because Swift would not allow lease operators to drive for

11

anyone else, Swift's control over load assignments and the mileage rate gave it complete control over Plaintiffs' earnings—the more loads (miles) it assigned the more a Plaintiff could earn, the fewer loads (miles) it assigned the less they earned; the choice was entirely up to Swift. PSOF ¶¶117-120, *see, e.g.* Doc. 772-5, Ex. 4 (VS: 185:5-186:9 (When Swift cut her miles in half she didn't have enough "to pay for the truck.")). Swift also controlled Plaintiffs day-to-day operations just as it controlled the operations of its employee drivers: Both were assigned loads and dispatched in exactly the same manner, PSOF ¶¶143-164, both had to check-in on the same schedule, PSOF ¶¶ 148-149, 155-156, 101(h), 101(j), and both were subject to the same continuous monitoring through the Omni-tracs system, PSOF ¶¶150-151. Both had to comply with all of the policies set forth in Swift's driver manual, PSOF ¶¶98-101, 187-198, 246-249, and both were subject to termination at-will, a provision that gave Swift extraordinary leverage to demand compliance with whatever request Swift made.[15] PSOF¶¶31, 52. In short, no meaningful difference existed between the control that Swift exercised over its employee drivers and the control it exercised over its lease operators. The only difference between them was that lease operators indebted themselves to Swift by signing a lease, while employees did not. But far from contributing to lease operators' independence, that indebtedness simply gave Swift even more leverage over their behavior than it had over its employee drivers.

In sum, while Swift's motions set forth a laundry list of minor things that Swift sometimes allowed Plaintiffs to control (most of which it also allowed employee drivers to control), those motions fail to identify *any* controls exercised by Plaintiffs that contributed to their ability to stand as independent economic entities. All *necessary* controls over the Plaintiffs' jobs were exercised by Swift and Swift alone. In these circumstances the control

---

[15] To cite but one example of the level of control Swift could exercise over its lease operators by virtue of the power to terminate, Plaintiff Schwalm testified that she preferred to use paper logs but was told by Swift that she had to agree to pay for a new Qualcomm computer that could generate electronic logs or she could not have her truck. Swift installed it where Swift wanted it installed even though Schwalm thought it obstructed her view and wanted it placed elsewhere in her cab. *See* Doc. 772-5, Ex. 4 at VS: 111:20-117:8.

factor weighs heavily in favor of finding that the Contract established an employment relationship.

## II.     PLAINTIFFS HAD NO OPPORTUNITY TO SELECT LOADS[16]

Swift argues that it had no control over what loads Plaintiffs would accept, what days they would be available, or the hours per day they would work. This argument is nonsensical for two reasons. First, if what Swift means is that Plaintiffs did not work fixed five days-a-week, nine-to-five schedules, that is simply the nature of the trucking industry; employee drivers had no fixed schedules either.[17] Second, instead of imposing fixed schedules, Swift exercised all necessary control over the hours that Plaintiffs and employee drivers worked through the per-mile pay system applicable to both kinds of drivers. That pay system effectively forced drivers to work as many hours as possible if they had any hope of making a living. Indeed, Swift set the mileage rate for lease operators at a level that forced them to drive 2400 miles a week to be successful—exactly the same number of miles Swift expected of its employee drivers. PSOF ¶101(k). Not surprisingly, therefore, Plaintiffs ended up driving approximately the same number of hours per week as they did

---

[16] In their various statements of undisputed facts, Defendants assert that Plaintiffs "selected" their loads. That is a highly misleading characterization. Loads were assigned by Swift one at a time; Plaintiffs were never given the opportunity to select a load from among offered options. PSOF ¶¶135-139. Like employee drivers, lease operators had only one choice: accept the load offered or turn it down without knowing what would be offered next, or when. PSOF ¶¶140-142.

[17] As Plaintiff Schwalm explained, as an employee driver no one ever instructed her what days or hours to work; she knew which days and hours she was expected to work because "We were given a load, and we were- there is no time frame in truck driving. You're given a load, and your job is to get it where it needs to get." Doc. 772-5, Ex. 4 at VS: 22:9-24). *See also* Doc. 772-2, Ex. 1 at VVD: 31:23-32:22 (employee drivers don't report to terminal)); PSOF ¶101(i) (Driver Manual states: "Your work schedule will be determined by Company requirements, freight availability for delivery, and DOT requirements."). *See also* PA ¶4.

when they were employees.[18] PSOF ¶92. As for the specific hours a day a driver worked, Swift's set the load pick-up time and the imperative of timely delivery determined the hours a driver worked when under load. PA ¶4.

