SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
RONALD J. HOLLAND, Cal. Bar No. 148687 *(Pro Hac Vice)*
rholland@sheppardmullin.com
ELLEN M. BRONCHETTI, Cal. Bar No. 226975 *(Pro Hac Vice)*
ebronchetti@sheppardmullin.com
PAUL S. COWIE, Cal. Bar No. 250131 *(Pro Hac Vice)*
pcowie@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone: 415-434-9100
Facsimile: 415-434-3947

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
ROBERT MUSSIG, Cal. Bar No. 240369 *(Pro Hac Vice)*
rmussig@sheppardmullin.com
ANNA M. STANCU, Cal. Bar No. 288283 *(Pro Hac Vice)*
astancu@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone: 213-620-1780
Facsimile: 213-620-1398

Attorneys for Defendants
SWIFT TRANSPORTATION CO. OF ARIZONA, LLC, INTERSTATE EQUIPMENT LEASING, LLC, CHAD KILLEBREW and JERRY MOYES

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

VIRGINIA VAN DUSEN; JOHN DOE 1; and JOSEPH SHEER, individually and on behalf of all other similarly situated persons,

Plaintiffs,

v.

SWIFT TRANSPORTATION CO., INC.; INTERSTATE EQUIPMENT LEASING, INC.; CHAD KILLIBREW; and JERRY MOYES,

Defendants.

Case No. CV 10-899-PHX-JWS

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF PETER WOOD'S STATUS AS AN INDEPENDENT CONTRACTOR**

[Filed concurrently with Reply to Plaintiff's Controverting and Additional Statements of Fact, Supplemental Declaration of Robert Mussig and Supplemental Declaration of Anna M. Stancu]

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 0

II. LEGAL ARGUMENT .......... 2

A. Wood Cannot Dispute That He Exercised Control Over The Manner and Means By Which He Performed His Work .......... 2

B. Wood Cannot Dispute That He Was Responsible For Investing In All Equipment, Material, Labor, And Tools He Needed To Run His Business .......... 8

C. Wood And His Business' Lack Of Success Highlights Rather Than Obviates The Opportunity He Had For Profit Or Loss Based On His Managerial Skill .......... 9

D. Wood's Cited Cases Are Inapposite .......... 10

III. CONCLUSION .......... 10

-i-

SMRH:479126740.1

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF PETER WOOD'S STATUS AS AN INDEPENDENT CONTRACTOR

# TABLE OF AUTHORITIES

Cases Page(s)

*Aviles v. Quik Pick Express, LLC*
2015 U.S. Dist. LEXIS 174960 (C.D. Cal. Dec. 3, 2015) .......... 7, 8

*Carney v. JNJ Express, Inc.*
10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) .......... 7, 8

*Chao v. Mid-Atlantic Installation Servs.*
16 Fed. Appx. 104 (4th Cir. 2001) .......... 9

*Davis v. Larson Moving & Storage Co.*
2008 U.S. Dist. LEXIS 87251 (D. Minn. Oct. 27, 2008) .......... 7, 8

*Dole v. Amerilink Corp.*
729 F. Supp. 73 (E.D. Mi. 1990) .......... 10

*GreenFleet Systems v. Int'l Bro. of Teamsters*
2015 WL 1619964 (NLRB Div. of Judges Apr. 9, 2015) .......... 11

*Max Trucking LLC v. Liberty Mut. Ins. Corp.*
802 F. 3d 793 (6th Cir. 2014) .......... 11

*Time Auto Transport v. NLRB*
377 F.3d 496 (6th Cir. 2004) .......... 11

*Van Dusen v. Swift*
544 Fed. App'x 724 (9th Cir. 2013) (*Van Dusen II*) .......... 1

*Van Dusen v. Swift*
No. 15-70592, 2016 U.S. App. LEXIS 13575 (9th Cir. 2016) (*Van Dusen III*) .......... 1, 8

