1

2

3                    **UNITED STATES DISTRICT COURT**

4                         **DISTRICT OF ARIZONA**

5

6   **John Doe 1,** *et al.,*                    )
                                              )
7              **Plaintiffs,**                 )        **2:10-cv-00899 JWS**
                                              )
8           **vs.**                            )        **ORDER AND OPINION**
                                              )
9   **Swift Transportation Co., Inc.,** *et al.,* )     **[Re:   Motions at Dockets 771, 744,**
10                                            )              **751, 757, 763, 768, 820]**
                                              )
11             **Defendants.**                 )
12  _____        )

13

14                      <u>**I.  MOTIONS PRESENTED**</u>

15          At docket 771 the five named plaintiffs in this suit ("Plaintiffs") filed a motion for

16  partial summary judgment, asking the court to find that the contractor agreements they

17  entered into with Defendant Swift Transportation Co., Inc. ("Swift") constituted contracts

18  of employment, which are exempt from the Federal Arbitration Act ("FAA") and the

19  Arizona Arbitration Act ("AAA").  Their statement of facts and supporting documents are

20  filed at dockets 772 through 776.  Defendants respond at docket 792, with their

21  statement of facts at docket 797, and their supporting documents at dockets 793

22  through 795.  Plaintiffs reply at docket 851.  Defendants filed separate motions for

23  partial summary judgment as to each of the named Plaintiffs at dockets 744, 751, 757,

24  763, and 768.  Plaintiffs responded jointly to all motions at docket 608.  Defendants

25  filed separate replies.  Oral argument was not requested and would not be of

26

27

28

assistance to the court.  As shown in the following discussion, this order has the effect

of rendering moot Defendant's motion for reconsideration at docket 820.

## II.  BACKGROUND

Swift is a motor carrier that is engaged in the interstate transportation of freight.

Plaintiffs are truck drivers who each entered into a contractor operating agreement with

Swift (the "Contractor Agreement(s)").[1]   Under each Contractor Agreement, the

respective Plaintiff agreed to furnish "Equipment" and labor necessary for the

transportation of freight, which would be furnished by Swift.  The "Equipment" is a truck

specifically identified in "Schedule A" of each Contractor Agreement with a unit number,

year, make, and serial number.  The Plaintiff is listed as the owner of the truck,

Defendant Interstate Equipment Leasing ("IEL") is listed as the financing entity, and

Swift is identified as the operator of the truck.[2]  Each Contractor Agreement refers to

the signing Plaintiff as a "Contractor" and specifically states that he or she is an

independent contractor, not an employee of Swift, and is responsible for determining

"the method, means and manner of performing work and services" under the Contractor

Agreement.[3]  Each Contractor Agreement also contains a provision requiring that "all

---

[1]The five named Plaintiffs all entered into Contractor Agreements with Swift.  The material language in the agreements for purposes of these motions is the same or similar. When citing to the relevant provisions, the court has made note of language differences.

[2]Doc. 772-7 at p. 46 (Van Dusen Contractor Agreement, Schedule A); Doc. 772-8 at p. 11 (Sheer Contractor Agreement, Schedule A); Doc. 772-9 at p. 26 (Motolinia Contractor Agreement, Schedule A); Doc. 772-10 at p. 28 (Schwalm Contractor Agreement, Schedule A); Doc. 775 at p. 48 (Peter Wood Contractor Agreement (2009), Schedule A); Doc. 775-1 at p. 22 (Peter Wood Contractor Agreement (2014), Schedule A).

[3]Doc. 772-7 at p. 44 (Van Dusen Contractor Agreement at ¶ 18); Doc. 772-8 at p. 9 (Sheer Contractor Agreement at ¶ 18); Doc. 772-9 at p. 24 (Motolinia Contractor Agreement at ¶ 18); Doc. 772-10 at p. 25 (Schwalm Contractor Agreement at ¶ 17); Doc. 775 at p. 8 (Peter

disputes and claims arising under, arising out of or relating to [the Contractor Agreement], including . . . any disputes arising out of or relating to the relationship created by the [Contractor Agreement]" be "fully resolved by arbitration."[4]

None of the Plaintiffs owned the "Equipment" before entering into the Contractor Agreement.  Rather, on the same day, each Plaintiff also executed an "Equipment Leasing Agreement" with IEL ("IEL Lease"), wherein he or she agreed to lease the truck that is referred to in Schedule A of the Contractor Agreement.[5]  Each IEL Lease provides in pertinent part that the lessee will fill out a form that authorizes Swift to deduct weekly lease payments owed to IEL under the lease from his or her earned compensation under the Contractor Agreement.[6]  Each one also states that the lessee shall be in default under the lease in the event his or her Contractor Agreement with Swift is terminated and that in the event of default IEL may "declare the entire amount

_____

Wood Contractor Agreement (2009) at ¶ 17); Doc. 775-1 at p. 28 (Peter Wood Contractor Agreement (2014) at ¶ 17).

[4]Doc. 772-7 at p. 44 (Van Dusen Contractor Agreement at ¶ 24); Doc. 772-8 at p. 9 (Sheer Contractor Agreement at ¶ 24); Doc. 772-9 at p. 24 (Motolinia Contractor Agreement at ¶ 24); Doc. 772-10 at p. 26 (Schwalm Contractor Agreement at ¶ 25); Doc. 775 at p. 46 (Peter Wood Contractor Agreement (2009) at ¶ 24); Doc. 775-1 at p. 29 (Peter Wood Contractor Agreement (2014) at ¶ 25).

[5]The terms of Peter Wood's lease have not been provided to the court.  Defendants provided documents showing that Peter Wood obtained his truck in 2009 and in 2014 by assuming another driver's lease.  The documents contain the assignments, IEL's consent to the assignments, and the authorization for deduction forms granting Swift permission to pay the lease rents from his settlement account.  The parties do not assert that the specific terms of Peter Wood's lease are materially different from the other Plaintiffs' leases.

[6]Doc. 722-7 at p. 22 (Van Dusen Lease at ¶ 2(e)); Doc. 772-9 at p. 2 (Motolinia Lease at ¶ 2(e)); Doc. 772-10 at p. 2 (Schwalm Lease at ¶ 2(e)).  Sheer's lease is worded differently but nonetheless gives the same effect.  Doc. 765-4 at p. 2 (Sheer Lease at ¶ 2).

of unpaid rent then accrued and thereafter payable for all Equipment then leased . . . to be immediately due and payable."[7]

In 2009, Plaintiffs filed a complaint against Swift and IEL alleging various labor law claims and putting the status of the employment relationship between Plaintiffs and Swift at the heart of the lawsuit.  Defendants moved to compel arbitration based on the terms of the Contractor Agreements, but Plaintiffs opposed arbitration based in part on § 1 of the FAA, which exempts "contracts of employment of . . . workers engaged in foreign or interstate commerce."[8]  By order dated September 30, 2010, the court granted Defendants' motion to compel arbitration and stay this action pending completion of arbitration.  The court concluded that applicability of the exemption was a question for the arbitrator to decide in the first instance.[9]

Plaintiffs subsequently filed a petition for writ of mandamus with the Ninth Circuit Court of Appeals.  In their Petition, Plaintiffs argued that the district court committed clear error by "refusing to resolve their claim of exemption from arbitration under Section 1 of the [FAA] and Section 12-1517 of the Arizona Arbitration Act . . . before compelling arbitration pursuant to those acts."[10]  The Ninth Circuit concluded that a district court must first determine whether the agreement at issue is exempt as a contract of employment pursuant to § 1 before ruling on a motion to compel arbitration.

---

[7]Doc. 772-7 at p. 25 (Van Dusen Lease at ¶ 13(b)); Doc. 772-9 at p. 5 (Motolinia Lease at ¶ 13); Doc. 772-10 at p. 5 (Schwalm Lease at ¶ 13).  Doc. 765-4 at p. 6 (Sheer Lease at ¶ 13).

[8]9 U.S.C. § 1.

[9]Doc. 223.

[10]*In re Van Dusen*, 654 F.3d 838, 840 (9th Cir. 2011) ("*Van Dusen I*").

It nonetheless denied Plaintiffs' petition for mandamus relief on the grounds that it was not satisfied that the district court committed clear error.

