Dan Getman (*Pro Hac Vice*)
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, NY 12401
(845) 255-9370
dgetman@getmansweeney.com

Susan Martin (AZ#014226)
Daniel Bonnett (AZ#014127)
Jennifer Kroll (AZ#019859)
Martin & Bonnett, PLLC
4647 N. 32nd St., Suite 185
Phoenix, Arizona 85018
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com

Edward Tuddenham (*Pro Hac Vice*)
23 Rue du Laos
75015 Paris, France
etudden@prismnet.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Virginia Van Dusen, et al., | No. CV 10-899-PHX-JWS |
| Plaintiffs, | JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT |
| vs. | |
| Swift Transportation Co., Inc., et al., | |
| Defendants. | |

**INTRODUCTION**

The parties jointly move for preliminary approval of the class action Settlement Agreement attached as Ex. 1. The Settlement, which is the product of arms-length negotiation between the parties, provides for a Gross Settlement Amount of $100,000,000.00 (and potentially more) for the settlement of the Settlement Class Members' pending claims against Defendants. Simultaneously with this motion for preliminary approval of the Settlement, the parties are filing a motion for certification of the Settlement Class and approval of the proposed notice to be issued to the Settlement Class Members. As discussed below, the Settlement achieved is fair, reasonable and adequate and preliminary approval is appropriate so that notice of the Settlement can be issued to class members.

**CASE HISTORY AND SETTLEMENT NEGOTIATIONS**

Having issued multiple rulings, the Court is well-acquainted with the history of the case. By way of brief summary, on December 22, 2009, Named Plaintiffs Jose Motolinia and Joseph Sheer[1] filed a Collective & Class Action Complaint ("Complaint") in the Southern District of New York against corporate Defendants Swift Transportation Co. of Arizona, LLC (formerly known and named in the operative complaint as Swift Transportation Co., Inc. and hereafter referred to as "Swift") , and Interstate Equipment Leasing, LLC (formerly known and named in the operative complaint as Interstate Equipment Leasing, Inc. and hereafter referred to as "IEL"), and individual Defendants Jerry Moyes and Chad Killebrew. (All Defendants are hereafter collectively referred to as "Defendants"). *See* Doc. 1 (S.D.N.Y. Docket). In the Complaint, Plaintiffs alleged that Swift misclassified its lease operator drivers as independent contractors and failed to pay them the legally-required minimum wage for each hour worked per week in violation of

---

[1] Another Named Plaintiff, Virginia Van Dusen, joined the action in 2010 when the first amended complaint was filed. Doc. 17. Two other Named Plaintiffs, Vickii Schwalm, and Peter Wood, joined the action in 2014 when the third amended complaint was filed, which also facially identified Jose Motolinia as the John Doe Plaintiff. Docs. 562, 588.

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206 *et seq.* Plaintiffs also alleged violations of state wage and contract laws as well as violations of federal forced labor statutes, 18 U.S.C. §§ 1589, 1595. Defendants deny all of Plaintiffs' allegations and contend that they and other owner-operators were properly classified as independent contractors under state and federal law.

On May 21, 2010, after transferring venue to the District of Arizona, Defendants moved to compel arbitration of the claims under the Federal Arbitration Act (FAA) and the Arizona Arbitration Act (AAA) pursuant to the arbitration clause in Plaintiffs' Contractor Agreements with Swift. *See Doc* 127. That arbitration clause contained a class action waiver that required each driver to arbitrate individually. Doc 128-1 at 12 ¶ 24. Plaintiffs opposed the motion arguing, *inter alia,* that they were exempt from arbitration pursuant to § 1 of the FAA (9 U.S.C. § 1), which excludes arbitration agreements contained in "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," and exempt from the AAA pursuant to Ariz. Rev. Stat. § 12-1517 which excludes arbitration agreements with employees. *See* Doc. 188 at 9-15. In an Order entered on September 30, 2010, this Court compelled arbitration finding that the delegation clause in the arbitration agreement required the arbitrator to determine whether Plaintiffs were exempt from the FAA and the AAA. Doc 223.

Plaintiffs then filed a petition for mandamus. The Ninth Circuit denied the petition but indicated that the district court should decide the exemption question. *In re Van Dusen,* 654 F.3d 858 (9th Cir. 2011). Plaintiffs moved for reconsideration of the September 30, 2010 order based on the mandamus decision. The Court again ordered arbitration but certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Doc. 321. On appeal the Ninth Circuit reversed and directed the Court to decide the exemption question. *Van Dusen v. Swift,* 544 Fed. Appx. 724 (9th Cir. 2013). After Defendants' petition for *certiorari* was denied, *Swift Transp. Co. v. Van Dusen,* 573 U.S. 916 (2014), this Court entered a scheduling order for resolving the exemption issue, including deadlines for discovery on the misclassification issue, as well as setting a schedule for dispositive

motions, and, if necessary, a trial of the exemption issue. Doc 548.

Defendants filed a petition for mandamus arguing that the Court should not have permitted discovery before deciding the exemption question. Defendants also filed an appeal arguing that the scheduling order amounted to a denial of the motion to compel arbitration. The appeal was dismissed for lack of jurisdiction, *Swift Transp. v. Van Dusen,* 830 F.3d 893 (9th Cir. 2016), and the petition for mandamus was denied with one dissent and a concurring opinion that indicated the concurring judge might have agreed with the dissent if the case had come up on appeal. *In re Swift Transportation Co., Inc.,* 830 F.3d 913 (9th Cir. 2016).

In the meantime, the parties engaged in extensive discovery on the employer/employee issue including five sets of requests for production and interrogatories directed to Defendants as well as 30(b)(6) depositions of Swift and IEL; requests for production, interrogatories, and deposition notices directed to all five Plaintiffs; and third-party subpoenas for documents directed to Qualcomm (the system used by Swift to communicate with drivers), AR Systems, and Aon Truck Group.

Upon completion of discovery, the parties filed cross motions for partial summary judgment on the question of whether the Plaintiffs' contracts were contracts of employment of a class of workers engaged in foreign or interstate commerce for purposes of § 1 of the FAA. Docs 771 and 792. On January 6, 2017, the Court entered an order finding that the independent contractor agreements signed by Plaintiffs constituted contracts of employment exempt from arbitration pursuant to § 1 of the FAA and § 12-1517 of the AAA. Doc 862. A few days following that Order, Swift rolled out a new contractor agreement to its Owner-Operators, including those operating trucks under a lease agreement with IEL. Plaintiffs argued the new agreement was improper, in part because it could possibly be read as retroactive and if Owner-Operators did not sign it, their relationship with Swift would be terminated.  The new agreement included provisions that Plaintiffs viewed as interfering with potential remedies in this case and make drivers financially liable to Defendants if they were adjudged to be employees. In response to a

motion by Plaintiffs, Defendants agreed to the Court to issue a clarifying notice stating that the new agreements would not affect drivers' rights and remedies in this case. Doc. 917.

Defendants appealed the partial summary judgment order denying arbitration pursuant to 9 U.S.C. § 16(a)(1)(B). *Swift Transp. Co. v. Van Dusen,* No. 17-15102 (9th Cir.). The Court stayed the case pending appeal, and denied without prejudice Plaintiffs' motions to certify the classes and amend the complaint. Doc. 918. In the meantime, the Court ordered Swift to provide Plaintiffs with the names and contact information of potential class members "to help preserve Plaintiffs' ability to reach potential witnesses and class members in the event a class is ultimately certified after the appeal." Docs. 976, 1016. Swift sought mandamus review of that Order. *In re Swift Transp. Co.,* No. 17-71757 (9th Cir. Filed June 15, 2017). In response, the Ninth Circuit stayed the order and referred the mandamus petition to the merits panel considering Swift's appeal of the order denying the motion to compel arbitration. *Id.* Doc. 7 (9th Cir. Nov. 14, 2017). After briefing was completed and just prior to the scheduled March 2018 oral argument of the appeal and mandamus petition, the Supreme Court granted *certiorari* in *New Prime Inc. v. Oliviera,* 138 S. Ct. 1134 (2018), to decide two questions: (1) whether a claim of exemption under § 1 of the FAA should be decided by the court or the arbitrator when an arbitration agreement contains a delegation clause, and (2) whether the term "contracts of employment" as used in FAA § 1 applies to contracts with independent contractors or only to contracts with employees. Because the outcome of these issues could potentially resolve the pending appeal, the Ninth Circuit stayed Defendants' appeal and mandamus petition pending resolution of the *New Prime* case. *Van Dusen v. Swift*, No. 17-15102, Doc. 55 (9th Cir. Feb. 27, 2018).

