Dan Getman (*Pro Hac Vice*)
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, NY 12401
(845) 255-9370
dgetman@getmansweeney.com

Susan Martin (AZ#014226)
Daniel Bonnett (AZ#014127)
Jennifer Kroll (AZ#019859)
Martin & Bonnett, PLLC
4647 N. 32nd St., Suite 185
Phoenix, Arizona 85018
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com

Edward Tuddenham (*Pro Hac Vice*)
23 Rue du Laos
75015 Paris, France
etudden@prismnet.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Virginia Van Dusen, *et al.,* individually and on behalf of all others similarly situated persons, <br><br> Plaintiffs, <br><br> vs. <br><br> Swift Transportation Co, Inc., *et al.,* <br><br> Defendants. | **No. CV 10-899-PHX-JWS** <br><br> **Plaintiffs' Motion for Certification of Settlement Class and for Final Approval of Collective and Class Action Settlement** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

CASE HISTORY AND EVENTS SINCE PRELIMINARY APPROVAL ....................... 2

A. Preliminary Approval, Notice, and Claims Process ...................................... 2

B. Results of Class Notice  .............................................................................. 3

LEGAL STANDARD FOR FINAL APPROVAL ................................................... 6

ARGUMENT ..................................................................................................... 6

I. The Notice and Claims Process Satisfied Rule 23(c) and Due Process ......................... 6

II. The Class Is Properly Certified .................................................................... 7

III. The Settlement Is Fair, Reasonable, and Just, and Deserves Final Approval .............. 7

IV. The Requested Service Awards Are Fair and Reasonable ........................................ 14

V. Plaintiffs' Requested Fees and Costs Are Fair and Reasonable .................................. 18

VI  The Settlement Administration Costs Are Fair and Reasonable ................................ 18

CONCLUSION .................................................................................................. 19

i

**TABLE OF AUTHORITIES**

**Cases**

*Act Litig.,*
   295 F.R.D. 438 (C.D. Cal. 2014) ............................................................. 9, 10

*Adoma v. Univ. of Phoenix, Inc.,*
   913 F.Supp.2d 964 (E.D. Cal. 2012) ..................................................... 6, 7, 11

*Allen v. Bedolla,*
   787 F.3d 1218 (9th Cir. 2015) ..................................................................... 13

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) ...................................................................................... 7

*Beaver v. Tarsadia Hotels,*
   No. 11cv1842-GPC-KSC, 2017 WL 4310707 (S.D. Cal. Sept. 28, 2017) ........ 18

*Carlin v. DairyAmerica, Inc.,*
   380 F.Supp.3d 998 (E.D. Cal., 2019) ............................................................ 17

*Churchill Village LLC v. Gen Elec.,*
   Co., 361 F.3d 566 (9th Cir. 2004) ................................................................. 8

*Class Plaintiffs v. Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ...................................................................... 6

*Cook v. Niedart,*
   142 F.3d 1004 (7th Cir. 1998) ..................................................................... 15

*CV-0175-TOR,*
   2019 WL 1966112 (E.D. Wash. May 2, 2019) ............................................... 8

*Gatula v. CRST Internat'l., Inc.,*
   No. CV11-1285 VAP (OPx), 2015 WL 12697656 (C.D. Cal. Aug. 26, 2015) ........... 14

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ...................................................................... 6

*Harris v. Vector Marketing Corp.,* C08-5198 EMC,
   2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ............................................... 14

*In re Apollo Grp. Inc. Sec. Litig.,*
   No. CV 04-2147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ........... 11

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ....................................................................... 13

*In re High-Tech Employee Antitrust Litig.*,
   No. 11cv2509-LHK, 2015 WL 5158730 (N.D Cal. Sept. 2, 2015) ............................ 18

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ........................................................................ 9

*In re Titanium Dioxide Antitrust Litig.*,
   No. 10cv318 RDB, 2013 WL 6577029 (D. Md. Dec. 12, 2013) ............................... 18

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2019 WL 2077847 (N.D. Cal. May 10, 2019) ................. 8

*In re Volkswagen "Clean Diesel" Mktg Sales Prac. & Prod. Liab. Litig.*,
   No. MDL2672 CRB (JSC), 2017 WL 2212780 (N.D. Cal. May 17, 2017) ............... 11

*In re: Cathode Ray Tube (Crt) Antitrust Litig.*,
   No. C-07-5944-SC, 2016 WL 3763382 (N.D. Cal. Feb. 29, 2016) ........................... 13

*McNeal v. RCM Techs. (USA) Inc.*,
   No. 2:16-CV-05170-ODW-SS, 2017 WL 2974918 (C.D. Cal. July 12, 2017) ...... 15, 16

*Nat. Rural Telecomms. Coop v. DirecTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ..........................................................9, 11, 12, 13

*Nitsch v. Dreamworks Animation SKG,* Case,
   No. 14-CV-04062-LHK. 2017 WL 2423161 (N.D. Cal. 2017) ................................ 18

*Rieckborn v. Velti PLC*,
   No. 13-CV-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015)....................... 13

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009)..................................................................... 11, 15

*Satchell v. Fed Express Corp.*,
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007).................................................. 14

*Staton v. Boeing,*
   327 F.3d 938 (alterations in original)............................................................ 15