As for lacking control over the loads that Plaintiffs would accept, Swift exercised all necessary control through its mileage rate. It knew full well that, at the rates it paid, Plaintiffs' need to earn money to meet their weekly lease payments would provide more than sufficient incentive for them to accept most, if not all, loads offered—particularly when they had no other source of loads. (And if it wasn't sufficient incentive, Swift retained the right to terminate excessively picky drivers at will). Swift permitted employee drivers the right to turn down loads as well, no doubt for the same reason: it knew that— because they could only drive for Swift—they would have to accept most, if not all, of the loads that Swift offered.

Swift also knew that turning down loads was of little, if any, economic value to drivers so giving them that right was hardly a concession. As explained in Plaintiffs' motion for summary judgment, Doc. 771 at 13-14, Swift only offered drivers one load at a time. PSOF ¶¶135-136. Drivers who turned down an offered load had no way of knowing whether the next load offered would be better or worse or when it would be offered. PSOF ¶¶134-137, 141. Moreover, Plaintiffs were uniformly under the impression that turning down a load posed a serious risk of retaliation in the form of having to wait days for another load to be offered—a cost that drivers who had to meet weekly lease payments could ill afford. PSOF ¶140. Swift did not admit to retaliating, but it did concede that turning down a load could result in a long wait before another load materialized. PSOF ¶141. In these circumstances, lease operators generally avoided turning down loads. PSOF ¶142. Some drivers, like Vicki Schwalm, made a point of never turning down anything in order to convey to Swift her commitment to drive as many miles as possible, Doc. 772-5, Ex. 4 at VS: 28:11-23; 35: 3-36:3), an attitude that Swift encouraged. PSOF ¶134

---

[18] Swift could also keep drivers on the road by not assigning them a load toward home where they could take time off. PSOF ¶101(l)-(m).

14

(Training Manual states "Owner Operators who run rather than sit usually fare better than those who often wait for a 'better load.'"). In this way, Swift was able to exercise all necessary control over load assignment and had no need to impose a rigid requirement that drivers accept all loads assigned.

As with the other controls urged in the first part of Swift's argument, Plaintiffs' alleged right to decide whether to accept an offered load and, hence, decide the hours they would work, was of no significance in allowing them to operate as independent economic entities. If Plaintiffs had been allowed to accept loads freely from other carriers, the right to turn down an unprofitable load offered by Swift might have had some meaning, as a driver could then seek a better paying load from someone else. But since Plaintiffs were required to drive exclusively for Swift, the right to turn down a load amounted to nothing more than the right to be unemployed—a right that has never contributed to anyone's ability to stand as an independent economic entity.

## III.   PLAINTIFFS HAD NO MEANINGFUL INVESTMENT IN EQUIPMENT

Swift contends that Plaintiffs invested "thousands of dollars" in equipment because Swift "did not provide anything" to lease operators, as distinguished from its employee drivers for whom "Swift provided . . . all equipment and tools," Doc. 769 at 9. Once again, the facts are to the contrary. Swift provided lease operators with exactly the same equipment and tools it provided to employee drivers, it just did so on credit, rather than outright. The difference between the two was simply an accounting gimmick. Along with its extension of credit to Plaintiffs, Swift also paid a higher mileage rate designed to allow Plaintiffs to pay back their debt as long as they drove the expected number of miles. Plaintiffs never saw the full earnings generated by their higher mileage rate and, while employed, didn't actually make payments for the debt they owed for their truck and supplies—Swift calculated everything for them, reimbursing itself in full for the credit it had extended during the week, and remitting the remainder to the driver. Remarkably, from Swift's point of view it was cheaper to provide drivers with trucks and equipment through this credit/higher mileage rate/deduction scheme than it was to provide them

outright to employee drivers. *See* PSOF ¶121 (Swift's cost per mile for lease operator trucks is lower than for employee trucks despite having to pay a higher mileage rate). *See also* Doc. 776-3, Ex. 22 ¶12, Doc. 776-4, Ex. 23 ¶14, Doc. 776-4, Ex. 24 ¶13 (Plaintiffs saw little difference between being an employee and a lease operator because, although as the latter they were responsible for operating costs, the higher mileage rate covered those costs).