*Wolcott v. Nationwide Mut. Ins. Co.*
884 F.2d 245 (6th Cir. 1989) .......... 11

Statutes Page(s)

Federal Arbitration Act, 9 U.S.C. § 1 .......... 1

## I. INTRODUCTION

Plaintiffs' opposition fails to raise any triable issue of material fact indicating that Defendants misclassified Plaintiff Peter Wood as an independent contractor.[1] The opposition was filed on behalf of all five Plaintiffs, and consists entirely of sweeping generalizations about *all* Owner-Operators and *all* Plaintiffs. However, Plaintiffs fail to cite evidence supporting these broad, sweeping conclusions. With respect to virtually every purported "fact" they assert, the opposition cites the deposition testimony of Plaintiffs ***other than Wood***. None of the other Plaintiffs testified about Wood's experiences. Plaintiffs cherry-pick the testimony they like best for each fact and simply ignore contravening testimony by Wood. The net effect is that Plaintiffs utterly fail to set forth a full and coherent opposition on behalf of Wood.

Wood fails to dispute that, during the time he was an Owner-Operator:

- Swift did not train him on, provide him with, or hold him to <u>any</u> company policies, and the only requirements he had to comply with were federal regulations (in this regard, he was no different from Swift or any other motor carrier);

[1] Defendants maintain the Court should not entertain Plaintiffs' or Defendants' pending summary judgment motions. Consistent with the views expressed by two of the three judges on the Ninth Circuit panel in *Van Dusen v. Swift*, No. 15-70592, 2016 U.S. App. LEXIS 13575 (9th Cir. 2016) (*Van Dusen III*), the Court should vacate the pending summary judgment motions and determine whether Plaintiffs' ICOAs are exempt from arbitration based solely on the four corners of the agreements themselves. In *Van Dusen v. Swift*, 544 Fed. App'x 724 (9th Cir. 2013) (*Van Dusen II*), the Ninth Circuit held that the Court "must determine whether the [ICOAs] are exempt [from arbitration] under § 1 of the FAA before it may consider Swift's motion to compel." The Court interpreted this to mean it should examine the entire relationship between the parties and determine whether Plaintiffs were properly classified as independent contractors or whether they were actually employees, which is the ultimate question in the case. In *Van Dusen III*, Judge Andrew D. Hurwitz and Judge Sandra S. Ikuta (who was on the panel in *Van Dusen II*) agreed that this approach is incorrect and that the Court should determine whether the section 1 exemption applies based solely on the language in the ICOAs. Based on *Van Dusen III*, Defendants have filed a filed a motion for reconsideration of the Court's prior orders requiring discovery and trial on this issue. (Doc. 820).

- His ***business***, "Starlight Trucking," entered into an Independent Contractor Operating Agreement ("ICOA") with Swift, and his business could not possibly have been an employee of Swift;
- He had the autonomy to develop a fleet of trucks, hire as many employees and laborers as he wanted, and direct those employees and laborers to drive for him and deliver loads (the fact that he chose not to exercise this autonomy, whether due to perceived financial constraints or some other reason, is irrelevant);
- He was free to drive for other carriers and use his truck for any reason he saw fit, as long as he removed placards displaying Swift's name from his truck;
- He was free to accept or decline any loads offered by Swift and, in fact, could choose not to accept any loads at all if that was his decision;
- He was free to purchase or rent the products and/or equipment he needed to perform his work – including his truck – from any company he desired;
- He had full decision-making authority with respect to delivery of loads, including the ability to choose the route taken, where to purchase fuel, and where to obtain any necessary repairs;
- While he claims he was assigned to a "driver manager," he was free to and in fact ***did*** fire his "manager" because he did not see eye-to-eye with him, and he admits that his supposed "manager" did not have any power to require him to accept a load offering from Swift;
- He controlled his own hours, and he could return home and take time off as he pleased; and
- He was responsible for obtaining and paying for all of the tools and equipment he needed as an Owner-Operator, and he made a substantial investment of thousands of dollars in his truck and equipment necessary to run his business.