After the Ninth Circuit's denial of mandamus, Plaintiffs requested that the court again reconsider its order compelling arbitration or, alternatively, to certify an interlocutory appeal under 28 U.S.C. § 1292(b).  The court granted the request to certify an interlocutory appeal.  On appeal, the Ninth Circuit stated that its opinion in *Van Dusen I* was the law of the circuit and remanded the case.[11]

The court issued an order asking the parties to file a notice outlining what needed to be done to conclude the case.  Defendants contended that the only thing to be done was for the court to review the four corners of the Contractor Agreements to determine if they were contracts of employment.  Plaintiffs requested a comprehensive schedule for discovery needed to determine what facts bear on Plaintiffs' status as employees or independent contractors.  The court concluded that Plaintiffs' approach was correct given its prior orders which indicated it thought that information outside the four corners of the Contractor Agreements was necessary to decide the issue and the Ninth Circuit's decisions did not instruct otherwise, and it set forth a scheduling and planning order in conformity with Plaintiffs' suggested schedule.[12]  Defendants objected to the court's ruling, but the court maintained its decision to proceed with discovery after considering how other district courts have handled the issue and citing multiple cases where the courts have looked to the relationship of the parties in determining whether

---

[11]*Van Dusen v. Swift*, 544 Fed. Appx. 724 (9th Cir. 2013) ("*Van Dusen II*").

[12]Doc. 548.

the contract is one of employment.[13]  Defendants petitioned the Ninth Circuit for a writ of mandamus, challenging the district court's decision.  The Ninth Circuit denied the request, with one judge on the panel issuing a dissenting opinion.[14]

### III.  DISCUSSION

**A.     Identifying "Contracts of Employment"**

The issue before the court is whether Plaintiffs' Contractor Agreements are exempt from arbitration under § 1 of the FAA and § 12-1517 of the AAA.  Section 1 of the FAA provides that the FAA does not apply to "contracts of employment" of transportation workers.[15]  Section 12–1517 of the AAA "exempts all employer and employee employment agreements from the provisions of [the Act]."[16]  When Defendants originally moved to compel arbitration, Plaintiffs opposed the motion arguing that because they were employees of Swift they were therefore exempt from arbitration under the FAA and the AAA.  The court declined to consider the exemption issue when it originally compelled arbitration back in 2010.  It concluded that the arbitrator needed to decide the exemption issue because such a decision would require an analysis of the Contractor Agreements and the IEL Leases, as well as consideration of Plaintiffs' working relationship with Swift and that, under the arbitration provision in the Contractor Agreements, issues of arbitrability and issues regarding the relationship

---

[13]Doc. 605.

[14]*In re Swift Transp. Co. Inc.*, 830 F.3d 913 (9th Cir. 2016).

[15]*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).

[16]*N. Valley Emergency Specialists, LLC v. Santana*, 93 P.3d 501, 506 (Ariz. 2004).

of the parties were to be decided by an arbitrator.  It declined to address the exemption issue in part because determining whether Plaintiffs' were exempt from arbitration based on an employee-employer relationship with Swift—as Plaintiffs requested— would overlap with the merits of plaintiffs' claims, which would exceed the proper role of a court in addressing threshold questions of arbitrability.[17]

When reviewing this court's decision, the Ninth Circuit agreed with Plaintiffs' position that § 1 exemption is not a "question of arbitrability" that can be delegated to an arbitrator.  Rather, the issue of exemption is a threshold question that the court is required to answer.  The Ninth Circuit, however, recognized that it was a close call given "the law's repeated admonishments that district courts refrain from addressing the merits of an underlying dispute."[18]  This suggested to the court that the Ninth Circuit did not take issue with Plaintiff's position that exemption would turn on their employment status.  Ultimately, the Ninth Circuit mandated that the court "determine whether the Contract Agreements between each appellant and Swift are exempt under § 1 of the FAA before it may consider Swift's motion to compel."[19]

On remand, over the objection of Defendants, the court maintained its position that its exemption analysis requires the court to consider the Contractor Agreement as a whole, as well as the lease and evidence of the amount of control exerted over Plaintiffs by Defendants.  It indicated that determining exemption status will require the

[17]*Van Dusen I*, 654 F.3d at 843.

[18]*Id.* at 846.

[19]*Van Dusen II*, 544 Fed. Appx. 724, at **1.

-7-

court to consider numerous fact-oriented details about how the contracts operated,

such as the employer's right to control the work, the individual's opportunity to earn

profits from the work, the individual's investment in equipment and material needed for

the work, whether the work requires a specialized skill, and whether the work done by

the individual is an integral part of the employer's business.[20]  The court's decision to

look to the parties' relationship, as well as the Contractor Agreements and IEL leases,

was supported by numerous district court cases that framed the § 1 exemption issue in

terms of a plaintiff's employment status.[21] The court set a case management schedule

and provided the parties an opportunity to discover evidence that would affect the

court's analysis.

Defendants again petitioned the Ninth Circuit for a writ of mandamus ordering

this court to vacate its case management order and decide the petition to compel

arbitration without discovery or trial.  The Ninth Circuit denied the request.[22]  It did so

---

[20]Doc. 605.

[21]*See, e.g., Operator Indep. Drivers Assoc., Inc. v. Swift,* 288 F. Supp. 2d 1033 (D. Ariz. 2003); *Carney v. JNJ Express, Inc.,* 10 F. Supp. 3d 858, 853-54 (W. D. Tenn. 2014) (examining whether the plaintiffs were actually employees and how much control the defendant had over plaintiffs' performance); *Port Drivers Fed'n 18, Inc. v. All Saints,* 757 F. Supp. 2d 463, 472 (D. N.J. 2011) (concluding that plaintiffs failed to establish that they were employees rather than independent contractors); *Davis v. Larson Moving & Storage Co.,* 2008 WL 4755835, at *5-6 (D. Minn. Oct. 27, 2008) (examining whether plaintiff was functionally an employee of the defendant); *Flinn v. CEVA Logistics U.S., Inc.,* 2014 WL 4215359, at * 5 (S.D. Cal. Aug. 25, 2014) (examining whether plaintiff had an employment relationship with defendant); *Cilluffo v. Central Refrigerated Services, Inc.,* 2012 WL 8523507, at * 3 (C.D. Cal. Sept. 24, 2012) (noting that the Section 1 exemption issue turns on whether the plaintiffs are independent contractors or employees); *Bell v. Atl. Trucking Co.,* 2009 WL 4730564, at *4  (M.D. Fla. 2009) (examining whether plaintiff was an independent contractor or an employee).

[22]*In re Swift,* 830 F.3d at 915.

-8-

after considering the requisite mandamus factors set forth in *Bauman*.[23]  While it recognized that the issue of how to proceed when deciding a § 1 exemption issue was one of first impression, it found the other factors did not support mandamus relief—the Defendants could obtain relief on appeal after this court makes the decision about arbitration, there was no significant risk of prejudice, the district court did not commit clear error or an often-repeated error.  Indeed, the Ninth Circuit concluded that "the issuance of a case management order is not only consistent with, but required by, the federal rules."[24]  It indicated that it could decide the issue of what to consider when deciding the exemption issue—an issue of first impression—on direct appeal after the court's "final order denying or compelling arbitration."[25]

In dissent, Judge Ikuta applied the factors differently and concluded that Defendants' petition for mandamus should be granted.  In doing so, she concluded that this court had committed clear error and an error that has been often made by district courts considering the issue.  She indicated her belief that the law requires that the court consider only the Contractor Agreements and decide whether they set forth terms and conditions of employment.[26]  Judge Horowitz, while not joining in Judge Ikuta's dissent because he concluded mandamus was not necessary, did specifically indicate

---

[23]557 F.2d 650, 654-55 (9th Cir. 1977).

[24]*In re Swift*, 830 F.3d at 917.

[25]*Id.* at 916.

[26]*Id.* at 920.

-9-

that he thought the issue should be decided on the terms and conditions of the

agreements alone.[27]

This court need not make a definitive ruling as to whether it must look at only the

applicable contracts themselves to see if they set forth terms and conditions of

employment or whether it can look outside the contracts at how the provisions of the

contract operate in practice because, in either scenario, the Plaintiffs were operating

under employment contracts.