Starting in September 2017, when Swift's parent company merged with Knight Transportation, Inc., and occurring simultaneously with litigation, the parties agreed to explore settlement. They agreed to use the services of Mark Rudy, an experienced mediator in the wage and hour and collective and class action field, and thereafter engaged in extensive negotiations, exchanges of data, documents, and information, and in-person and

telephonic mediation. Settlement efforts continued with the help of the Mediator for well over a year. Throughout the settlement negotiations, the parties attempted to resolve complex, difficult, and hotly-disputed issues including the amount of the settlement fund, the scope of the settlement period and scope of the settlement class, the procedures for notice, confidentiality, and the scope of any release. Finally, following intense arms-length negotiations by and through Mr. Rudy and between the Parties directly, the Settlement Agreement was reached and was executed by the parties on February 7, 2019.

## THE SETTLEMENT

The Settlement provides substantial monetary relief and non-monetary benefits to a Settlement Class defined as:

> any and all individuals who entered into an independent contractor agreement with Swift and any affiliated entity (as defined below), and also entered into a lease agreements with IEL at any time prior to January 1, 2019 or the date on which the Court grants preliminary approval to this settlement, whichever date occurs first, regardless of whether the individual participates in the Settlement unless said individual opts-out of the Settlement as set forth herein.

Ex. 1 ¶ 1.a. The Settlement Agreement recites that there are approximately 20,000 class members. *Id.* at 1.

The key provisions of the Settlement Agreement are as follows:

1.      Defendants will fund a Gross Settlement Fund of $100,000,000 for complete resolution of the claims in the lawsuit arising during the period December 23, 1999 through September 8, 2017, the date of the merger between Swift's parent entity and Knight Transportation (hereafter referred to as "pre-merger claims"), as well as all claims for service awards, attorneys' fees, expenses, and costs of administration. ¶ 3A.

2.      The Settlement is a claims-made settlement. All Settlement Class Members who previously filed opt-in forms, including the Named Plaintiffs, are deemed to have already made a claim. Other class members have 120 days after notice is issued to file a claim form, although late claim forms will be accepted up to one week before the final fairness hearing. ¶¶ 1.b; 2; 10.c. Those Settlement Class Members who make a claim are

5

referred to as Participating Settlement Class Members.

3.    In order to maximize the recovery for Participating Settlement Class Members, the funds available for distribution for pre-merger claims (i.e. the Gross Settlement Amount, less service awards, fees, expenses, and costs of administration) will be allocated to Participating Settlement Class Members based on the assumption that an 80% claim rate (by claim value) for pre-merger claims will completely exhaust the available funds. If the claim rate for pre-merger claims is higher than 80%, individual awards will decrease pro-rata to ensure that the total awarded for pre-merger claims, plus the service awards, fees, expenses and costs of administration does not exceed $100,000,000. ¶ 3A.

4.    To the extent that the pre-merger claim awards to Participating Settlement Class Members based on the 80% claim rate calculation (plus the service awards, fees, expenses, and costs of administration) do not exhaust the $100,000,000 Settlement Fund, any remaining portion of the Settlement Fund will be used to pay post-merger claims, i.e. claims of settlement class members arising during the period September 9, 2017 through January 1, 2019, as well as the employer share of employment taxes on the settlement awards. However, if there are not sufficient funds to pay all post-merger claims or employment taxes out of the $100,000,000 Settlement Fund without reducing the maximum payment for pre-merger claims based on an 80% participation rate, Defendants will pay such additional funds over and above the $100,000,000 as are necessary to ensure that all post-merger claims are paid using the same allocation formula as the pre-merger claims and that the employer share of employment taxes are paid. ¶ 3B.

5.    There is a guaranteed payout floor of $60,000,000 for all pre-and post-merger claims, service awards, fees, expenses, and costs of administration; individual awards will be increased pro-rata to reach the $60,000,000 minimum if payment of claims using the 80% claim rate calculation does not exhaust the minimum guarantee. ¶ 3C. If, after payment of the minimum, including for all pre-and post- merger claims, attorney's fees, costs, and service awards, any part of the $100,000,000 Gross Settlement Fund remains

unclaimed, the remainder may revert to Defendants.

6.     Defendants have the right to terminate the Settlement if the total payout, including pre- and post-merger awards, service awards, fees, expenses, and costs of administration exceeds $75,000,000. ¶ 3C. Defendants can also terminate the Settlement if more than 5% of the Settlement Class Members affirmatively opt-out of the Settlement. ¶ 10.b. Defendants can exclude post-merger claims from the Settlement (but not terminate the Settlement) if the value of those claims exceeds $3,500,000 provided that, if Defendants exclude post-merger claims, those claims will not be released. ¶ 10c. In the event that Defendants terminate the Settlement, or it is not approved, all claim forms filed by Settlement Class Members will be treated as FLSA consent to sue forms in this case and the Action will continue as if no settlement had been reached. ¶ 13.

7.     The Settlement provides that Plaintiffs' attorneys may seek up to 1/3 of the Gross Settlement Fund as attorney's fees, as well as costs, expenses, and costs of administration), ¶ 4, and that Named Plaintiffs may apply for up to $50,000 in Service Awards. ¶ 5.

8.     The formula for calculating pre-merger settlement awards to Participating Settlement Class Members is set forth in a Plan of Allocation attached as Exhibit 1 to the Settlement Agreement. The allocations will be based on information contained in Swift's payroll records including the number of weeks the class member provided truck driving services for Swift pursuant to a contractor agreement and using a truck leased from IEL and the miles driven. Ex. 1, ¶ 8. The allocation will also take into account the presumed number of hours a class member worked, the net pay each received, the different claims asserted and the relative strengths of those claims. *Id*. Post-merger settlement awards will be calculated using the same formula. ¶¶ 7, 8, Ex. 1. The allocation is crafted to match Plaintiffs' counsel's assessment of the relative strengths and weakness of the respective wage and non-wage claims, and that assessment is applied equally and consistently for all class members across the various time periods, with different discounts to account for different types of litigation risk.

7

9.      Fifteen percent of each Settlement Class Members' settlement award is to be considered wage payments subject to withholding taxes and 85% is treated as non-wage penalties and interest not subject to payroll withholding taxes.[2] ¶ 9.

10.      The notice issued to each Settlement Class Member provides a summary of the Settlement and the formula for calculating individual settlement awards, the estimated award to be received by the class member, and an explanation that that amount is an estimate and may be somewhat higher or lower depending on the number of drivers who claim and other factors. The notice discloses and explains the amount of the Service Awards, the attorneys' fees and expenses to be requested by Plaintiffs' counsel, the process and deadlines for filing a claim, for objecting, and for opting out of the Settlement, and the date of the final fairness hearing. ¶ 11.b.

11.      Settlement Class Members have 120 days from the date notice is issued to opt-out of the Settlement, to file an objection to the Settlement, and/or to file a claim form, although claim forms postmarked or electronically received up to one week prior to the final fairness hearing will not be rejected. ¶¶ 10.c, 10.d, 10.e.

12.      Settlement Class Members may dispute the information from Defendants' records used to calculate their settlement awards by providing additional evidence within 60 days of the date that notice is issued. The parties will attempt to reach agreement with respect to such disputes, if any, and, in the event they are unable to agree, the dispute will be presented to the Court for resolution. ¶ 11.b.

13.      Assuming the Settlement is approved, Defendants will fund the Settlement within 14 days of the Effective Date.  ¶¶ 12, 14. The Settlement Administrator will issue checks to the participating class members within 10 days after the qualified settlement fund is established. ¶ 14. Class members will have six months to cash their checks, renewable

---

[2] The tax breakdown of the settlement payments reasonably reflects the damages alleged in this litigation. Non-wage damages alleged, including liquidated damages under the FLSA and state minimum wage laws, punitive damages for forced labor, and disgorgement of profits for unjust enrichment.

8

for an additional 6 months upon request. ¶ 11f. Any checks that are not cashed will be paid to a mutually agreeable *cy pres* recipient. *Id.*

14.     If the Settlement becomes effective, Settlement Class Members (except those who timely request to opt-out of the Settlement) are deemed to have released Defendants and Swift's Related Entities from certain claims and Defendants are deemed to release settlement class members from certain claims (other than those who opt-out of the Settlement) ¶ 15.b.iii, iv. The precise release language and scope of the release is set forth in the Settlement Agreement.