*Van Vranken v. Atl. Richfield Co.*,
   901 F. Supp. 294 (N.D. Cal. 1995)............................................................... 18

*Vinh Nguyen v. Radient Pharm. Corp.*,
   No. 11–cv–00406, 2014 WL 1802293 (C.D. Cal. May 6, 2014)............................. 13

*Wal-Mart Store, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................... 6

**Statutes**

28 U.S.C. § 1715 ...................................................................................... 2

**Rules**

Rule 23 of the Federal Rules of Civil Procedure.......................................*passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

The Court granted preliminary approval to the Parties' Settlement Agreement on April 22, 2019. Doc 1124. Pursuant to Fed. R. Civ. P. 23(e) Plaintiffs hereby move for final approval of the Settlement. This motion is supported by the Declarations of Class Counsel, Docs. 1131-1133, the Declaration of the Settlement Administrator, Doc. 1134, the Supplemental Declaration of Edward Tuddenham submitted herewith, the declarations of the Named Plaintiffs submitted herewith and the record before this Court. As set forth below and in the foregoing declarations, Notice to the Settlement Class was effectuated in accordance with the Court's preliminary approval order. Extensive additional efforts have been made to locate Settlement Class Members. As a result of those efforts, 89% of the funds available for distribution to Settlement Class Members (more than $62 million) will be distributed to more than 8,656 Settlement Class Members who filed claims (43% of the total class of 19,955 individuals)[1]—an extraordinary result for any common-fund case. The results are even more impressive given the mobility of the Class Member truck drivers and the fact that the claim period extends back twenty years. Between 6 and 56 Class Members chose to opt-out (at most .28%),[2] and only six individuals filed objections to the Settlement (.03%). The high claim rate and low objection and opt-out rates demonstrate the essential fairness of the Settlement and, as explained below, the six objections do not challenge the essential fairness of the Settlement. Accordingly, Plaintiffs urge the Court to grant final approval of the Settlement.

---

[1] This includes those Class Members who previously opted into the lawsuit who were not required to submit claim forms. These numbers will increase slightly because, as explained *infra,* the Parties have agreed to add 27 claimants who were erroneously omitted from the Class List and an additional group of omitted individuals is currently under review. In addition, the Settlement Agreement provides that late claims can be filed through January 15, 2020. Doc 1115-1 at ¶10.c. The final count and updated allocations to Class Members will be submitted prior to the January 22, 2020 hearing.

[2] The reasons for this range are explained in fn. 6, *infra*, and the Getman Decl. ¶8, Doc 1131.

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CASE HISTORY AND EVENTS SINCE PRELIMINARY APPROVAL**

The long history of this litigation, beginning with its commencement in 2009 and its torturous course through three appeals and three mandamus petitions is detailed in the Parties' Motion for Preliminary Approval of the Settlement Agreement and will not be repeated here. Doc 1115, at 2-10.

**A.      Preliminary Approval, Notice, and Claims Process**

The Parties' Settlement Agreement was presented to the Court for Preliminary Approval in March 2019. Doc 1115 (motion), Doc 1115-1 (Agreement). After briefing and a hearing, the Court conditionally certified the following Settlement Class pursuant to Fed. R. Civ. P. 23(b)(3):

> Any and all individuals who entered into an independent contractor agreement with Swift Transportation Co. of Arizona, LLC ("Swift") and any affiliated entity (as defined in the parties' Settlement Agreement), and also entered into a lease agreements with Interstate Equipment Leasing, LLC ("IEL") at any time prior to January 1, 2019, regardless of whether the individual participates in the Settlement unless said individual opts-out of the Settlement.

Doc 1124 at 2. The Court then granted preliminary approval to the Settlement Agreement, finding it to be "fair, reasonable, and adequate to the Class Members." *Id.* The Court approved Settlement Services, Inc. ("SSI") as the Settlement Administrator, approved the form and content of the Class Notices and attached forms, and directed that notice be issued. *Id.* at 2-3. A final fairness hearing, initially set for November 4, 2019. *Id.* at 2-3, was rescheduled for January 22, 2020 at the Parties' request. Doc 1129.

Pursuant to ¶28 of the Settlement Agreement, Defendants served the notice required by the Class Action Fairness Act, 28 U.S.C. § 1715, on the U.S. Department of Justice and the attorneys general of all states in which Class Members reside within 30 days of the filing of the preliminary approval motion..[3]

On August 16, 2019, SSI mailed a total of 19,955 Notices, 18,860 to non-opt-in

---

[3] Decl. of R. Mussig to be filed by counsel for Defendants.