Swift structured this credit/deduction scheme so that it did not require any more investment on the part of the lease operator than Swift's employee drivers made. Swift only required a down payment of $500 for a truck lease and waived that frequently. PSOF ¶83 (three of the five Plaintiffs paid no down payment for their trucks). Everything a lease operator needed—insurance, taxes, bond, lease payments—was financed on Swift's credit with no financial outlay by the Plaintiffs at all. PSOF ¶¶82-91. And, by virtue of the fuel cards, weekly advances and other credit offered by Swift, lease operators could continue to drive week after week without any financial outlay at all as long as Swift offered, and they drove, sufficient miles each week. PSOF ¶¶207-237. Such an arrangement does not constitute an "investment" by Plaintiffs, let alone the kind of investment indicative of an independent economic entity. *See Affinity Logistics*, 754 F.3d at 1101, 1104 (holding that it was "clearly erroneous" to view a paid leasing arrangement similar to Swift's as evidence of drivers providing or investing in their own equipment).

## IV.   PLAINTIFFS HAD NO OPPORTUNITY FOR PROFIT OR LOSS BASED ON ENTREPRENEURIAL SKILL

Swift notes that most of the Plaintiffs signed up to be lease operators because they hoped to establish their own businesses. That desire is understandable, but irrelevant. The question presented is not the relationship Plaintiffs hoped to achieve, but the relationship actually created by their contracts. As for that, Plaintiffs were unanimous in their opinion that signing a contract did not make them independent but left them in essentially the same position they had been as employees. PSOF ¶¶246-249.

Swift makes broad general assertions that Plaintiffs had the opportunity for profit and loss based on their business "acumen," "knowledge," and "managerial skill," but never actually describes what decisions Plaintiffs could make that would actually affect profits or loss, or what precisely they did that required the exercise of entrepreneurial skill. It does not, because it cannot. Plaintiffs simply did not make meaningful business decisions or exercise managerial expertise—they drove from point A to point B, nothing more. The more they drove, the more they earned, but the same was true for employee drivers as well. That lease operators did not and, indeed, could not exercise any kind of business judgment is highlighted by the meaninglessness of the only two driver decisions that Swift manages to identify. First it notes that Plaintiffs could make a profit because they "could . . . fully control [their] costs (such as fuel costs, repairs)." Doc. 745 at 15. Of course, contrary to that statement, the price of fuel was entirely out of their control, and, although drivers may have had some marginal ability to increase their earnings by driving in a fuel efficient manner, the weight of the loads assigned by Swift and the geographical terrain over which loads had to be carried had a greater impact on fuel consumption than any driving technique a driver might use. *See* PA ¶9. Besides, the ability to control costs is not the kind of "profit" that is indicative of independent contractor status. *Baker v. Flint Eng'g. & Const. Co.,* 137 F.3d 1436, 1444 (10th Cir. 1998) (ability to earn more by controlling costs does not enable a worker to make a "profit"); *Collinge v. IntelliQuick Delivery, Inc.,* No. 2:12-cv-00824 JWS, 2015 WL 1299369, at *5 (D. Ariz. Mar. 23, 2015) ("although selecting a fuel-efficient vehicle will likely reduce a driver's costs over the long run, there is little 'managerial skill' involved in that decision").

Second, Swift claims that, although none of the Plaintiffs ever did so, they *could have* leased multiple trucks and hired employees to drive them as a way of increasing their earnings. That kind of "could have" speculation is of no relevance to the employee/independent inquiry. "[I]t is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Brock v. Mr. W. Fireworks, Inc.,* 814 F.2d 1042, 1047 (5th Cir. 1987) (emphasis in original); *Scantland*

17

1   *v. Jeffry Knight,* 721 F.3d 1308, 1311 (11th Cir. 2013) ("It is not significant how one 'could

2   have' acted under the contract terms. The controlling economic realities are reflected by

3   the way one actually acts.") (quoting *Usery v. Pilgrim Equipment,* 527 F.2d 1308, 1312

4   (5th Cir. 1976).[19] Even if arguments about what Plaintiffs could have done under the

5   contract were relevant, there is not an iota of evidence to support Swift's assertion that

6   Plaintiffs *could* have afforded to lease or own multiple trucks. PSOF ¶16 (most Plaintiffs

7   could not pass a credit check or afford a substantial down payment for a truck and, as IEL

8   testified, "there's a large percentage of truck drivers that don't have very good credit.").