These admissions conclusively demonstrate that no employment relationship existed between Wood and Swift – let alone between Wood and IEL (which merely leased him a truck and never had any contact with him outside that transaction).

Rather than disputing the facts presented by Defendants in their moving papers, Wood relies almost entirely on speculation, the cherry-picked testimony of **other** plaintiffs regarding their **own** alleged experience and **not his**, mischaracterizations of the record, conflation of procedures which applied to employees with those for Owner-Operators, and citations to inapposite cases, in order to create the appearance of a disputed material fact. These efforts fail.  Wood has presented no competent evidence that Defendants controlled the manner and means in which he performed his work, has not disputed that he made substantial investments in the tools and equipment required to conduct his business as an Owner-Operator, has not disputed that his success or failure as an Owner-Operator depended on his entrepreneurialism and managerial skill, and has not disputed that he was paid as an independent contractor.  Accordingly, Defendants have carried their burden to establish that no employment relationship existed between Defendants and Wood during the time he was an Owner Operator.  Defendants are therefore entitled to summary judgment.

## II.     LEGAL ARGUMENT

### A.     Wood Cannot Dispute That He Exercised Control Over The Manner and Means By Which He Performed His Work

As set forth in Defendants' moving papers, Wood had full control over the manner and means of performing his work.  He established his own business to perform this work and entered into the ICOA with Swift not on his own behalf but on behalf of the business. In operating his business, Wood was free to hire employees and laborers and assign someone to drive in his place, determine his own routes and stops, and work to achieve success by developing his own fleet of trucks.  (UMFs 12, 15-38.)  Wood had full autonomy to determine his own working conditions.

Wood does not present any competent evidence to create a triable issue in response to these facts, but instead relies on rank conjecture, misstatements of the record, and *other* plaintiffs' self-serving testimony about their personal beliefs and experience which have

no application to him.  Wood's attempts to obfuscate and mislead the Court should be rejected.

First, in the opposition Plaintiffs claim that Swift controlled Wood because it had "extensive policies" that he had to follow.  (Oppo., 3:5-4:3.)  This claim is contradicted by Wood's own deposition testimony.  Wood testified under oath he did not receive any policies as an Owner-Operator, was not trained on any policies as an Owner-Operator, and **understood that Swift's policies did not apply to him as an Owner-Operator**.  (*See* UMFs 15, 16.)  Rather, the policies discussed in the opposition brief are those contained in the **employee** handbook, which by its own terms expressly applied only to employee drivers.  The opposition cites 2 pages in the 208-page employee handbook which mention Owner-Operators.  Critically, those 2 pages state that both employee drivers and Owner-Operators must comply with Department of Transportation ("DOT") regulations regarding hours of service, and describe the manner in which a truck is to be operated in compliance with DOT safety regulations.  (*See* Wood's Additional Statement of Facts [Doc. 800], Facts 11-13 (citing Plaintiffs' "Ex. 14b, p.3, Bates 5408" and "Ex. 14b, Sec. 6, p.1, DEF5064" [Doc. 775-6]))  These cited pages do not purport to bind Owner-Operators to any Swift company policies.  The opposition also references two documents (the "Pre-CABS Manual" and "Contracted Driver Manual") **which Wood admits he never received, was never trained on, did not even know existed, and which did not apply to him** (*see* UMFs 15, 16) and speculates that Swift *could have* applied these policies to him (Oppo., 4:4-11, fns. 5, 6).  This type of speculation is not evidence, and cannot create a triable issue as a matter of law.  The opposition also notes that one plaintiff claims she received training as an Owner-Operator, and speculates that Swift *could have* trained Wood *if it wanted*.  (Oppo., 4:4-11 (citing Plaintiffs' Statement of Facts [Doc. 772], Facts 202-203.)  This person's claim that *she* underwent training as an Owner-Operator is irrelevant to the determination of Wood's relationship with Swift.  **Wood admits he never underwent such training**.  (UMFs 15, 16.)  Wood does not dispute that he did not receive

any training during either of his two stints as an Owner-Operator, and did not receive any policies during his two stints as an Owner-Operator. (*Id*.)