## B. Four Corners of the Contractor Agreements

As noted above, § 1 of the FAA excludes "contracts of employment" from the

FAA.  The dissenting opinion in *Swift* indicated that the court should take "a categorical

approach that focuses solely on the words of the contract and the definition of the

relevant category," which in this case is employment.[28]  That is, the court should look to

see if the contract at issue sets forth "terms and conditions of employment."[29]

Employment is generally determined by looking at the extent of the alleged employer's

control, matters related to payment and opportunity for profit and loss, the workers'

ability to operate as an autonomous business, the type of work and its relation to the

alleged employer's work, and the length of the relationship.[30]

---

[27]*Id.* at 918.

[28]*In re Swift*, 830 F.3d at 920 (Ikuta, J., dissenting).

[29]*Id.*

[30] The common law factors for identifying employment are as follows: (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the kind of occupation at issue and whether that occupation is generally done under employer supervision or by a specialist without supervision; (4) the skill required; (5) whether the employer supplies

Under the dissent's categorical approach, the court must look to see to what extent and how the terms and conditions in the Contractor Agreements bear upon the above-listed factors.  Other terms and conditions related to employment are ones that prevent the worker from maintaining other employment without consent, require a worker to devote all time and ability working for the employer, or create a covenant not to compete after termination.[31]

Looking solely at the Contractor Agreements, there are several terms and conditions that suggest an employment relationship:

- **Type of work:** The terms of the contract make clear that Swift is in the business of transportation and Plaintiffs were doing the work of transporting on behalf of Swift.  Swift's "central mission is the delivery of [freight] to customers; the drivers' job is to effectuate that purpose" and

_____

the instrumentalities and place of work; (6) the length of time for which the person will be doing the work; (7) whether the payment is by time or by the job; (8) whether the work is a part of the regular business of the employer; (9) whether the employer is or is not in business; (10) whether the parties believe they are creating an employment relationship. Restatement (Second) of Agency §220(2) (1958); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (noting that when a statute refers to "employment" without further discussion, the common law definition of employment applies and referencing the Restatement (Second) of Agency; *see also Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 145 n.6 (Ariz. 1990) (en banc) (noting that Arizona courts look to the common law factors set forth in the Restatement of Agency to determine the existence of employment). The economic realities test employed by the Ninth Circuit for purposes of defining employment status is determined by the following factors: (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).  These two sets of factors are functionally the same.

[31]*In re Swift*, 830 F.3d at 920 (Ikuta, J., dissenting).

-11-

therefore the Plaintiff's work is "the very core of its business."[32]  This

suggests an employment relationship.

- **Permanence:** The Contractor Agreements, except for Plaintiff Sheer's,

   specify that the term of the agreement runs from the date of signing until

   December 31 of the same year, after which it automatically extends year

   to year unless terminated by either party.[33]  The agreements do not

   contemplate an end to the service relationship—the terms show that

   Plaintiffs were not hired to perform a specific project or work for a defined

   period of time.  A term of infinite duration is indicative of employee

   status.[34]

- **Control:** The Contractor Agreements give Swift the right to terminate the

   agreements without cause on ten days notice.[35]  A provision allowing

---

[32]*FedEx Home Delivery*, 361 NLRB No. 55, at p. 20 (Sept. 30, 2014).

[33]Doc. 772-7 at p. 43 (Van Dusen Contractor Agreement at ¶ 17.A); Doc. 772-9 at p. 23 (Motolinia Contractor Agreement at ¶ 17.A); Doc. 772-10 at p. 24  (Schwalm Contractor Agreement at ¶ 16.A); Doc. 775 at p. 45 (Peter Wood Contractor Agreement (2009) at ¶ 17.A); Doc. 775-1 at p. 27 (Peter Wood Contractor Agreement (2014) at ¶ 16.A).  Sheer's Contractor Agreement was more limited in its duration.  It provided for a one-year contract with an option to renew for an additional year. Doc. 772-8 at p. 8 (Sheer Contractor Agreement at ¶17.A).

[34]*Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1105 (9th Cir. 2014); *Narayan v. EGL, Inc.*, 616 F.3d 895, 903 (9th Cir. 2010).

[35]Doc. 772-7 at p. 43 (Van Dusen Contractor Agreement at ¶ 17.A); Doc. 772-8 at p. 8 (Sheer Contractor Agreement at ¶17.A); Doc. 772-9 at p. 23 (Motolinia Contractor Agreement at ¶ 17.A); Doc. 772-10 at p. 24 (Schwalm Contractor Agreement at ¶ 16.A); Doc. 775 at p. 45 (Peter Wood Contractor Agreement (2009) at ¶ 17.A); Doc. 775-1 at p. 27 (Peter Wood Contractor Agreement (2014) at ¶ 16.A).

termination at-will is indicative of the right to control the agent's activities and suggests an employment relationship.[36]

- **Control:** Despite a provision that states Plaintiffs control the method and manner of their work, the terms of the Contractor Agreements nonetheless provide Swift with some control over Plaintiff's delivery schedule. The Contractor Agreements state that if a lease operator fails to properly and timely deliver a shipment and Swift determines in its sole discretion that the lease operator has failed to deliver a shipment, Swift has the right to temporarily take possession of lease operator's truck and complete the delivery and to require the driver to indemnify Swift for any costs and expenses incurred by Swift as a result.[37]

- **Control and opportunity for profit:** Plaintiffs agreed to be paid on a per mile basis at a rate set forth in a schedule attached to each agreement, but Swift retained the right to decrease the rate per mile with 30 days notice.[38] Provisions providing the company unilateral control to change the terms of the agreement is a factor that weighs in favor of employment

---

[36]*Narayan*, 616 F.3d at 900, 903.

[37]Doc. 772-7 at p. 39 (Van Dusen Contractor Agreement at ¶ 5.C); Doc. 772-8 at p. 4 (Sheer Contractor Agreement at ¶ 5.B); Doc. 772-9 at p.19 (Motolinia Contractor Agreement at ¶ 5.C); Doc. 772-10 at p. 20 (Schwalm Contractor Agreement at ¶ 5.C); Doc. 775 at p. 41 (Peter Wood Contractor Agreement (2009) at ¶ 5.C); Doc. 775-1 at p. 23 (Peter Wood Contractor Agreement (2014) at ¶ 5.C).

[38]Doc. 772-7 at p. 38 (Van Dusen Contractor Agreement at ¶ 2.C); Doc. 772-8 at p. 3 (Sheer Contractor Agreement at ¶ 2.D); Doc. 772-9 at p. 18 (Motolinia Contractor Agreement at ¶ 2.C); Doc. 772-10 at p. 19 (Schwalm Contractor Agreement at ¶ 2.C); Doc. 775 at p. 40 (Peter Wood Contractor Agreement (2009) at ¶ 2.C); Doc. 775-1 at p. 22 (Peter Wood Contractor Agreement (2014) at ¶ 2.C).

status.[39]  Moreover, Swift controlled when and if it offered loads to

Plaintiffs.  That is, there was no agreement to provide a certain number of

loads or to perform a specific delivery job.  Therefore, under the terms of

the agreements, Swift controlled load assignments and mileage rates,

which in turn dictated how much Plaintiffs could earn.

- **Control:** The Contractor Agreements require Plaintiffs to comply with "any

[company] policy."[40]  Such a provision evinces a certain level of control

over Plaintiffs' day-to-day work.[41]

- **Equipment:** Plaintiffs were required to have a Qualcomm

Communications system that is compatible with the company's

equipment.[42]  While Plaintiffs did not have to obtain that required system

from Swift, all Plaintiffs nonetheless did so through a rental agreement

that was attached and incorporated into their Contractor Agreements.[43]

---

[39]*NLRB v. United Ins. Co.*, 390 U.S. 254, 259 (1968).

[40]Doc. 772-7 at p. 43 (Van Dusen Contractor Agreement at ¶ 17.A); Doc. 772-8 at p. 8 (Sheer Contractor Agreement at ¶17.A); Doc. 772-9 at p. 23 (Motolinia Contractor Agreement at ¶ 17.A); Doc. 772-10 at p. 24 (Schwalm Contractor Agreement at ¶ 16.A); Doc. 775 at p. 45 (Peter Wood Contractor Agreement (2009) at ¶ 17.A); Doc. 775-1 at p. 27 (Peter Wood Contractor Agreement (2014) at ¶ 16.A).