15. Defendants will not retaliate against any class member whether or not they participate or exclude themselves from the Settlement. In addition, Defendants will, upon request, provide notice to HireRight[3] that defaults under a Swift independent contract agreement or IEL lease that have been released have been rescinded, and will give no new or additional negative references to HireRight relating to any settlement class member for actions during the settlement class period. ¶ 15.b.v.-vii.

16.     Defendants may request the Court to order that the Settlement be kept confidential until preliminary approval has been granted, but not thereafter. ¶ 16.

17.     The Settlement provides that the Court will retain jurisdiction to enforce the Settlement. ¶ 25.

## STANDARD OF REVIEW

The approval of a proposed Rule 23 class action settlement is a matter of discretion for the trial court. *Churchill Village, LLC v. Gen. Elec. Co.*, 361 F.3d 566, 575 (9th Cir. 2004). To assess the fairness of a proposed settlement, courts consider several factors, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

---

[3] HireRight is a background screening company that provides trucking companies with "Drive-A-Check" ("DAC") reports listing, *inter alia,* lease and contract defaults and terminations. These reports are used throughout the trucking to make hiring decisions.

9

completed and the stage of the proceedings; (6) the experience and view of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., LLC.,* 361 F.3d at 575). In exercising its discretion and applying these factors the court should give "proper deference to the private consensual decision of the parties." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1988).

"FLSA claims may not be settled without approval of either the Secretary of Labor or a district court*." Seminiano v. Xyris Enter., Inc.,* 602 F. App'x 682, 683 (9th Cir. 2015). In the absence of Supreme Court or Ninth Circuit guidance, district courts in this circuit generally use the same factors for determining the fairness of an FLSA settlement as they use to evaluate a Rule 23 class settlement. *See, e.g., Maciel v. Bar 20 Dairy, LLC,* No. 17cv902 ADSKO, 2018 WL 5291969 at *4 (E.D. Cal. Oct. 23, 2018).

Under Rule 23(e)(1) as amended, the parties must provide the Court with information sufficient for the Court to determine whether notice to the settlement class is justified based on a showing that the court will be likely to approve the settlement and certify the proposed settlement class. The parties satisfy these standards.

**ARGUMENT**

**I.     The Settlement Agreement is Fair, Reasonable and Adequate.**

All eight of the *Churchill Village* factors demonstrate that the proposed settlement is fair, reasonable, and adequate:

**A.     The Strength of Plaintiffs' Case**

This factor requires the court to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.,* 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, the court need "not reach 'any conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation.'" *Brewer v Salver,* 2017 WL 2813178, *3 (E.D. Cal. June 29, 2017). *See also Carlin v. Dairy America, Inc.,* 328 F.R.D. 393, 402 (E.D. Ca. 2018). In assessing the strength of a

plaintiff's case, "there is no 'particular formula by which th[e] outcome must be tested.'" *Bellinghausen v. Tractor Supply Co.,* 306 F.R.D. 245, 255 (N.D. Cal. 2015). Rather, "the court's assessment of the likelihood of success is 'nothing more than an amalgam of delicate balancing, gross approximations and rough justice.'" *Id.* The court may "presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner v. State Farm Mutual Auto Ins., Co.,* No. 08-cv-1365-CW, 2010 WL 1687832 at *9 (N.D. Cal. April 22, 2010).

Plaintiffs' proposed fourth amended complaint, Doc 884-1, sets forth ten causes of action. Five are wage claims that seek, *inter alia*, unpaid minimum wages and liquidated or treble damages and related remedies (Counts 1 [FLSA], 4 [NY Labor Law], 6 [Calif. Labor Law], 9 [Az. Min. Wage], and 10 [Az. Wage Law]), two assert unconscionable contract claims, (Counts 5 [NY Contract], and 7 [Calif. Contract]), one seeks damages under the federal forced labor statute (Count 8), one seeks restitution for unjust enrichment of the Defendants (Count 2), and one seeks a declaratory judgment (Count 3) that the contractor agreement is unconscionable.[4] The damages under the non-wage claims are, for the most part, cumulative of the damages Plaintiffs would receive were they successful on their wage claims. Plaintiffs' Counsel assesses the wage-related claims as the strongest, however these claims are largely congruent insofar as they address the same allegations of impropriety—the misclassification of drivers as contractors and the financial harm flowing therefrom.

Plaintiffs contend that the strength of their FLSA claim was greatly enhanced by the court's ruling that Plaintiffs' contracts were contracts of employment under the FAA Section 1 exemption. However, because the ruling arose solely in the context of determining the applicability of the FAA, Defendants continue to assert that Plaintiffs and

---

[4] The parties stipulate that Plaintiffs may file their proposed fourth amended complaint if this motion for preliminary approval is granted.

the proposed class were properly classified and contend that the wage statutes at issue do not apply to Plaintiffs and the proposed class. They have appealed the court's determination that Plaintiffs' arbitration agreements are exempt from the FAA.

Although Plaintiffs contend that the Court's ruling strengthens Plaintiffs' FLSA claim, the FLSA requires claimants to affirmatively opt-into the case (i.e. a Rule 23 class cannot be asserted) and such claims carry only a two-year statute of limitations from the date of the filing of each opt-in notice, three-years if Plaintiffs can establish that the violation was willful. Thus, absent success on claims for equitable tolling of the statute of limitations, the number of individuals who might benefit from that claim, and the period over which they might claim, could ultimately be extremely limited in comparison to the Settlement.[5] Plaintiffs contend that the Court's ruling on FAA exemption issue greatly strengthens Plaintiffs' state-law wage claims which, unlike the FLSA, can be brought as class actions. Nevertheless, there are serious questions as to which state wage laws should apply to interstate truckers who move constantly throughout the United States. Plaintiffs believe that their claims under the Arizona wage statutes are the strongest because the contractor agreement specifically states that it is governed by the laws of Arizona. Doc 128-1 ¶ 23. However, even considering that provision, the application of Arizona laws to interstate truckers is unsettled and would be a hotly-contested issue. Defendants contend that there is also a risk that some or all of Plaintiffs' state law claims may be preempted by federal law.

Even if liability under the FLSA and state wage statutes can be established, proof of damages could pose serious problems for Plaintiffs. Proof of Plaintiffs' hours of work presents significant legal questions, including what constitutes an hour of work for purposes of minimum-wage laws for interstate truck drivers who, while on the road 24-

---

[5] The formula for allocating the settlement treats FLSA claims for opt-ins as 100% likely to succeed under the two year statute of limitations and 50% likely to succeed during the third year of liability that requires a showing of willfulness. *See* Ex 1 to Settlement Agreement (Allocation) at ¶¶ III(B)(2)(e) and (f).

hours a day, have strict legal limits on their "on duty" time. Defendants claim that the "on-duty" time recorded in Department of Transportation logs is the maximum possible measure of Plaintiffs' hours of work. Plaintiffs dispute that and would attempt to prove that their "hours of work" for FLSA and wage law purposes include many additional hours. That dispute, plus the myriad factual issues that would arise regarding the amount of time the Plaintiffs expended on work tasks not recorded as "on duty" time, present difficult questions that will be hard fought. That not only poses problems for Plaintiffs' success on the merits and damages, it raises potential concerns regarding class certification.

As set forth in the parties' Motion for Certification of the Settlement Class, the pre-requisites for certification of the proposed Settlement Class are easily met because a settlement class need not satisfy the trial manageability requirements applicable to non-settlement classes. Absent a settlement, there is a risk that the Court could find the class unmanageable or that the class would be certified for some issues but not others. Failure to obtain class certification for all issues would greatly diminish the strength of Plaintiffs' case and vastly increase the time, effort, and expense of litigation by requiring individual drivers to prove their claims. Plaintiffs also contend that drivers might also be reluctant to come forward given fears of publicity and retaliation or because they perceive legal risk admitting that their DOT logs are inaccurate.