2

Class Members and 1,095 to opt-in class members. It also emailed 6,455 Notices to class members for whom email addresses existed in Swift's or Class Counsel's records (5,400 to non-opt-ins and 1,055 to opt-ins). Doc. 1134 (Patton ¶3). In addition, Swift sent Qualcomm messages on three consecutive days to then current employee Class Members alerting them to the Settlement Agreement. Decl. of R. Mussig. A total of 6,099 notice packets sent by mail were returned as undeliverable (30%) and a total of 540 email notices were confirmed undeliverable (8%). Doc 1134 (Patton ¶4). SSI and Class Counsel then undertook extensive efforts to locate and provide notice to Class Members who may not have received the original mail or email Notice. These efforts included:

1.   Performing skip traces which resulted in 5,356 Notices being re-mailed to a possible new address per ¶11d of the Agreement. Doc 1134 (Patton ¶4). In addition, more than 500 Notices were re-mailed at the request of the Class Member who had heard of the Settlement and contacted the Settlement Administrator. *Id.*

2.   Beginning in mid-September and continuing until December 13, 2019, Class Counsel attempted to locate and call, the 14,736 Class Members who had not yet filed claim forms or opt-out requests to remind them of the Settlement and the December 14, 2019 opt-out and objection deadline. Doc 1131 (Getman ¶¶22-25). In addition, on November 1, 2019, Class Counsel mailed a postcard reminder to those Class Members. *Id.* Of the 14,736 Class Members that counsel attempted to contact through these efforts, 3,444 filed claims totaling $18,744,000 in Settlement Awards. *Id.*

3.   In addition to making extensive efforts to remind Class Members of their right to file a claim or opt-out of the settlement, Class Counsel and SSI answered thousands of emails and calls from Class Members requesting information regarding the Settlement and the method of calculating Settlement Awards. Doc 1131 (Getman ¶23).

**B.    Results of Class Notice**

To date, a total of 8,656 Class Members out of 19,955 filed claims to participate in

the Settlement (43%). Doc 1134 (Patton ¶9). That figure includes 1,094 individuals[4] who had previously opted into the case and 7,562 non-opt-in Class Members. *Id.*

The "Minimum Individual Settlement Awards" for these 8,656 participating Class Members total $49.87 million out of the $70 million[5] available for distribution to the class—i.e., 71% of the total claim value. *Id.* Pursuant to the Settlement Agreement ¶3, because less than 80% of the total claim value was claimed, all Participating Class Members' awards have been increased to the "Maximum Individual Settlement Award" amount. As a result of this increase, the Participating Class Members' Settlement Awards will total more than $62,339,469 (89% of the available $70 million). Doc 1131 (Getman ¶12).

During the Notice period 27 Class Members challenged the amount of their Settlement Awards. Doc 1134 (Patton ¶7). Pursuant to Paragraph 11.b. of the Settlement Agreement the Parties considered the evidence in support of these challenges and agreed that none of the challenges demonstrated error in the allocation calculation or the Swift data used to make the calculations. (Supp. Decl. Tuddenham ¶3).

In addition, during the Notice period 125 individuals who were not sent Class Notices filed claims asserting that they should have been included on the Class List (hereafter "omitted claimants"). Doc 1134 (Patton ¶8). The Settlement Administrator requested further information from these individuals. *Id.* When an "omitted claimant" sent in additional information, the Settlement Administrator forwarded the claim to the Parties to determine whether the claimant was a Class Member. *Id.* After the Parties reviewed the evidence relating to these claims the Parties agreed that 27 of these "omitted claimants" (10 solo drivers and 17 team drivers) fell within the class definition and should receive

---

[4] Nine of the individuals who filed consent to sue forms in this case turned out not to be members of the Class. They have been informed that they are not covered by the settlement or the release of claims set forth therein. Doc 1131 (Getman ¶7, Ex. 3).

[5] In the Motion for Preliminary Approval, Class Counsel indicated they would seek $29,000,000 in fees, $250,000 in service awards and up to $750,000 in costs, leaving $70 million available to the Class out of the total $100 million Settlement Fund.

1   Settlement Awards. (Supp. Decl. Tuddenham ¶5) .

2          Plaintiffs requested that the Settlement Administrator provide the Parties with copies

3   of the claim forms filed by "omitted claimants" who did <u>not</u> respond to the Administrator's

4   request for additional information, but Defendants objected. *Id.* ¶6. The Parties were unable

5   to reach agreement on this issue so on January 7, 2020, Class Counsel asked the

6   Administrator to compare the information on these "omitted claimants" forms with all of

7   the fields of information on the Class List. *Id.* ¶6. The Administrator performed that

8   comparison and on January 8,2020 advised the Parties that matching information in the

9   data provided by Swift indicated that an additional 31 "omitted claimants" may, in fact, be

10  Class Members. The Administrator transmitted those 31 claim forms to the Parties on

11  January 9, 2020 and the Parties are reviewing them to determine if any of the 31 should be

12  treated as a Class Member and will so advise the Court. (Supp. Decl. E. Tuddenham ¶7).

13         In addition to investigating these additional 31 "omitted claimants," the Parties are

14  attempting to resolve how to calculate Settlement Awards for the 27 "omitted claimants"

15  they agree are Class Members (and any individuals among the additional 31 who are

16  eventually determined to be part of the Class). Pursuant to ¶24 of the Settlement Agreement,

17  the Parties are seeking to reach agreement on a method for calculating awards for these

18  individuals given that (a) many of the "omitted claimants" are team drivers and the

19  Settlement Agreement Formula does not provide a method for calculating awards for teams

20  of drivers and (b) earnings and deductions data used by the Formula to calculate awards is

21  not available for other "omitted claimants" who were solo drivers,. *Id.*  These discussions

22  affect, at most, 58 claimants (27 +31), and likely fewer. *Id.* The Parties will file a

23  supplemental declaration explaining the resolution of these issues including the allocations

24  to be provided to "omitted claimants" prior to the January 22 Final Fairness Hearing. *Id.*

25         A total of six Class Members filed objections to the settlement. Doc 1134-3. These

26  objections are discussed in detail below. At least 6, and possibly up to 56 Class Members,

requested to opt-out of the Settlement (0.03%-0.28% of the total).[6] These individuals are deemed non-participants in the Settlement and their rights are neither waived nor affected by the Settlement terms. The names of the 6 opt-outs who have been identified to date are set forth on Ex. B to the Decl. of M. Patton, Doc 1134-2.