9   Besides, Swift itself would first have to approve a driver seeking to lease a second truck

10  and would also have to approve the driver for that truck. PSOF ¶¶175, 181-183. Swift

11  required drivers seeking to lease a second truck to meet much higher financial and credit

12  standards than it required for the first truck, which may explain why very few lease

13  operators did so. PSOF ¶¶185-186. Even if a lease operator could afford a second truck, he

14  or she would still be entirely dependent on Swift to provide sufficient loads to keep his or

15  her trucks moving and cover the lease payments—something that Swift has no obligation

16  to do. Contract ¶1. Plaintiffs, who did not get enough miles from Swift to keep one truck in

17  the black, would not have fared any better had they had two trucks. *See* Doc. 772-5, Ex. 4

18  at VS: 50:21-51:6; 186: 5-20 (Schwalm quit after her miles were reduced to the point she

19  could not break even)); Doc. 772-3, Ex. 2 at JS: 74:14-18 (terminated contract in part

20  because Swift "did not give us enough miles to cover our own expenses")); *see* Doc. 776-

21

22

---

23  [19] Cases holding that the court should look to how a worker actually acts are consistent
    with cases that hold courts should look to an employer's *right* to control rather than his

24  actual exercise of it. An employer who unilaterally drafts a contract has the ability to
    include provisions that provide the appearance of worker independence without giving the

25  worker the ability to act on those provisions, such as the provision in the Plaintiffs'
    contracts that purports to allow them to drive for other carriers. Hence, it is important to

26  look at how workers actually act. Conversely, an employer that has the right to control
    certain aspects of the work may choose not to exercise it, but that does not preclude him

27  from exercising it in the future if he deems it necessary. Hence, the importance of looking
    to the employer's *right* to control, not the *exercise of it.*

28

3, Ex. 22 ¶13, Doc. 776-4, Ex. 23 ¶15 and Doc. 776-5, Ex. 24 ¶14 (Plaintiffs do not believe that hiring a driver would have helped them earn more money).

The fact of the matter is that Swift had no confidence in the ability of its lease operators to make decisions for themselves—a point that is well illustrated by Swift's policies regarding driver maintenance accounts. Although the contract indicated that such accounts were voluntary, Plaintiffs testified that they were told that such accounts were mandatory. PSOF ¶211. Moreover, Swift required drivers to provide a repair order or receipt to withdraw their own funds from the account, Doc. 772-7, Ex. 6 (VVD contract/lease at p 41 of 63), and to further ensure that lease operators did not use the funds for non-maintenance expenses, Swift prohibited drivers from withdrawing funds from the accounts except during the first 5 days of each calendar quarter. *Id.* If lease operators were truly independent businessmen then surely they could have been trusted to make their own decisions about how best to allocate their money, whether to pay the rent or a doctor's bill or save for an unexpected repair. Swift's exercised control over lease operators' maintenance accounts precisely because Swift did not want lease operators to exercise independent judgment with regard to their money, but instead wanted to force them to spend their money in the way that was most beneficial to Swift—*i.e.* on the maintenance of their trucks.

Rather than making money from the exercise of independent business judgment, Plaintiffs made their money by their labor alone: the more miles they drove the more money they could make, period. Of course, Swift, and Swift alone, controlled how many miles they would be assigned and what mileage rate they would be paid for that work. PSOF ¶¶115-116. In this regard Plaintiffs were no different from employee drivers: In either case, if Swift wanted a driver to be successful, it offered him or her sufficient miles at a sufficient rate to make money. If it did not want a driver to be successful, or just did not care, it could force him out by simply withholding assignments or terminating him. PSOF ¶117. No amount of fuel efficiency, shopping for inexpensive repairs, or leasing of multiple trucks could make a lease operator successful if Swift chose not to assign

19

1  sufficient miles each week. For this reason, Swift's argument that there was no limit to the

2  money drivers could make is meaningless. The only money Plaintiffs could make was the

3  direct result of loads assigned by Swift. If Swift assigned sufficient loads to keep their

4  trucks moving, Plaintiffs' could make money—but the same could be said for employee

5  drivers as well. In both cases, it was Swift's choice what loads to assign.