Second, Wood does not dispute that he never received any type of performance review or evaluation as an Owner-Operator. Instead, he attempts to dismisses this key fact by claiming that "the weekly financial obligations the lease imposed on Plaintiffs rendered formal evaluations unnecessary." (Oppo., 4:21-24.) But the fact that Wood may have had personal financial obligations does not create an employment relationship. By this logic, a wealthy Owner-Operator contracting with Swift under the same facts and circumstances would be an independent contractor, while Wood would be deemed an employee simply because he had bills to pay. There is no legal support for this position.

Third, the opposition claims that, because Wood was required to stay within the legal speed limit and otherwise follow traffic regulations and DOT safety regulations, Swift exerted control over him. (Oppo., 5:2-5, 6:5-12.) This argument is simply absurd, as *all* drivers on the road are subject to applicable traffic laws and safety regulations. These are not requirements set by Swift but rather the government, and therefore do not evince any "control" by Swift. Wood also argues that the existence of an Omni-tracs/Sensor-tracs device in his truck, which listed his speed, location, estimated time of arrival, and other statistics, is evidence of Swift's control. (Oppo., 5:10-20.) However, Wood does not dispute that Swift did not monitor these statistics, and he does not claim that they had any ramifications for him. (*See* Berry Depo., 97:11-98:11; Berry Decl., ¶ 7.) The opposition cites Plaintiff Motolinia's testimony that **<u>Motolinia</u>** once received a message on his Qualcomm when he stopped with a high-value load, yet this claim – even if true – has no bearing on Wood's relationship with Swift. Similarly, Wood unavailingly relies on other Plaintiffs' testimony regarding their contact with driver managers, in an attempt to dispute his own testimony that he was not required to communicate, check in, or interact with anyone from Swift while he was carrying out his work. (*Compare* UMF 29 (Wood's admissions) with Oppo., 5:13-16 (citing Sheer and Van Dusen's testimony – but

not Wood's – regarding their own experiences).)  This misguided attempt to avoid his own deposition testimony fails.

Fourth, the opposition attempts to dispute Wood's sworn testimony that he was free to drive any route he wanted when delivering his cargo, and could stop wherever he chose for fuel, repairs, or other purposes.  (UMF 12, 18, 21, 22.)  The opposition claims that because Swift provided a recommended route and recommended stops to Plaintiffs, Swift somehow *mandated* routes and stops, and thus exerted control over them.  (Oppo., 7:1-8:17.)  Yet Wood admitted that he ignored these recommendations almost entirely, instead taking a route that was different from Swift's recommended route "as much as possible," visiting fueling stops that were not recommended by Swift the vast majority of the time, and avoiding Swift repair shops because he thought their work was deficient.  (UMF 19, 22.)  Thus, plainly, there was no *mandate* that Wood or any other Plaintiff follow the recommended routes, which Wood admitted were provided solely to assist with trip planning.  Wood also does not dispute that he did not have to inform Swift that he was taking a different route than the optional route suggested.  (Berry Depo. at 96:10-14.)

Fifth, the opposition desperately tries to downplay key indicators of Wood's autonomy as an Owner-Operator, such as the ability to:

(1) fire his so-called "Driver Manager" (in fact, Wood <u>did</u> fire the person he identified as his "Driver Manager" when he was an Owner-Operator, thereby demonstrating that his sole supposed supervisor had no control over him (*see* UMF 32)),

(2) use his truck to perform work in partnership with other companies or for whatever personal reasons he chose (UMFs 37-38, 54),

(3) drive dedicated routes for a particular customer if he desired, thereby determining his own schedule, the route he drove, the cargo he carried, the business for whom he conducted deliveries, and the regularity with which he was available to take on other work (*see* Berry Depo. 15:14-16:6; 19:11-20:14), and

(4) choose what terminal he was based out of, and the routes he wanted to drive (line-haul, dedicated, or intermodal) (*see* Berry Depo. 15:14-16:6; 19:11-20:14).