[41]*Affinity Logistic*, 754 F.3d at 1102; *In re Slay Transp. Co., Inc.*, 331 NLRB 1292, 1294 (2000).

[42]Doc. 772-7 at p. 39 (Van Dusen Contractor Agreement at ¶ 5.D); Doc. 772-8 at p. 4 (Sheer Contractor Agreement at ¶ 5.C); Doc. 772-9 at p. 20 (Motolinia Contractor Agreement at ¶ 5.D ); Doc. 772-10 at p. 21 (Schwalm Contractor Agreement at ¶ 5.D); Doc. 775 at p. 42 (Peter Wood Contractor Agreement (2009) at ¶ 5.D); Doc. 775-1 at p. 42 (Peter Wood Contractor Agreement (2014) at ¶ 5.D).

[43]Doc. 772-7 at p. 53 (Van Dusen Contractor Agreement, Qualcomm Rental Addendum); Doc. 765-5 at p. 2 (Sheer Qualcomm Purchase Agreement); Doc. 772-9 at p. 33

- **Equipment and Operational Costs:** The Contractor Agreement also
  offer leasing and cost-advancing options to Plaintiffs.  In the agreements,
  Swift also retains the discretion to pay for certain items on behalf of
  Plaintiff and then deduct those payments from Plaintiffs' settlements.[44]
  Cost-advancing and leasing arrangements that allow drivers to operate
  are evidence of an employment relationship.[45]

On the other hand, each Contractor Agreement contains provisions declaring

that the signing Plaintiff operates as an independent contractor and not an employee of

Swift.  The applicable provision in the agreements require the signing Plaintiff "to

determine the method, means and manner of performing work and service under [the

agreement]."[46]  Such a provision suggests that the parties intended to create an

---

(Motolinia Contractor Agreement, Qualcomm Rental Addendum ); Doc. 747-9 at p. 2 (Schwalm
Contractor Agreement, Qualcomm Rental Addendum ); Doc. 775 at p. 55 (Peter Wood
Contractor Agreement, Qualcomm Purchase Addendum); Doc. 775-1 at p. 83 (Peter Wood
Contractor Agreement (2014), Qualcomm Rental Agreement).  Plaintiff Sheer's Contractor
Agreement did not specify that the Qualcomm Rental Agreement would be incorporated into the
agreement but other provisions operate to do so.  See Doc. 772-8 at p. 9 (Sheer Contractor
Agreement at ¶ 21) (incorporating any document specifically referred to or contemplated by the
agreement).

[44]Doc. 772-7 at p. 43 (Van Dusen Contract Agreement at ¶ 14); Doc. 772-8 at p. 8
(Sheer Contractor Agreement at ¶ 14); Doc. 772-9 at p. 23 (Motolinia Contractor Agreement at
¶ 14); Doc. 772-10 at p. 24 (Schwalm Contractor Agreement at ¶ 14); Doc. 775 at p. 45 (Peter
Wood Contractor Agreement (2009) at ¶ 14); Doc. 775-1 at p. 27 (Peter Wood Contractor
Agreement (2014) at ¶ 14).

[45]See Affinity Logistics Corp., 754 F.3d at 1104 (finding that drivers do not provide their
own tools, which would be indicative of an independent contractor, when a company provides
those tools through a leasing and cost-advancing arrangement).

[46]Doc. 772-7 at p. 44 (Van Dusen Contractor Agreement at ¶ 18); Doc. 772-8 at p. 9
(Sheer Contractor Agreement at ¶ 18); Doc. 772-9 at p. 24 (Motolinia Contractor Agreement at
¶ 18); Doc. 772-10 at p. 25 (Schwalm Contractor Agreement at ¶ 17); Doc. 775 at p. 46 (Peter
Wood Contractor Agreement (2009) at ¶ 18); Doc. 775-1 at p. 28 (Peter Wood Contractor
Agreement (2014) at ¶ 17).

independent contractor relationship and that the Plaintiff would be able to have

autonomy.  The Contractor Agreements also state that Plaintiffs would not be entitled to

workers' compensation benefits.

There are also provisions in the Contractor Agreements enforcing the idea that

Plaintiffs would have the right to daily autonomy and the opportunity to operate their

own profitable trucking business.  For example, each agreement states that the

respective Plaintiff can turn down any loads tendered by Swift.[47]  Each one also states

that the Plaintiff cannot haul for another carrier while he or she is using the truck under

Swift's operating authority, but if the Plaintiff removes and returns all indicia and

documents relating to Swift's operating authority— "all identification devices, licenses

and base plates pertaining to [Swift]"—then he or she can provide services to another

carrier.[48]  Each also provides that the Plaintiff can hire employees as long as the

Plaintiff obtains the required amount of accident/hazard insurance.[49]  The agreements

---

[47]Doc. 772-7 at p. 38 (Van Dusen Contract Agreement at ¶ 1 ); Doc. 772-8 at p.2 (Sheer Contractor Agreement at ¶ 1); Doc. 772-9 at p. 18  (Motolinia Contractor Agreement at ¶ 1); Doc. 772-10 at p. 19  (Schwalm Contractor Agreement at ¶ 1); Doc. 775 at p. 40 (Peter Wood Contractor Agreement (2009) at ¶ 1); Doc. 775-1 at p.22 (Peter Wood Contractor Agreement (2014) at ¶ 1 ).

[48]Doc. 772-7 at p. 39 (Van Dusen Contract Agreement at ¶ 5.A., 5.B); Doc. 772-9 at p. 19  (Motolinia Contractor Agreement at ¶ 5.A, 5.B); Doc. 772-10 at p.  20 (Schwalm Contractor Agreement at ¶5.A, 5.B ); Doc. 775 at p.  41 (Peter Wood Contractor Agreement (2009) at ¶ 5.A, 5.B ); Doc. 775-1 at p. 23 (Peter Wood Contractor Agreement (2014) at ¶ 5.A, 5.B). Sheer's Contract Agreement has different language.  The applicable provision states that Sheer cannot haul goods for any third party while operating under Swift's operating authority and that he cannot haul for any other carrier while using Swift's resources, name, or authorities. There is no provision describing what would need to be returned before Sheer could drive for another carrier. Doc. 772-8 at p. 4 (Sheer Contractor Agreement ¶ 5.A).

[49]Doc. 772-7 at p. 40 (Van Dusen Contract Agreement at ¶ 7.A); Doc. 772-8 at p. 5 (Sheer Contractor Agreement at ¶ 7.A); Doc. 772-9 at p. 20 (Motolinia Contractor Agreement at ¶ 7.A); Doc. 772-10 at p. 21 (Schwalm Contractor Agreement at ¶ 7.A); Doc. 775 at p. 42 (Peter Wood Contractor Agreement (2009) at ¶ 7.A); Doc. 775-1 at p. 24 (Peter Wood Contractor

make Plaintiffs responsible for all repairs and fuel costs, but the agreements state that

Plaintiffs can use Swift's repair services and purchase fuel from Swift facilities or with

Swift's credit.[50]  Plaintiffs were not required to purchase or rent any equipment from

Swift, but they could do so.[51]  Indeed, as noted above, all Plaintiffs rented their required

communications equipment from Swift through an addendum agreement to the

Contractor Agreement.  Plaintiffs were responsible for certain types of insurance, but

they could purchase such insurance through Swift.[52]

On the surface, these terms suggest that Plaintiffs had autonomy and support

the idea that Plaintiffs had the opportunity to work for others and establish a distinct,

profitable business.  However, the Contractor Agreements and the terms that Plaintiffs

agreed to therein cannot be read in isolation and do not provide the complete terms and

conditions of their working arrangement.  Each of the named Plaintiffs also executed an

accompanying IEL lease on the same day as the Contractor Agreement.  That is, the

_____

Agreement (2014) at ¶ 7.A).

[50]Doc. 772-7 at pp. 42-43 (Van Dusen Contractor Agreement at ¶¶ 10,15); Doc. 772-8 at pp. 7-8 (Sheer Contractor Agreement at ¶¶ 10,15); Doc. 772-9 at pp. 22-23 (Motolinia Contractor Agreement at ¶¶ 10,15); Doc. 772-10 at pp. 23-24 (Schwalm Contractor Agreement at ¶¶ 10,15); Doc. 775 at pp. 44-45 (Peter Wood Contractor Agreement (2009) at ¶¶ 10,15); Doc. 775-1 at pp. 26-27 (Peter Wood Contractor Agreement (2014) at ¶¶ 10,15).