Plaintiffs' other causes of action also have their strengths and weaknesses. Plaintiffs believe that Defendants have considerable exposure for the alleged unconscionability of the contractor agreement signed by Plaintiffs (which Plaintiffs contend is the key issue in Plaintiffs' breach of contract and unjust enrichment claims). Whether Plaintiffs would be entitled to damages for those claims in addition to simple rescission of the contract is an issue that the parties undoubtedly disagree on. Plaintiffs' forced labor claim presents a novel use of that statute to redress what Plaintiffs viewed as the unconscionable forfeiture provisions of the lease/contract. The novelty of the claim, coupled with the undeniable fact that many class members eventually stop working with Swift, renders that claim a difficult one to sustain. Moreover, all of these non-wage claim causes of action carry potential risks

with respect to class certification because of highly-contested issues regarding the proper measure of damages and the manageability of proving damages and liability on a class-wide basis.

Finally, the above assessment of the strengths of Plaintiffs' claims does not take into account the various affirmative defenses that Defendants may raise such as laches. Defendants have not yet answered the proposed fourth amended complaint. The potential risks posed by those as yet unknown defenses is another consideration weighing in favor of settlement.

In sum, while Plaintiffs have raised serious claims that could necessitate a trial in the absence of a settlement, the strengths and weaknesses of those claims has led all parties to conclude that settlement is the wiser option.

**B.      Continued Litigation Would Be Expensive, Complex and Risky**

Although this case has been in litigation for over nine years, has generated three appeals, three mandamus petitions, and a petition for *certiorari* and has resulted in four separate opinions from the Ninth Circuit (three of them published), it is no exaggeration to say that the case is still at its very inception. All that has been decided during the course of this almost decade long litigation is the denial of Defendants' motion to compel arbitration and even that decision is on appeal. Defendants have yet to answer the proposed fourth amended complaint. Absent a settlement, litigating the case from now to a final judgment could consume many additional years given the class allegations and the extraordinary number of other contested issues. The prospect of such a period of time weighs heavily in favor of a settlement in the best of circumstances, but it is particularly crucial here given the fact that the case has already been in litigation since 2009. Fading memories and lost documents as well as the difficulties of finding and maintaining contact with class members—some of whom last worked for Defendants as long ago as 2002—already pose serious problems. Years of additional litigation will only add to those difficulties.

The expense of further litigation also weighs heavily in favor of settlement. Discovery, travel costs, and attorney time to bring a case of this magnitude to trial, would

1   be enormous. Expert witnesses have already been hired and would be necessary to prove

2   damages and the merits of Plaintiffs' numerous causes of action. On top of all that, if past

3   history of this litigation is any guide, the likelihood of multiple appeals before the case

4   finally came to judgment would further increase attorney time and costs.

5        In short, the second *Churchill* factor, likely duration, expense and risk of further

6   litigation, strongly favors reaching a settlement now while class members can still be found

7   and enjoy the benefit of receiving at least some portion of the money Plaintiffs' assert they

8   are owed. *Nat. Rural Telecomms. Coop v. DirecTV, Inc.,* 221 F.R.D. 523, 527 (C.D. Cal.

9   2004) ("Avoiding such a trial and the subsequent appeals in this complex case strongly

10   militates in favor of settlement rather than further protracted and uncertain litigation.").

11   **C.      Risk of Certification/Decertification Weighs in Favor of Settlement**

12        For the same reason that obtaining class certification presents a significant risk for

13   the class, maintaining a class even after initial certification and defeating potential time-

14   based defenses also presents risks. The manageability issues in proving damages and

15   liability for such a large class are very real, although Plaintiff contends they are not

16   insurmountable. It is possible that Plaintiffs will not be permitted to prove damages on a

17   collective or class basis. Decertification of a class generally or as to discrete issues would

18   make the litigation substantially more complex, expensive, and time-consuming, and

19   would, as a practical matter, mean that a significant number of the class members would

20   never receive damages simply because the time and cost of proving their damages

21   individually would be prohibitive. Likewise, the Settlement provides recovery to class

22   members for losses incurred well a decade or two ago. Prevailing on possible time-based

23   defenses presents significant additional risk.

24        The proposed Settlement Agreement avoids all possible risk of lack of certification

25   or decertification and thus weighs in favor of approval of the settlement. *See In re Toys-R-*

26   *Us-Delaware, Inc. – Fair and Accurate Credit Transactions Act Litig.,* 295 F.R.D. 438,

27   452-53 (C.D. Cal. 2014) ("Avoiding the risk of decertification . . . favors approval of [a]

28   settlement); *McKenzie v. Fed. Exp. Corp.,* No. CV10-2420 (PLAx), 2012 WL 2930201, *4

15

(C.D. Cal. July 2, 2012) ("[S]ettlement avoids all possible risk [of decertification]. This factor therefore weighs in favor of final approval of the settlement").

### D.     The Amount Offered in the Settlement is an Excellent Result for Class Members

#### 1.     The Settlement Fund and Non-Monetary Benefits Are Fair

To determine whether the settlement amount is reasonable, the Court must first consider the amount obtained in recovery against the estimated value of the class claims if successfully litigated. *Litty v. Merrill Lynch & Co., Inc.,* 2015 WL 4698475, at *9 (C.D. Cal. Apr. 27, 2015); (quoting *In re Mego Finan. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000)). However, The Ninth Circuit has previously noted that "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. [A] proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved[.]" *Officers for justice v. Civil Serv. Comm'n.,* 688 F.2d 615, 625 (9th Cir. 1982). "Estimates of a fair settlement figure are [to be] tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years)." *In re Toys-R-Us,* 295 F.R.D. at 453.

Plaintiffs estimate their reasonable best-day damages in this case as $422M in wage-based damages plus $16M in forced labor claims. These claims are of course subject to significant litigation risk discounts to account for liability defenses, uncertainty as to the proof of hours worked, the need for drivers to opt-in to assert FLSA claims, uncertainties with respect to equitable tolling of the limitation period for FLSA and other claims, Defendant's allegation of good faith and lack of willfulness, jury and appeal risks, choice of law problems with respect to long haul truckers' state claims, risks of non-certification and decertification of classes, significant uncertainties in the law, and of course the time value of money. The forced labor claim has never been utilized before in the trucking industry and faces the challenge that many drivers eventually stopped working for Swift and relinquished their truck despite what Plaintiffs contend are severe financial

16

consequences that flowed from that decision. State statutory and quasi-contract claims are largely duplicative of the FLSA claims insofar as any unpaid wages recovered would likely reduce unconscionability or unjust enrichment damages. Plaintiffs contend the presence of these claims bolsters the value of the wage calculus, however the uncertainties regarding class certification and the uncertainty as to which, if any, state's statutory law would be deemed to apply to long-haul interstate drivers, makes it extremely difficult to assign any independent value to these claims. Without disclosing Plaintiffs' privileged assessment of its litigation risk discounts, counsel consider a 100M fund to be an excellent recovery that provides what Plaintiffs' Counsel deem to a fair and reasonable settlement value given the variety of litigation risks remaining in this case.

In addition to monetary benefits, Settlement Class Members will receive significant non-monetary benefits as part of the Settlement that they might not have recovered through continued litigation. Defendants have agreed in the Settlement to release any claims they have against Settlement Class Members related to their contractor agreements or leases during the class period, Ex 1 ¶ 15.b.iv., and have also agreed not to pursue collections efforts against class members who Defendants allege have defaulted on their IEL leases during the class period. *Id.* Finally, if a Settlement Class Member makes a request by letter, Defendants will timely provide a letter to HireRight that defaults under a lease which have been released have been rescinded. *Id.* ¶ 15.b.vi. These are considerable benefits for the proposed class because a default has a negative effect on a driver's ability to be hired and some trucking companies refuse to hire drivers who have a default listed on their DAC report. Thus, a default can rob a driver of his or her very livelihood.

While Plaintiffs might have obtained a larger recovery after full litigation, they unquestionably faced considerable risk that they and the class might have recovered significantly less, or, in the case of the class, nothing at all, and it is unquestionable that whatever recovery they would have received after full litigation would have been significantly delayed. In this situation, compromise as "a yielding of absolutes and an abandoning of highest hopes" is appropriate. *Officers of Justice v. Civil Serv. Comm'n,* 688

F.2d 615, 625 (9th Cir. 1982). "[T]he essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corregated Container Antitrust Litig.,* 659 F.2d 1322, 1325 (5th Cir. 1981). Thus, "[i]t is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate, and reasonable." *Shy v. Navistar Int'l. Corp.,* No. C3-92-333, 1993 WL 1318607, at *2 (S.D. Ohio May 27, 1993). The parties' view that the Settlement is a fair, adequate and reasonable compromise between Plaintiffs' and Defendants' "best days" is entitled to great weight.