## LEGAL STANDARD FOR FINAL APPROVAL

Class action settlements must be approved by the Court. Fed. R. Civ. P. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." *Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992). There is a strong policy favoring settlement of class actions. *Id.* Nevertheless, the Court must examine the settlement as a whole for overall fairness. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998) *overruled on other grounds by Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338 (2011). In this regard, a court must conduct a three-step inquiry. *See Adoma v. Univ. of Phoenix, Inc.,* 913 F.Supp.2d 964, 972 (E.D. Cal. 2012). First it assesses whether the parties have met the notice requirements of the Class Action Fairness Act. *Id.* Next it determines whether the notice requirements of Fed. R. Civ. P. 23(c)(2)(B) have been satisfied. *Id.* Finally, the Court determines whether the Class should be finally certified as a Rule 23(b)(3) class and whether the proposed settlement is fair, reasonable, and adequate under Rule 23(e)(3).

## ARGUMENT

### I.   The Notice and Claims Process Satisfied Rule 23(c) and Due Process

The Court previously approved, as to form and content, the Class Notices to be distributed to the Class and found that the notice plan set forth in the Settlement Agreement

---

[6] As explained in the Getman Decl., Doc 1131 ¶8, Attorney P. Cullen filed timely opt-outs on behalf of 50 of his clients. However, he did not provide social security numbers for these individuals so that it is not possible to match each name with the Class List. Nevertheless, it appears that many of the 50 are not Class Members and do not need to be excluded. The Settlement Administrator has requested Attorney Cullen to provide the social security numbers and the matter is under review. Decisions regarding which Class Members, if any, should be excluded from the Settlement will be provided to the Court through a supplemental declaration.

was "the best practicable under the circumstances, complying fully with the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Constitution of the United States, and any other applicable law." Doc 1124, at 2. The declaration from SSI, Doc. 1134 attests to the fact that the Settlement Administrator carried out the Notice procedures specified in the Settlement Agreement in all respects. *Id.* In addition, although not required by terms of the settlement, Class Counsel voluntarily undertook extraordinary efforts to ensure that all Class Members who could be contacted were made aware of the Settlement Agreement and were afforded an opportunity to opt-out or file a claim. Doc 1131 (Getman ¶¶22-27). This effort resulted in a much higher claim rate than would otherwise have been the case. No Class Member has questioned or objected to the adequacy of the Notice. Accordingly, the Court should find that the form and method for notifying the Class Members satisfied the requirements of Rule 23(c)(2)(B) and due process and constituted the best notice practicable under the circumstances.

## II.   The Class Is Properly Certified

Before granting final approval of a class action settlement agreement, the Court must determine whether the proposed class can be certified. *Amchem Prods. v. Windsor,* 521 U.S. 591, 520 (1997). The Court previously conditionally certified the Settlement Class. Doc 1124, at 2. Nothing has changed in the interim which would call into question the propriety of that ruling. All of the criteria under Rule 23(a) and (b)(3) continue to be met. The relative efficiency with which the Parties have dealt with Notice and questions arising during the Notice period attests to the appropriateness of class treatment in the settlement of this case. Accordingly, the Settlement Class certified in the Preliminary Approval Order should be granted final certification for purposes of effectuating the Settlement Agreement.

## III.   The Settlement Is Fair, Reasonable, and Just, and Deserves Final Approval

As stated in the Advisory Committee Notes to the 2018 amendments to Rule 23, Subdivision (e)(2), the central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. After noting that the Circuit courts have developed

lists of factors to shed light on these concerns, (many with differing vocabulary and some without change for "thirty or forty years") and opining that lengthy lists can distract from "core concerns," Rule 23(e) was changed to focus on the core procedural and substantive concerns that should guide the approval decision. As amended, Rule 23(e)(2) provides that if a settlement proposal would bind class members the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate" after considering whether (A) class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

In applying the amended rule several courts continue to utilize earlier precedent in conjunction with the revised Rule 23 factors.[7] All of the key concerns addressed in Rule 23(e) are also encompassed in the factors consistently applied in this Circuit as enumerated in *Churchill Village LLC v. Gen Elec. Co.,* 361 F.3d 566, 575 (9th Cir. 2004) and analyzed at length in the Joint Motion for Preliminary Approval Doc 1115, at 11-23. These factors are: 1) the strength of Plaintiffs' case; 2) the risk expense, complexity, and likely duration of further litigation; 3) the risk of maintaining class action status throughout the trial; 4) the amount offered in settlement; 5) the extent of discovery completed and the stage of the