6  ## V.    DURATION OF EMPLOYMENT FAVORS EMPLOYEE STATUS

7          Swift argues that Plaintiff Wood's fairly short tenure as a lease operator, four

8  months the first time and ten months the second time, suggests independent contractor

9  status. But it is not the actual number of months worked that matters, particularly in a

10 relationship with an at-will termination provision. Rather, as the Ninth Circuit explained, it

11 is the indefinite nature of a worker's tenure that suggests employee status as opposed to

12 being "hired to perform a specific task for a defined period of time" which suggests

13 independent contractor status. *Alexander v. FedEx Ground Package System, Inc.,* 765 F.3d

14 981, 996 (9th Cir. 2014) (quoting *Narayan,* 616 F.3d at 903). Plaintiff Wood, like the other

15 Plaintiffs, was hired pursuant to a contract that automatically renewed each year unless

16 terminated. That is evidence of an indefinite tenure and employee status. *Id.*

17 ## VI.   DEFENDANTS' PAY PRACTICES SUPPORT A FINDING OF EMPLOYEE
18         STATUS

19         Swift contends that it paid lease operators "per completed trip" and that that per-job

20 payment system is indicative of independent contractor status. Here again, the record does

21 not support Swift's assertions. Lease operators, like employees, were paid based on the

22 number of miles they drove each week. [20] PSOF ¶¶58, 113. Pay-per-mile is a form of piece

23 rate indicative of employee status. *U.S. v. Rosenwasser,* 323 U.S. 360, (1945) ("A worker

24 is as much an employee when paid by the piece as he is when paid by the hour."). The

25 weekly settlement system for employee drivers and lease operators was similar, the only

---

26 [20] To be sure, employee drivers and lease operators had to complete a delivery and turn in
27 their trip packet before they would be compensated for the miles associated with that trip,
   but that does not transform a per-mile rate into a "job rate." In the latter system, the
28 amount paid for each job varies and the worker is paid at the conclusion of each job.

1    difference being that lease operators received a higher mileage rate and had the operating
2    expenses advanced to them by Swift deducted from their settlements while employee
3    drivers did not if they submitted receipts. PSOF ¶¶7-8.

4        Swift also argues that the fact lease operators are not eligible for employee benefits
5    and receive 1099s rather than W-2 forms is evidence of independent status. But those facts
6    are simply the consequences of Swift's decision to designate lease operators as
7    independent contractors; they prove nothing about the actual nature of the relationship. *See*
8    *Seattle Opera v. NLRB,* 292 F.3d 757, 764 fn 8 (D.C. Cir. 2002) ("if an employer could
9    confer independent contractor status through the absence of payroll deductions there would
10   be few employees falling under the protection of the Act.") (quoting *J. Huizinga Cartage*
11   *Co. v. NLRB,* 941 F.2d 616, 620 (7th Cir. 1991)); *O'Connor v. Uber Technologies Inc.,* No.
12   C-13-3826 EMC, 2015 WL 5138097 at *27 fn. 31 (N.D. Cal. Sept 1, 2015) ("Likewise,
13   workers who are classified as independent contractors may receive a Form 1099–MISC
14   from their employers. This form simply indicates that the employer engaged the worker as
15   an independent contractor, not that the worker is actually an independent contractor. . . ."
16   (quoting Department of Labor Administrator's Interpretation No. 2015–1, 2015 WL
17   4449086 at *4); *Toyota Motor Sales USA, Inc. v. Superior Court,* 220 Cal. App. 3d 864,
18   877 (1990) ("The requirements that Heard pay his own payroll and income taxes and
19   provide his own worker's compensation insurance are of no help to [the purported
20   employer]. These are merely the legal consequences of an independent contractor status,
21   *not means of proving it."*) (emphasis supplied).