(Oppo., 8:18-9:12.)

The opposition claims, without any support, that these are insignificant to the determination of whether Swift exerted control over the manner and means in which Wood performed his work. This is plainly not so, as courts commonly look to these precise factors to determine whether an independent contractor relationship existed. *See, e.g., Aviles v. Quik Pick Express, LLC*, 2015 U.S. Dist. LEXIS 174960, *11-13 (C.D. Cal. Dec. 3, 2015) (finding a putative class of truck drivers to be independent contractors because, for example, (1) drivers set their own schedule; (2) the company did not instruct the drivers on what routes to take or when and where to stop for fuel; (3) drivers could balance their loads as they saw fit in order to increase efficiency; (4) drivers could work for other companies); *Carney v. JNJ Express, Inc.*, 10 F. Supp. 3d 848, 853-854 (W.D. Tenn. 2014) (drivers were considered independent contractors because they were "responsible for determining the means of their performance under the Leases, including equipment, routes, and scheduling."); *Davis v. Larson Moving & Storage Co.*, 2008 U.S. Dist. LEXIS 87251, 17-18 (D. Minn. Oct. 27, 2008) (truck driver was properly classified as an independent contractor because, for instance, plaintiff assumed control over selection of routes and fuel stops, decisions about maintenance of his truck, arrangements for loading and unloading his truck, and scheduling work hours and rest periods, subject to legal requirements and the needs of Defendant's customers).

Sixth, while Wood admitted at deposition that he could drive as part of a team if he chose, could assign someone of his choosing to drive in his place, and could hire employees and laborers to work for him (UMFs 33, 35, 36, 51), the opposition now claims this is not so because Wood's truck lease with IEL purportedly said that he could only assign a driver to drive his leased truck if he was "ill, disabled, or otherwise unable to drive the Equipment." (Oppo., 9:13-25.) This argument is unavailing. For one thing, it contradicts Wood's sworn deposition testimony. Wood cannot avoid his own deposition admissions. Moreover, Plaintiffs concede at another point in their brief that under the terms of the lease, lessees had the ability to hire drivers to work for them at any time, not

just if they were "ill" or "disabled" – indeed the contract states that someone could drive in their place anytime the lessee was "otherwise unable to drive the Equipment." (Oppo., 9:20-22.) The only limit on this right was that such individuals had to meet DOT regulations and other state and federal legal requirements (which also apply to Swift and every other trucking company in the United States). (*See* UMF 46; Defendants' Response to Plaintiffs' Purportedly Undisputed Material Facts, Fact No. 176 [Doc. 797]). **Plaintiffs do not dispute that, in practice, neither Swift nor IEL exerted oversight over the employees that Owner-Operators chose to hire, and rarely, if ever, took any action regarding any Owner-Operator's decision to hire any particular employee**. (Berry Decl. ¶ 10; Spence Depo., 62:22-63:19 (IEL does not approve or reject substitute drivers).) Finally, a term in Wood's contract with *IEL* is not evidence of an employment relationship between Wood and *Swift*. Wood does not claim that he performed work for IEL, nor that Swift exercised veto power over who drove his truck. Any control exerted by IEL as a company leasing high value equipment to Wood is analogous to the control a bank exerts over an individual leasing a car and, in any event, is irrelevant to the determination of the type of relationship Wood had with Swift.