[51]Doc. 772-7 at p. 39 (Van Dusen Contractor Agreement at ¶ 4); Doc. 772-8 at p. 4 (Sheer Contractor Agreement at ¶ 4); Doc. 772-9 at p. 19 (Motolinia Contractor Agreement at ¶ 4); Doc. 772-10 at p. 20 (Schwalm Contractor Agreement at ¶ 4); Doc. 775 at p. 41 (Peter Wood Contractor Agreement (2009) at ¶ 4); Doc. 775-1 at p. 23 (Peter Wood Contractor Agreement (2014) at ¶ 4).

[52]Doc. 772-7 at p. 41 (Van Dusen Contractor Agreement at ¶ 8); Doc. 772-8 at pp. 6-7 (Sheer Contractor Agreement at ¶ 8); Doc. 772-9 at pp. 21-22 (Motolinia Contractor Agreement at ¶ 8); Doc. 772-10 at pp. 22-23 (Schwalm Contractor Agreement at ¶ 8); Doc. 775 at pp. 43-44 (Peter Wood Contractor Agreement (2009) at ¶ 8); Doc. 775-1 at pp. 25-26 (Peter Wood Contractor Agreement (2014) at ¶ 8).

truck they were going to use to provide their driving services to Swift was a leased truck. For those contract drivers who had accompanying IEL leases, such as Plaintiffs, the lease provisions effectively curtail the provisions in the Contractor Agreements that provide for their autonomy and ability to operate as a distinct business.

While the Contractor Agreements state that the respective Plaintiff can use his or her truck for other carriers, the accompanying leases refer to drivers working for one "Carrier" and that term is defined under the lease as Swift.[53] Pursuant to the IEL leases, each Plaintiff must have a Contractor Agreement with Swift, and the only provision related to payments indicates that rents must be paid by Swift on a weekly basis after it had deducted the requisite amount from the Plaintiff's earnings.[54] The lease also specifies a maximum number of miles that the Plaintiff can drive the leased truck per month and specifically contemplates that Swift will keep track of mileage:

> [Plaintiff] agrees that the Rent is based upon normal wear and tear, and that [Plaintiff] shall drive the vehicle 11,000 miles dispatched by Carrier, whether loaded or empty, or less per MONTH. . . . [Plaintiff] agrees to a charge of nine cents ($.09) for each mile driven in excess . . . . This Excess Mileage Charge shall be calculated monthly by subtracting the Standard Mileage from the same month's actual miles dispatched by Carrier, whether loaded or empty–based on Carrier's then most current version of its mileage guide– and multiplying by $0.09 cents per mile.[55]

---

[53]Doc. 772-7 at p. 22 (Van Dusen Lease at ¶ 2(e)); Doc. 772-9 at p. 2 (Motolinia Lease at ¶ 2(e)); Doc. 772-10 at p. 2 (Schwalm Lease at ¶ 2(e)). Plaintiff Sheer's lease does not contain the term "Carrier" but, rather, just uses "Swift." Doc. 765-4 at p. 2 (Sheer Lease at ¶ 2).

[54]Doc. 772-7 at pp. 22, 24-25 (Van Dusen Lease at ¶¶ 2(e), 12(g)); Doc. 772-9 at pp. 2, 4-5 (Motolinia Lease at ¶¶ 2(e), 12(g)); Doc. 772-10 at pp. 2, 5 (Schwalm Lease at ¶¶ 2(e), 12(g)); Doc. 765-4 at pp. 2, 8 (Sheer Lease at ¶¶ 2, 12(g)).

[55]Doc. 772-7 at p. 22 (Van Dusen Lease at ¶ 2(c)); Doc. 772-9 at p. 2 (Motolinia Lease at ¶ 2(c)); Doc. 772-10 at p. 2 (Schwalm Lease at ¶ 2(c)); Doc. 765-4 at p. 9 (Sheer Lease at ¶ 21).

Therefore, when read in conjunction, contract drivers with accompanying IEL Leases, as a practical matter, had to drive for Swift.

Under the terms of the IEL Leases, the ability of Plaintiffs to keep leasing their trucks was explicitly dependent on them maintaining their Contractor Agreements with Swift.[56]  When read in conjunction with the at-will termination provision in the Contractor Agreements, Swift effectively had full control of the terms of the relationship.  Swift could use the threat of the at-will termination provision to pressure Plaintiffs to agree to changes because termination would automatically put him or her in default, which, under the terms of the lease, had significant financial consequences for contract drivers—default by a Plaintiff meant that IEL could accelerate all remaining lease payments for the remainder of the lease and satisfy the debt out of the Plaintiff's bond, maintenance account, and settlements with Swift.[57]

The lease provisions also limited the ability of the Plaintiffs to have a different driver operate the leased truck.  A substitute driver could only be used if the Plaintiffs

---

[56]Doc. 772-7 at pp. 24-25 (Van Dusen Lease at ¶ 12(g)); Doc. 772-9 at pp. 4-5 (Motolinia Lease at ¶ 12(g)); Doc. 772-10 at p. 5 (Schwalm Lease at ¶12(g)); Doc. 765-4 at p. 6 (Sheer Lease at ¶ 12(g)).

[57]Doc. 772-7 at p. 25 (Van Dusen Lease at ¶ 13); Doc. 772-9 at p. 5 (Motolinia Lease at ¶ 13); Doc. 772-10 at p. 5 (Schwalm Lease at ¶ 13); Doc. 765-4 at pp. 6-7 (Sheer Lease at ¶ 13).

were "ill, disabled, or otherwise unable to drive the [truck]."[58]  Moreover, in order to hire

a substitute driver, Plaintiffs had to submit written notice for IEL's approval.[59]

Plaintiffs therefore were not free to use their discretion to choose their own employees;

generally an independent contractor would have the unrestricted right to hire its own

employees.[60]

Defendants argue that IEL is a separate company and that the terms of the IEL

Leases should not be considered as part of Plaintiffs' Contractor Agreements with Swift.

The court disagrees.  The terms of the two agreements are explicitly entwined and

clearly designed to operate in conjunction for those drivers who leased equipment from

IEL for purposes of becoming contract drivers with Swift.  As noted above, the IEL

Leases provide that Plaintiffs are in default if their Contractor Agreements with Swift are

terminated by Swift or Plaintiffs.  In such an event, IEL is entitled to terminate the lease

and accelerate all remaining lease payments for the remainder of the lease and satisfy

---

[58]Doc. 772-7 at p. 23 (Van Dusen Lease at ¶ 6(a)); Doc. 772-9 at p. 3 (Motolinia Lease at ¶ 6(a)); Doc. 772-10 at p. 3 (Schwalm Lease at ¶ 6(a)).  Sheer's lease does not have a provision regarding third-party drivers; rather, it has a provision preventing sublease without consent.

[59]The court notes that Defendants misrepresent the record to this effect.  In their response to Plaintiffs' statement of facts, Defendants state that the lease specifically allows contract drivers to "substitute a competent, licensed driver who will be under his/her control and direction."  This is an incomplete representation of the provision.  The whole provision is as follows: "Lessee agrees that, except as otherwise provided below, he/she shall be the driver assigned to the Equipment.  If Lessee is ill, disabled, or otherwise unable to drive the [truck], he/she must submit a written request to substitute a competent, licensed driver who will be under his/her control and direction and will not abuse the [truck] and will operate it with reasonable care, diligence, and caution, and subject to all provision of the Lease, which request Lessor shall review within ten (10) business days."  *See, e.g.,* Doc. 772-7 at p. 23 (Van Dusen Lease at ¶ 6(a)).

[60]Doc. 771 at p. 22. *Affinity Logistics Corp.*, 754 F.3d at 1102-03 (finding the right to hire helpers of little significance where employer had to approve hires).

the debt out of the Plaintiff's bond, maintenance account, and settlements with Swift.