## 2.    The Individual Allocation of the Settlement Fund Is Fair

Not only is the overall settlement fair and reasonable, the plan for allocating the Settlement Fund is as well. The plan applies uniformly to all class-members and involves a two-step process. In the first step, each Settlement Class Member's actual gross unpaid wage damages are estimated and then discounted by different percentages depending on the estimated chances of success on the claim and statute of limitations periods applicable to the wage claim. Thus, for example, because of the relative strength of the FLSA claim, no discount is applied to the estimated FLSA damages falling within the two-year limitations period prior to the filing of a driver's consent to sue form or claim form. FLSA damages in the third year of liability will be discounted 50% to reflect the additional risks associated with proving willfulness (a necessary element for liability in the third year). Because of the far greater risks associated with the Arizona wage claims those claims are discounted 50% if they fall within the two-year statute of limitations and an additional amount for the third year of liability. Additional discounts are applied to wage claims that would exist only if Plaintiffs were successful in proving equitable tolling or relation back. Where the Arizona and FLSA claim periods overlap, the statute that generates the highest damages is the one used in the allocation.

The second step of the allocation plan discounts each Settlement Class Member's gross damage amount on a *pro-rata* basis to ensure that the total pre-merger claim damages

do not exceed the amount available for distribution to drivers—i.e. the $100 million settlement fund less fees, expenses, service awards, and costs of administration. In addition, all Settlement Class Members will receive a $250 minimum regardless of when they worked as compensation for the non-wage damages arising under the forced labor and other state claims. The same formula is applied to all drivers.

The resulting individual damage amounts are the *minimum* amounts that individual drivers would receive if 100% of the drivers with pre-merger claims participate in the settlement. If fewer than 100% of the Settlement Class Members participate, the Agreement calls for a further calculation, which generates the *maximum* award for pre-merger claims that a class member could be awarded, essentially increasing the settlement awards (other than the minimum awards) for pre-merger claims so as to equal 80% of claim value if fewer of the class members (by claim value) participate in the settlement.

Post-merger awards are calculated in exactly the same way as pre-merger awards (A complete description of the allocation formula is set forth in Ex. 1 to the Settlement Agreement).

Considering the uncertainties and expense of trial, the expected duration of litigation, and potential challenges relating to damage calculations and rights to recovery, the amount offered in the Settlement Agreement and the uniform allocation formula is fair, reasonable and adequate and counsels in favor of approval of the Settlement.

**E.    Extensive Discovery Was Completed Weighing in Favor of Settlement.**

This factor considers the amount of information that was available to the parties prior to entering into the Settlement Agreement, since "[t]he more the discovery completed, the more likely it is that the Parties have a clear view of the strengths and weaknesses of their cases." *See In re Toys-R- Us-Delaware,* 295 F.R.D. at 454 (internal citation and quotation omitted). Informal discovery is also considered under this factor since it may provide as much, if not more, information useful to settlement negotiations than formal discovery on the merits. *See In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d at 459 (upholding district court finding and explaining that in the absence of formal discovery this factor turns

on whether "the parties have sufficient information to make an informed decision about settlement.")

The parties engaged in extensive discovery in response to the Court's scheduling order for determining whether Plaintiffs were exempt from arbitration. Docs. 772, et seq. The Defendants also provided Plaintiffs with large quantities of pay data for the class during the settlement negotiations. Swift provided data as to all pay, all expense deductions, and detailed data as to all trips for every class member from 2002 up through the mediation. Consequently, the parties had a good idea of the strengths and weaknesses of their cases and were in a good position to settle the litigation in a fair, reasonable and adequate way.

The Court should lean in favor of a settlement where evidence is presented that a considerable amount of discovery has been conducted "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Adoma,* 913 F.Supp.2d at 977 (citation omitted)

**F. The Settlement Agreement Was Negotiated by Experienced Counsel Who View the Settlement as Fair, Reasonable and Adequate, Favoring Settlement.**

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 528 (internal quotation marks and citation omitted). This reliance is predicated on the fact that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 967 (9th Cir. 2009) (quoting *in re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995). Moreover, settlements are afforded a presumption of fairness if the negotiations occurred at arm's length. *Corson v. Toyota Motor Sales U.S.A., Inc.,* No. CV128499JGBVBKx, 2016 WL 137838, *7 (C.D. Cal. Apr. 4, 2016) (citing 4 Newberg on Class Actions § 11.41 (4th ed. 2013). *See also Lane v. Facebook, Inc.,* 696 F.3d 811, 821-23 (9th Cir. 2012) ("[T]he district court properly

declined to undermine [the parties'] negotiations by second-guessing the parties' decision as part of its fairness review over the settlement agreement.").

As set forth in the March 11, 2019 declaration of Dan Getman in support of this motion ("*Getman Decl.*") and in the prior filings with the Court (*see also* declarations at Doc. 884, Exs. 2, 3), Plaintiffs' counsel has extensive experience and expertise in prosecuting wage-and-hour collective- and class-action litigation cases on behalf of plaintiffs and have the necessary skill and experience to negotiate a fair settlement for the Settlement Class. Plaintiffs' counsel vigorously and successfully prosecuted this case since 2009. Plaintiffs' counsel has carefully analyzed the legal issues and evidence, the risks to the Settlement Class in continuing the litigation, the total potential damages, and the benefits and detriments of the Settlement reached with Defendants.

Based on an exhaustive review of the potential value of the case, Plaintiffs' counsel negotiated the Settlement Agreement over a period of 16 months, and they are satisfied that the Settlement is fair, reasonable, adequate, and in the best interests of the Named Plaintiffs and the Settlement Class. Plaintiffs' Counsel's opinion deserves great weight both because of their familiarity with the litigation and because of their extensive experience in similar actions.

In addition to counsels' assessment of the Settlement, the parties engaged the services of Mark Rudy to mediate between the parties and assist with reaching a settlement. Mr. Rudy is a highly respected mediator. *See Allen v. Labor Ready Southwest, Inc.,* 2016 WL 9024598 at *1 (C.D. Cal. Sept. 30, 2016) (granting final approval of settlement achieved through the assistance of "well-respected mediator Mark Rudy."); *Barcia v. Contain-A-Way, Inc.,* 2009 WL 3061984 (S.D. Cal. Sept. 23, 2009) (referring to Mr. Rudy as a "nationally recognized labor mediator"). Use of an experienced mediator like Mr. Rudy also lends support to the reasonableness of the settlement. *Nunez v. BAE Systems San Diego Ship Repair, Inc.,* 292 F.Supp.3d 1018, 1037 (S.D. Ca. 2017).

1     **G. The Reaction of the Class Members to the Proposed Settlement is**
2          **Favorable, Weighing in Favor of Settlement**

3          Although notice of the Settlement and its details have not yet issued to the class, the
4     Named Plaintiffs support the settlement and have signed the Settlement Agreement. *See*
5     *Getman Decl.* at ¶ 40. The Court should more fully analyze this factor after notice issues
6     and Settlement Class members are given the opportunity to opt-out or object.

7          **H.     The Release Language Is Fair and Reasonable**

8          As required by Rule 23, the Settlement Agreement and proposed notices make clear
9     that Settlement Class Members who affirmatively opt-out of the Settlement will not release
10    any claims. All other Settlement Class Members, whether they choose to participate by
11    filing a claim form or not, will, upon final approval of the Settlement, release all claims
12    under a release provision that is reasonable and appropriately tracks the claims asserted or
13    that could have been asserted in the action. The Settlement does not release unrelated
14    claims that the Settlement Class Members may have against the Defendants. This form of
15    release comports with Ninth Circuit law. *Hesse v. Sprint Corp.,* 598 F.3d 581, 590 (9th Cir.
16    2010) ("[a] Settlement Agreement may preclude a party from bringing a related claim in
17    the future even though the claim was not presented and might not have been presentable in
18    the class action, but only where the released claim is based on the identical factual predicate
19    as that underlying the claims in the settled class action.") (internal quotation and citation
20    omitted); *Collin v. Cargill Meat Solutions Corp.,* 274 F.R.D. 294, 303 (E.D. Cal. 2011)
21    (noting that released claims "appropriately track the breadth of Plaintiffs allegations in the
22    action and the settlement does not release unrelated claims that class members may have
23    against defendants.").