---

[7] *See, e.g., Zamora Jordan v. Nationstar Mortg., LLC*, 2:14-CV-0175-TOR, 2019 WL 1966112, at *2 (E.D. Wash. May 2, 2019) ("While the Ninth Circuit has yet to address the amendment to Rule 23(e)(2), the Court observes that the factors in amended Rule 23(e)(2) generally encompass the list of relevant factors previously identified by the Ninth Circuit"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019).

proceedings; and 6) the experience and views of counsel and the reaction of the class members to the proposed settlement. *See In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 944 (9th Cir. 2015). To summarize briefly:

1.   Although Plaintiffs' case has strengths, notably the Court's finding that Plaintiffs were employees of Defendant Swift, that ruling is on appeal. Considerable other difficulties lie ahead were the case to go to trial, including difficult legal issues regarding tolling of the FLSA statute of limitations, the application of state wage and hour laws to interstate long-haul truck drivers, the novelty of Plaintiffs' forced labor claim, and difficulties of proof and issues of damages for contested hours of work. The uncertainties surrounding Plaintiffs' claims weigh heavily in favor of granting final approval.

2.   Given that this case has been intensely litigated for nearly ten years and given the multiplicity and complexity of the issues still to be resolved, it is clear that, absent a settlement, this case is likely to go on for many more years before it can be brought to a conclusion. Throughout that period, it will be risky and extraordinarily expensive for both sides. That fact alone strongly supports final approval of the settlement. *Nat. Rural Telecomms. Coop v. DirecTV, Inc.,* 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("Avoiding such a trial and the subsequent appeals in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation.").

3.   While the Settlement Class clearly satisfies the requirements of Rule 23(b)(3) for settlement purposes, if the case were to go to trial, manageability problems, particularly with respect to the proof of damages, would have to be addressed. Plaintiffs believe that such problems could be overcome, but success on that point is by no means assured. The proposed Settlement avoids the risks of obtaining certification in the absence of a settlement and the risks of decertification and thus favors approval of the settlement. *See Toys-R-Us-Delaware, Inc., Fair & Accurate Credit Trans. Act Litig.,* 295 F.R.D. 438, 452-53 (C.D. Cal. 2014) ("Avoiding the risk of decertification . . . favors approval of [a] settlement.").

4.   In light of the risks, expense, and delay of further litigation, the $100,000,000 amount offered in settlement of Plaintiffs' claims represents a fair, reasonable and just

result for the class members. The robust results of class notice offer strong confirmation of that conclusion: only 6 opt-outs have been confirmed (.03%), and only 6 objected (.03%) while a total of 89% of the $70 million in settlement funds available for distribution to class members was claimed and will be distributed if final approval is granted. That represents an average of $7,196 per participating class member, with some receiving more than $50,000 and at least one receiving $95,861. Doc 1131 (Getman ¶11). These statistics are a testament to the fact that the amount offered in Settlement is fair, reasonable and adequate and supports granting of final approval.

All of the Settlement Class Members are treated equitably relative to each other. The Formula for determining Individual Settlement Awards was fair and reasonable and applied equally to all 19,955 Class Members.[8] Doc 1132 (Tuddenham ¶¶9-16) The small number of objections filed (discussed below) do not call into question the essential fairness of the allocation formula. *See Id.*

In addition, all Settlement Class Members (except those who have chosen to opt-out of the settlement) will receive significant non-monetary benefits including release of all claims that Swift (and related entities) might have against them related to their contractor agreements or leases during the class period. Doc 1115-1 ¶15.b.iv. Swift has also agreed to cease collections efforts against class members who defaulted on their IEL leases and, upon request, to provide a letter to HireRight that defaults under the lease have been released and rescinded. *Id.* ¶15b.vi. This latter relief in particular is a considerable benefit to the class as a default has a negative effect on a driver's ability to be hired in the trucking industry.

5.   The Court authorized extensive discovery prior to considering the § 1 FAA exemption issue. In addition, in the course of settlement discussions the Parties exchanged an enormous amount of data, including all pay and deduction data for each individual class member (totaling over 250 gigabytes of raw data). Doc 1131 (Getman ¶21). This counsels

---

[8] As noted above, the Formula cannot be applied as written to the 27+ "omitted Class Members." The Parties are seeking to agree on allocations for these individuals that will treat them equitably vis a vis the other Class Members. (Supp. Decl. E. Tuddenham ¶7).

in favor of final approval "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Adoma,* 913 F.Supp.2d at 977 (citation omitted).

6.   The Settlement was negotiated at arm's length by experienced counsel all of whom support final approval of the Settlement as fair, reasonable, and adequate. Great weight should be accorded to that recommendation as counsel are the ones "most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomm. Coop.,* 221 F.R.D. at 528.