22   **VII.   ANALOGOUS CASES SHOW PLAINTIFFS WERE EMPLOYEES**

23       Swift cites four cases that it claims are analogous to the instant case, yet all four are
24   easily distinguished. In *Aviles v. Quik Pick Express LLC,* No. CV-15-5214, 2015 WL
25   9810998 (C.D. Cal. 2015), the status of the plaintiff drivers was decided on a motion to
26   compel arbitration without discovery and without any evidence or argument in favor of
27   employee status being made. *See Id.* at *4 (the "Plaintiff failed to submit any declarations
28   in support of Plaintiff's position that the Hired Parties are employees . . . In fact, as

discussed above, Plaintiffs' supplemental brief failed entirely even to argue the point."). A case decided on such a one-sided record is hardly persuasive. *Carney v. JNJ Exp., Inc.,* 10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014); *Davis v. Larson Moving and Storage Co.,* No. 08-1408*, 2008 WL 4755835 (D. Minn. Oct. 27, 2008), were also decided on motions to compel arbitration without benefit of discovery. The plaintiffs in both cases relied primarily upon the argument that truck drivers at issue were statutory employees regardless of the facts of their situation—an argument which both district courts rejected. *Carney,* 10 F. Supp.3d at 852-853; *Davis,* 2008 WL 4755835 at *5. Beyond that the plaintiffs in *Carney* made a cursory argument that their relationship did not change when they became owner operators, but presented no evidence to support their claim that they exercised the same level of control when they were employees. *Id.* at 853-854. The *Davis* court's opinion contains even less analysis. *Davis,* 2008 WL 4755835 at *6. Finally in a clear sign of desperation, Swift cites a California Labor Commission decision finding a *pro se* Swift driver to be an independent contractor. The decision contains only one paragraph of analysis regarding the right to hire employee drivers in paragraph 5A of the contract. The commission does not even mention the contradictory terms in the lease agreement (indeed it does not mention the lease agreement at all) and it makes no attempt to analyze the various ways, discussed above, in which Swift exercised complete control over its lease operators. In short, none of the "analogous" cases cited by Swift are remotely helpful in analyzing the employment status of the Plaintiffs in this case.

Far more helpful are the cases cited in Plaintiffs' motion for summary judgment, Doc. 771 at 24-25, such as *Time Auto Transport,* 377 F.3d 496 (6th Cir. 2004), which notes the pervasive control a company can exercise where, as here, it can terminate their leases at will and thereby forfeit drivers' down payments and other monies held by the company, and *Max Trucking LLC v. Liberty Mut. Ins. Corp.,* 802 F.3d 793 (6th Cir. 2014), which finds that the lack of independence that exists where, as here, drivers are wholly dependent upon the company to finance their truck and advance operating costs. *See also GreenFleet Systems v. Int'l. Bro. of Teamsters,* Cases 21-CA-10003, 2015 WL 1619964

(NLRB Div. of Judges Apr. 9, 2015) (drivers who leased their trucks from company they drove for were "neither independent nor businesses"); *see also IntelliQuick Delivery, Inc.*, 2015 WL 1299369, at \*6 (noting economic reality and common law standards identical); *Affinity Logistics*, 754 F.3d 1093; *Alexander*, 765 F.2d 981.

## VIII.   CONCLUSION

For all of the foregoing reasons Defendants' motions for summary judgment should be denied. Not because the essential facts concerning Plaintiffs' circumstances are in dispute, but because those facts overwhelmingly establish, contrary to Defendants' motions, that Plaintiffs were not independent contractors and that the contracts/leases entered into by Plaintiffs were contracts of employment exempt from arbitration under §1 of the FAA.

Respectfully submitted this 22nd day of July, 2016.


**Martin & Bonnett, P.L.L.C.**

By: <u>s/Susan Martin</u>
Susan Martin
Daniel Bonnett
Jennifer Kroll
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900

Dan Getman  (*pro hac vice*)
Lesley Tse (*pro hac vice*)
Getman & Sweeney, PLLC
9 Paradies Lane
New Paltz, NY 12561
Telephone: (845) 255-9370

Edward Tuddenham (*pro hac vice*)
228 W. 137th St.
New York, New York 10030

ATTORNEYS FOR PLAINTIFFS

# CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to the following CM/ECF registrants:

Ellen M. Bronchetti
Paul S. Cowie
Ronald Holland
Sheppard Mullin Richter & Hampton
Four Embarcardero Center, 17th Floor
San Francisco, CA 94111

Robert Mussig
Anna M. Stancu
Sheppard Mullin Richter & Hampton
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071

Attorneys for Defendants

s/T. Mahabir