Seventh, the opposition claims that Swift exerted control over Wood simply by virtue of the fact that it offered him loads (which he could freely decline) and had a particular customer base for which it could offer loads. (Oppo., 11:18-23.) As a matter of law, this is insufficient to establish that Swift exerted sufficient control over Wood to make him an employee. If it were, a trucking company could never contract with independent contractor drivers, which clearly is not the case. *See, e.g.*, *Aviles*, 2015 U.S. Dist. LEXIS 174960, *11-13; *Carney*, 10 F. Supp. 3d at 853-54; *Davis*, 2008 U.S. Dist. LEXIS at 17-18; *Young*, Case No. 08-46182 RR (filed with Defendant's Request for Judicial Notice [Doc. 756]). What is important is the undisputed fact that, regardless of what loads Swift had available and offered to him, Wood could select what loads he wanted to pick up, could decline loads and independently determine when to work, where, and how long to work. (UMFs 11, 17, 24-27.) Wood admitted that he knew he had the ability and

authority to decline loads that were offered to him as an Owner-Operator. (UMF 26.) No one at Swift could force Wood to take a load, and Wood would not be disciplined if he turned down a load. (Berry Depo. at 81:25-82:13; 268:5-7.) He admitted it was his personal, discretionary decision not to decline loads often, because he sought to maximize his revenue. (UMF 27.) Thus, it was Wood – not Swift – who exercised control over what loads Wood delivered.

**B. <u>Wood Cannot Dispute That He Was Responsible For Investing In All Equipment, Material, Labor, And Tools He Needed To Run His Business</u>**

Wood invested thousands of dollars into the lease of his truck as an Owner-Operator; paid for the repair, maintenance, and upkeep of his truck; and paid for his own insurance, fuel, tolls, and all other costs involved in performing his work as an Owner-Operator. (UMFs 14, 39, 43.) Wood does not dispute any of this. Instead, the opposition focuses on the relatively low start-up cost to become an Owner-Operator as a red herring to distract the Court from the substantial investment Wood ultimately made in his trucking business. (Oppo., 16:7-12.) The fact that Owner-Operators are generally only required to make a $500 down payment to lease a truck from IEL is irrelevant, because Wood did not merely pay $500, but in fact paid *thousands of dollars* for his equipment while he was an Owner-Operator. (UMF 39.) The key fact is not the amount of money an Owner-Operator put down, but that **<u>neither IEL nor Swift paid for anything Wood needed to perform his work as an Owner-Operator</u>**. (UMF 45.) By contrast, when Wood worked as an employee driver, Swift provided him with all the equipment and tools he needed to perform his work, including his truck, gas, maintenance, repair, tolls, insurance, and any other instrumentalities that he may need. (Wood Depo. at 19:2-21:6.) Furthermore, Wood was responsible for paying any drivers, driver helpers, and laborers he hired. (UMFs 46, 47, 51.) Under these facts, Wood's status as an independent contractor cannot be disputed. *See Chao v. Mid-Atlantic Installation Servs.*, 16 Fed. Appx. 104, 107 (4th Cir. 2001) (explaining that expenditures on instrumentalities to perform work are usually expected of independent contractors but not of employees, who are given the tools to perform their job

by their employer); *see also Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76 (E.D. Mi. 1990) (same).

**C. <u>Wood And His Business' Lack Of Success Highlights Rather Than Obviates The Opportunity He Had For Profit Or Loss Based On His Managerial Skill</u>**