The leases require the respective Plaintiff to authorize and direct *Swift* to pay the rent

due on the truck directly to IEL from the Plaintiff's earned compensation on a weekly

basis:

> [Plaintiff] shall execute an "Authorization and Assignment" (in the form attached hereto) in favor of [IEL] authorizing and directing the motor carrier ("Carrier") with which [Plaintiff] has entered into [an] independent contractor operating agreement ("ICOA")–which shall be Swift Transportation Co., Inc. –to deduct weekly the Overall Lease Payments from [Plaintiffs] earned and available settlement compensation under the ICOA and to electronically deliver all Overall Lease Payments to [IEL] within two business days of each Overall Lease Payment Date. [Plaintiff] shall supply [IEL] with a copy of [Plaintiff's ICOA . . . immediately upon its signing by all parties.[61]

In turn, the authorization for deduction of weekly lease payments to IEL is specifically

incorporated by reference into the Contractor Agreement.[62]   The Contractor

Agreements also reference Plaintiffs' indebtedness to IEL:

> [Swift] and [Plaintiff] acknowledge that [Plaintiff] may have indebtedness or obligations to third parties whereby [Plaintiff], with the consent of [Swift], has agreed to have sums deducted from [Plaintiff's] settlements to satisfy such indebtedness or obligations. [Plaintiff] hereby authorizes [Swift] to deduct any such indebtedness or obligations from [Plaintiff's] settlements.[63]

---

[61]Doc. 772-7 at p. 22 (Van Dusen Lease at ¶ 2(e)); Doc. 772-9 at p. 2 (Motolinia Lease at ¶ 2(e)); Doc. 772-10 at p. 2 (Schwalm Lease at ¶ 2(e)).  Plaintiff Sheer's lease is worded differently but to the same effect.  Doc. 765-4 at p. 2 (Sheer Lease at ¶ 2).

[62]Doc. 772-7 at p. 31 (Van Dusen Lease, Authorization and Assignment Form); Doc. 772-9 at p. 11 (Motolinia Lease, Authorization and Assignment Form); Doc. 772-10 at p.11 (Schwalm lease, Authorization and Assignment Form).  Plaintiff Sheer's authorization form for deduction is worded differently and does not contain incorporation language.  Doc. 765-4 at p. 13 (Sheer Lease, Authorization for Deduction Form).

[63]Doc. 772-7 at p. 43 (Van Dusen Contract Agreement at ¶ 16); Doc. 772-8 at p. 8 (Sheer Contractor Agreement at ¶ 16); Doc. 772-9 at p. 19 (Motolinia Contractor Agreement at ¶ 4); Doc. 772-10 at p.  23 (Schwalm Contractor Agreement at ¶ 16); Doc. 775 at p. 45 (Peter Wood Contractor Agreement (2009) at ¶ 16); Doc. 775-1 at p. 27 (Peter Wood Contractor Agreement (2014) at ¶ 14).

Schedule A to each Contractor Agreement acknowledges that the Plaintiff was leasing his truck and that he did, in fact, have indebtedness to a third party—IEL.[64]  It is undisputed that both agreements were presented to Plaintiffs together and were unilaterally drafted by Swift's attorneys.  It is also undisputed that IEL is a wholly-owned subsidiary of Swift that is publically traded as part of the Swift umbrella of companies, is located at the same location as Swift, and shares Swift's computer systems.  Therefore, the contractual terms and conditions of Plaintiffs' agreements with Swift were set forth in both the Contractor Agreements and the IEL Leases and should be considered together when determining whether Plaintiffs operated under a contract for employment.

In sum, looking at the terms and conditions of the Contractor Agreement and the terms and conditions of the IEL Leases, which essentially restricted the purported autonomy allowed in the Contractor Agreements, contract drivers who obtained their trucks through a lease with IEL, such as Plaintiffs, had contracts for employment that are therefore exempt from arbitration under the FAA and the AAA.

**C. Other Evidence**

The evidence presented from outside the four corners of the agreements also support the court's conclusion that Plaintiffs had employment contracts with Swift.  The load assignment and payment structure limited Plaintiffs' autonomy and ability to

[64]Doc. 772-7 at p. 46 (Van Dusen Contract Agreement, Schedule A); Doc. 772-8 at p. 11 (Sheer Contractor Agreement, Schedule A); Doc. 772-9 at p. 26 (Motolinia Contractor Agreement, Schedule A); Doc. 772-10 at p. 28 (Schwalm Contractor Agreement, Schedule A); Doc. 775 at p. 48 (Peter Wood Contractor Agreement (2009), Schedule A); Doc. 775-1 at p. 22 (Peter Wood Contractor Agreement (2014), Schedule A).

maximize their profits.  Defendants assert that Plaintiffs were paid by the job, on a per mile basis, and not by time spent at work.  The fact that Plaintiffs were paid on a per mile basis and not based on time spent working does not make their compensation project-based.  As noted above, the mileage rate was set by Swift, and Swift could unilaterally change it.  Plaintiffs were not paid after completion of a specific job; rather, they received settlement payments on a weekly basis.  Indeed, payment of Swift's employee drivers was set up similarly: Plaintiffs, as well as many other contract drivers, were paid per mile driven on a weekly basis just as they had been paid previously when they worked as employees for Swift.[65]

Defendants argue that Plaintiffs were free to do as little or as much for Swift as needed to make a profit as an independent driver.  Plaintiffs had much less control of their schedule than Defendants contend.  Even though Plaintiffs were not explicitly required to work a set number of hours, the combination of the Contractor Agreements and the IEL Leases dictated a minimum amount of time Plaintiffs needed to drive for Swift in order to pay the weekly rent for the leased truck.  The evidence shows that to make enough to pay rent and other costs out of their Swift earnings, Plaintiffs needed to drive 2,100 to 2,400 a week for Swift.[66]  That is around the same mileage expected of

---

[65]Doc. 797 (Defendants' Response to Fact 113); Doc. 776-1 at p. 3 (Motolinia Declaration at ¶¶ 9, 10); 776-2 at pp. 3, 4 (Van Dusen Declaration at ¶¶ 8, 9); Doc. 776-3 at p. 3 (Sheer Declaration at ¶¶ 7, 8); Doc. 776-4 at pp. 3, 4 (Schwalm Declaration at ¶¶ 9,10); Doc. 776-5 at p. 3 (Wood Declaration at ¶¶ 8, 9).

[66]Doc. 776-8 at pp. 40-41 (Swift 30(b)(6) Depo. at pp. 154-57); Doc. 775-3 at p. 111 (Ex. 12, Swift's Contracted Driver Manual at Section 5, p. 2).

Swift's employee drivers.[67]  Plaintiffs' declarations show that they had to drive at least

as many hours for Swift when driving as contract drivers as they had to drive when they

were employees.[68]  Swift provided a declaration from its CEO, David Barry, which states

that "there are many instances where Owner Operators will not accept loads for weeks

or even months at a time with no repercussion."[69]  However, he does not state that the

owner operators he refers to are ones with IEL Leases like Plaintiffs.  Clearly, for drivers

with IEL Leases, failure to drive for Swift would be failure to pay rent and could result in

lease termination, loss of use of the truck, and possible rent acceleration.  There is no

evidence to show that drivers with IEL Leases had any way to pay rent apart from

Swift's deductions.

Defendants argue that Plaintiffs could maximize their earnings based on what

assignments they agreed to take.  They assert that contract drivers had the opportunity

to receive multiple loads at a time if desired, relying on an affidavit from David Barry.[70]

However, during his deposition, Barry acknowledged that loads were *normally* only

offered one load at a time except for times when a stacked delivery package was

assigned to a driver.[71]  While Barry said Swift tried to accommodate contract drivers'

---

[67]*Compare* Doc. 775-3 at p. 111 (Ex. 12 Swift's Contracted Driver Manual at Section 5, p. 2) *with* Doc. 775-6 at p. 23 (Ex. 14b, Employee Driver Manual at Section 5, p. 1).

[68]Doc. 776-1 at p. 3 (Motolinia Declaration at ¶ 7); 776-2 at p. 3 (Van Dusen Declaration at ¶ 6); Doc. 776-3 at p. 3 (Sheer Declaration at ¶ 5); Doc. 776-4 at p. 3 (Schwalm Declaration at ¶ 7); Doc. 776-5 at p. 3 (Wood Declaration at ¶ 6).