24         **I.      Risk of Collusion**

25         In addition to examining the eight *Churchill* factors, where, as here, a settlement is
26    reached prior to formal class certification, the Court must ensure that the settlement is not
27    the product of collusion. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935,
28    946-47 (9th Cir. 2011). Collusion may not be evident on its face, thus the Ninth Circuit has

22

provided examples of subtle signs of collusion including: (1) "when counsel receive a disproportionate distribution of the settlement or when the class receives no monetary distribution but class counsel are amply rewarded;" (2) "when the parties negotiate a 'clear sailing' arrangement apart from class funds;" and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* at 947 (citations omitted).

Here none of these red flags is present. The class is receiving significant monetary benefits; likely far more (and far sooner) than they would have received if the case had been litigated and the class not certified. Further, Counsel's share of the Settlement Fund is to be determined by the Court; it is not separate from the class funds and there is no clear sailing agreement. Defendants remain free to challenge the fee application and the determination of the fees does not impact effectiveness of the Agreement. Nor can there be any claim that Counsel seek a disproportionate distribution.[6] As discussed below, Plaintiffs' counsel is applying for less than 1/3 of the Gross Settlement Fund, a fee they believe is fully justified. Any portion of the Settlement Fund that is not awarded to counsel in fees and costs will automatically be added to the amount for distribution to class members.

Finally, and most importantly, the entire Settlement was arrived at in an arm's-length and non-collusive manner with the assistance of an experienced and well-respected neutral mediator, Mark Rudy. It took over a year following mediation and countless additional conferences with the mediator to hammer out the current Agreement. Settlements reached with the help of a mediator are likely non-collusive. *Gatula v. CRST Internat'l., Inc.,* No. CV11-1285 VAP (OPx), 2015 WL 12697656 at *9 (C.D. Cal. Aug. 26, 2015); *Harris v. Vector Marketing Corp.,* C08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (noting that the parties' use of a mediator "further suggests that

---

[6] Moreover, the settlement includes payment for post-merger claims which may result in the Gross Settlement Fund exceeding $100 million but Plaintiffs' Counsel seek no additional fee award for generating those funds.

the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel"); *Satchell v. Fed Express Corp.*, 2007 WL 1114010 at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). Thus, none of the "subtle signs" of collusion are present here which further weighs in favor of approving the settlement. *Gatdula,* 2015 WL 12697656 at *9.

### J.    The Service Awards Are Reasonable

Pursuant to paragraph 5 of the Settlement Agreement, Plaintiffs may ask that Service Awards of up to $50,000 for each of the five Named Plaintiffs be deducted from the Settlement Fund. *See Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (service awards "are fairly typical in class action cases."). Factors the court should consider when assessing whether service awards are reasonable include: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the amount of time and effort the plaintiff expended in pursuing the litigation; (4) the risk to the class representative in commencing suit, both financial and otherwise, and the notoriety and personal difficulties encountered by the class representative; and (5) the relationship between the service award, the total fund, and the amounts received by the individual claimants. *McNeal v. RCM Techs. (USA), Inc.*, No. 2:16-CV-05170-ODW-SS, 2017 WL 2974918, at *1 (C.D. Cal. July 12, 2017); *Gatdula v. CRST Int'l., Inc.,* 2015 WL 12697656 at *9-10 (C.D. Cal. Aug. 26, 2015).

Here, all of these considerations point to the Service Awards being fair and reasonable. As explained in the Getman declaration submitted herewith, the Named Plaintiffs believe they faced very real risks by publicly stepping forward to sue their employer. *Getman Decl.* ¶¶ 12-18. They believe that Swift, as the largest truckload carrier in the U.S., was a formidable opponent and the claims in this case could be expected to be well-circulated in the industry. Plaintiffs believe that few starting truckers would put their names on such a suit, particularly now when google searches will reveal the lawsuit they filed against their employer a part of the public record in perpetuity. Plaintiffs believe that

the professional harm that results from publicly suing one's employer is a risk that few are willing to take. *Getman Decl.* ¶ 14. Second, the Named Plaintiffs have engaged in dedicated, difficult work over the past ten years to protect the interests of the class, including investing considerable time and energy to prepare for and attend their depositions, dependably communicating with counsel in literally hundreds of phone conversations and hundreds of emails, providing numerous declarations in support of the many motions in the case, and answering interrogatories and requests to produce documents. All of these efforts posed significant problems for the Plaintiffs who were constantly on the road in locations that were often far from home or other convenient places to communicate and transmit documents to counsel. Attending their depositions required negotiations with their current employers for time off from work with the associated loss of pay, both of which posed not only financial hardship but genuine risks of retaliation. It is difficult for non-truckers to understand the logistical complications involved in planning to be in a specific location on a specific date, when the driver is required to be available to be sent anywhere in the continental U.S. at any time, subject only to the company's needs at the moment. The size of the Settlement Fund itself speaks volumes about the degree to which the efforts of the Named Plaintiffs in staying with this suit for ten years have benefitted the proposed class.

Plaintiffs believe that many meritorious suits are never brought because individual workers will not take the risk of bringing suit, let alone make the extraordinary commitment to stick with the suit over the many years that class litigation often takes. They believe that it is, therefore, extremely important to the FLSA's remedial purposes, that individuals who do in fact assume such risks to vindicate the rights of the class be compensated for those risks. Plaintiffs' counsel regularly hears from individuals who call to learn of their rights, but who ultimately do not step forward to assert them, due to fear of long-term consequences in publicly suing one's employer.

Courts regularly award larger service payments in large fund cases, particularly where the awards will not dilute the fund. In total, the awards sought here represent only a very

small fraction of the total settlement fund—one quarter of one percent. *See In re OnlineDVD-Rental Antitrust Litig.,* 779 F.3d 934, 948, (9th Cir. 2015) (approving $45,000 in incentive awards to class representatives based on the awards making up 0.17% of the total settlement fund); *Nitsch v. DreamWorks Animation SKG Inc.,* No. 14cv4062-LHK, 2017 WL 2423161, *14-15 (N.D. Cal. June 5, 2017) (finding service awards 7.3 times the average recovery to be "not unreasonable"). Finally, the amount of the incentive awards is within the range approved in other similar cases. *See Cilluffo v. Central Refrigerated Services, Inc.,* ED12cv886 VAP (OPx) at 19-22 (C.D. Cal. Order Apr. 3, 2018) (approving incentive awards of $50,000 to named plaintiff truck drivers who alleged they were misclassified as independent contractors and who litigates litigated collective action FLSA claims against their alleged employer for six years); *Nitsch v. Dreamworks Animation SKG,* Case No. 14-CV-04062-LHK. 2017 WL 2423161 at *14 (N.D. Cal. 2017) (awards of $80,000 and $20,000); *Beaver v. Tarsadia Hotels,* No. 11cv1842-GPC-KSC, 2017 WL 4310707, at *7-8 (S.D. Cal. Sept. 28, 2017) (approving $50,000 service awards); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D. Cal. 1995) ("Court finds that an incentive award of $50,000 is just and reasonable under the circumstances"). *See also Marchbanks Truck Serv. v. Comdata Network, Inc*., Case No. 07-CV-1078, Dkt. 713 at 2, 8 (E.D. Pa. July 14, 2014) (approving $130 million class action settlement, including service award of $150,000 to one class representative and service awards of $75,000 to two other class representatives); *In re Titanium Dioxide Antitrust Litig.,* No. 10cv318 RDB, 2013 WL 6577029 at *1 (D. Md. Dec. 12, 2013) (awarding $125,000 to lead class representative out of $163.5MM settlement); *In re High-Tech Employee Antitrust Litig.,* No. 11cv2509-LHK, 2015 WL 5158730, at *18 (N.D Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 service awards in case with $415MM settlement fund and collecting similar "mega-fund" cases).

Accordingly, Plaintiffs respectfully request that the Court grant preliminary approval for Service Awards of $50,000 to the five Named Plaintiffs to be deducted from

1    the Settlement Fund.[7]

2    **K.    Plaintiffs' Attorneys' Fees Request Is Reasonable**

3          Paragraph 4 of the Settlement Agreement provides that Plaintiffs' Counsel may seek

4    up to 33% of the Settlement Fund as compensation for their attorneys' fees and expenses

5    however the Settlement Agreement is not conditioned on any specific attorneys' fee award.

6    Rather than seek a full third plus costs, counsel will seek 29% of the fund (29 million), plus

7    costs limited to no more than $750,000. Plaintiffs seek preliminary approval of this request

8    so that the amount can be set forth in the Notice to the Settlement Class, thereby allowing

9    the Settlement Class Members to comment on the fee and expense amounts Plaintiffs' seek.