7.   Reaction of the Class Members is perhaps the most important factor for the Court to consider at the Final Fairness stage as it is the one aspect of the Settlement that could not be fully evaluated at the time of the Preliminary Fairness Hearing. Of the 19,955 class members, 8,656 (43%) have so far taken the steps necessary to receive a Settlement Award, between 6 and 56 chose to opt out of the case and only six (.03%) filed objections. Those statistics alone indicate an extraordinarily positive reaction from the class and strongly support final approval. *See Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 967 (9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement given" a 13.8% claims rate a .01% objection rate); *In re Volkswagen "Clean Diesel" Mktg Sales Prac. & Prod. Liab. Litig.,* No. MDL2672 CRB (JSC), 2017 WL 2212780 at *10 (N.D. Cal. May 17, 2017) aff'd 746 F.App'x. 655 (9th Cir. 2018) (low opt out and objection rate "strongly favors final approval."); *In re Apollo Grp. Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2012 WL 1378677, at *3 (D. Ariz. Apr. 20, 2012) ("[T]he absence of a large number of objections to a proposed class settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.") (quoting *Nat'l. Rural Telecomm.,* 221 F.R.D. at 529).

The 6 objections were filed by R. Hernandez, L. Dykes, J. Major, E. Turnage, S. Watts and M. Jordan. Doc 1134-3 (Ex. C to Decl. M. Patton). Each of the 6 objects to the amount of his or her Settlement Award, arguing that the allocation formula was flawed for various reasons because it should have given them a higher award. R. Hernandez states that

the formula should have given more to drivers who opted-in. Doc 1134-3, at 7-8. L. Dykes objects that Swift did not assign him many miles and that that should have been taken into account. *Id.,* at 3-6. J. Major objects that he made considerable weekly payments on his truck over the course of his employment, and that that those payments should have been considered in calculating his award. *Id.,* at 30. S. Watts objects that the formula should have taken into account insurance money she believes Swift received and should have paid to her as a result of an accident involving her truck. *Id.,* at 32-45. E. Turnage and M. Jordan assert they should have received more without specifying a reason. *Id.,* at. 9-29, 31.

These objections, while sincere, do not call into question the fairness of the Settlement Agreement. Most reflect a misunderstanding of the Settlement Allocation Formula. The Allocation Formula attempts to calculate the minimum-wage injury suffered by drivers, discounted by their chances of success in light of the statutes of limitations applicable to class members' claims. Thus, contrary to R. Hernandez' complaint, the allocation formula does give additional money to drivers who opted-in early because the formula treats their FLSA statute of limitations as tolled from the date they opted in; for that reason, their allocation is higher than a similar person who did not opt-in and whose limitations period was not tolled until later. Doc 1132 (Tuddenham at ¶¶11-12). L. Dykes' objection fails to recognize that the amount of revenue a driver received each week (which was based, in part, on the number of miles driven) was a key factor in determining each driver's Settlement Award. Thus, drivers, like Dykes, who were assigned lower mileage compared to their weekly fixed costs did receive higher Settlement Awards than drivers with similar costs who received more miles. *Id* at ¶14. J. Major's objection overlooks the fact that all of his weekly lease payments were considered in calculating his allocation because they were treated as deductions from his wages. *Id.* at ¶13. The more lease payments a driver made, the higher his award, everything else being equal. *Id.* S. Watts complaint fails to recognize that this is a class settlement seeking damages for common claims and that the allocation formula cannot and does not take into account each individual issue that a driver may have had with Swift, which is precisely why drivers were given the

opportunity to opt-out if they thought the formula failed to compensate them adequately. *Id.* at ¶15. As for Turnage and Jordan's general dissatisfaction, no matter what allocation formula is chosen, it is inevitable that it will tend to please some class members more than others. There is simply no way to avoid that. "It is the nature of a settlement, as a highly negotiated compromise . . . that it may be unavoidable that some class members will always be happier with a given result than others." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (internal quotation marks omitted). For this reason, courts recognize that a settlement allocation formula "need only have a reasonable, rational basis." *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. C-07-5944-SC, 2016 WL 3763382, at *6 (N.D. Cal. Feb. 29, 2016), *report and recommendation adopted in part,* No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016), *dismissed sub nom. In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 16-16368, 2017 WL 3468376 (9th Cir. Mar. 2, 2017); *Rieckborn v. Velti PLC*, No. 13-CV-03889-WHO, 2015 WL 468329, at *8 (N.D. Cal. Feb. 3, 2015) (same); *Vinh Nguyen v. Radient Pharm. Corp.,* No. 11–cv–00406, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) (same). Here, the formula, which is explained at length in the Parties' Joint Motion for Preliminary Approval, Doc 1115 at 8, 19-20, is both reasonable and rational.

       8.   In addition to the above factors, before granting final approval to a settlement, the Court must ensure that the settlement is not the product of collusion. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). In evaluating this concern, the Ninth Circuit examines three signs that may be indicative of collusion: (1) "when counsel receive a disproportionate distribution of the settlement or when the class receives no monetary distribution but class counsel are amply rewarded;" (2) "when the parties negotiate a 'clear sailing' arrangement apart from class funds;" and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* at 947 (citations omitted).