As set forth in Defendants' moving papers, Wood testified at length that he entered into an Owner-Operator relationship with Swift because he wanted to be profitable and commence a business partnership with the company. (UMF 1, 48, 50.) Indeed, he established his own business, Starlight Trucking, and it was that entity (not Wood himself) that entered into an ICOA with Swift during Wood's second stint as an Owner-Operator. (UMFs 6, 7.) Wood admits he aspired to develop a fleet of trucks, which he acknowledges other Owner-Operators were able to accomplish due to their own business acumen and willingness to accept the financial risk taking on additional trucks and employees. (UMFs 48-50.) Yet, Wood admittedly never took on these risks himself, nor followed through with his entrepreneurial plan. (Wood Depo., 96:4-14 ("Q: Did you ever hire any employees when you were an owner-operator? A: No. [Objection] No. Q: Did anybody prevent you from doing so? A: No. [Objection] No. I never had a desire to."); 140:2-7 ("Q: Could you also purchase a truck from another entity and use it driving with Swift?; A: I – [Objection] I suppose I could have, but I had no desire to.")). He chose <u>not</u> to obtain additional trucks for his fleet (unlike other, successful Owner-Operators), and chose <u>not</u> to hire laborers or employees (unlike other, successful Owner-Operators). Wood's refusal to take on business risk at least partly led to his lack of success as an Owner-Operator. Wood now attempts to characterize his and Starlight Trucking's failures as proof that he had no opportunity for profit or loss based on his managerial skill, and thus that it demonstrates that he was in fact an employee of Swift. (Oppo., 16:20-17:6.) This characterization fails. Contrary to Wood's characterization, his decision not to develop the fleet he once planned, and the fact that his risk-averse nature led his business to fail, demonstrate that Owner-Operators' managerial skill directly affected their profit or loss – which is a critical factor in determining whether Wood was properly classified as an independent contractor.

*Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 251 (6th Cir. 1989) (applying the common law agency test to determine if an independent contractor relationship existed and finding that the fact that the plaintiff "exercised managerial skill in the operation of his business" weighed in favor of an independent contractor relationship).

**D. <u>Wood's Cited Cases Are Inapposite</u>**

Finally, Wood attempts to analogize his relationship with Swift to those of drivers in several inapposite and easily distinguishable cases. As one example, in *Time Auto Transport v. NLRB*, 377 F.3d 496 (6th Cir. 2004), the Court determined that the drivers' relationship with Time Auto was akin to an employment relationship because (1) Time Auto evaluated their performance, terminated drivers for inadequate performance, and used the threat of termination for performance deficiencies as a means to control the drivers; (2) the drivers could not determine what types of routes they took (e.g., long-haul, intermodal, dedicated); (3) the drivers were required to follow detailed instructions from Time Auto's dispatchers for each and every delivery they made and were ordered to wait whenever they did not receive a load, such that they were expressly forbidden from driving for other companies; (4) Time Auto ordered and expected drivers to violate federal restrictions. None of these factors exist here, as set forth in Defendants' Motion and section II.A. above. Thus, Wood cannot rely on *Time Auto*'s holding to establish that his relationship with Swift was an employment relationship. Similarly, *Max Trucking LLC v. Liberty Mut. Ins. Corp.*, 802 F. 3d 793 (6th Cir. 2014) is distinguishable because the drivers in that case did not and could not maintain their own businesses or employees, contrary to Wood and other Swift Owner-Operators. *See also GreenFleet Systems v. Int'l Bro. of Teamsters*, 2015 WL 1619964 (NLRB Div. of Judges Apr. 9, 2015) (same).

## III. <u>CONCLUSION</u>

For the foregoing reasons, and as set forth more fully in Defendants' moving papers, Defendants respectfully request that the Court issue an order granting summary judgment in favor of Swift on the issue of Wood's independent contractor status.

-10-

SMRH:479126740.1 DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF PETER WOOD'S STATUS AS AN INDEPENDENT CONTRACTOR

Dated: September 30, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By /s/ Robert Mussig

RONALD HOLLAND
ELLEN M. BRONCHETTI
PAUL S. COWIE
ROBERT MUSSIG

Attorneys for Defendants
SWIFT TRANSPORTATION CO. OF ARIZONA, LLC, INTERSTATE EQUIPMENT LEASING, LLC, CHAD KILLEBREW and JERRY MOYES

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to the following CM/ECF registrants:

Susan Joan Martin
Jennifer Lynn Kroll
Martin & Bonnett PLLC
1850 N. Central Ave.; Ste. 2010
Phoenix, AZ 85004

Dan Getman
Edward John Tuddenham
Lesley Tse
Getman & Sweeney, PLLC
9 Paradies La.
New Paltz, NY 12561

Attorneys for Defendants

*/s/ Robert Mussig*