[69]Doc. 793 (Barry Declaration at ¶ 13).

[70]Doc. 793 (Barry Declaration at ¶ 16).

[71]Doc. 776-8 at p. 20 (Swift 30(b)(6) Depo. at pp. 73-76).  Defendants rely on the fact that at one point Barry said "the system will send out three or four choices they can choose

-24-

preferred loads when possible, there is nothing to show that those requests were

routinely granted or that Plaintiffs had any meaningful information about available loads

that would allow them to maximize income.  Indeed, Barry acknowledged that drivers do

not have access to programs that allow them to see which loads are available; Swift's

planners were the only ones with access to the available loads and were the ones who

controlled assignments offered.[72]

Defendants argue that Plaintiffs had the freedom to refuse a load and wait for a

better load to be offered.  However, turning down a load would have been very risky

because there was no way to know if doing so would result in a better or worse load to

follow or when the next load would be offered.[73]  It is undisputed that turning down

loads would likely lead to fewer miles driven and therefore was done infrequently.[74]

Plaintiffs acknowledged that they had the right to turn down loads, but they testified that

in practice it was discouraged or at least not advisable to do so.[75]  Without access to

from, if that's what they want to do.  It just depends upon what the freight basket looks like."
Doc. 776-8 at p. 20 (Swift 30(b)(6) Depo. at pp. 73-74). However, it is unclear if he means the
planners can choose or the driver himself can choose.  In any event, Barry agreed that in the
*normal course* "the planner puts together its puzzle matching loads to drivers and pushes a
button and the load matched to particular driver is communicated to the driver" and "only one
load is communicated to the driver at a time and he has some period of time to either accept it
or not." Doc. 776-8 at p. 20 (Swift 30(b)(6) Depo. at pp. 74-75).

[72]Doc. 776-8 at p. 20 (Swift 30(b)(6) Depo. at p. 76).

[73]Doc. 797 at p. 89 (Defendants' Response to Fact 141, acknowledging that turning
down a load meant a driver could sit for up to 48 hours).

[74]Doc. 797 at p. 89 (Defendants' Response to Fact 142, acknowledging that "turning
down loads could mean fewer miles" and is done "infrequently").

[75]Doc. 776-2 at p. 4 (Van Dusen Declaration at ¶ 11) (acknowledging that he rarely
turned down loads because it could result in sitting for "days"); (Doc. 776-3 at p. 4 (Sheer
Declaration at ¶ 10) (same); Doc. 776-4 at p. 4 (Schwalm Declaration at ¶ 12) (same);
Doc. 776-5 at p. 4 (Wood Declaration at ¶ 11) (same); Doc. 772-2 at p. 26 (Van Dusen Depo. at

the available load options and without any real choice over load assignments, Plaintiffs were unable to exercise judgment in a way that allowed them to generate additional income.

The evidence also shows that it was impracticable for Plaintiffs to establish their independence from Swift in order to maximize profits.  Defendants argue that there were ways Plaintiffs and other contract drivers could use their "business acumen, hard work, and enterprise" to make a profit and establish an autonomous business.[76] Specifically, they stress that Plaintiffs had the ability to work for other carriers as they saw fit.  That ignores the terms of the IEL Leases, which, as discussed above, operated to restrict drivers to carrying loads primarily for Swift.  IEL confirmed that the leases are structured to require the lessee to drive for Swift because rent payments were to be made through Swift and so that Swift could keep track of mileage fees that were to be applied under the lease.[77]  Defendants say that IEL leased to individuals with no

_____

p. 98) (stating that "Swift didn't like it when you turned down loads" and that it could result in sitting for awhile before you got offered another one.); Doc. 772-4 at pp. 6, 11, 19, 35 (Motolinia Depo. at pp. 19-20, 40, 69, 135) (acknowledging that if you didn't take loads, you did not work); Doc. 772-5 at p. 9 (Schwalm Depo. at p. 29) (stating that she believed she would be placed at the bottom of the assignment list if she declined a load); Doc. 772-6 at p. 13 (Wood Depo. at pp. 45-46) (stating that he risked being terminated or at least sitting for days if he declined an assignment); Doc. 772-3 at pp. 11-12 (Sheer Depo. at pp. 39-41) (stating that if he did not take a load then "they may just let you sit because you refused a load" and that he did not "refuse loads").  Defendants point to the fact that Sheer said he never suffered any adverse consequence from turning down a load, but he explained that was because he did not actually turn them down (Sheer Depo. at p. 124), and earlier he had also acknowledged that it was understood that turning down a load was not advisable (Sheer Depo. at p. 41).

[76]Doc. 797 at p. 176 (Defendants' Statement of Fact 61).

[77]Doc. 776-7 at pp. 15-16 (IEL 30(b)(6) Depo. at pp. 56-59) (acknowledging that lessees were to be drivers for Swift but stating that there would be no way to know whether a driver moonlighted with others and got paid on the side and acknowledging that requiring lessees to drive for Swift ensured payment of excess milage fees).

affiliation with Swift and therefore IEL would have allowed Plaintiffs to drive for

someone not affiliated with Swift, but the only evidence of such an arrangement was

testimony that IEL leased trucks to drivers who had an independent contractor

agreement with Central Freight and authorized Central Freight to pay rent on their

leases.[78]  That evidence is not proof of a contract driver's ability to operate for multiple

carriers at one time but, rather, shows exclusiveness with a different carrier.  IEL

acknowledged that drivers did not have multiple authorizations and assignments in

effect at the same time.[79]  IEL did not receive payments from different carriers on behalf

of a driver bouncing back and forth between carriers.[80]  Plaintiffs themselves did not

drive for multiple carriers and believed they could not drive for other carriers or that

doing so would be impracticable.[81]

Defendants assert that nothing prevented Plaintiffs from moonlighting with other

carriers.  However, even if Plaintiffs could have moonlighted with other carriers on top

of any work for Swift, as a practical matter, it would have been hard to do so.  The

---

[78]Doc. 797 at p. 108 (Defendants' Response to Fact 170); Doc. 776-7 at pp. 16 (IEL 30(b)(6) Depo. at pp. 59-60).

[79]Doc. 776-7 at p. 17 (IEL 30(b) Depo. at p. 62).

[80]Doc. 776-7 at pp. 16-17 (IEL 30(b) Depo. at pp. 60-61).

[81]Doc. 772-2 at p. 13 (Van Dusen Depo. at pp. 45-48) (acknowledging that it would have been difficult to get the required permits and licences to moonlight under her own authority); Doc. 772-3 at pp. 24-25 (Sheer Depo. at p. 92-93) (stating that he was told by IEL that he could not drive for another carrier); Doc. 772-4 at p. 26 (Motolinia Depo. at pp. 97-98 (stating that he was told he could not drive for other carriers); Doc. 772-5 at p. 23 (Schwalm Depo. at pp. 87-88) (stating that she was not allowed to haul for another carrier and did not have the option of just removing all indicia of Swift's authority); Doc. 772-6 at pp. 23-24 (Wood Depo. at pp. 85-92) (acknowledging that in theory they were supposed to be able to drive for other carriers but that in practice it was not actually allowed or could only be allowed with permission and if he followed the terms of the contract).

Contractor Agreements required drivers to remove and return all evidence of Swift's

operating authority and its licenses to operate before they could use the truck to drive

for another company and also prohibited drivers from using any company equipment

while driving for another entity, which would include the Qualcomm communication

systems.  Defendants point to Barry's affidavit where he asserts that contract drivers

only had to cover up Swift indicia, implying no return was necessary.[82]  That contradicts

his testimony given during Swift's Rule 30(b) deposition where he acknowledged that

doing only that would be a contract violation.[83]  Moreover, even if covering up indicia

was sufficient, that does not change the fact that drivers had to remove or cover up the

base plates on the truck, which means they would then need new registration for the

truck to get new base plates from the applicable department of motor vehicles.[84]  Barry

testified that he did not know whether there had been a contract driver who drove for a

third-party carrier in compliance with the Contractor Agreements.[85]

Defendants also rely on the fact that Plaintiffs were free to establish a fleet of

trucks by leasing more trucks and hiring more drivers.  As noted above, the IEL Leases

restricted the ability of Plaintiffs to use third-party drivers to situations where he or she

[82]Doc. 793 (Barry Declaration at ¶ 8).