10   Prior to the final fairness hearing, Plaintiffs' Counsel will submit a motion for final

11   approval of their request fees in compliance with Fed. R. Civ. P. 23(h), Rule 54(d)(2), and

12   LRCiv. 54.2, which the Court may consider along with the reaction of the class prior to

13   granting final approval of the fee and expense request.

14         Because the benefit to the class is easily quantifiable in common fund cases, the

15   percentage of the fund method for calculating fees is typically used rather than the more

16   time-consuming lodestar method. *In re Bluetooth,* 654 F.3d at 942. "Applying this

17   calculation method, courts typically calculate 25% of the fund as the reasonable fee award,

18   providing adequate explanation in the record of any 'special circumstances' justifying a

19   departure. *Id.* Special factors to be considered include: (1) whether an exceptional result

20   was achieved, (2) the complexity of the case and the risks and expense to counsel of

21   litigating it, (3) the skill, experience, and performance of counsel; (4) the contingent nature

22   of the fee; and (5) fees awarded in comparable cases. *Vizcaino v. Microsoft Corp.,* 290 F.3d

23   1043, 1048-49 (9th Cir. 2002) (affirming award of 28% of $96,885,000 award.). These

24   factors are known as the "*Kerr* factors." *Fischer v. SJB-P.D. Inc,* 214 F.3d 1115, 1119 (9th

25   Cir. 2000) (citing *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975),

26

27   _____

28   [7] As part of the motion for final approval, Plaintiffs will submit the affidavits of the
     Named Plaintiffs attesting to their efforts in bringing this case to a successful conclusion.

1    abrogated on other grounds by *City of Burlington v. Dague,* 505 U.S. 557 (1992). *In re*

2    *Apollo Group Inc. Securities Litigation,* 2012 WL 1378677 (D. Ariz. 2012) (awarding 33%

3    of fund where case was in litigation for seven years, was risky and settlement produced

4    exceptional result). All of these factors fully support the upward enhancement of the fee

5    from the 25% benchmark that Counsel request.

6         First, the $100 million fund plus the non-monetary benefit is an extraordinary result

7    for the class for the reasons outlined above, and there is the possibility of additional sums

8    over and above the $100 million being paid for post-merger claims. The Settlement is all

9    the more exceptional because of the Plaintiffs' uncertainty of success when the case was

10   commenced. As the case citations in Defendant's summary judgment brief attest, there are

11   numerous decisions finding truckers to be contractors, including the seminal Supreme

12   Court case *U.S. v. Silk,* 331 U.S. 704 (1947). Furthermore, the California Labor

13   Commissioner had previously determined that one of Swift's drivers was properly

14   classified as an independent contractor. *Young v Swift Transportation Co. of Arizona, LLC,*

15   Case No. 08-46182 RR. These cases rendered the outcome in this case highly uncertain

16   from the outset. Even now, there is no certainty that the Rule 23 classes would be certified,

17   no certainty as to which if any state law would be applied to which drivers, no certainty as

18   to tolling of limitation periods, and no certainty that the damages would be provable on

19   class grounds. The settlement represents a significant achievement for a case of this nature.

20        Second, the case was extremely risky for counsel to pursue. Plaintiffs' counsels'

21   firms are two small firms and a solo practitioner. For these litigators to take on a case this

22   size represented a huge investment of their firm time and resources and the risks they

23   undertook were enormous as a consequence. Counsel knew that that Swift was likely to

24   put up a vigorous defense and that the case would not be resolved easily or quickly. The

25   lease contracts and independent contractor agreements were highly complex involving

26   numerous schedules and appendices. The legal documents were intricately intertwined

27   with myriad facts as to how the long-haul trucking industry operates. And to prove damages

28   would require showing the full extent of Plaintiffs' work and thereby potentially call upon

truckers to controvert their certified submissions to the Department of Transportation. Plaintiffs' Counsel knew that it would take great effort even to reach the fundamental liability question in light of the fact that all Plaintiffs signed arbitration agreements containing class action waivers which, if enforced, would have rendered the case incredibly difficult if not impossible for counsel to litigate. Thus, even leaving aside consideration of the merits of the claims, at the time the case was filed its viability turned on successfully invoking the FAA § 1 exemption to avoid arbitration. And the case proved even more difficult than first feared. Plaintiffs twice lost that issue before the Court and only revived their case after two trips to the Ninth Circuit. But even that did not end the issue because, after the Court entered a scheduling order aimed at resolving the § 1 issue, Plaintiffs' Counsel had to defend the scheduling order in the face of an appeal and a mandamus petition filed by Defendants. Those appeals were eventually rejected (although in a manner that left Plaintiffs' case at risk as one judge dissented and one judge indicated that he might agree with the dissent had the case come up on appeal rather than mandamus, which it later did). On remand the Court held that the § 1 exemption applied but Defendants appealed that determination as well, opening the door to possible reversal based on the rather equivocal opinions in the previous mandamus decision. As if that weren't enough, in 2018 the Supreme Court granted *certiorari* in *New Prime v. Oliviera,* 138 S. Ct. 1164 (Feb. 26, 2018), to determine, *inter alia,* the original question presented by this case back in 2010: who should determine the § 1 exemption question, the court or the arbitrator. Until January 2019, when the Supreme Court finally ruled that the Court should decide the issue, Plaintiffs were under the threat that the Supreme Court decision in *New Prime* would render more than nine years of litigation, including three appeals and three mandamus petitions, utterly meaningless and return the parties to square one by affirming the Court's initial determination that the arbitrator should decide the exemption question.

Having finally decided who should decide the case (and by its summary judgment decision, whether Plaintiffs were misclassified), the risks faced by Plaintiffs with respect to the merits of their claims and proving damages remain just as daunting, if not more so,

than that initial issue. The extraordinary risks taken by counsel in lengthy litigation involving four trips to the Court of Appeals is a factor that weighs heavily in favor of adjusting the 25% benchmark upward. *See Vizcaino v. Microsoft Corp.,* 290 F.3d at 1051 (upholding upward adjustment of percentage to 28% in a case involving $98 million fund because of the risks taken by plaintiffs' counsel, most notably twice reversing adverse rulings of the district court on appeal); *Vandervort v. Balboa Capital Corp.,* 8 F. Supp. 3d 1200 (C.D. Cal. 2014) (awarding 33%, *inter alia,* because of interlocutory appeal of class determination); *Ruiz v. XPO Last Mile, Inc.,* 2017 WL 6513962 (S.D. Cal. Dec. 20, 2017) (awarding 35% of fund in case that lasted twelve years and involved two appeals); *Harris v. Amgen Inc.,* 2017 WL 6048215 at *8 (C.D. Cal. Apr. 4, 2017) (awarding 45% of fund as fees, *inter alia*, because "the duration of the case—now more than nine years—counsels in favor of a large attorneys' fees award."). Indeed, while Plaintiffs have found a couple of cases that have lasted as long as this one, they have been unable to find any case that involved as many trips to the Court of Appeals, let alone the risk that a Supreme Court decision would completely undo the results of almost a decade of litigation.

Third, the skill and performance of counsel factor also weighs in favor of enhancing the benchmark percentage upward. Plaintiffs' Counsel demonstrated considerable skill in prevailing in this Court on the near decade long battle over Defendants' motion to compel individual arbitration. Moreover, they have been exceptionally proactive and skilled in monitoring other relevant cases and the ongoing practices of Defendants that might potentially bear on this case. Not only did Plaintiffs' Counsel raise an issue about provisions in a new contract with the Court, which led to Swift offering to issue a clarifying notice, Plaintiffs' Counsel acted affirmatively to protect the interests of the drivers in this case by objecting to releases in several other cases that could affect the rights of proposed class members to obtain relief here. *See e.g. Montalvo v. Swift Transportation Co. of Arizona, LLC,* Case No.: 37-2011-00094313-CU-OE-CTL (San Diego County Superior Court) (stipulation resolving objection); *Ellis v. Swift Transportation*, Civ. No. 3:13-CV-00473-JAG (EDVA); *Slack v. Swift Transportation of Arizona*, No. 3:11-cv-05843-BHS

(WDWA). In addition, Plaintiffs' counsel also filed an amicus brief in *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014), an appeal from a district court decision finding drivers to be independent contractors. The case required the Ninth Circuit to decide the standard for independent contractor misclassification in the trucking context and, given the result in the District Court in that case, Plaintiffs' Counsel feared that absent amicus assistance the appeal could wind up setting an extremely damaging precedent which would have direct negative consequences for this litigation.[8]

Fourth, the contingent nature of the fee weighs in favor of increasing the percentage above the benchmark. Plaintiffs' Counsel litigated this case for almost a decade without any pay and fronted all costs associated with the litigation, counting on a successful resolution that was by no means guaranteed. If Plaintiffs had lost the case, Plaintiffs' Counsel would not have recovered any fees, would have foregone other potentially profitable litigation, and would have lost any costs advanced. *See Vizcaino,* 290 F.3d at 1051 ("In common fund cases, 'attorneys whose compensation depends on their winning the case [] must make up in compensation in the cases they win for the lack of compensation in the cases they lose'") (citation omitted).

Fifth, awards in similar cases support the requested percentage fee here. *See Goodwin v. Citywide Home Loans, Inc.*, No. SACV14866JLSJCGX, 2015 WL 12868143, at *4 (C.D. Cal. Nov. 2, 2015) (awarding fees of one-third of the total settlement amount in FLSA and Cal. Lab. Code common fund case); *Lee v. JPMorgan Chase & Co.*, No. SACV13511JLSJPRX, 2015 WL 12711659, at *9 (C.D. Cal. Apr. 28, 2015) (same); *Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804, at *9 (C.D. Cal. Nov. 18, 2014) (same); *Vedachalam v. Tata Consultancy Services, Ltd,* 2013 WL 3941319 at *3

---

[8] The outcome of *Affinity Logistics* was favorable to the drivers, which Plaintiffs' Counsel believe was at least partly due to their efforts. The importance of that outcome to this case is evident from the fact that this Court cited the *Affinity Logistics* case six times in its opinion finding Plaintiffs to be exempt from arbitration. *See* Doc 862 at footnotes 34, 41, 45, 60, 88, 97.

1  (N.D. Cal. July 18 2013) (awarding 30% of $29 million fund in employment class action

2  that lasted seven years and involved two appeals); *In re Anthem Inc. Data Breach Litig.*,

3  2018 WL 3960068 (N.D. Cal. Aug 17, 2018) (awarding 27% of $115 million fund in

4  litigation that lasted 3 years); *Ridgeway v. Wal-Mart Stores,* 265 F.Supp.3d 975 (N.D. Cal.

5  2017) (awarding 25% of $60.8 million fund in 9 year litigation involving no appeals); *In*

6  *re Cathode Ray Tube Antitrust Litig.,* 2016 WL 41265333 (N.D. Cal. Aug. 3, 2016)

7  (awarding 27.5% of $576 million fund in 9 year old case).[9]

8    Finally, one other factor that should be considered in evaluating the fee request are

9  the views of the class members themselves. Although notice has not yet been issued, the

10  Named Plaintiffs and 1,205 current opt-ins have agreed in writing to a 1/3 contingency fee

11  for counsel. While not necessarily controlling, these agreements reflect the views of a

12  significant number of the class members as to what they consider a fair, market-rate fee for

13  this litigation and their views should be given considerable weight. For example, in

14  *McKeen-Chaplin v. Provident Savings Bank, FSB,* the court approved a fee of 33% of the

15  settlement fund, noting that the opt-ins had all signed 1/3 contingency fee agreements and

16  that "[i]n FLSA-only settlements, it is appropriate to approve fees based on a contingency

17  agreement." 2018 WL 3474472, *3 (E.D. Cal. July 19, 2018) (citing cases). *See also*

18  *Blanchard v. Bergeron,* 489 U.S. 87, 93 (1989) (a contingency fee agreement "may aid in

19  determining reasonableness" of a fee claim and in demonstrating the attorney's fees

20  expectations when the attorney accepted the case.); *Vizcaino,* 290 F.3d at 1049 (noting that

21  28% of fund awarded was below the market rate established by the retainer agreements

22  signed by the named plaintiffs which promised a 30% contingency); *Lopez v. Gryphon*

23  *Investors, Inc.,* 2009 WL 10673064 at I1 (D. Ariz. Dec. 18, 2009) (finding 1/3 contingency

24

25

26   [9] Additional cases in which the total settlement values were large and the fee awards
were above 25 percent of the common fund include: *Allapattah Servs., Inc. v. Exxon Corp.*,
27  454 F. Supp. 2d 1185 (S.D. Fla. 2006) (awarding 31.3 percent of $1.075 billion settlement
fund); *In re Vitamins Antitrust Litig.*, MDL No. 1285, 2001 WL 34312839 (D.D.C. July
28  16, 2001) (awarding 34 percent of $365 million settlement fund).

fee agreement reasonable and awarding 1/3 in class action settlement). Counsel are aware of no firm capable of handling a case such as this one, that would agree to work for less than a 1/3 contingency. Indeed, fees higher than 1/3 are common even in far simpler, far less risky cases than this one.

Plaintiffs assert that a lodestar cross-check supports the reasonableness of the 29% fee sought by Plaintiffs. *See Getman Decl*. ¶¶ 54-56. The hours expended and the rates reflected in the lodestar calculation are reasonable. *Id.* Given the likely thousands of additional hours Plaintiff's Counsel will be required to expend after filing of this motion to bring the settlement to finality and oversee and assist in responding to inquiries or possible disputes regarding payments affecting 20,000 class members, the percentage of the fund requested represents an estimated multiplier of less than 5 times the expected lodestar and is fair and reasonable and warranted under in this case. Such a multiplier falls well within the normal range applied in similar cases. *See Vizcaino*, 290 F.3d at 1051 n.6 (finding the range of multipliers applied in common fund cases was up to 19.6%.; *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (approving a multiplier of 5.2 and stating that "there is ample authority for such awards resulting in multiplier in this range or higher"); *Beckman v. KeyBank*, N.A., 293 F.R.D. 467, 481–82 (S.D.N.Y. 2013) (Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers).

**II. THE CLAIMS ADMINISTRATOR SHOULD BE APPROVED**

The parties have agreed to use Settlement Services, Inc. as the claims administrator in this Settlement. Settlement Services, Inc. has provided the parties an estimated budget of $165,000.00 to perform all of the services called for in the settlement, including issuing notices, receiving and compiling claim forms, objections, and opt-out requests, setting up a website and handling inquiries from the large class. Settlement Services, Inc. will maintain an 800 number where class members can obtain information about the settlement and will, if the settlement receives final approval, handle payment of the settlement awards to the participating class members along with holding funds and reporting and paying taxes.

1  Settlement Services, Inc. acted as claims administrator in similar class actions. The parties

2  are confident that Settlement Services, Inc. has the skills and experience necessary to

3  handle the claims administration of this settlement. *See* March 11, 2019 declaration of

4  Mark Patton.

5  **CONCLUSION**

6  For all the foregoing reasons, Plaintiffs respectfully request that this Court:

7  (i) Preliminarily approve the proposed Settlement as fair, reasonable, and adequate

8  for the Settlement Class;

9  (ii) Appoint Settlement Services, Inc. as the Settlement Administrator; and

10  (iii) Schedule a Final Fairness Hearing on the question of whether the proposed

11  settlement should be finally approved so that that date can be stated in the Notices of

12  Settlement.

13  Respectfully submitted this 11th day of March 2019.

14  **Martin & Bonnett, P.L.L.C.**

15

16  By: s/Susan Martin
    Susan Martin
    Daniel Bonnett

17  Jennifer Kroll

18  4647 N. 32nd St. Suite 185
    Phoenix, Arizona 85018

19  Telephone: (602) 240-6900

20

21  Dan Getman  (*pro hac vice*)
    Getman, Sweeney & Dunn, PLLC

22  260 Fair Street
    Kingston, NY 12561

23  Telephone: (845) 255-9370

24

25  Edward Tuddenham (*Pro Hac Vice*)
    23 Rue du Laos

26  75015 Paris, France

27  ATTORNEYS FOR PLAINTIFFS

28

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sheppard Mullin Richter & Hampton**

By: s/Paul Cowie (with permission)
Paul Cowie
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111

Robert Mussig
Sheppard Mullin Richter & Hampton
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071

Kevin Cloutier
Sheppard Mullin Richter & Hampton
70 W. Madison St., Suite 4800
Chicago, IL 60602

ATTORNEYS FOR DEFENDANTS