      Here none of the red flags indicative of collusion is present. The class is receiving significant monetary benefits; likely far more (and far sooner) than they would have

received if the case had been litigated and the class not certified. Further, Counsel's share of the Settlement Fund is to be determined by the Court; it is not separate from the class funds and there is no "clear sailing" agreement. The ultimate fee determination will have no impact on the effectiveness of the Agreement. The amount sought by counsel (29% of the $100 million fund) is not disproportionate compared to the monetary benefits conferred on the class and, in the event the fees are reduced below 29%, the reduction would be added to the amounts available for distribution to the class; only the unclaimed portion of the $70 million available for distribution (approximately $7 million or 8%) will revert to Defendants. Most importantly, the Settlement Agreement was arrived at after nine years of vigorously contested litigation and over a year of arm's-length settlement negotiations conducted with the assistance of an experienced and well-respected neutral mediator, Mark Rudy. These circumstances, and the Settlement as a whole, belie any suggestion of collusion. *See Gatula v. CRST Internat'l., Inc.,* No. CV11-1285 VAP (OPx), 2015 WL 12697656 at *9 (C.D. Cal. Aug. 26, 2015) (settlements reached with the help of a mediator are likely non-collusive; *Harris v. Vector Marketing Corp.,* C08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (same); *Satchell v. Fed Express Corp.,* 2007 WL 1114010 at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

In sum, all of the relevant *Churchill* and Rule 23 substantive and procedural factors strongly support the conclusion that the Settlement Agreement is fair, reasonable, and adequate. Accordingly, the Court should grant final approval of the Settlement Agreement. Once approved, two other matters that do not negate final approval remain to be determined: the Service Awards for the Named Plaintiffs and Plaintiffs' motion for attorneys' fees and costs. These issues are discussed below.

## IV.  The Requested Service Awards Are Fair and Reasonable

As provided for in the Settlement Agreement Named Plaintiffs seek service awards of $50,000 each for their services to the class. Doc 1115-1 ¶5. The relevant facts and persuasive legal authority for these awards is set forth in the declarations of the Named

Plaintiffs, submitted herewith and in the Motion for Preliminary Approval, Doc.1115, at 24-28, and will not be repeated here. By way of brief summary, service awards are permitted "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez,* 563 F.3d at 958-59; *see* cases cited at Doc. 1115, at 24, 27. The propriety of incentive payments are determined "using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" *Staton v. Boeing,* 327 F.3d 938, 977 (alterations in original) (quoting *Cook v. Niedart,* 142 F.3d 1004, 1016 (7th Cir. 1998). *See also McNeal v. RCM Techs. (USA) Inc.,* No. 2:16-CV-05170-ODW-SS, 2017 WL 2974918, at *1 (C.D. Cal. July 12, 2017) (adding as a factor to be considered the relationship between the amount of the service award, the total fund, and the amounts received by individual claimants).

As explained in their declarations, the Named Plaintiffs have engaged in dedicated, difficult work over the past ten years to protect the interests of the class, including investing considerable time and energy to prepare for and attend their depositions, dependably communicating with counsel in literally hundreds of phone conversations and hundreds of emails, providing numerous declarations in support of the many motions in the case, and answering interrogatories and requests to produce documents. All of these efforts posed significant problems for the Plaintiffs who were constantly on the road in locations that were often far from home or other convenient places to communicate and transmit documents to counsel. Attending their depositions required negotiations with their current employers for time off from work with the associated loss of pay, both of which posed not only financial hardship but genuine risks of retaliation. It is difficult for non-truckers to understand the logistical complications involved in planning to be in a specific location on a specific date, when the driver is required to be available to be sent anywhere in the

continental U.S. at any time, obligated to remain with their truck, which can be routed anywhere, subject only to the company's needs at the moment. The size of the Settlement Fund itself speaks volumes about the degree to which the efforts of the Named Plaintiffs in staying with this suit for ten years have benefitted the proposed class.

There is no question that the Class Members benefitted significantly from these efforts of the Named Plaintiffs. In large measure this litigation has been an endurance test that not only required time and effort from the Named Plaintiffs but required consistent dedication to the litigation over an extraordinarily long period of time. If they at any point had lost interest or given up the results for the class would have been negligible at best. Their persistence (along with the equally dedicated efforts of their attorneys[2]) resulted in a remarkable settlement that will benefit thousands of drivers. Certainly, the results of the Settlement Agreement and the absence of any objection by any class member fully support the requested service awards.

As for Plaintiffs' fears of workplace retaliation, the declarations make clear that the Named Plaintiffs faced very real risks by publicly stepping forward to sue their employer. *See also* Doc 1131 (Getman ¶¶53-60). They knew that Swift, as the largest truckload carrier in the U.S., was a formidable opponent and the claims in this case could be expected to be well-circulated in the industry. *Id.* Few truckers would risk putting their names on such a suit, particularly given the fact that, for ever after, a google search will reveal the lawsuit and the Plaintiffs who brought it. *Id.*

Many meritorious suits are never brought because individual workers will not take the risks that the Named Plaintiffs in this case did, let alone make the extraordinary commitment to stick with the suit over the many years that class litigation often takes. *Id.* at ¶56 (explaining that Plaintiffs' counsel regularly hears from individuals who call to learn of their rights, but who ultimately do not step forward to assert them, due to fear of long-

---

[2] It is common in cases of long duration, that Plaintiffs will lose hope, become disillusioned with the Courts, their counsel, their claims, and will doubt that persistent efforts will be repaid given what appears to be long odds of success.

term consequences in publicly suing one's employer). For this reason, it is extremely important to the FLSA's remedial purposes, that individuals who do in fact assume such risks to vindicate the rights of the class be compensated for those risks.

Perhaps the most compelling evidence in support of the awards is the fact that no class member has objected to the amount of the service awards. As a result of the Court's order granting preliminary approval of the Settlement Agreement, the Notices sent to Class Members specifically informed them that Plaintiffs would seek up to $50,000 in incentive awards for the Named Plaintiffs "in addition to their regular share of the Settlement Funds." Doc 1109-3 at 4. Despite being given the opportunity to voice concerns over the amount of the incentive awards, no member of the class objected. Since the Class Members themselves are the ones most familiar with the risks that the Named Plaintiffs took in coming forward to represent the Class, and the benefits that the Class received as a result of those efforts, the complete absence of objections supports the awards.

Courts regularly award large service payments in large-fund cases, particularly where the awards will not dilute the fund and are not excessive in light of the awards to class members. *See* cases at Doc. 1115, p. 27. *See also Carlin v. DairyAmerica, Inc.,* 380 F.Supp.3d 998 (E.D. Cal., 2019) (granting incentive awards of $45,000 to four class representatives after 10 year litigation and settlement of $40 million, where they benefited the class through active participation in the case and took risks regarding employment.); In this case the $50,000 awards sought by Plaintiffs represent only a very small fraction of the Total Settlement Fund—.025% (less than that approved in *In re Online DVD-Rental*), and they are less than some of the individual awards that other class members will receive. *See* Doc 1131 (Getman ¶11) (settlement awards range as high as $95,861). Here, the individual allocations for all five of the Named Plaintiffs are less than the *average* award for opt-in claimants ($9,034), which further supports the requested service awards. (Supp. Decl. E Tuddenham ¶2).

Finally, the amount of the incentive awards is within the range approved in similar cases. *See Cilluffo v. Central Refrigerated Services, Inc.,* ED12cv886 VAP (OPx) ECF No.

298, at 19-22 (C.D. Cal. Apr. 3, 2018) (approving awards of $50,000 to named plaintiff truck drivers in six year litigation alleging they were misclassified as independent contractors ); *Nitsch v. Dreamworks Animation SKG,* Case No. 14-CV-04062-LHK. 2017 WL 2423161 at *14 (N.D. Cal. 2017) (awards of $80,000 and $20,000); *Beaver v. Tarsadia Hotels,* No. 11cv1842-GPC-KSC, 2017 WL 4310707, at *7-8 (S.D. Cal. Sept. 28, 2017) ($50,000 service awards); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D. Cal. 1995) (service award of $50,000). *See also Marchbanks Truck Serv. v. Comdata Network, Inc*., Case No. 07-CV-1078, ECF No. 713 at 2, 8 (E.D. Pa. July 14, 2014) (in $130 million settlement, approving service award of $150,000 to one class representative and awards of $75,000 to two other class representatives); *In re Titanium Dioxide Antitrust Litig.,* No. 10cv318 RDB, 2013 WL 6577029 at *1 (D. Md. Dec. 12, 2013) (awarding $125,000 to lead class representative out of $163.5 million settlement); *In re High-Tech Employee Antitrust Litig.,* No. 11cv2509-LHK, 2015 WL 5158730, at *18 (N.D Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 service awards in case with $415 million settlement fund and collecting similar "mega-fund" cases).

## V.    Plaintiffs' Requested Fees and Costs Are Fair and Reasonable.

If the Court grants final approval to the Settlement Agreement, consideration of an award of attorney's fees and costs to class counsel is appropriate. Plaintiffs have filed a separate motion for fees and costs. Based on the arguments therein, Plaintiffs urge the Court to grant final approval to Plaintiffs' request for $29,000,000 in attorneys' fees and $116,541.96 in costs.

## VI  The Settlement Administration Costs Are Fair and Reasonable

As set forth in the Declaration of M. Patton, Doc 1134 at ¶10, the Settlement Administrator has billed Swift $215,203 as of Dec. 30, 2019 and anticipates billing a total of $270,000 to complete its duties under the Settlement Agreement. Although Swift pays these amounts to the Settlement Administrator, the amounts are part of the $100,000,000 Fund and must be approved by the Court. Given the size of this class and the extraordinary efforts SSI has made disseminating Notice, and will make issuing Settlement Awards as

well as calculating and reporting withholding taxes the $270,000 in Costs are reasonable and should be approved.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request the Court to: (1) grant certification of the Settlement Class; (2) find that the Settlement Agreement is fair, reasonable and adequate; (3) grant final approval to the Settlement Agreement and the allocations to Class Members calculated pursuant thereto; (4) grant each Named Plaintiff a service award of $50,000; (5) grant Plaintiffs' Motion for Attorneys' Fees and Costs in the amount of $29,000,000 in fees and $116,541.96 in costs; and, (6) approve the costs of Settlement Administration in the amount of $270,000.

Respectfully submitted this 9th day of January 2020.

**Martin & Bonnett, P.L.L.C.**
By: s/Susan Martin
Susan Martin
Daniel Bonnett
Jennifer Kroll
4647 N. 32nd St. Suite 185
Phoenix, Arizona 85018
Telephone: (602) 240-6900

Dan Getman  (*pro hac vice)*
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, NY 12561
Telephone: (845) 255-9370

Edward Tuddenham (*Pro Hac Vice*)
23 Rue du Laos
75015 Paris, France

ATTORNEYS FOR PLAINTIFFS