[83]Doc. 776-8 at pp. 55-56 (Swift 30(b)(6) Depo. at pp. 215-19).

[84]Doc. 776-8 at pp. 57-58 (Swift 30(b)(6) Depo. at pp. 223-26).

[85]His declaration states that he personally knows several contract drivers who have
driven for other carriers. Barry Declaration at ¶ 8. That contradicts his testimony where he said
he knows drivers asked him about how to drive for other carriers, but he did not know whether
any had properly done so.  He assumed that some drivers might do so in ways that contravene
the contractor agreement terms.  Doc. 776-8 at pp. 56-58 (Swift 30(b) Depo. at pp. 215 - 26).
*Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("[A] party cannot create an
issue of fact by an affidavit contradicting his prior deposition testimony.").

were ill, disabled, or otherwise unable to drive.  Even if hiring was allowed in practice,

Swift retained the authority to bar any of Plaintiffs' hires that it deemed unqualified and

required those hires to follow all "rules, policies, and protocols" of Swift.[86]  IEL also

required the driver to get its approval before hiring a third-party driver.[87]  "In such

circumstances, the significance of the right to hire employee drivers is greatly

diminished."[88]  Moreover, IEL considered the leasing of a second truck for a third-party

driver to be a "risky endeavor" and did not "encourage" the practice in any "way, shape,

or form."[89]

Even if Plaintiffs could have hired other drivers, they would have had to rely on

Swift for assignments adequate to cover their costs.  Also, given that contract drivers

simply carried the loads assigned to them for the price per mile set unilaterally by Swift,

the most Plaintiffs could gain from an additional driver was a cut of the milage earned

by that driver.

---

[86]Doc. 772-7 at pp. 40-41 (Van Dusen Contract Agreement at ¶¶ 7.A, 7.D); Doc. 772-8 at p. 6 (Sheer Contractor Agreement at ¶ 17.D); Doc. 772-9 at pp. 20-21 (Motolinia Contractor Agreement at ¶¶ 7.A, 7.D); Doc. 772-10 at pp. 22-23 (Schwalm Contractor Agreement at ¶¶ 7.A, 7.D); Doc. 775 at pp. 42-43 (Peter Wood Contractor Agreement (2009) at ¶¶ 7.A, 7.D); Doc. 775-1 at pp. 24-25 (Peter Wood Contractor Agreement (2014) at ¶¶ 7.A, 7.D).

[87]Doc. 772-7 at p. 23 (Van Dusen Lease at ¶ 6(a)); Doc. 772-9 at p. 3 (Motolinia Lease at ¶ 6(a)); Doc. 772-10 at p. 3 (Schwalm lease at ¶6 (a)).  Sheer's lease does not have a provision regarding third-party drivers; rather, it has a provision preventing sublease without consent.

[88]Doc. 771 at p. 22. *Affinity Logistics Corp.*, 754 F.3d at 1102-03 (finding the right to hire helpers of little significance where employer had to approve hires and required them to comply with company policies).

[89]Doc. 776-7 at p. 32 (IEL 30(b)(6) Depo. at pp. 122-23)

The Plaintiffs, in fact, were not independent businesses when they started contract driving and never operated as independent business.  They all leased their trucks from IEL at the time they entered in their Contractor Agreements and did not present themselves as independent business entities.[90]  Indeed, Swift chose candidates for contract driving from its employee driver pool based on experience, safety record, and ability to haul a certain number of miles, not their business reputation.[91]  Plaintiffs were offered trucks through IEL with no credit check and little to no money down.[92]  Pursuant to the Contractor Agreements, Plaintiffs had the opportunity to lease equipment and pay for expenses through Swift.  Plaintiffs all obtained their insurance, transponder, and Qualcomm communications system through Swift.[93]  Plaintiffs also accepted Swift's offer to set up a maintenance account to cover cost of repairs that Plaintiffs would pay into through settlement deductions.[94]  Swift offered Plaintiffs access to Swift's "Comdata" card so that Plaintiffs could rely on Swift's credit to purchase fuel

---

[90]Defendants point to the fact that Plaintiff Wood entered into a Contractor Agreement with Swift in 2014 where he indicated that he would be doing business as "Starlight Trucking." Wood testified that he did that because he wanted to start his own company and to feel more independent, but he clarified that he did not actually start the business. Doc. 776-2 at p. 26 (Wood Depo. at pp. 99-100).  He thought that if he presented himself has an established company that he would have a different relationship with Swift (2014 was the second time that Wood worked as a contract driver with Swift). Doc. 776-2 at p. 27 (Wood Depo. at pp. 101-02).

[91]Doc. 797 at pp. 6-9 (Defendants' Response to Facts 9-14).

[92]Doc. 797 at pp. 9-10 (Defendants' Response to Fact 15).

[93]Doc. 776-1 at p. 3 (Motolinia Declaration at ¶¶ 4-5); Doc. 776-2 at p. 3 (Van Dusen Declaration at ¶¶ 3, 5); Doc. 776-3 at p. 3 (Sheer Declaration at ¶¶ 3-4); 776-4 at p. 3 (Schwalm Declaration at ¶¶ 4-5); Doc. 776-5 at p. 3 (Wood Declaration at ¶¶ 3-4).

[94]Doc. 797 at pp. 135 (Defendants' Response to Fact 210).

and other expenses with charges on the card being deducted from later settlements.[95]

Swift advanced fuel taxes for Plaintiffs and later recouped the money.[96]  Swift's

assistance in providing the necessary equipment and credit through cost-advancing and

leasing arrangements is evidence that Plaintiffs did not actually operate

autonomously.[97]  Plaintiffs did not build businesses while driving for Swift; it is

undisputed that Plaintiffs did not gain equity in their trucks or rented equipment through

their payments.[98]

        While there are some disputes about how much control Swift actually exercised

over Plaintiffs, the evidence shows that Swift indeed monitored their operations.  While

Barry's declaration states that Plaintiffs did not have to do any regular check-ins and

were not met at delivery sites or supervised by anyone at Swift, his deposition testimony

provides a more accurate picture of how Plaintiffs were supervised.  In his deposition,

he states that contract drivers report arrivals and departures and give an estimated time

of arrival through the Qualcomm communications system that they are required to

have.[99]  He affirmed that these updates were expected to be sent by all types of

drivers.[100]  His affidavit states that Swift does not monitor their progress while en route,

---

[95]Doc. 797 at pp. 140-41 (Defendants' Response to Fact 218).

[96]Doc. 797 at pp. 132 (Defendants' Response to Fact 207).

[97]*See Affinity Logistics Corp.*, 754 F.3d at 1104 (finding that drivers do not provide their own tools as would be indicative of an independent contractor when a company provides the tools through a leasing and cost-advancing arrangement).

[98]Doc. 797 at pp. 26 (Defendants' Response to Fact 49).

[99]Doc. (Swift 30(b)(6) Depo. at pp. 99, 110).

[100]Doc. (Swift 30(b)(6) Depo. at p. 110).

but he testified that the progress of loads for certain customers were monitored by a specific group within Swift, and he stated that the assignment planners have access to data to show if loads are running on time and that driver managers have the ability to know where all drivers are and what their availability is at frequent intervals.[101]  Based on that testimony, it is clear that, while Swift did not have a person visually monitoring pick-ups and drop-offs, it nonetheless expected contract drivers to report regularly as to their status and had the capability to track their progress.

Altogether, the terms of the Contractor Agreements, bolstered by the evidence presented as to how those terms worked in practice, persuade the court to find that Plaintiffs had contracts of employment which are exempt from arbitration under § 1 of the FAA and under the AAA.

## V.  CONCLUSION

Based on the preceding discussion, Plaintiffs' motion at docket 771 is GRANTED.  Defendants' motions for summary judgment as to each individual Plaintiff at dockets 744, 751, 757, 763, and 768 are DENIED.  The preceding discussion shows that even without considering the evidence obtained in discovery, Plaintiffs had contracts of employment.  Accordingly, Defendants' motion at docket 820 for

---

[101]Doc. (Swift 30(b)(6) Depo. at pp. 44, 101-02, 105).

reconsideration of the case management order or certification of an interlocutory appeal is DENIED as moot.

DATED this 5th day of January 2017.


/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT